## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| iGPS COMPANY LLC,[1] | ) Case No. 13-11459 (     ) |
| | ) |
| Debtor. | ) |
| | ) |

## DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, AND (C) GRANTING ADEQUATE PROTECTION TO PURCHASING SECURED PARTY

iGPS Company LLC ("iGPS"), as the debtor and debtor in possession in the

above-captioned chapter 11 case (the "Debtor"), files this motion (the "Motion") pursuant to

sections 105(a), 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§

101, et seq. (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules") for entry of an interim order (substantially in the form attached

hereto as Exhibit "A", the "Interim Order") and a final order (the "Final Order" and together

with the Interim Order, the "DIP Orders") (i) (a) authorizing the Debtor to enter into a senior

secured, superpriority debtor-in-possession financing facility, in an amount up to $12 million (as

amended, modified or otherwise in effect from time to time, the "DIP Facility"), substantially on

the terms set forth in the debtor-in-possession credit agreement attached as Exhibit "1" to the

Interim Order (as amended, supplemented, or otherwise modified and in effect from time to time,

---

[1]    The last four digits of iGPS Company LLC's federal tax identification number are 6297.  The location of iGPS Company LLC's corporate headquarters and the service address is 225 E. Robinson Street, Suite 200, Orlando, Florida.

the "DIP Credit Agreement,"[2] together with all other agreements, documents, notes, certificates,

and instruments executed and/or delivered with, to or in favor of the DIP Secured Parties (as

defined below), the "DIP Financing Agreements"), and (b) granting the DIP Liens and the DIP

Superpriority Claims (in each case, as defined below); (ii) authorizing the interim use of Cash

Collateral (as defined below) on a consensual basis on the terms set forth in the Interim Order;

(iii) granting "adequate protection" to the Purchasing Secured Party (as defined below);

(iv) modifying the automatic stay as imposed by section 362 of the Bankruptcy Code to the

extent necessary to implement and effectuate the terms of the DIP Facility and the DIP Orders;

and (v) scheduling a final hearing with respect to the relief requested herein (the "Final

Hearing"). In support of the Motion, the Debtor relies upon and refers this Court to the

Declaration of Walter Myers in Support of First Day Motions and Applications (the "Myers

Declaration"), and respectfully represents as follows:

**Preliminary Statement**

1.      Prior to the commencement of this chapter 11 case (the "Chapter 11

Case"), the Debtor's operations were funded, in part, with the proceeds of the Prepetition Credit

Facility (defined and described more fully in the Interim Order) among iGPS, as borrower (the

"Borrower"), certain financial institutions from time to time party thereto, as lenders

(collectively, the "Prepetition Lenders"),[3] and Bank of America, N.A., as administrative and

collateral agent (the "Prepetition Agent"). The indebtedness of the Debtor under the Prepetition

---

[2]      Capitalized terms used but not defined herein shall have the meanings given to them in the DIP Credit Agreement or, if not defined in the DIP Credit Agreement, the Interim Order.

[3]      As of the Petition Date, the following institutions were Prepetition Lenders under the Prepetition Credit Facility: Morgan Stanley Bank, N.A., Barclays Bank PLC, JPMorgan Chase Bank, N.A., Suntrust Bank, TD Bank, N.A., Branch Banking and Trust Company, Wells Fargo Bank, N.A., and Bank of America, N.A.

Credit Facility (the "Prepetition Debt") is secured by liens on substantially all of the Debtor's assets (the "Prepetition Collateral").

2.      Immediately prior to the Petition Date, the Prepetition Agent and the Prepetition Lenders agreed to sell their claims and interests under the Prepetition Credit Facility to iGPS Logistics LLC (the "Purchasing Secured Party"), a Delaware limited liability company formed as a joint venture by and among Balmoral, One Equity Partners, a shareholder of SAS, and Jeff and Robert Liebesman. Simultaneously therewith, the Purchasing Secured Party and the Company entered into that certain Asset Purchase Agreement dated June 4, 2013 (the "Purchase Agreement") pursuant to which the Purchasing Secured Party has agreed to serve as the stalking horse bidder for the sale of substantially all of the Debtor's assets.

3.      As set forth below and in the Myers Declaration, the Debtor is seeking to sell substantially all of its assets to the Purchasing Secured Party under section 363 of the Bankruptcy Code, subject to higher or better offers pursuant to a court supervised auction process.[4] Assuming the Court approves such sale on the schedule proposed by the Debtor, the Debtor expects to consummate the sale within approximately 30 to 45 days.

4.      During that time, the Debtor requires the use of cash, which comprises the cash collateral of the Purchasing Secured Party securing the Prepetition Debt within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"),[5] and the proceeds of the

---

[4]      Contemporaneously herewith, the Debtor is filing a motion to, among other things, approve bidding procedures in connection with the sale of substantially all of the Debtor's assets.

[5]      Section 363(a) of the Bankruptcy Code defines "cash collateral" as:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title[.]

proposed DIP Facility, mainly to fund day-to-day operations and maintain and preserve the value

of the Debtor's business (including the Prepetition Collateral), pending the sale of the Debtor's

assets, in all cases for the benefit of the Debtor's estate and creditors, including the Purchasing

Secured Party. The availability to the Debtor of sufficient working capital and liquidity to

finance its operations is vital to its ability to maintain such operations and is necessary for the

preservation of the value of the estate as a whole, pending the contemplated sale of the Debtor's

assets.

        5.      The Debtor seeks authority during the interim period, and pursuant to the

terms of the Interim Order, to use Cash Collateral. It further seeks authority to borrow up to $6

million under the proposed DIP Facility during the interim period, and up to $12 million upon

entry of the Final Order.

        6.      As discussed more fully below, the Debtor proposes to secure its

obligations under the DIP Facility by, among other things, granting to the proposed lender under

the DIP Facility (the "DIP Lender"), first, junior, and first and priming liens on, and security

interests in, substantially all of the Debtor's assets, with certain exceptions and, in each case,

subject to the "Carve Out", as defined and described more fully below. The DIP Credit

Agreement and the DIP Orders also provide the DIP Lender with allowed superpriority

administrative expense claims.

        7.      The DIP Credit Agreement and the DIP Orders provide for, among other

things, budgetary constraints on the use of Cash Collateral and the proceeds of the DIP Facility.

The proceeds of the DIP Facility will provide credit for up to approximately three months to fund

the Chapter 11 Case.

---

11 U.S.C. § 363(a).

8.     The Purchasing Secured Party is also provided adequate protection under the proposed DIP Orders, solely to the extent of any diminution in the value of its interests in the Prepetition Collateral as more fully set forth in the DIP Orders (and subject to the Carve Out and the Debtor's preserved rights pursuant to section 506(c) of the Bankruptcy Code), in the form of replacement security interests in and liens on substantially all of the Debtor's assets and property (with certain exclusions) and superpriority claims (in each case, in accordance with their relative priorities, and junior and subject to the liens and superpriority claims granted to the DIP Lender), as well as payment of reasonable professional fees and expenses incurred by the Purchasing Secured Party under the Prepetition Credit Facility.  If the Debtor is unable to obtain approval of the use of Cash Collateral and the DIP Facility, its ability to consummate the sale of its assets will be jeopardized, substantially reducing recoveries to all creditors.  Entry of the Interim Order and, after the requisite notice and the Final Hearing, the Final Order is therefore (a) critical to the Debtor's ability to preserve and maximize the value of its assets in a sale of substantially all of its assets under section 363 of the Bankruptcy Code, (b) in the best interests of the Debtor and its estate, and (c) necessary to avoid irreparable harm to the Debtor, its creditors and its assets, business, goodwill, reputation and employees.  Furthermore, access to the Cash Collateral and the proceeds under the DIP Facility is necessary to avoid immediate and irreparable harm to the value of the Debtor's assets pending the sale.  The Debtor, therefore, respectfully requests that this Motion be granted.

## Bankruptcy Rule 4001 Statement

9.     In accordance with Bankruptcy Rule 4001, the following sets forth a

concise summary of material terms of the proposed DIP Facility and the DIP Orders:[6]

| | |
|---|---|
| BORROWER: | iGPS, as Borrower (the "Borrower") |
| DIP LENDER: | Crystal Financial LLC |
| DIP FACILITY: | Superpriority secured debtor-in-possession credit facility in the aggregate principal amount of up to $12 million. |
| AVAILABILITY: | Up to $6 million in the aggregate under the DIP Facility will be available upon entry of the Interim Order.  Interim Order ¶ 3. |
| CLOSING DATE: | Upon satisfaction or waiver of the conditions precedent set forth in Section 4.01 of the DIP Credit Agreement, including Court approval of the Interim Order. DIP Credit Agreement § 4.01. |
| MATURITY DATE: | The earliest to occur of (a) August 30, 2013, (b) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Aggregate Commitments are irrevocably terminated (or deemed terminated) upon the occurrence of an Event of Default, (c) the termination of the Commitments in accordance with the provisions of Section 2.05 of the DIP Credit Agreement, (d) the date which is thirty (30) days following the Closing Date, unless a Final Borrowing Order has been entered on or prior to such date, (e) a disposition of all or substantially all of the Loan Parties' assets under section 363 of the Bankruptcy Code, or (f) the Consummation Date. DIP Credit Agreement §§ 1.01, 2.04(d). |
| USE OF PROCEEDS: | To fund the Debtor's day-to-day operations and general corporate purposes and to maintain and preserve the Debtor's assets.  DIP Credit Agreement § 7.11. |
| AGREED BUDGET: | The Debtor's use of the DIP Facility proceeds will be in accordance with a detailed budget (the "Agreed Budget") providing financial projections for the Loan Parties covering the period from the Petition Date through the Termination Date on a weekly basis, which projections shall include, at a minimum, projected receipts, projected disbursements, projected Revolving Loan balance and projected Availability for the period covered thereby, substantially in the forms of the initial Budget previously approved by the Agent, and any subsequent projections furnished pursuant to Section 6.02(c) and (i) of the DIP Credit Agreement, in each case, in substance satisfactory to the Required Lenders.  DIP Credit Agreement §§ 1.01, 6.20.  The Agreed Budget is attached to the Interim Order as Exhibit "2". |
| INTEREST RATE: | LIBOR + 8.00%.  DIP Credit Agreement § 2.06(a). |

---

[6]     This summary is not intended to limit the terms of the DIP Facility, including in respect of any use of Cash Collateral, in each case as set forth in the DIP Credit Agreement, the Interim Order and the Final Order.  Reference should be made to the Interim Order, the DIP Credit Agreement and the Final Order for the full terms thereof.

FEES:

The Borrower agrees to pay to the DIP Lender, as applicable, the fees in the amounts and on the dates as set forth in the DIP Credit Agreement, including (a) a closing fee payable to the DIP Lender, for its own account, in the amount of up to $775,000; and (b) a commitment fee, payable to DIP Lenders' account, equal to the equivalent of 0.75% per annum of the difference between the Aggregate Commitments and the Total Oustandings, calculated and payable monthly.  DIP Credit Agreement § 2.07.

CARVE OUT:

The DIP Liens, DIP Superpriority Claim, the Prepetition Liens, the Prepetition Replacement Liens, and the Prepetition Superpriority Claims are subordinate only to the following (collectively, the "Carve Out"):

    a)  allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6) for fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee (collectively, the "U.S. Trustee Fees");

    b)  professional fees of Winter Harbor LLC, and professional fees and costs and expenses incurred by, professionals or professional firms retained by the Debtor and of any Committee(s) and out-of-pocket costs and expenses incurred by members of the Committee(s), always as provided in and as may be limited by the Carve Out Budget (defined below) and allowed by the Court (collectively, the "Case Professionals"), in an aggregate amount not to exceed the sum of $2,350,000.00;

    c)  In addition to the $2,350,000 referred to in subparagraph (b) above, there will be an additional $125,000 carved out for the fees and expenses incurred by Houlihan Lokey, the prospective financial advisor for the Debtor;

    d)  As used herein, "Carve Out Budget" means that budgetary projection of professional fees and expenses for Case Professionals, on an accrual basis, annexed to the Interim Order as Exhibit "3".

Notwithstanding anything to the contrary contained in the Interim Order, so long as no notice of the occurrence of a DIP Order Event of Default shall have been delivered, the payment of compensation and reimbursement of expenses allowed and payable under 11 U.S.C. §§328, 330 and 331, as the same may be due and payable and allowed by the Court, shall in all instances be limited by, and not exceed, the Carve Out. In addition, the amount of the Carve Out shall automatically reduce dollar-for-dollar by the amount of compensation allowed and paid during the Chapter 11 Case. Furthermore, the Committee (if formed) and its professionals shall be limited to the use of $25,000 of the Carve Out on account of fees incurred in connection with the investigation of any claim relating to the Prepetition Loan Obligations; provided that no portion of the Carve Out may be used by the Committee for the purpose of objecting

to the allowance of any portion of the Prepetition Loan Obligations and/or the validity and enforceability of the Prepetition Liens or to bring any Challenge. Nothing contained in the Interim Order shall limit payment of compensation and reimbursement of expenses allowed and payable under 11 U.S.C. §§ 328, 330 and 331, as the same may be due and payable and allowed by the Court even if they exceed the amounts contained in the Budget or the Carve Out Budget, out of funds other than the Carve Out, after (x) the DIP Obligations have been irrevocably paid in full to the DIP Lender, (y) the Prepetition Loan Obligations have been irrevocably paid in full to the Prepetition Lender, and (z) the Challenge Period Termination Date with no Challenge having been brought. Interim Order ¶¶ 29, 32.

DIP LIENS:

The DIP Lender is granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, priming first priority, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests and Liens (collectively, the "DIP Liens") senior and superior in priority to all other secured and unsecured creditors of the Debtor's estate, including the Prepetition Liens in favor of the Prepetition Lenders, except as otherwise provided in the Interim Order with respect to Permitted Prior Liens, and subject to the Carve Out, upon and to substantially all of the Debtor's assets (collectively, the "DIP Collateral") including, but not limited to Bankruptcy Recoveries (as defined below), but only (A) the full amount of any such recovery or settlement thereof to the extent arising under Section 549 of the Bankruptcy Code and (B) all amounts necessary to reimburse the DIP Lender for the amount of the Carve Out, if any, used to finance the pursuit of such recovery or settlement with respect to all Bankruptcy Recoveries, and no other Bankruptcy Recoveries. As used herein, "Bankruptcy Recoveries" shall mean any claims and causes of action to which the Debtor may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtor or the estate of the Debtor under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof. Interim Order, ¶ 6.

ADEQUATE
PROTECTION:

As adequate protection for the interest of the Prepetition Lenders in the Prepetition Collateral (including Cash Collateral) on account of the granting of and subordination to the DIP Liens, subordination to the Carve Out, the Debtor's use of Cash Collateral, and other decline in value arising out of the automatic stay or the Debtor's use, sale, depreciation, or disposition of the Prepetition Collateral, including the disposition of assets as contemplated in the 363 Sale Motion and the APA Motion, the Prepetition Lenders shall receive adequate protection as follows (collectively, "Adequate Protection"):

(a) Prepetition Replacement Liens. To the extent of the diminution in the value of the interest of the Prepetition Lenders in the Prepetition Collateral, the Prepetition Lenders shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code additional and replacement security

interests and Liens in the DIP Collateral (the "Prepetition Replacement Liens") which shall be junior only to the Carve Out, the DIP Liens securing the DIP Obligations, and Permitted Prior Liens.

(b) <u>Prepetition Superpriority Claim</u>.    To the extent of the diminution in the value of the interests of the Prepetition Lenders in the Prepetition Collateral, the Prepetition Lenders shall have an allowed superpriority administrative expense claim (the "Prepetition Superpriority Claim") which shall have priority (except with respect to (i) the DIP Liens, (ii) the DIP Superpriority Claim, and (iii) the Carve Out), in the Chapter 11 Case under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and, upon entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment. Other than the DIP Liens, the DIP Superpriority Claim, and the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Case, or in any Successor Case, will be senior to, prior to, or on parity with the Prepetition Superpriority Claim. The Prepetition Superpriority Claim shall be secured by Liens in the DIP Collateral which shall be junior only to the Carve Out and the DIP Liens securing the DIP Facility (for purposes hereof, such liens will be deemed part of the "Prepetition Replacement Liens").

(c) <u>Confirmation of Credit Bidding Rights</u>. Notwithstanding anything in the Interim Order to the contrary, the Prepetition Lenders, or any designee or assignee, shall have the absolute right, as contemplated by section 363(k) of the Bankruptcy Code, to "credit bid," in full or in part, the amount of its secured claim in connection with the sale of any of the Debtor's assets occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization. Interim Order ¶ 17.

<u>PRIORITY:</u>    Except to the extent expressly set forth in the Interim Order in respect of the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative

claims against the Debtor with priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(d), 726, 1113 and 1114 of the Bankruptcy Code and, upon entry of the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment. Interim Order ¶ 11.

| | |
|---|---|
| FINANCIAL REPORTING: | Monthly, a balance sheet of the Debtor and the related statement of income or operations, shareholders' equity, and cash flows, setting forth in each case in comparative form the figures for (i) the corresponding month of the Debtor's previous fiscal year and (ii) the corresponding portion of the previous fiscal year, all in reasonable detail, certified by a responsible officer of the Debtor as fairly presenting the Debtor's financial condition, results of operations, and shareholders' equity and cash flows as of the end of such the month in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes. DIP Credit Agreement § 6.01. |
| AFFIRMATIVE AND NEGATIVE COVENANTS: | Customary for financings of this type, as set forth more fully in the DIP Credit Agreement. DIP Credit Agreement §§ 6.01-6.23; 7.01-7.16. |
| REPRESENTATIONS AND WARRANTIES: | Customary for financings of this type, as set forth more fully in the DIP Credit Agreement. DIP Credit Agreement §§ 5.01-5.26. |
| EVENTS OF DEFAULT: | Customary and appropriate for financings of this type (subject to customary and appropriate grace periods), including, without limitation, failure to make payments when due, breaches of representations and warranties, defaults under other agreements or instruments of indebtedness, and noncompliance with covenants. DIP Credit Agreement § 8.01. |
| CONDITIONS PRECEDENT: | Include, _inter alia_: (i) execution and delivery of Loan Documents, (ii) satisfaction of the DIP Lender with the Agreed Budget, and (iii) entry of the Interim Order by the Court. DIP Credit Agreement § 4.01. |
| CONDITIONS TO EACH EXTENSION OF CREDIT: | Include, _inter alia_: (i) no default or event of default shall have occurred, (ii) accuracy of representations in all material respects, and (iii) the Interim Order, or following entry thereof, the Final Order shall be in full force and effect. DIP Credit Agreement § 4.02. |
| INDEMNIFICATION: | The Debtor shall indemnify the DIP Lender and any agent or sub-agent thereof (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Debtor arising out of, |

in connection with, or as a result of (i) the execution or delivery of the DIP Credit Agreement, any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder, the consummation of the transactions contemplated thereby, or the administration of the DIP Credit Agreement, (ii) any Revolving Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Debtor, or any Environmental Liability related in any way to the Debtor, (iv) any claims of, or amounts paid by the DIP Lender, a Blocked Account Bank or other Person which has entered into a control agreement with the DIP Lender thereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Debtor or any of the Debtor's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, or willful misconduct of such Indemnitee.  DIP Credit Agreement, § 10.04(b)

## Disclosure Pursuant to Bankruptcy Rule 4001 and Compliance with Local Rule 4001-2

10.    The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi), to the extent applicable, are set out in the following sections of the DIP Credit Agreement and the Interim Order:

- *Grant of a Priority or Lien on Property of the Estate*:  DIP Credit Agreement § 5.19; Interim Order ¶¶ 6, 7 (a)-(c).

- *Adequate Protection or Priority for a Claim that Arose Before Commencement of Chapter 11 Case*:  Interim Order ¶¶ 17-19.

- *Determination of Validity, Enforceability, Priority, or Amount of Claim that Arose Before Commencement of Case or of any Lien Securing the Claim*:  Interim Order ¶ E(4)(a).

- *Waiver or Modification of Bankruptcy Code Provisions or Applicable Rules Relating to Automatic Stay*:  Interim Order ¶ 27, 38.

- *Waiver or Modification of any Entity's Authority or Right to File Plan, Seek Extension of Exclusivity, Request Use of Cash Collateral or Request Authority to Obtain Credit*:  Not Applicable.

- *Establishment of Deadlines for Filing Plan, Approval of Disclosure Statement, Hearing on Confirmation or Entry of Confirmation Order*:  Not Applicable.

- *Waiver or Modification of Applicability of Nonbankruptcy Law Relating to Perfection of Lien on Property of Estate or on Foreclosure or Other Enforcement of Lien*:  DIP Credit Agreement § 10.20(c); Interim Order ¶¶ 12, 20-24.

- *Release, Waiver, or Limitation on any Claim or Other Cause of Action Belonging to Estate*: Interim Order ¶¶ E(4)(b)-(c), 28.

- *Indemnification of any Entity*:  DIP Credit Agreement §§ 3.01(c), 9.13, 9.15(c), 10.02(d), 10.04(b), 10.20(d).

- *Release, Waiver, or Limitation of any Right under § 506(c)*:  Interim Order ¶ 45.

- *Granting of a Lien on any Claim or Cause of Action Arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a) or 724(a)*:  Interim Order ¶ 6(b).

11.    Local Rule 4001-2 also requires that certain provisions of the DIP Facility be highlighted and that the Debtor provide justification for the inclusion of such highlighted provisions.  Set forth below are the provisions of the DIP Facility that are required to be identified in accordance with Local Rule 4001-2.  As discussed more fully below, the provisions of the DIP Facility as to which disclosure is required pursuant to Local Rule 4001-2 are all justified under the circumstances of this Chapter 11 Case.  The Debtor was unable to obtain financing on more favorable terms from sources other than the DIP Lender, and without such financing the Debtor's ability to consummate the sale of its assets will be jeopardized.  The Debtor thus respectfully submits that the facts and circumstances of this Chapter 11 Case demonstrates that the above-described provisions, which are set forth in greater detail below, are necessary and appropriate and should be authorized and approved by this Court.

12.    *Waiver of Claims Against Secured Creditor*.  Local Rule 4001-2(a)(i)(B) requires identification of provisions or findings of fact that bind the estate or other parties in interest with

respect to the validity, perfection or amount of the secured creditor's prepetition lien or the

waiver of claims against the secured creditor without first giving parties in interest at least

seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at

least sixty (60) days from the date of its formation to investigate such matters. Del. Bankr. L. R.

4001-2(a)(i)(B). In the Interim Order, the Debtor stipulates, among other things, that (a) the

Prepetition Indebtedness constitutes the legal, valid and binding obligations of the Debtor, not

subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim,

defense or Claim of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(b) the Debtor forever waives and releases any and all Claims, counterclaims, causes of action,

defenses or setoff rights against each of the Purchasing Secured Party, whether arising at law or

in equity, including any recharacterization, subordination, avoidance or other claim arising under

or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar

provisions of applicable state of federal law; (c) the Debtor has granted valid, binding, perfected,

enforceable, first priority liens upon and security interests in the Prepetition Collateral for the

benefit of the Purchasing Secured Party, not subject to avoidance, subordination,

recharacterization, recovery, attack, offset, counterclaim, defense or Claim of any kind pursuant

to the Bankruptcy Code or applicable non-bankruptcy law; and (d) the Purchasing Secured Party

is granted the Adequate Protection Liens, which are valid and perfected. Interim Order ¶¶ E(4),

17(a), 20-27.

   13. The Interim Order, however, is consistent with Local Rule 4001-

2(a)(i)(B), as it makes such admissions, stipulations and releases binding only if a party-in-

interest other than the Debtor (subject to such entity first obtaining standing from the Court) has

properly filed an adversary proceeding or contested matter by no later than the date that is the

earlier of (a) the deadline for the submission of competitive bids in connection with the Sale

Order Motion or (b) seventy-five (75) days from the entry of the Final Order (or, in the case of

the Committee, if any, sixty (60) days from the appointment of the Committee, if any), (x) to

object to or challenge (i) the validity, extent, perfection, or priority of the security interests and

Liens of the Prepetition Lender in and to the Prepetition Collateral, or (ii) the validity,

allowability, priority, status, or amount of the Prepetition Debt, or (y) to bring suit against the

Prepetition Lender in connection with or related to the Prepetition Debt, or the actions or

inactions of the Prepetition Lender arising out of or related to the Prepetition Debt.  Interim

Order ¶ 28.

   14. *Section 506(c) Waiver*.  Local Rule 4001-2(a)(i)(C) requires explicit

disclosure of provisions that constitute a waiver, without notice, of the estate's rights under

Bankruptcy Code section 506(c).  Del. Bankr. L. R. 4001-2(a)(i)(C).  The Interim Order provides

that, upon entry of the Final Order, the Debtor (and any successor thereto or any representative

thereof, including any trustees appointed in the Chapter 11 Case or any Successor Case) shall be

deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code as

against the DIP Lender and/or the DIP Collateral, and the Prepetition Lender and/or the

Prepetition Collateral, as applicable, or any other assets that serve as collateral for the DIP

Obligations or the Prepetition Loan Obligations.  Interim Order ¶ 45.  Notwithstanding anything

in the Interim Order to the contrary, the Prepetition Liens, the Prepetition Replacement Liens,

and the Prepetition Superpriority Claims shall be subject and subordinate to the Debtor's rights

under section 506(c) of the Bankruptcy Code with respect to any unpaid fees and costs (at any

time allowed) of Winter Harbor LLC, White & Case LLP and Fox Rothschild LLP incurred

through the Closing Date (as defined in the Asset Purchase Agreement) in excess of the Carve Out. Interim Order ¶ 30.

15.   *Liens on Avoidance Actions*.  Local Rule 4001-2(a)(i)(D) requires the identification of provisions that immediately grant to prepetition secured creditors liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. Del. Bankr. L. R. 4001-2(a)(i)(D).  The Interim Order provides as security for the DIP Obligations and as adequate protection for the amount of any Collateral Diminution, among other things and subject to the entry of a Final Order, the granting of the DIP Liens and the Adequate Protection Liens in, among other things Bankruptcy Recoveries, but only (A) the full amount of any such recovery or settlement thereof to the extent arising under Section 549 of the Bankruptcy Code and (B) all amounts necessary to reimburse the DIP Lender for the amount of the Carve Out, if any, used to finance the pursuit of such recovery or settlement with respect to all Bankruptcy Recoveries, and no other Bankruptcy Recoveries.  Interim Order ¶ 6(b).

16.   *Priming Liens*.  Local Rule 4001-2(a)(i)(G) requires a description of any provisions of the proposed debtor-in-possession facility which contemplate a priming of any secured lien without the consent of that lienor. Del. Bankr. L. R. 4001-2(a)(i)(G).  As discussed more fully herein, the liens of the Purchasing Secured Party are primed by the DIP Liens, and the Purchasing Secured Party is provided with adequate protection to the extent of any Diminution in Value of their interests in the Prepetition Collateral, in the form of replacement Adequate Protection Liens, Adequate Protection Claims, and as to the Purchasing Secured Party, the reasonable professional fees and expenses incurred in connection with the Prepetition Credit Agreement.  Interim Order ¶¶ H, 17-19.  Finally, the Purchasing Secured Party has expressly consented to such priming on the terms proposed in the DIP Credit Agreement.  Id. at ¶ H.

## Background

17.    On June 4, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manages its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

18.    Additional background facts on the Debtor, including an overview of the Debtor's business, information on the Debtor's corporate structure, information on the Debtor's debt structure and information on the events leading up to the Debtor's Chapter 11 Case is contained in the Myers Declaration.

## Jurisdiction

19.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

20.    By this Motion, the Debtor seeks entry of the DIP Orders, inter alia:

    (i)    under sections 363, 364(c) and 364(d) of the Bankruptcy Code, authorizing the Debtor, as Borrower, to obtain senior secured superpriority priming debtor-in-possession financing under the terms and conditions of the DIP Credit Agreement and the other DIP Financing Agreements, consisting of a loan facility in an aggregate amount of $12 million, from Crystal, as DIP Lender, and authorizing the Debtor to enter into and comply in all respects with the DIP Financing Agreements, and approving the terms and conditions of the DIP Financing Agreements;

    (ii)    under sections 363 and 364 of the Bankruptcy Code, authorizing the Debtor to use the proceeds of the DIP Facility in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Agreed Budget, (i) to fund the Chapter 11 Case, (ii) to pay fees and expenses associated with

the DIP Facility, and (iii) for working capital and other corporate purposes of the Debtor;

(iii)  under sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, as security for the repayment of the borrowings and all other obligations arising under the DIP Financing Agreements, authorizing the Debtor to grant to the DIP Lender (first priority priming, valid, perfected and enforceable liens, subject to certain exceptions, including the Carve Out, upon substantially all of the Debtor's real and personal property, as described below and in the DIP Orders, the DIP Credit Agreement and the other DIP Financing Agreements;

(iv)  under section 364(c)(1) of the Bankruptcy Code, granting in favor of the DIP Lender a superpriority administrative expense claim (the "DIP Superpriority Claim") in respect of all Obligations under (and as defined in) the DIP Credit Agreement (the "DIP Obligations"), subject only to the payment of the Carve Out;

(v)  under sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, authorizing the use of Cash Collateral by the Debtor, in accordance with the Agreed Budget, and under the terms set forth in the DIP Orders;

(vi)  under sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, authorizing the granting the Purchasing Secured Party, of the Adequate Protection Liens and Adequate Protection Claims to the extent of any Diminution in Value of the Purchasing Secured Party's interests in the Prepetition Collateral, and having the priorities set forth in the DIP Orders; as well as additional adequate protection in the form of the payment of fees and expenses incurred by the Purchasing Secured Party in connection with the Prepetition Credit Facility;

(vii)  under section 362 of the Bankruptcy Code, modifying the automatic stay to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders, the DIP Credit Agreement and the other DIP Financing Agreements;

(viii)  scheduling the Final Hearing no later than twenty-five (25) days from entry of the Interim Order to consider entry of the Final Order granting the relief requested in the Motion on a final basis, including final approval of the Debtor's use of Cash Collateral and entry into the DIP Credit Agreement, and approving the form of notice with respect to the Final Hearing;

(ix)     waiving any right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code; and

(x)      waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for the immediate effectiveness of the DIP Orders.

### Basis for Relief

**A.      The Debtor's Need for Financing and Use of Cash Collateral**

21.     As indicated above, the financing requested herein is being requested for only a short period of time, as the Debtor contemplates a sale of substantially all of its assets within approximately 35 days. Despite the proposed expedited term of the Chapter 11 Case, however, such financing is critical to the Debtor's operation and its ability to preserve the value of the assets pending the auction and approval of such a sale. The proposed financing under the DIP Facility is needed to maintain an appropriate level of liquidity and help fund the Debtor's day-to-day operations. Furthermore, the DIP Facility was negotiated as part of the prepetition negotiations with the Purchasing Secured Party, and in connection with the marketing process for the Debtor's estate; if the Debtor is unable to obtain approval of the proposed DIP Facility and use of Cash Collateral on an interim and final basis, the ability to consummate the sale will be jeopardized.

22.     The Debtor requires sufficient liquidity during the Chapter 11 Case to fund working capital and general corporate requirements for essential, day-to-day operations, to preserve and maintain the value of the Debtor's assets (including the Prepetition Collateral) and fund the marketing and sale efforts in an amount consistent with the Debtor's receivables and payables, in accordance with the Agreed Budget for the benefit of the estate and creditors, including the Purchasing Secured Party.

23.     The Debtor requires the immediate use of cash on hand, the DIP Facility, and other income generated from its commercial activities in order to maintain the day-to-day business operations and pay employees and vendors on a timely basis pending a sale of the Debtor's assets. Absent such relief from the Court, the Debtor will not have sufficient liquidity to ensure uninterrupted business operations and will suffer a substantial loss of asset value to the detriment of all parties in interest. It is therefore critical that the Debtor have the initial $6 million of the DIP Facility in place on an interim basis in order to ensure that the Debtor has enough cash to operate the business. Moreover, it is necessary that the Debtor be able to demonstrate to its customers, who rely on the Debtor for the timely delivery of pallets for the customer's shipping and delivery of goods, that the business will continue without interruption and that the Debtor will continue to pay vendors in the ordinary course of business. Absent such a showing—and in the event of any interruption or delay in the business—the Debtor's customers will likely pursue opportunities with competitors, which would cripple the Debtor's business. Finally, the DIP Facility was negotiated in consideration of the marketing and sale process; if the Debtor is unable to obtain interim approval of the DIP Facility and use of Cash Collateral on an interim and final basis, the ability to consummate the sale will be jeopardized.

24.     The interests of the Purchasing Secured Party will be protected and enhanced by the Debtor's use of Cash Collateral and the DIP Facility because such relief will ensure the uninterrupted operation of the Debtor's business and operations that secure the Purchasing Secured Party's claims, thus protecting the Debtor's revenue streams and protecting the going concern value of the Debtor. In the absence of approval of the DIP Facility, the Debtor's customers, for whom time is of the essence, would likely discontinue working with the Debtor if the Debtor's operations were halted, even briefly, and the Debtor was unable to timely

fulfill customer requests.  The DIP Facility is critical to the Debtor's ability to continue to

operate during the chapter 11 process.  Moreover, employees, customers and trade creditors will

expect the Debtor to have more than ample access to liquidity in order to continue operations.

   25. The ability of the Debtor to finance its operations and the availability to

the Debtor of sufficient working capital and liquidity is vital to its ability to maintain operations.

If the Debtor is unable to obtain such financing and to use Cash Collateral for such purposes, the

recoveries to all creditors, including the Purchasing Secured Party, would be greatly reduced

because the value of the Debtor's estate would decline dramatically.  Entry of the Interim Order

is therefore (i) critical to the Debtor's ability to sell its assets pursuant to the Bankruptcy Code,

(ii) in the best interests of the Debtor and its estate and (iii) necessary to avoid irreparable harm

to the Debtor, its creditors, and its assets, business, goodwill, reputation and employees.

  **B.**  **The Debtor's Entry into the DIP Facility Is Authorized Under Section 364 of the Bankruptcy Code**

   26. Section 364 of the Bankruptcy Code gives bankruptcy courts the power to

authorize postpetition financing for a chapter 11 debtor in possession.  See In re Defender Drug

Stores, Inc., 126 B.R. 76, 81 (Bankr. D. Ariz. 1991), aff'd, 145 B.R. 312 (B.A.P. 9th Cir. 1992).

   27. Bankruptcy courts have the power to authorize secured postpetition

financing under section 364 of the Bankruptcy Code, which provides, in pertinent part, as

follows:

    (c) If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

     (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

(d)(1)  The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A)     the [debtor in possession] is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(c)-(d)(1).

28.     "Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend post-petition credit.'" Defender Drug Stores, 126 B.R. at 81 (quoting Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co.), 834 F.2d 599, 603 (6th Cir. 1987), cert. denied, 488 U.S. 817 (1988)).  The incentives enumerated in section 364 are not intended to be an exhaustive list of the inducements that a court may grant.  Id.  In fact, it is not uncommon for a court to approve a lending arrangement containing terms that far exceed those authorized by section 364.  Id.

29.     Generally, courts apply a three-part test to determine whether a debtor in possession may obtain credit under section 364(c) of the Bankruptcy Code.  Under such test, the Debtor may incur postpetition financing under the DIP Facility pursuant to section 364(c) if it demonstrates that (a) it cannot obtain credit unencumbered or without superpriority status, (b) the DIP Facility is necessary to preserve the assets of its estate, and (c) the terms of the DIP Facility are fair, reasonable and adequate given the circumstances of the Debtor, as Borrower, and the

proposed lenders.  See In re Crouse Group, Inc., 71 B.R. 544, 549-50 (Bankr. E.D. Pa. 1987); see
also In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).

　　　　30.　　In addition, section 364(d)(1) of the Bankruptcy Code authorizes a debtor

in possession to incur superpriority senior secured debtor or "priming" liens if (a) the debtor is

unable to obtain financing from another source and (b) the interests of the secured creditors

whose liens are being primed by the postpetition financing are adequately protected.  11 U.S.C. §

364(d)(1); see also Aqua Assocs., 123 B.R. at 196.  Importantly, consent by the secured creditors

to priming obviates the need to show adequate protection.  See Anchor Sav. Bank FSB v. Sky

Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien,

those [undersecured] creditors relieved the debtor of having to demonstrate that they were

adequately protected.").  Accordingly, the Debtor may incur "priming" liens under the DIP

Facility if it is unable to obtain unsecured or junior secured credit and either (i) the Purchasing

Secured Party has consented or (ii) the Purchasing Secured Party's interests in the collateral are

adequately protected.

　　　　31.　　Against this statutory backdrop, courts will evaluate the facts and

circumstances of a debtor's case and accord significant weight to the necessity for obtaining the

financing.  See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990).

Debtors in possession are generally permitted to exercise their basic business judgment

consistent with their fiduciary duties when evaluating the necessity of proposed protections for a

party extending credit under section 364 of the Bankruptcy Code.  Id. at 38.

　　　　(i)　　The Debtor is Unable to Obtain Unsecured or Junior Secured Credit

　　　　32.　　To show that the credit required is not obtainable on an unsecured basis,

the Debtor need only demonstrate "by a good faith effort that credit was not available" without

the protections afforded to potential lenders by section 364(c) or (d) of the Bankruptcy Code.

Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th

Cir. 1986); see also Anchor Sav. Bank, 99 B.R. at 120 n.4 (noting that the debtor satisfied the

requirement of section 364(d) by "approach[ing] all lenders reasonably likely to be willing to

make a junior or unsecured loan"); Ames, 115 B.R. at 37-40 (debtor in possession must show

that it has made a reasonable effort to seek other sources of financing under section 364(a) and

(b) of the Bankruptcy Code). Thus, "[t]he statute imposes no duty to seek credit from every

possible lender before concluding that such credit is unavailable." Snowshoe, 789 F.2d at 1088;

see also In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1998) (finding that "it would

be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for

financing" where the debtor "suffers some financial stress and has little or no unencumbered

property"), aff'd sub nom., Anchor Sav. Bank, 99 B.R. at 117.

        33.     As discussed above and in the Myers Declaration, the Debtor's assets are

subject to the Prepetition Liens asserted by the Purchasing Secured Party. Because of the

Debtor's prepetition debt, obtaining the financing needed as unsecured debt on an administrative

priority basis, or as debt which would be secured solely by liens junior to the liens of the

Purchasing Secured Party, was not a viable option, especially from a third party who did not

already have a financial interest in the Debtor to protect. Moreover, the Purchasing Secured

Party would not have consented to the granting of senior or pari passu liens to a new third party

debtor-in-possession lender. In fact, the DIP Facility was negotiated with the Purchasing

Secured Party in connection with the proposed sale of substantially all of the Debtor's assets.

The Debtor thus concluded that adequate alternative financing terms more favorable than those

to be provided by the DIP Lender under the DIP Facility are currently unobtainable.

(ii)    <u>The Purchasing Secured Party's Interests in the Prepetition Collateral Are Adequately Protected</u>

34.    If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien (<u>i.e.</u>, a priming lien). <u>See</u> 11 U.S.C. § 364(d). Such relief may be granted so long as there is adequate protection of the secured creditor's interests in the property on which the senior lien is supposed to be granted. <u>See id.</u>; <u>see also</u> <u>Aqua</u>, 123 B.R. at 196. Although the Bankruptcy Code does not explicitly define "adequate protection," section 361 of the Bankruptcy Code provides that it may take the form of (1) a cash payment or periodic cash payments to the extent that there is a decrease in the lien holder's property interest; (2) an additional or replacement lien to the extent that there is a decrease in the lien holder's property interest; or (3) other relief that will result in a secured party's realizing the indubitable equivalent of its property interest. <u>See</u> 11 U.S.C. § 361.

35.    Where a debtor's proposed use of funds from additional postpetition financing augment the value of the secured creditor's collateral, adequate protection exists. <u>Sky Valley</u>, 100 B.R. at 114 (noting the flexible nature of section 361(3) and collecting cases). The Debtor believes that the measures of protection set forth in the DIP Facility constitute adequate protection. In addition to replacement liens on substantially all assets, junior in priority only to the DIP Liens and any existing senior liens (and subject to the Carve Out), the Purchasing Secured Party will receive superpriority administrative expense claims, and reasonable professional fees and expenses incurred by the Purchasing Secured Party in connection with the Prepetition Credit Facility. Moreover, the use of any DIP Facility proceeds shall be solely in accordance with the Agreed Budget and subject to borrowing base requirements. Accordingly, the DIP Facility not only maintains the value of the collateral in which the Purchasing Secured

Party is receiving replacement liens, it increases the collateral base and strengthens the value of the Debtor's businesses.

36.     Finally, as mentioned above, consent may take the place of adequate protection under section 364(d)(1) of the Bankruptcy Code, and the Debtor has obtained the consent of the Purchasing Secured Party to use the Cash Collateral and enter into the DIP Facility on the terms set forth in the DIP Orders.

(iii)     The DIP Facility Is Fair, Reasonable, and in the Best Interests of the Estate

37.     The Debtor believes that the terms and conditions of the DIP Facility are fair and reasonable. The DIP Facility is necessary to support the Debtor's ongoing operations pending approval and consummation of a sale will signal the Debtor's continued strength to compete in the marketplace for new business. The DIP Facility will also ensure the continued support of the Debtor's customers and critical suppliers. Furthermore, as is more fully explained in the Declaration, the Debtor, with Winter Harbor LLC's assistance, undertook an effort to obtain the best available terms for debtor-in-possession financing. Based upon these efforts, the interest rates and fees appear to be consistent with the existing market for debtor-in-possession loans of this nature. The Debtor believes that the proposed DIP Facility is the best financing available and well within the exercise of sound business judgment.

38.     Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. See Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best

interests [of the debtor] and its creditors"); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D.

Colo. 1985) ("In exercising [the debtor's] business judgment of conducting its drilling

operations, it has found it necessary to obtain loans to make these endeavors possible."). In fact,

"[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of

the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for

private control of administration of the estate, and threaten the court's ability to control a case

impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir.

1985); see also Simasko Prod., 47 B.R. at 449 ("Business judgments should be left to the board

room and not to this Court." (quoting In re Lifeguard Indus. Inc., 37 B.R. 3, 17 (Bankr. S.D.

Ohio 1983)). Consistent with this authority, the Debtor respectfully submits that the Court

should approve the Debtor's decision to accept and enter into the proposed DIP Facility.

   39.  Moreover, the Debtor has made a concerted good faith effort to obtain credit on

the most favorable terms available. Specifically, in connection with the marketing of the

Debtor's assets, the Debtor also sought debtor in possession financing from interested parties,

none of whom would agree to provide financing on a junior or *pari passu* basis. The DIP

Facility was ultimately determined to provide the requisite liquidity on the most advantageous

terms given that the Purchasing Secured Party expressed its lack of consent to a senior or *pari*

*passu* third party debtor-in-possession lender. Absent such consent, distracting and costly

litigation over the propriety of any priming or *pari passu* third party debtor-in-possession

financing would likely have ensued, with potentially severe consequences for the Debtor, its

estate, and creditors. Against this backdrop, the Debtor carefully evaluated the proposed

financing structure from the DIP Lender, engaged in negotiations with the DIP Lender regarding

the proposed terms, and eventually agreed to the DIP Lender's proposal as the proposal best

suited to the Debtor's needs.  The terms and conditions of the DIP Facility were negotiated by

the parties (and their legal and financial advisors) in good faith and at arms' length and, as

outlined above, were instituted for the purpose of enabling the Debtor to meet ongoing

operational expenses while in chapter 11 and to preserve the going concern status of the Debtor

as well as the value of the Prepetition Collateral.  Accordingly, the DIP Lender should be

provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if

any of the provisions of the DIP Facility are later modified, vacated, stayed or terminated by

subsequent order of this or any other Court, the DIP Lender will be fully protected with respect

to any amounts previously disbursed.

### C. The Use of Cash Collateral Is Appropriate Under the Current Circumstances and Should Be Authorized

40.     The Court should authorize the Debtor to use Cash Collateral, whether

existing as of the Petition Date or arising thereafter based on the conversion of existing non-cash

collateral into cash.  It is essential to the continued operation of the Debtor that it obtains

authority to use Cash Collateral to fund payroll and other operating needs, including the costs of

administration of this Chapter 11 Case.  Currently, the Debtor has little or no available cash or

assets readily convertible into cash that are not likely subject to the Purchasing Secured Party's

asserted liens and security interests.

41.     If the Debtor is permitted to use Cash Collateral to fund ongoing business

operations and administration of this Chapter 11 Case, the Debtor will preserve the value of the

Debtor's assets as a going concern.  Thus, the Debtor can continue to run its business

successfully, but only if it is allowed to use Cash Collateral in the course of the day to day

operations.  Without such use, the detrimental result to the value of the estate will be rapid and

ultimately disastrous, given the nature of the Debtor's business.  Access to Cash Collateral is

crucial to the Debtor's ability to avoid immediate and irreparable harm to the value of the estate

and the creditors, and ongoing business both before and after the Final Hearing.

        42.      Section 363(c)(2) of the Bankruptcy Code sets forth the requirements for a

debtor's proposed use of cash collateral.  Specifically, section 363(c)(2) provides, in pertinent

part:

> The trustee [or debtor in possession] may not use, sell, or lease
> cash collateral under paragraph (1) of this subsection unless –
> (A) each entity that has an interest in such cash collateral consents;
> or (B) the court, after notice and a hearing, authorizes such use,
> sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).  Additionally, section 105(a) of the Bankruptcy Code provides that "[t]he

court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

        43.      The Debtor respectfully submits that the proposed use of Cash Collateral,

in conjunction with the DIP Facility, is necessary for the Debtor to have sufficient liquidity

during the chapter 11 process to preserve the value of its assets and property (including the

Prepetition Collateral).  The Debtor's proposed use of Cash Collateral thus prejudices no one; it

affirmatively and directly benefits the Debtor's estates and creditors, including the Purchasing

Secured Party, and enhances the prospects of a successful outcome in this case.

### D.     The Proposed Adequate Protection for the Use of Cash Collateral Is Appropriate

        44.      In considering whether to authorize use of cash collateral, a court

generally must find that the interests of the holder of the secured claim are adequately protected.

See 11 U.S.C. § 363(e).  Section 363(e) of the Bankruptcy Code provides that "on request of an

entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or

debtor in possession], the court, with or without a hearing, shall prohibit or condition such use,

sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C.

§ 363(e). The Debtor's use of Cash Collateral is conditioned upon adequate protection being

provided to the Purchasing Secured Party, as set forth in the DIP Orders.

    45. The Purchasing Secured Party's primary form of adequate protection will

be the Debtor's use of Cash Collateral to preserve the going concern value of the Debtor's assets

and solely in accordance with the Agreed Budget. Courts have held that adequate protection

may be demonstrated by a showing that the going concern value of the debtor is preserved by the

debtor's continuing operations and use of cash collateral. See, e.g., In re Snowshoe Co., Inc.,

789 F.2d at 1087-89 (trustee reported that ski resort would lose 50% to 90% of its fair market

value if it ceased operations). Additionally, as mentioned above, the Debtor will be granting

replacement liens and superpriority claims as adequate protection, which is commonplace. See,

e.g., MBank Dallas N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-98 (10th Cir.

1987) (allowing the debtor to replace a lien on cash with a lien on property likely to be worth

five times as much); Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Ctr.

Wholesale, Inc.), 759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional

property of the debtor would likely constitute adequate protection for the secured creditor);

Wrecclesham Grange, 221 B.R. at 981) (noting that a replacement lien of equal value on

postpetition rents is adequate protection); In re Stein, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982)

(continued lien on debtors' crops, livestock and equipment resulted in an increase rather than a

decrease in collateral, and debtors were granted authority to use cash collateral to meet operating

expenses during chapter 11 proceedings).

46.     For the foregoing reasons, the Debtor respectfully submits that the adequate protection contemplated herein (described in more detail above) and in the DIP Orders is appropriate and should be approved.

### Request for a Final Hearing

47.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtor respectfully request that the Court set a date for the Final Hearing no later than twenty-five (25) days from entry of the Interim Order and approve the provisions for notice of the Final Hearing and the objection procedures that are set forth in the Interim Order.

### The Need for Immediate Relief Pending a Final Hearing

48.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion for authorization to use cash collateral may not be commenced earlier than fourteen (14) days after service of such motion. Fed. R. Bankr. P. 4001(b)(2). Upon request, however, a court may conduct a preliminary expedited hearing on a motion and authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing, based on the business exigencies of individual cases. See id. The Debtor submits that, for the reasons set forth herein, authority to use Cash Collateral on an interim basis as requested in the Motion is necessary to enable the Debtor to maintain ongoing operations pending a sale of substantially all of the Debtor's assets in this Chapter 11 Case.

### Waiver of Bankruptcy Rules 6004(a) and (h)

49.     Should the Court grant the Motion and enter the DIP Orders, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

## Notice

50.    Notice of this Motion has been provided to the Office of the United States Trustee for the District of Delaware, counsel to the Purchasing Secured Party, counsel to the DIP Lender, the Debtor's 30 largest unsecured creditors (including counsel if known), and all parties requesting notices pursuant to Bankruptcy Rule 2002.  The Debtor submits that no other or further notice need be provided.

51.    No previous motion for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests entry of an order (i) granting the relief requested herein and (ii) granting the Debtor such other and further relief as the Court deems just and proper.

Dated:   June 5, 2013
       Wilmington, Delaware

FOX ROTHSCHILD LLP

By: _____
Jeffrey M. Schlerf (No. 3047)
John H. Strock (No. 4965)
L. John Bird (No. 5310)
Citizens Bank Center, Suite 1600
919 North Market Street
Wilmington, DE 19801
Telephone:  (302) 654-7444

– and –

John K. Cunningham
Richard S. Kebrdle
Kevin M. McGill
Fan B. He
WHITE & CASE LLP
Southeast Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131
Telephone:  (305) 371-2700
Facsimile:  (305) 358-5744

*Proposed Attorneys for the Debtor and Debtor in Possession*