**Exhibit "1"**

**DIP Credit Agreement**

**SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of [_____ __], 2013,

among

**IGPS COMPANY LLC**,

as the Lead Borrower, as a Debtor and as a Debtor-in-Possession,

for

The Borrowers Named Herein, as Debtors and Debtors-in-Possession,

The Guarantors Named Herein, as Debtors and Debtors-in-Possession,

**CRYSTAL FINANCIAL LLC**,

as Administrative Agent and Collateral Agent,

and

The Lenders Party Hereto

1560850.12

**TABLE OF CONTENTS**

**Section**                                                                                           **Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ................................................................. 1

    1.01    Defined Terms ........................................................................................................ 1

    1.02    Other Interpretive Provisions ............................................................................ 34

    1.03    Accounting Terms. ............................................................................................. 35

    1.04    Rounding ............................................................................................................ 35

    1.05    Times of Day ...................................................................................................... 36

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS ................................................. 36

    2.01    Revolving Loans. ................................................................................................ 36

    2.02    Revolving Borrowings. ....................................................................................... 37

    2.03    Reserved. ........................................................................................................... 38

    2.04    Repayments and Prepayments. ........................................................................ 38

    2.05    Termination or Reduction of Aggregate Commitments. ................................. 38

    2.06    Interest. ............................................................................................................. 39

    2.07    Fees .................................................................................................................... 39

    2.08    Computation of Interest and Fees .................................................................... 40

    2.09    Evidence of Debt. .............................................................................................. 40

    2.10    Payments Generally; Agent's Clawback. .......................................................... 40

    2.11    Sharing of Payments by Lenders ...................................................................... 42

    2.12    Settlement Amongst Lenders. .......................................................................... 43

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY; APPOINTMENT OF LEAD BORROWER .............. 43

    3.01    Taxes. ................................................................................................................ 43

    3.02    Illegality ............................................................................................................ 45

    3.03    Inability to Determine Rates ............................................................................ 45

    3.04    Increased Costs. ................................................................................................ 45

**TABLE OF CONTENTS**

| **Section** | | **Page** |
|---|---|---|
| 3.05 | Mitigation Obligations. | 46 |
| 3.06 | Survival | 46 |
| 3.07 | Designation of Lead Borrower as Borrowers' Agent. | 46 |
| ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS | | 47 |
| 4.01 | Conditions of Initial Credit Extension | 47 |
| 4.02 | Conditions to all Credit Extensions | 51 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES | | 52 |
| 5.01 | Existence, Qualification and Power | 52 |
| 5.02 | Authorization; No Contravention | 53 |
| 5.03 | Governmental Authorization; Other Consents | 53 |
| 5.04 | Binding Effect | 53 |
| 5.05 | Financial Statements; Initial Budget; No Material Adverse Effect. | 53 |
| 5.06 | Litigation | 54 |
| 5.07 | No Default | 54 |
| 5.08 | Ownership of Property; Liens. | 54 |
| 5.09 | Environmental Compliance. | 55 |
| 5.10 | Insurance | 55 |
| 5.11 | Taxes | 56 |
| 5.12 | ERISA Compliance. | 56 |
| 5.13 | Subsidiaries; Equity Interests | 57 |
| 5.14 | Margin Regulations; Investment Company Act. | 57 |
| 5.15 | Disclosure | 57 |
| 5.16 | Compliance with Laws | 58 |
| 5.17 | Intellectual Property; Licenses, Etc | 58 |
| 5.18 | Labor Matters | 58 |

**TABLE OF CONTENTS**

| Section | | Page |
|---|---|---|
| 5.19 | Security Interest | 59 |
| 5.20 | . | 59 |
| 5.21 | Reserved | 59 |
| 5.22 | Deposit Accounts | 59 |
| 5.23 | Brokers | 59 |
| 5.24 | Customer and Trade Relations | 59 |
| 5.25 | Material Contracts | 59 |
| 5.26 | Casualty | 59 |
| ARTICLE VI AFFIRMATIVE COVENANTS | | 60 |
| 6.01 | Financial Statements | 60 |
| 6.02 | Certificates; Other Information | 60 |
| 6.03 | Notices | 61 |
| 6.04 | Payment of Obligations | 63 |
| 6.05 | Preservation of Existence, Etc. | 63 |
| 6.06 | Maintenance of Properties | 63 |
| 6.07 | Maintenance of Insurance | 63 |
| 6.08 | Compliance with Laws | 65 |
| 6.09 | Books and Records; Accountants. | 65 |
| 6.10 | Inspection Rights. | 66 |
| 6.11 | Additional Loan Parties. | 67 |
| 6.12 | Cash Management. | 67 |
| 6.13 | Information Regarding the Collateral. | 68 |
| 6.14 | Physical Inventories. | 69 |
| 6.15 | Environmental Laws | 70 |
| 6.16 | Further Assurances | 70 |

**TABLE OF CONTENTS**

| Section | | Page |
|---------|---|------|
| 6.17 | Compliance with Terms of Leaseholds ................................................................. | 70 |
| 6.18 | Material Contracts ............................................................................................. | 71 |
| 6.19 | Retention of Consultants; Communication with Accountants and Other Financial Advisors ............................................................................................................ | 71 |
| 6.20 | Performance within Budget ................................................................................. | 72 |
| 6.21 | Permitted Sales Process ...................................................................................... | 72 |
| 6.22 | Additional Bankruptcy Related Affirmative Covenants ........................................ | 73 |
| ARTICLE VII NEGATIVE COVENANTS ............................................................................... | | 73 |
| 7.01 | Liens ................................................................................................................... | 73 |
| 7.02 | Investments ........................................................................................................ | 74 |
| 7.03 | Indebtedness; Equity Issuances .......................................................................... | 74 |
| 7.04 | Fundamental Changes ......................................................................................... | 74 |
| 7.05 | Dispositions ........................................................................................................ | 74 |
| 7.06 | Restricted Payments ........................................................................................... | 74 |
| 7.07 | Prepayments of Indebtedness ............................................................................. | 74 |
| 7.08 | Change in Nature of Business .............................................................................. | 74 |
| 7.09 | Transactions with Affiliates ................................................................................. | 74 |
| 7.10 | Burdensome Agreements. .................................................................................... | 75 |
| 7.11 | Use of Proceeds .................................................................................................. | 75 |
| 7.12 | Amendment of Material Documents .................................................................... | 75 |
| 7.13 | Fiscal Year .......................................................................................................... | 76 |
| 7.14 | Deposit Accounts ................................................................................................ | 76 |
| 7.15 | Reserved............................................................................................................. | 76 |
| 7.16 | Bankruptcy Related Negative Covenants.............................................................. | 76 |
| ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES ......................................................... | | 77 |
| 8.01 | Events of Default................................................................................................. | 77 |

**TABLE OF CONTENTS**

| Section | | Page |
|---|---|---|

8.02    Remedies Upon Event of Default ................................................................ 81

8.03    Application of Funds ............................................................................... 82

ARTICLE IX THE AGENT ................................................................................ 83

9.01    Appointment and Authority ..................................................................... 83

9.02    Rights as a Lender ................................................................................. 83

9.03    Exculpatory Provisions ........................................................................... 84

9.04    Reliance by Agent .................................................................................. 85

9.05    Delegation of Duties .............................................................................. 85

9.06    Resignation of Agent ............................................................................. 85

9.07    Non-Reliance on Agent and Other Lenders ............................................. 86

9.08    [Reserved] ............................................................................................ 86

9.09    Collateral and Guaranty Matters ............................................................ 86

9.10    Notice of Transfer ................................................................................. 87

9.11    Reports and Financial Statements ......................................................... 87

9.12    Agency for Perfection ............................................................................ 88

9.13    Indemnification of Agent ........................................................................ 88

9.14    Relation Among Lenders ........................................................................ 88

9.15    Defaulting Lender .................................................................................. 89

ARTICLE X MISCELLANEOUS ......................................................................... 90

10.01    Amendments, Etc ................................................................................ 90

10.02    Notices; Effectiveness; Electronic Communications. ........................... 91

10.03    No Waiver; Cumulative Remedies ....................................................... 93

10.04    Expenses; Indemnity; Damage Waiver. ............................................... 93

10.05    Payments Set Aside ........................................................................... 95

10.06    Successors and Assigns. .................................................................... 95

**TABLE OF CONTENTS**

**Section**                                                                  **Page**

10.07   Treatment of Certain Information; Confidentiality.................................... 99

10.08   Right of Setoff ................................................................................... 100

10.09   Interest Rate Limitation .................................................................... 101

10.10   Counterparts; Integration; Effectiveness ........................................... 101

10.11   Survival ............................................................................................. 101

10.12   Severability........................................................................................ 101

10.13   Governing Law; Jurisdiction; Etc. ...................................................... 102

10.14   Waiver of Jury Trial ........................................................................... 103

10.15   No Advisory or Fiduciary Responsibility............................................. 103

10.16   USA Patriot Act Notice ...................................................................... 104

10.17   Foreign Asset Control Regulations .................................................... 104

10.18   Time of the Essence .......................................................................... 104

10.19   Press Releases. .................................................................................. 104

10.20   Additional Waivers. ........................................................................... 105

10.21   No Strict Construction........................................................................ 106

10.22   Attachments....................................................................................... 107

10.23   DIP Orders .......................................................................................... 107


SIGNATURES.................................................................................................. S-1

**SCHEDULES**

1.01            Borrowers

2.01            Commitments and Revolving Credit Facility Applicable Percentages

5.01            Loan Parties; Organizational Information

5.06            Litigation

5.08(b)(1)      Owned Real Estate

5.08(b)(2)      Leased Real Estate

5.10            Insurance

5.11            Taxes

5.13            Subsidiaries; Other Equity Investments

5.18            Collective Bargaining Agreements

5.21            DDAs; Collection Account

5.23            Brokers

5.24            Material Contracts

6.02            Financial and Collateral Reporting

7.01            Existing Liens

7.02            Existing Investments

7.03            Existing Indebtedness

10.02           Agent's Office; Certain Addresses for Notices

**EXHIBITS**

*Form of*

A       Revolving Loan Notice

B       Revolving Note

C       Compliance Certificate

D       Assignment and Assumption

E       Borrowing Base Certificate

**SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

This **SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** ("Agreement") is entered into as of [_____ __], 2013, among

**IGPS COMPANY LLC**, a Delaware limited liability company, as a Borrower, Debtor and Debtor-in-Possession (the "Lead Borrower"),

the Persons named on Schedule 1.01 hereto (individually, a "Borrower", and collectively, the "Borrowers"), as Debtors and Debtors-in-Possession,

the Guarantors party hereto, as Debtors and Debtors-in-Possession, to the extent applicable,

each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and

**Crystal Financial LLC**, as Administrative Agent and Collateral Agent.

**R E C I T A L S:**

WHEREAS, on June __, 2013, Lead Borrower commenced Chapter 11 Case No. [_____] (the "Bankruptcy Case") by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Borrowers continue to operate their business and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

The Borrowers have requested that the Lenders provide a senior secured, super-priority revolving credit facility, and the Lenders have indicated their willingness to lend on the terms and conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

**ARTICLE I**
**DEFINITIONS AND ACCOUNTING TERMS**

**1.01    Defined Terms.**  As used in this Agreement, the following terms shall have the meanings set forth below:

"Accommodation Payment" as defined in Section 10.20(d).

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of or (b) for services rendered or to be rendered.

"ACH" means automated clearing house transfers.

"Act" shall have the meaning provided in <u>Section 10.16</u>.

"Affiliate" means, with respect to any Person, (a) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (b) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (c) any other Person directly or indirectly holding 10% or more of any class of the Equity Interests of that Person, and (d) any other Person 10% or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Agent" means Crystal, in its capacity as administrative agent and collateral agent under any of the Loan Documents, or any successor thereto.

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on <u>Schedule 10.02</u>, or such other address or account as the Agent may from time to time notify the Lead Borrower and the Lenders.

"Aggregate Commitments" means the sum of the Commitments of all Lenders.  As of the Closing Date, the Aggregate Commitments are $12,000,000.

 "Agreement" means this Senior Secured Super-Priority Debtor-in-Possession Credit Agreement.

"AIM" means AIM Logistics Services, LLC, a Florida limited liability company. [1]

"AIM Documents" means each agreement, document, contract or instrument entered into in connection with the transactions set forth in that certain Depot Facility Service Provider Agreement dated July 1, 2009, between Debtor and AIM, whether now or hereafter existing.[2]

"Allocable Amount" has the meaning specified in <u>Section 10.20(d)</u>.

"Applicable Lenders" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Margin" means 8.00% with respect to all Obligations.

---

[1] Discuss relationship between AIM/Belacon.

[2] iGPS: please provide copies.  We have seen certain AIM documents, but none of which are the Depot Facility Service Provider Agreement.

"Appraised Value" means with respect to Eligible Non-Damaged Pallets and Eligible Damaged Pallets, the appraised orderly liquidation value per Pallet, net of costs and expenses to be incurred in connection with any such liquidation, as determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Agent, which may be an Affiliate of (a) the Agent, (b) any Lender, (c) any Participant or (d) any SPC, assignee or other participant permitted under Section 10.06.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, (c) an entity or an Affiliate of an entity that administers or manages a Lender, or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of Exhibit D or any other form approved by the Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of:

        (a)        the Loan Cap

<u>minus</u>

        (b)        the Total Outstandings.

In calculating Availability at any time and for any purpose under this Agreement, the Lead Borrower shall certify to the Agent that all accounts payable (other than pre-petition accounts payable) and Taxes (other than as set forth on Schedule 5.11) are being paid on a timely basis, in each case, other than those for which Reserves have been established.

"Availability Block" means an amount equal to $1,200,000.

"Availability Period" means the period from and including the Closing Date to the earliest of (a) the Termination Date, (b) the date of termination of the Aggregate Commitments pursuant to

<u>Section 2.05</u>, and (c) the date of termination of the commitment of each Lender hereunder pursuant to <u>Section 8.02</u>.

"Availability Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, (a) the EPA Reserve, (b) the Professional Fee Carve Out Reserve, (c) a reserve during the period that the interim Borrowing Order is in effect until entry of the Final Borrowing Order which includes a waiver of any right to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, in such amounts as the Agent from time to time determines in its Permitted Discretion as being appropriate, and (d) such other reserves as the Agent from time to time determines in its Permitted Discretion as being appropriate (i) to reflect the impediments to the Agent's ability to realize upon the Collateral, (ii) to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Collateral, (iii) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, or (iv) to reflect that a Default or an Event of Default then exists. Without limiting the generality of the foregoing, Availability Reserves may include, in the Agent's Permitted Discretion, (but are not limited to) reserves based on: (A) rent; (B) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the Collateral; (C) salaries, wages and benefits due to employees of any Loan Party; (D) customer deposits; (E) reserves for reasonably anticipated changes in the Appraised Value of Eligible Non-Damaged Pallets and Eligible Damaged Pallets between appraisals; (F) warehousemen's or bailee's charges and other Liens which may have priority over the interests of the Agent in the Collateral; (G) reserves to reflect the value of Pallets at leased locations with respect to which the lease therefor has not been assumed commencing as of the date that is twelve weeks prior to the deadline by which such lease must be assumed or rejected; and (H) without duplication of the Reserves in clause (F), a reserve in an amount equal at any time to the aggregate amount of payables and accrued expenses owing to AIM, EPC, Ryder, PTM, and each i-Depot.

"Bankruptcy Case" has the meaning specified therefor in the recitals to this Agreement.

"Bankruptcy Code" means Title 11, U.S.C., as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court" has the meaning provided in the recitals to this Agreement.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate, as in effect from time to time, plus one-half of one percent (0.50%), or (b) the rate of interest in effect for such day published in the "Money Rates" section of The Wall Street Journal as the "prime rate." Any change in the Federal Funds Rate or the prime rate shall take effect at the opening of business on the day of such change.

"Bidding Procedures Motion" has the meaning provided in <u>Section 6.21</u>

"Bidding Procedures Order" has the meaning provided in <u>Section 6.21</u>.

"Blocked Account" has the meaning provided in <u>Section 6.12(a)</u>.

"Blocked Account Agreement" means with respect to any deposit account established by a Loan Party, an agreement, in form and substance satisfactory to the Agent, establishing control (as defined in the UCC) of such deposit account by the Agent and whereby the bank maintaining such deposit account agrees to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrowers" has the meaning specified in the introductory paragraph hereto.

"Borrowing Base" means, at any time of calculation, an amount equal to:

(a)     the Appraised Value of Eligible Non-Damaged Pallets (net of unaccounted for Pallet accruals and net of Pallet Reserves) that (i) have been verified through the Depot receiving and sort process as "ready" (can be shipped to customer) or "wash" (requires minor cleaning) and (ii) are located in a Depot subject to a Collateral Access Agreement, *multiplied* by 85% (as reduced pursuant to the proviso below);

        <u>plus</u>

(b)     the Appraised Value of Eligible Damaged Pallets (net of Pallet Reserves) that are located in a Depot or any other location, in each case, subject to a Collateral Access Agreement, *multiplied* by 50% (as reduced pursuant to the proviso below);

        <u>plus</u>

(c)     the Appraised Value of Eligible Non-Damaged Pallets (net of unaccounted for Pallet accruals and net of Pallet Reserves) that are not located in a Depot subject to a Collateral Access Agreement (it being agreed that Pallets included in the Borrowing Base pursuant to this clause (c) shall, to the best knowledge of the Borrowers, not be damaged, defective or unfit for sale or lease) *multiplied* by 85% (as reduced pursuant to the proviso below);

        <u>plus</u>

(d)     85% <u>multiplied by</u> the face amount of Eligible Trade Receivables (net of Receivables Reserves applicable thereto);

minus

(e)      the then amount of all Availability Reserves;

minus

(f)      the Availability Block;

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit E hereto (with such changes therein as may be required by the Agent to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Lead Borrower which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Agent.

"Budget" means the financial projections for the Loan Parties covering the period from the Petition Date through the Termination Date on a weekly basis, which projections shall include, at a minimum, projected receipts, projected disbursements, projected Revolving Loan balance and projected Availability for the period covered thereby, substantially in the forms of the initial Budget previously approved by the Agent, and any subsequent projections furnished pursuant to Section 6.02(c) and (i) hereof, in each case, in substance satisfactory to the Required Lenders.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located.

"Capital Expenditures" means, with respect to any Person for any period, (a) all expenditures made (whether made in the form of cash or other property) or costs incurred for the acquisition or improvement of fixed or capital assets of such Person (excluding normal replacements and maintenance which are properly charged to current operations), in each case that are (or should be) set forth as capital expenditures in a Consolidated statement of cash flows of such Person for such period, in each case prepared in accordance with GAAP, and (b) Capital Lease Obligations incurred by a Person during such period.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Case Professionals" means Persons or firms retained by the Loan Parties or the Creditors' Committee or other statutory committee appointed in the Bankruptcy Case pursuant to §§327 and 1103 of the Bankruptcy Code.

"Cash Management Order" means an order entered by the Bankruptcy Court, in form and substance reasonably satisfactory to the Agent, authorizing the Loan Parties to, among other things, continue their cash management systems, as such order may be amended, modified or supplemented from time to time with the express written consent of the Agent and with the approval of the Bankruptcy Court.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Collateral" means any and all "Collateral" as defined in any applicable Security Document and all other property that is or is intended under the terms of the Security Documents to be subject to Liens in favor of the Agent, including pursuant to any DIP Order.

"Collateral Access Agreement" means either (a) an agreement reasonably satisfactory in form and substance to the Agent executed by (i) a bailee or other Person in possession of Collateral, or (ii) any landlord of Real Estate leased by any Loan Party, pursuant to which such Person (A) acknowledges the Agent's Lien on the Collateral, (B) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (C) provides the Agent with access to the Collateral held by such bailee or other Person or located in or on such Real Estate, (D) as to any landlord, provides the Agent with a reasonable time to sell and dispose of the Collateral from such Real Estate, and (E) makes such other agreements with the Agent as the Agent may reasonably require, (b) a court order in form and substance satisfactory to the Agent that is in full force and effect and is not subject to a stay or

appeal that provides the Agent similar rights with respect to the Collateral as those specified in clause (a), it being agreed that a court order continuing the effectiveness of any existing pre-petition collateral access agreement for the benefit of the Agent shall constitute an arrangement satisfactory to the Agent, or (c) any other valid and enforceable arrangement satisfactory to the Agent, including am assignment or delegation by the agent under the Pre-Petition Credit Agreement of its rights to access the Collateral, that provides the Agent similar rights with respect to the Collateral as those specified in clause (a).

"Collection Account" has the meaning provided in Section 6.12(c).

"Commitment" means, as to each Lender, its obligation to make Revolving Loans to the Borrowers pursuant to Section 2.01, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Consummation Date" means the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Plan of Reorganization confirmed by a Final Order.

"Contractual Obligation" means, as to any Person, any provision of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrowers' accounting practices, known to the Agent, which practices are in effect on the Closing Date as such calculated cost is determined from invoices received by the Borrowers, the Borrowers' purchase journals or the Borrowers' stock ledger. "Cost" does not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrowers' calculation of cost of goods sold.

"Credit Extensions" mean any Revolving Borrowing.

"Creditors' Committee" means any official committee of creditors formed, appointed or approved in the Bankruptcy Case pursuant to the Bankruptcy Code.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (iv) any other Person to whom Obligations under this Agreement and other Loan Documents are owing, and (v) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means (a) all reasonable out-of-pocket expenses incurred by the Agent and its Affiliates, in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agent, (B) outside consultants for the Agent, (C) appraisers, (D) commercial finance examiners, and (E) all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the syndication of the credit facilities provided for herein, (B) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (C) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to preserve, protect, collect, or enforce the Collateral or in connection with the Bankruptcy Case, or (D) any workout, restructuring or negotiations in respect of any Obligations; and (b) all reasonable out-of-pocket expenses incurred by the Credit Parties who are not the Agent or any Affiliate thereof, after the occurrence and during the continuance of an Event of Default.

"Crystal" means Crystal Financial LLC and its successors.

"Crystal Entity" means Crystal or any of its Affiliates.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties.  All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"Debtor[s]" means iGPS Company LLC, a Delaware limited liability company.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed to fund any portion of the Revolving Loans required to be funded by it hereunder within one Business Day of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Agent or any other Lender any other amount

required to be paid by it hereunder within one Business Day of the date when due, or (c) has, or whose holding company has, been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"Default Rate" means, when used with respect to Revolving Loans and other Obligations, an interest rate equal to the interest rate (including the Applicable Margin) otherwise applicable to such Revolving Loan or Obligations plus three percent (3%) per annum.

"Depot" means a physical location (other than one operated by a retailer, distributor or manufacturer, or a third party performing services on behalf or at the request of a retailer, distributor or manufacturer) at which Pallets are received and stored on behalf of a Borrower awaiting issue or transfer.

"Disposition" or "Dispose" means the sale, transfer, exclusive license, lease or other disposition (including any sale and leaseback transaction), whether in one transaction or in a series of transactions, of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Dollars" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States, any state thereof or the District of Columbia (excluding, for the avoidance of doubt, any Subsidiary organized under the laws of Puerto Rico or any other territory).

"DIP Orders" means and refers to the Interim Borrowing Order and the Final Borrowing Order.

"Disclosure Statement" means a disclosure statement filed in the Bankruptcy Case in connection with a Plan of Reorganization.

"Effect of Bankruptcy" means, with respect to any contractual obligation, contract or agreement to which a Loan Party is a party, any default or other legal consequences arising on account of the commencement or the filing of the Bankruptcy Case (including the implementation of any stay), or the rejection of any such contractual obligation, contract or agreement with the approval of the Bankruptcy Court if required under applicable law.

"Eligible Assignee" means (a) a Lender or any of its Affiliates or an Approved Fund, and (b) any other Person (other than a natural Person) approved by the Agent; provided that notwithstanding the foregoing, "Eligible Assignee" shall not include a Loan Party or any of their respective Affiliates or Subsidiaries.

"Eligible Damaged Pallets" means, as of the date of determination thereof, Pallets that would otherwise constitute Eligible Non-Damaged Pallets, but for the fact that such Pallets are damaged,

- 10 -

defective or unfit for sale or lease that are deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base.

"Eligible Lease" means a duly-executed rental, lease or similar agreement between a Borrower and a customer, pursuant to which such customer agrees to lease Pallets from such Borrower, and which the Agent, in its Permitted Discretion, deems to be an Eligible Lease. In no event shall any such lease be deemed an Eligible Lease if it constitutes cchattel ppaper.

"Eligible Non-Damaged Pallets" means, as of the date of determination thereof, Pallets consisting of rental pool pallets that are deemed by the Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Agent, complies with each of the representations and warranties respecting Pallets made by the Borrowers in the Loan Documents.   Except as otherwise agreed by the Agent, in its discretion, the following Pallets shall not be included in Eligible Non-Damaged Pallets:

(a)     Pallets that are not solely owned by a Borrower or as to which a Borrower does not have good and valid title thereto free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents, Liens securing the Pre-Petition Liabilities, and the rights of a customer leasing such Pallets pursuant to an Eligible Lease);

(b)     Pallets that are leased by or are on consignment to a Borrower or which is consigned by a Borrower to a Person which is not a Loan Party;

(c)     Pallets that are not located in the continental United States;

(d)     Pallets that are subject any warehouse receipt or negotiable document;

(e)     Pallets that are comprised of goods which (i) are damaged, defective, lost or otherwise unfit for sale or lease, (ii) are to be returned to the vendor, (iii) are obsolete or custom items, or that constitute samples, promotional, marketing, labels, bags and other packaging and shipping materials or supplies (other than Pallets) used or consumed in a Borrower's business, (iv) are not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Pallets, its use or sale or (v) constitute Hazardous Materials (other than decabromodiphenyl ether);

(f)     Pallets that are not subject to a perfected first-priority security interest in favor of the Agent;

(g)     Pallets that are not insured in compliance with the provisions of <u>Section 5.10</u> hereof;

(h)     Pallets that have been sold but not yet delivered or as to which a Borrower has accepted a deposit or down payment; or

(i)     Pallets that do not contain a bar code or a radio frequency identification sufficient to permit the reasonable determination of such Pallet's location; or

- 11 -

(j)      Pallets that are subject to a license that restricts the rights of the Agent or any Loan Party to dispose of such Pallet.

"Eligible Trade Receivables" means Accounts arising from the sale of Pallets or the lease of rental pool Pallets (including those Accounts consisting of basic periodic rent, issue and transfer fees, fuel surcharges, and out-of-network charges and other fees expressly payable pursuant to the terms of the lease agreement in respect of the Account, other than that portion of Accounts consisting of interest, security deposits, taxes, late charges, charges assessed for damages or lost pallets or warranty charges with respect to Pallets) that satisfy the following criteria at the time of creation and continue to meet the same at any time of determination: such Account (a) has been earned by performance and represents the bona fide amounts due to a Borrower from an account debtor, and, in each case, is originated in the ordinary course of business of such Borrower, and (b) in each case, is acceptable to the Agent in its Permitted Discretion.   Without limiting the foregoing, to qualify as an Eligible Trade Receivable, an Account shall indicate no Person other than a Borrower as payee or remittance party.  In determining the amount to be so included, the face amount of an Account shall be reduced by, to the extent not reflected in such face amount, (x) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that a Borrower may be obligated to rebate to a customer pursuant to the terms of any agreement or understanding (written or oral)) and (y) the aggregate amount of all cash received in respect of such Account but not yet applied by the Borrowers to reduce the amount of such Eligible Trade Receivable.   Eligible Trade Receivables shall also include the Borrower's weekly estimates reported to the Agent of unbilled Accounts which have actually been earned by performance (that is, such Account reflects revenues earned at rates dictated by customer contracts for (i) pallets issued to customers whereby the issues have been recorded in the Loan Parties' system and confirmed by delivered Bills of Lading, (ii) pallet transfers recorded in the Loan Parties' system through RFID or scanning, and (iii) pallet rental charges calculated based on the issue and transfer dates recorded in the foregoing clauses (i) and (ii) of this paragraph.  Unbilled Accounts will exclude self-correction revenue and manually billed items, which will only be included as Eligible Trade Receivables when invoiced to the customer), so long as (a) each weekly estimate is reconciled monthly in the Borrower's regular reporting to the Agent to the satisfaction of the Agent in its Permitted Discretion, and (b) all such estimated Accounts are subject to a "systems reserve" on the Borrowing Base, initially in an amount equal to ten percent (10%) of the estimated, unbilled accounts, or such greater or lesser percentage as the Agent may thereafter establish at any time, and from time to time, in its Permitted Discretion.  Except as otherwise agreed by the Agent, any Account included within any of the following categories shall not constitute an Eligible Trade Receivable:

(a)      Accounts that are not evidenced by an invoice from a Borrower to such account debtor;

(b)      Accounts that have been outstanding for more than the greater of (i) ninety (90) days from the invoice date, or (ii) a number of days equal to the payment terms granted such account debtor in the ordinary course of business consistent with past practices;

(c)      All Accounts owed by an account debtor and/or its Affiliates for which 25% or more of such Accounts are not Eligible Trade Receivables;

(d)      All Accounts owed by an account debtor and/or its Affiliates together exceeding 25%, or such higher amount as agreed by the Agent in its Permitted Discretion, of the amount of all Accounts at any one time (but the portion of the Accounts not in excess of such percentage may be deemed Eligible Trade Receivables, in the Agent's discretion);

(e)      Accounts (i) that are not subject to a perfected first-priority security interest in favor of the Agent, or (ii) with respect to which a Borrower does not have good and valid title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents);

(f)      Accounts which are disputed or with respect to which a claim, counterclaim, offset or chargeback has been asserted, but only to the extent of such dispute, counterclaim, offset or chargeback;

(g)      Accounts which arise out of any sale or lease (i) not made in the ordinary course of business, (ii) made on a basis other than upon credit terms usual to the business of the Borrowers or (iii) are not payable in Dollars;

(h)      Accounts which are owed by any account debtor whose principal place of business is not within the continental United States (i) except to the extent covered by credit insurance (calculated net of any deductibles or other retention by the Borrowers) in an amount, by an insurer and on terms reasonably acceptable to the Agent, or (ii) unless supported by an irrevocable letter of credit in an amount, from a financial institution and on terms reasonably acceptable to the Agent;

(i)      Accounts which are owed by any Affiliate or any employee of a Loan Party;

(j)      Accounts for which all consents, approvals or authorizations of, or registrations or declarations with any Governmental Authority required to be obtained, effected or given in connection with the performance of such Account by the account debtor or in connection with the enforcement of such Account by the Agent have not been duly obtained, effected or given and are not in full force and effect;

(k)      Accounts due from an account debtor which is the subject of any bankruptcy or insolvency proceeding, has had a trustee or receiver appointed for all or a substantial part of its property, has made an assignment for the benefit of creditors or has suspended its business;

(l)      Accounts due from any Governmental Authority except to the extent that the subject account debtor is the Federal Government of the United States and the Borrowers have complied with the Federal Assignment of Claims Act of 1940;

(m)      Accounts (i) owing from any Person that is also a supplier to, or creditor of, a Loan Party or any of its Subsidiaries unless such Person has waived any right of setoff in a manner acceptable to the

Agent or (ii) representing any manufacturer's or supplier's credits, discounts, incentive plans or similar arrangements entitling a Loan Party or any of its Subsidiaries to discounts on future purchase therefrom;

(n)     Accounts arising out of sales on a bill-and-hold, guaranteed sale, sale-or-return, sale on approval or consignment basis or subject to any right of return;

(o)     Accounts evidenced by a promissory note, chattel paper or other instrument or that arise out of a lease to customer that is not an Eligible Lease;

(p)     Accounts consisting of amounts due from vendors as rebates or allowances;

(q)     Accounts which are in excess of the credit limit for such account debtor established by the Borrowers in the ordinary course of business and consistent with past practices;

(r)     Accounts owed by an account debtor deemed by the Agent in its Permitted Discretion to not be creditworthy; and

(s)     Accounts which include extended payment terms (datings) granted in the ordinary course of business.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Loan Party or its Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"EPA Reserve" means an amount equal to the sum of 100% of the Total Outstandings advanced against Eligible Damaged Pallets, plus 10% of the Appraised Value of Eligible Non-Damaged Pallets.  The EPA Reserve will be released following the ratification of the of United States Environmental Protection Agent's Toxic Substances Control Act (the "TSCA") and the Agent's determination, in its sole discretion and interpretation of the TSCA, that the TSCA and any applicable Laws related thereto do not limit the Loan Parties' ability to recycle Eligible Damaged Pallets into new Pallets as part of their ongoing business practices.

"EPC" means epcSolutions, Inc., a Delaware corporation.

- 14 -

"EPC Documents" means, collectively, (a) that certain Software Maintenance and Support Agreement dated August 22, 2008, (b) that certain Agreement Granting Right to Sublicense to End-Users dated as of August 22, 2008, (c) that certain Software Development and Reservation of Rights Agreement dated as of August 22, 2008, (d) that certain Software License Agreement dated August 22, 2008, each of the foregoing, between EPC and iGPS, and (e) each other agreement, document, contract or instrument entered into by the Lead Borrower and/or the Debtor and EPC in connection with the transactions set forth in such agreements, whether now or hereafter existing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or non-voting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with a Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by a Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Loan Party or any ERISA Affiliate.

"Event of Default" has the meaning specified in Section 8.01.   An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01 hereof.

"Excluded Taxes" means, with respect to the Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Loan Party is located and (c) any United States federal, state or local backup withholding tax, and (d) any United States federal withholding tax imposed under FATCA.

"Executive Order" has the meaning set forth in Section 10.17.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Loan Party on account of

(a)       any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party;

(b)       any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset of a Loan Party, unless the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Agent;

(c)       the issuance by a Loan Party of any Equity Interests, other than any such issuance of Equity Interests (i) to a Loan Party, or (ii) as a compensatory issuance to any employee, director, or consultant (including under any option plan);

(d)       the incurrence by a Loan Party of any Indebtedness for borrowed money other than Permitted Indebtedness;

(e)       tax refunds, pension plan reversions, indemnity payments and any purchase price adjustments; or

(f)       proceeds of any settlements, judgments, arbitrations or similar matters.

"Facility Guaranty" means a Guaranty made by the Guarantors in favor of the Agent and the other Credit Parties, in form reasonably satisfactory to the Agent.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to

comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%), as determined by the Agent, charged to such reference bank(s) as the Agent may determine on such day on such transactions.

"Final Borrowing Order" means an order of the Bankruptcy Court which order shall be in form, scope and substance reasonably acceptable to the Required Lenders, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Obligations, grant Liens under this Agreement, the other Loan Documents, and the DIP Orders, and provides for the super priority of the Agents' and the Lenders' claims, which order is a Final Order.

"Final Order" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Clerk of the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal or seek leave to appeal, petition for certiorari, reargue or seek rehearing has expired and no proceeding for certiorari, reargument or rehearing is pending or if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing was sought, or certiorari has been denied and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"Fiscal Month" means any fiscal month of any Fiscal Year, which month shall generally end on the last day of each calendar month in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Quarter" means any fiscal quarter of any Fiscal Year, which quarters shall generally end on the last day of each March, June, September and December of such Fiscal Year in accordance with the fiscal accounting calendar of the Loan Parties.

"Fiscal Year" means any period of twelve consecutive months ending on December 31st of any calendar year.

"Foreign Asset Control Regulations" has the meaning set forth in Section 10.17.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means each Subsidiary of the Lead Borrower (other than a Borrower) that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.11.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates,

asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"i-Depot" means a physical location operated by a retailer, distributor or manufacturer, or a third party performing services on behalf of a retailer, distributor or manufacturer, at which Pallets are received and stored on behalf of Borrower while awaiting issue or transfer.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)     the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     net obligations of such Person under any hedging agreement or swap arrangement;

(d)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not outstanding for more than 60 days or past due);

(e)     indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)     all Attributable Indebtedness of such Person;

(g)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person, or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitees" has the meaning specified in <u>Section 10.04(b)</u>.

"Independent Consultant" means Winter Harbor or another independent third party consultant reasonably acceptable to the Agent.

"Information" has the meaning specified in <u>Section 10.07</u>.

"Intellectual Property" means all present and future:  trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Interest Payment Date" means, as to any Revolving Loan, the first Business Day of each month and the Termination Date.

"Interest Period" means, as to each Revolving Loan, the period commencing on the first day of each calendar month and ending on the last day of such calendar month, <u>provided</u> that no Interest Period shall extend beyond the Termination Date.

"Interim Borrowing Order" means an order entered by the Bankruptcy Court, in form and substance acceptable to the Agent and the Required Lenders, approving, on an interim basis, the Loan Parties' entering into and performing their obligations under this Agreement and the other Loan Documents.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Lead Borrower's and/or its Subsidiaries' internal controls over financial reporting.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any other investment of money or capital.  For purposes of covenant compliance, the amount of any Investment shall be the amount

- 20 -

actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"Joinder Agreement" means an agreement, in form satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as the Agent may determine.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case, whether or not having the force of law.

"Lead Borrower" has the meaning specified in the introductory paragraph hereto.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any real property for any period of time.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means, as to any Lender, the office or offices as such Lender may from time to time notify the Lead Borrower and the Agent.

"LIBOR Rate" means, for any Interest Period with respect to any Revolving Loan outstanding, as applicable, the rate of interest per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) published in the "Money Rates" section of The Wall Street Journal as the London interbank offered rate for deposits in Dollars on the date which is two (2) Business Days prior to the commencement of such Interest Period (or, if more than one rate is published, then the highest of such rates) for a term of three months, or if such "Money Rates" section is unavailable for any reason on such date, the rate of interest determined by the Agent to be the average (rounded upward, if necessary, to the nearest 1/100th of 1%) of the rates per annum at which deposits in U.S. dollars are offered to such reference banks by other reference banks as the Agent determines in the London interbank market as of 10:00 a.m. two (2) Business Days prior to the first day in such Interest Period for a three month term and in an amount comparable to the amount of the applicable Revolving Loan.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other

title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidation" means the exercise by the Agent of those rights and remedies accorded to the Agent under the Loan Documents and applicable Laws as a creditor of the Loan Parties with respect to the realization on the Collateral, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agent, of any public, private or other similar sale or any other disposition of the Collateral for the purpose of liquidating the Collateral.  Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Loan Account" has the meaning assigned to such term in Section 2.09(a).

"Loan Cap" means, at any time of determination, the lesser of (a) the Aggregate Commitments and (b) the Borrowing Base.

"Loan Documents" means this Agreement, each Note, all Borrowing Base Certificates, the Security Documents, the Facility Guaranty, each Collateral Access Agreement, and any other instrument or agreement now or hereafter executed and delivered in connection herewith.

"Loan Parties" means, collectively, each Borrower and each Guarantor.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties (including, without limitation, any material adverse change in the value of Pallets beyond what is already addressed through Reserves), liabilities (actual or contingent), condition (financial or otherwise) or prospects of any Loan Party or of the Lead Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material impairment of the rights and remedies of the Agent or the Lenders under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party. In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other than existing events would result in a Material Adverse Effect.  Notwithstanding anything to the contrary, a "Material Adverse Effect" shall not be deemed to exist as a result of the Effect of Bankruptcy or the events leading up to and resulting therefrom.

"Material Contract" means, with respect to the Loan Parties or any Subsidiary thereof, the AIM Documents, the EPC Documents, the Ryder Documents,  each agreement of a Loan Party in respect of a Depot and each other contract to which such Person is a party material to the business, condition (financial or otherwise), operations, performance properties or prospects of such Person.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $500,000. For purposes of determining the amount of Material Indebtedness at any time, (a) undrawn committed or available amounts shall be included, and (b) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maximum Rate" has the meaning provided therefor in <u>Section 10.09</u>.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Proceeds" means with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any other Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates)) and (C) to fund an escrow account, subject to a Lien in favor of the Agent, for reasonably anticipated income taxes to be paid in connection with any such Disposition or Extraordinary Receipt; <u>provided</u> that any excess amount set forth in such account after the payment of such income taxes shall constitute Net Proceeds and shall be used to repay the Obligations; and

(b)     with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness for borrowed money by any Loan Party or any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"Note" means a promissory note made by the Borrowers in favor of a Lender evidencing Revolving Loans made by such Lender, substantially in the form of Exhibit B, as each may be amended, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Revolving Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees, costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees costs, expenses and indemnities are allowed claims in such proceeding.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-United States jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity; and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Outstanding Amount" means, at any time of determination, the then aggregate outstanding principal amount of Revolving Loans.

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Pallet" means a pallet and any other device for carrying, supporting or handling ggoods, including devices attached to such pallets or Goods, such as bar codes and radio frequency identification devices, in each case, owned by a Loan Party.

"Pallet Reserves" means such reserves as may be established from time to time by the Agent in its discretion with respect to the determination of the saleability, Eligible Damaged Pallets and Eligible Non-Damaged Pallets, which reflect such other factors as affect the market value of the such Pallets or

which reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Pallets.

"Participant" has the meaning specified in Section 10.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Discretion" means a determination made by the Agent in the exercise of its reasonable credit judgment, exercised in good faith.

"Permitted Disposition" means any of the following:

(a)      leases of Pallets in the ordinary course of business;

(b)      non-exclusive licenses of Intellectual Property of a Loan Party or any of its Subsidiaries in the ordinary course of business;

(c)      Dispositions of Equipment in the ordinary course of business that is substantially worn, damaged, obsolete or, in the judgment of a Loan Party, no longer useful or necessary in its business or that of any Subsidiary having an aggregate fair market value not in excess of $10,000 in any Fiscal Year;

(d)      sales, transfers and dispositions among the Loan Parties or by any Subsidiary to a Loan Party; and

(e)      sales, transfers and dispositions of Pallets so long as the Net Proceeds received in respect of such sale, transfers and dispositions exceed the amount of Availability attributable to such Pallets.

"Permitted Encumbrances" means:

(a)      Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Laws, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in compliance with Section 6.04;

(c)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d)    deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)    Liens in respect of judgments that would not constitute an Event of Default hereunder;

(f)    easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property;

(g)    Liens existing on the Closing Date listed on Schedule 7.01;

(h)    Liens in favor of the Agent;

(i)    landlords' and lessors' statutory Liens in respect of rent not in default;

(j)    possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the Closing Date and other Permitted Investments, provided that such liens (i) attach only to such Investments and (ii) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(k)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, Liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(l)    [Reserved]

(m)    Liens arising from precautionary UCC filings regarding "true" operating leases; and

(n)    Liens securing Pre-Petition Liabilities, subject at all times to the DIP Orders.

"Permitted Indebtedness" means each of the following:

(a)    Indebtedness outstanding on the Closing Date listed on Schedule 7.03;

(b)      (i) Subordinated Indebtedness (Overdrawn) in an aggregate principal amount not to exceed the amount required to make any payment pursuant to Section 2.04(b) and (ii) Subordinated Indebtedness (Variance) in an aggregate principal amount not to exceed $2,000,000;

(c)      Indebtedness under hedging agreements that are incurred for the bona fide purpose of hedging the interest rate or foreign currency risk associated with the Loan Parties' operations and not for speculative purposes;

(d)      Indebtedness of any Loan Party to any other Loan Party;

(e)      contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business in connection with the construction or improvement of the Loan Party's properties;

(f)      the Obligations; and

(g)      the Pre-Petition Liabilities.

"Permitted Investments" means each of the following:

(a)      readily marketable obligations issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States is pledged in support thereof;

(b)      commercial paper issued by any Person organized under the laws of any state of the United States and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)      time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (b) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d)      fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above or with any primary dealer and having a market value at the time that such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such counterparty entity with whom such repurchase agreement has been entered into;

(e)      Investments, classified in accordance with GAAP as current assets of the Loan Parties, in any money market fund, mutual fund, or other investment companies that are registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and which invest solely in one or more of the types of securities described in clauses (a) through (d) above;

(f)      Investments existing on the Closing Date set forth on Schedule 7.02, but not any increase in the amount thereof or any other modification of the terms thereof;

(g)      (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Closing Date, and (ii) additional Investments by any Loan Party and its Subsidiaries in Loan Parties;

(h)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(i)      Guarantees constituting Permitted Indebtedness;

(j)      Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case, in the ordinary course of business; and

(k)      advances to officers, directors and employees of the Loan Parties and Subsidiaries in the ordinary course of business in an amount not to exceed $10,000 to any individual at any time or in an aggregate amount not to exceed $25,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes, it being agreed that these advances do not include corporate credit card charges incurred in the ordinary course of business by officers, directors, or employees;

provided, however, that notwithstanding the foregoing, no such Investments specified in clauses (a) through (e) shall be permitted unless no Revolving Loans are then outstanding and Availability is greater than $0.00, and any such Investments shall be pledged to the Agent as additional collateral for the Obligations pursuant to such agreements as may be reasonably required by the Agent.

"Permitted Overadvance" means an Overadvance made by the Agent, in its discretion, which:

(a)      is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties;

(b)      is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation;

(c)      is an Unintentional Overadvance; or

- 28 -

(d)        is made to pay any other amount chargeable to any Loan Party hereunder.

provided however, that the foregoing shall not result in any claim or liability against the Agent (regardless of the amount of any Overadvance) for Unintentional Overadvance.

"Permitted Sale" means (a) the disposition of any furniture, fixture or equipment that is no longer used or useful in the business of the Lead Borrower and its Subsidiaries, (b) the sale of all or substantially all of the Loan Parties' assets as a going concern in a single transaction or series of related transactions as approved by the Bankruptcy Court pursuant to the applicable provisions of the Bankruptcy Code, or other applicable law; provided that any such going concern sale shall be for cash consideration in an amount in excess of all outstanding Obligations, which amount shall be paid to the Agent for application to the Obligations, or Liabilities, or (c) dispositions in connection with the liquidation of the Loan Parties' Pallets by one or more independent, nationally recognized, professional inventory liquidation firms, reasonably acceptable to the Agent, which transaction shall be on terms reasonably satisfactory to the Agent and Required Lenders and approved by the Bankruptcy Court to the extent required by applicable law.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" means June 4, 2013

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by a Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Plan of Reorganization" means a plan filed in the Bankruptcy Case pursuant to Chapter 11 of the Bankruptcy Code.

"Pre-Petition Credit Agreement" means that certain Loan and Security Agreement, dated as of November 24, 2009 (as amended, restated, supplemented or otherwise modified prior to the Closing Date), by and among, among others, the Lead Borrower and Bank of America, N.A., as Administrative Agent and Collateral Agent."

"Pre-Petition Liabilities" means the "Secured Obligations" as defined in the Pre-Petition Credit Agreement.

"Professional Fee Carve Out" means the "Carve Out" as defined in a DIP Order.

"Professional Fee Carve Out Reserve" means a Reserve equal to the maximum possible amount of the Professional Fee Carve Out, it being agreed that if interim professional fee applications are allowed by the Bankruptcy Court and paid by the Borrower during the Bankruptcy Case, then the amount of the Professional Fee Carve Out and the amount of the Professional Fee Carve Out Reserve shall be correspondingly reduced.

"Professional Fees and Expenses" means, subject to any limitations contained in the DIP Orders, (a) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6), and (b) professional fees of, and costs and expenses incurred by, Case Professionals.

"PTM" means Plasticos Technicos Mexicanos.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Receivables Reserves" means such Reserves as may be established from time to time by the Agent in the Agent's Permitted Discretion with respect to the determination of the collectability in the ordinary course of Eligible Trade Receivables, including, without limitation, on account of dilution.

"Register" has the meaning specified in Section 10.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reports" has the meaning provided in Section 9.11(a).

"Required Lenders" means, as of any date of determination, Lenders holding more than 50% of the Aggregate Commitments, or if the Commitment of each Lender to make Revolving Loans has been terminated, Lenders holding in the aggregate more than 50% of the Total Outstandings; provided that the Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Reserves" means all Availability Reserves, Pallet Reserves and Receivables Reserves. The Agent shall have the right, at any time and from time to time after the Closing Date in its reasonable discretion, exercised in good faith, to establish, modify or eliminate Reserves.

"Responsible Officer" means the chief executive officer, president or chief financial officer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

- 30 -

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, "Restricted Payments" with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

"Revolving Borrowing" means a borrowing of a Revolving Loan pursuant to ARTICLE II.

"Revolving Credit Facility" means the facility established pursuant to this Agreement for the making of Revolving Loans.

"Revolving Credit Facility Applicable Percentage" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitment Commitments represented by such Lender's Commitment at such time.  If the commitment of each Lender to make Revolving Loans has been terminated pursuant to Section 2.05 or Section 8.02 or if the Aggregate Commitment Commitments have expired, then the Revolving Credit Facility Applicable Percentage of each Lender shall be determined based on the Revolving Credit Facility Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments.

"Revolving Loan" has the meaning specified in Section 2.01.

"Revolving Loan Notice" means a notice of a Revolving Borrowing, pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A.

"Ryder" means Ryder Integrated Logistics, Inc., a Delaware corporation.

"Ryder Documents" means each agreement, document, contract or instrument entered into in connection with the transactions set forth in the Standard Terms and Conditions, as amended, dated June 14, 2006, between (x) the Debtor and/or the Lead Borrower and (y) Ryder, whether now or hereafter existing.

"Sale Order" has the meaning provided in Section 6.21.

"Sale Order Motion" has the meaning provided in Section 6.21.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"SAS" means SAS Services B.V., a company formed under the laws of The Netherlands and its Affiliates.

"Security Agreement" means the Security Agreement dated as of the Closing Date among the Loan Parties and the Agent.

"Security Documents" means (a) the Security Agreement, the Blocked Account Agreements, and the documents executed in connection therewith, and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations and (b) the DIP Orders.

"Settlement Date" has the meaning provided in Section 2.12(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Lead Borrower and its Subsidiaries as of that date determined in accordance with GAAP.

"Stalking Horse Bid" means a bid or bids to purchase substantially all of the assets of the Loan Parties pursuant to a Permitted Sale upon terms and conditions acceptable to the Agent in its discretion, which bid(s) the Lead Borrower accepts as the so called "stalking horse bid" pursuant to the Bidding Procedures Order.

"Stalking Horse Bidder" means one or more independent purchasers reasonably acceptable to the Agent; it being agreed that Balmoral Funds LLC or a Person Controlled thereby is acceptable to the Agent.

"Subordinated Indebtedness (Overdrawn)" means any unsecured Indebtedness of a Loan Party or its Subsidiaries incurred from time to time that is subordinated in right of payment to the Obligations, the proceeds of which are used solely to make any payment required by Section 2.04(b) and (a) that is only guaranteed by the Guarantors, (b) that is not subject to scheduled amortization, redemption, sinking fund or similar payment and does not have a final maturity, in each case, on or before the date that is six months after the Termination Date, (c) that does not include any financial covenants or any covenant or agreement that is more restrictive or onerous on any Loan Party in any material respect than any comparable covenant in the Agreement and (d) is otherwise on terms and conditions reasonably acceptable to Agent, (d) shall be limited to cross-payment default and cross-acceleration to designated "senior debt" (including the Obligations"), and (e) the terms and conditions of the subordination are reasonably acceptable to the Agent.

"Subordinated Indebtedness (Variance)" means any unsecured Indebtedness of a Loan Party or its Subsidiaries in an aggregate principal amount not to exceed $2,000,000 incurred from time to time that is subordinated in right of payment to the Obligations, the proceeds of which are used solely to cure any Default or Event of Default resulting from the failure of the Loan Parties to comply with Section 6.20 and (a) that is only guaranteed by the Guarantors, (b) that is not subject to scheduled amortization, redemption, sinking fund or similar payment and does not have a final maturity, in each case, on or before the date that is six months after the Termination Date, (c) that does not include any financial covenants or any covenant or agreement that is more restrictive or onerous on any Loan Party in any material respect than any comparable covenant in the Agreement and (d) is otherwise on terms and

conditions reasonably acceptable to Agent, (d) shall be limited to cross-payment default and cross-acceleration to designated "senior debt" (including the Obligations"), and (e) the terms and conditions of the subordination are reasonably acceptable to the Agent.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Lead Borrower.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (a) August 30, 2013, (b) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Aggregate Commitments are irrevocably terminated (or deemed terminated) in accordance with ARTICLE VIII, (c) the termination of the Commitments in accordance with the provisions of Section 2.05 hereof, (d) the date which is thirty (30) days following the Closing Date, unless a Final Borrowing Order has been entered on or prior to such date, (e) a disposition of all or substantially all of the Loan Parties' assets under Section 363 of the Bankruptcy Code, or (f) the Consummation Date.

"Total Outstandings" means the aggregate Outstanding Amount of all Revolving Loans under this Agreement.

"Trading with the Enemy Act" has the meaning set forth in Section 10.17.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in

such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UFCA " has the meaning specified in <u>Section 10.20(d)</u>.

"UFTA" has the meaning specified in <u>Section 10.20(d)</u>.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base, a change in eligibility criteria, Reserves, or a misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

"Variance Report" means a report prepared by the Lead Borrower's management reflecting on a line-item basis the Loan Parties' actual performance compared to the Budget for the immediately preceding four week period and on a cumulative basis for the period after the Closing Date and the percentage variance of the Loan Parties' actual results from those reflected in the then existing Budget, along with management's explanation of such variance.

"Winter Harbor" means Winter Harbor LLC, as chief restructuring officer of the Borrowers.

**1.02    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "<u>include</u>," "<u>includes</u>" and "<u>including</u>" shall be deemed to be followed by the phrase "without limitation."  The word "<u>will</u>" shall be construed to have the same meaning and effect as the word "<u>shall</u>."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "<u>herein</u>," "<u>hereof</u>" and "<u>hereunder</u>," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any

particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory rules, regulations, orders and provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds of all of the Obligations other than unasserted contingent indemnification Obligations.

**1.03    Accounting Terms.**

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time.

(b)    Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Lead Borrower or the Required Lenders shall so request, the Agent, the Lenders and the Lead Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04    Rounding**.  Any financial ratios required to be maintained by the Loan Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component,

carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05    Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**ARTICLE II**
**THE COMMITMENTS AND CREDIT EXTENSIONS**

**2.01    Revolving Loans.**

(a)    Subject to the terms and conditions set forth herein, including Section 2.01(c) hereof, each Lender severally agrees to make loans (each such loan, a "Revolving Loan") to the Borrowers from time to time during the Availability Period in an aggregate amount not to exceed at any time outstanding the lesser of (x) the amount of such Lender's Commitment, or (y) such Lender's Revolving Credit Facility Applicable Percentage of the Borrowing Base; subject in each case to the following limitations:

(i)    after giving effect to any Revolving Borrowing, the Total Outstandings shall not exceed the Loan Cap, and

(ii)    after giving effect to any Revolving Borrowing, such Lender's Revolving Credit Facility Applicable Percentage of the Total Outstandings shall not exceed such Lender's Commitment.

(b)    [Reserved].

(c)    The advance rates set forth in the Borrowing Base may be increased or decreased by the Agent at any time and from time to time in its Permitted Discretion based on the Agent's review of updated field examinations, collateral appraisals or evaluations, historical rates of dilution, changes in chargeoff rates and other like metrics.  Each Borrower consents to any such increases or decreases and acknowledges that decreasing such advance rates or increasing or imposing any Reserves may limit or restrict the amounts available to be borrowed hereunder.  The rights of the Agent to increase advance rates hereunder are subject to the provisions of Section 10.01 hereof.  The Agent shall use commercially reasonable efforts to notify the Lead Borrower of any increase or decrease in any advance rate or the establishment or modification of any Reserves under this Agreement and shall disclose to the Lead Borrower the basis for any decrease in any advance rate or the establishment or increase of any Reserves; provided that neither the Agent nor any other Credit Party shall have any liability for failure to so notify the Borrowers of any such changes (or the basis for any such changes), and any such changes by the Agent shall be effective from the date such changes are made by the Agent regardless of whether or when communicated to the Lead Borrower.

(d)     Within the limits of each Lender's Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow under Section 2.01(a), prepay under Section 2.04, and re-borrow under Section 2.01(a).

**2.02     Revolving Borrowings**.

(a)     Each Revolving Borrowing shall be made upon the Lead Borrower's irrevocable notice to the Agent by delivery to the Agent of a written Revolving Loan Notice, which must be received by the Agent not later than 12:00 p.m. on the date which is at least two (2) Business Days prior to the requested date of such Revolving Borrowing (each, a "2-Day Advance"); provided that the Lead Borrower may request a Revolving Borrowing not later than 12 p.m. on a Business Day to be made on that same day if the amount of such requested Revolving Borrowing is not more than the total cash receipts received by the Agent on such requested advance date (each, a "Same Day Advance").  Each Revolving Borrowing which is a 2-Day Advance shall be in a principal amount of $100,000 or a whole multiple of $100,000 in excess thereof.  Each Revolving Loan Notice shall specify (i) the requested date of the Revolving Borrowing (which must be a Business Day), and (ii) the principal amount of Revolving Loans to be borrowed.  The Lead Borrower may request up to three (3) 2-Day Advances in any fiscal week, and no more than one (1) Same Day Advance on any Business Day.

(b)     Following receipt of a Revolving Loan Notice and upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Revolving Borrowing is the initial Credit Extension, Section 4.01), the Agent shall use reasonable efforts to make all funds so requested available to the Borrowers by no later than 6:00 p.m. by wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Agent by the Lead Borrower.

(c)     The Agent, without the request of the Loan Parties, may advance any interest, fee, service charge (including direct wire fees), expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account as a Revolving Loan notwithstanding that an Overadvance may result thereby.  The Agent shall use commercially reasonable efforts to advise the Lead Borrower of any such advance or charge promptly after the making thereof.  Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrowers' obligations under Section 2.04.  Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(c) shall bear interest at the interest rate then and thereafter applicable to Revolving Loans.

(d)     The Agent and the Lenders shall have no obligation to make any Revolving Loan if an Overadvance would result.  The Agent may, in its discretion, make Permitted Overadvances without the consent of the Borrowers and the Lenders, and the Borrowers and each Lender shall be bound thereby.  Any Permitted Overadvance shall constitute a Revolving Loan and an Obligation, shall accrue interest at the Default Rate and shall be repaid by the Borrowers in accordance with the provisions of Section 2.04.  The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding.  The Agent shall have no liability for, and no Loan

Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvances.

**2.03**     **Reserved**.

**2.04**     **Repayments and Prepayments**.

(a)     The Borrowers may at any time or from time to time voluntarily prepay Revolving Loans in whole or in part; <u>provided</u> that (i) such notice must be received by the Agent not later than 11:00 a.m. on the date of prepayment of the Revolving Loans; and (ii) any prepayment of Revolving Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Each such notice shall specify the date and amount of such prepayment.  The Agent will promptly notify each applicable Lender of its receipt of each such notice, and of the amount of such Lender's Revolving Credit Facility Applicable Percentage of such prepayment.  If such notice is given by the Lead Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Each such prepayment shall be applied to the applicable Revolving Loans of the Lenders in accordance with their respective Revolving Credit Facility Applicable Percentages.

(b)     If for any reason the Total Outstandings at any time exceed the Loan Cap as then in effect, the Borrowers shall immediately repay the Revolving Loans in an aggregate amount equal to such excess.

(c)     On each Business Day, the Borrowers shall repay the Revolving Loans with all funds required to be deposited in the Collection Account in accordance Section 6.12 hereof.

(d)     The Borrowers shall repay to the Lenders on the Termination Date all Obligations outstanding on such date (other than contingent indemnification claims for which a claim has not been asserted).

**2.05**     **Termination or Reduction of Aggregate Commitments.**

(a)     The Borrowers may, upon notice from the Lead Borrower to the Agent, terminate the Aggregate Commitments or from time to time permanently reduce the Aggregate Commitments; <u>provided</u> that (i) any such notice shall be received by the Agent not later than 11:00 a.m. five Business Days prior to the date of termination or reduction, and (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $500,000 in excess thereof.

(b)     The Agent will promptly notify the Lenders of any termination or reduction of the Aggregate Commitments under this Section 2.05.  Upon any reduction of the Aggregate Commitments, the Commitment of each Lender shall be reduced by such Lender's Revolving Credit Facility Applicable Percentage of such reduction amount.  If, as a result of such termination or reduction, the Revolving Loans hereunder would exceed the Aggregate Commitments, the Borrowers shall contemporaneously with such reduction or termination, pay the Agent an amount equal to such excess.

**2.06    Interest**.

(a)    Subject to the provisions of <u>Section 2.06(b)</u> below, each Revolving Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the LIBOR Rate for such Interest Period <u>plus</u> the Applicable Margin.

(b)    If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by Law.

(i)    If any other Event of Default exists, then the Agent may, and upon the request of the Required Lenders shall, notify the Lead Borrower that all outstanding Obligations shall bear interest retroactively from the date such Default arose at a fluctuating interest rate per annum at all times equal to the Default Rate and such Obligations shall bear interest retroactively from the date such Default arose at the Default Rate to the fullest extent permitted by Law.

(ii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Except as provided in <u>Section 2.06(b)(ii)</u>, interest on each Revolving Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

**2.07    Fees.**

(a)    <u>Closing Fee</u>.  The Borrowers shall pay to the Agent, for its own account, a closing fee equal to $775,000 (the "Closing Fee"), which Closing Fee shall be fully earned on the Closing Date and shall be payable in two installments:

(i)    the first installment of the Closing Fee in the amount of $465,000 shall be paid on the Closing Date; <u>provided</u> that $310,000 of such fee shall be returned to the Borrowers if the Agent or an Affiliate thereof provides financing to the purchaser in connection with the acquisition of all or substantially all of the Loan Parties' assets pursuant to Section 363 of the Bankruptcy Code substantially contemporaneously with the funding of such financing; and

(ii)    the second installment of the Closing Fee in the amount of $310,000 shall be paid on the Termination Date, which installment shall be waived if the Agent or an Affiliate thereof provides financing to the purchaser in connection with the acquisition of all or substantially all of the Loan Parties' assets pursuant to Section 363 of the Bankruptcy Code.

(b)    Commitment Fee.  The Borrowers shall pay to the Agent for the account of each Lender in accordance with its Revolving Credit Facility Applicable Percentage, a commitment fee equal to 0.75% per annum *multiplied by* the actual daily amount by which the Aggregate Commitments exceed the Total Outstandings during the immediately preceding month.  The commitment fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable monthly in arrears on the first day of each month, commencing with the first such date to occur after the Closing Date, and on the last day of the Availability Period.

(c)    All fees set forth in this Section 2.07 shall be fully earned when paid except with respect to clause (a) above and shall not be refundable for any reason whatsoever.

**2.08    Computation of Interest and Fees.**  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on each Revolving Loan for the day on which the Revolving Loan is made, and shall not accrue on a Revolving Loan, or any portion thereof for the day on which the Revolving Loan is paid, underlined provided that any Revolving Loan that is repaid on the same day on which it is made shall, subject to Section 2.10(a), bear interest for one day.  Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.09    Evidence of Debt**.

The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "Loan Account") in the ordinary course of business.  In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Revolving Loan from such Lender, each payment and prepayment of principal of any such Revolving Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender.  The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Agent, the Borrowers shall execute and deliver to such Lender (through the Agent) one or more Notes, which shall evidence such Lender's Revolving Loans, in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Revolving Loans, and payments with respect thereto.  Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

**2.10    Payments Generally; Agent's Clawback**.

(a)     General.  All payments to be made by the Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  The Agent will promptly distribute to each Lender its Revolving Credit Facility Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Agent after 2:00 p.m. shall, at the option of the Agent, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(i)     Funding by Lenders; Presumption by Agent.  Unless the Agent shall have received notice from a Lender prior to  12:00 noon on the date of such Revolving Borrowing that such Lender will not make available to the Agent such Lender's share of such Revolving Borrowing, the Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Revolving Borrowing available to the Agent, then the applicable Lender and the Borrowers severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Revolving  Loans.  If the Borrowers and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays its share of the applicable Revolving Borrowing to the Agent, then the amount so paid shall constitute such Lender's Revolving Loan included in such Revolving Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Agent.

(ii)     Payments by Borrowers; Presumptions by Agent.  Unless the Agent shall have received notice from the Lead Borrower prior to the time at which any payment is due to the Agent for the account of any of the Lenders hereunder that the Borrowers will not make such payment, the Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment,

- 41 -

then each of the Lenders severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation.

A notice from the Agent to any Lender or the Lead Borrower with respect to any amount owing under this Section 2.10(a) shall be conclusive, absent manifest error.

(b)      Failure to Satisfy Conditions Precedent.   If any Lender makes available to the Agent funds for any Revolving Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrowers by the Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of Section 4.02 hereof), the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(c)      Obligations of Lenders Several.   The obligations of the Lenders hereunder to make Revolving Loans and to make payments hereunder are several and not joint.  The failure of any Lender to make any Revolving Loan or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its applicable Revolving Loan or to make its payment hereunder.

(d)      Funding Source.   Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Revolving Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Revolving Loan in any particular place or manner.

**2.11    Sharing of Payments by Lenders**.  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in such Credit Party's receiving payment of a proportion of the aggregate amount of such Obligations greater than its pro rata share thereof as provided herein (including as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Credit Parties, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided that:

(i)      if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Revolving Loans to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**2.12    Settlement Amongst Lenders.**

(a)     The amount of each Lender's Revolving Credit Facility Applicable Percentage of outstanding Revolving Loans shall be computed weekly, on Thursday of each week as of the close of business on the immediately preceding Wednesday (or more frequently in the Agent's discretion) and shall be adjusted upward or downward based on all Revolving Loans and repayments of Revolving Loans received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Agent.

(b)     The Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Revolving Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Agent shall transfer to each Lender its Revolving Credit Facility Applicable Percentage of repayments, and (ii) each Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Revolving Loans made by each Lender shall be equal to such Lender's Revolving Credit Facility Applicable Percentage of all Revolving Loans outstanding as of such Settlement Date.  If the summary statement requires transfers to be made to the Agent by the Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day. The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent.  If and to the extent any Lender shall not have so made its transfer to the Agent, such Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

**ARTICLE III**
**TAXES, YIELD PROTECTION AND ILLEGALITY; APPOINTMENT OF LEAD BORROWER**

**3.01    Taxes**.

(a)     <u>Payments Free of Taxes</u>.   Any and all payments by or on account of any obligation of the Borrowers hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, <u>provided</u> that if the Borrowers shall be required by Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the applicable Credit Party receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrowers shall make such deductions and (iii) the Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with Law.

(b)     <u>Payment of Other Taxes by the Borrowers</u>.   Without limiting the provisions of subsection <u>(a)</u> above, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Law.

(c)     <u>Indemnification by the Loan Parties</u>.   The Loan Parties shall indemnify each Credit Party, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by such Credit Party and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Lead Borrower by a Credit Party (with a copy to the Agent), or by the Agent on its own behalf or on behalf of any Credit Party, shall be conclusive absent manifest error.

(d)     <u>Evidence of Payments</u>.   As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrowers to a Governmental Authority, the Lead Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(e)     <u>Treatment of Certain Refunds</u>.   If any Credit Party determines that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Borrowers have paid additional amounts pursuant to this Section, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of such Credit Party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u> that the Loan Parties, upon the request of such Credit Party, agree to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Credit Party in the event that such Credit Party is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require

any Credit Party to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Loan Parties or any other Person.

**3.02    Illegality**.   If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to determine or charge interest rates based upon the LIBOR Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Lead Borrower through the Agent, all Revolving Loans of such Lender shall accrue interest at the Base Rate plus the Applicable Margin.

**3.03    Inability to Determine Rates**.   If the Agent determines that for any reason in connection with any request for a Revolving Loan that adequate and reasonable means do not exist for determining the LIBOR Rate for any requested Interest Period with respect to a Revolving Loan, the Agent will promptly so notify the Lead Borrower and each Lender.   Thereafter, for so long as the LIBOR Rate cannot be determined, all Revolving Loans shall accrue interest at the Base Rate plus the Applicable Margin.

**3.04    Increased Costs.**

(a)      <u>Increased Costs Generally</u>.   If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)      subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Revolving Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by <u>Section 3.01</u> and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

(iii)      impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Revolving Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any such Revolving Loan (or of maintaining its obligation to make any such Revolving Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Loan Parties will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)      <u>Capital Requirements</u>.   If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this

Agreement, the Commitments of such Lender or the Revolving Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Loan Parties will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.   A certificate of a Lender setting forth the calculation of the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Lead Borrower shall be conclusive absent manifest error.  The Loan Parties shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Delay in Requests.   Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Loan Parties shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Lead Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**3.05    Mitigation Obligations.**

If any Lender requests compensation under Section 3.04, or the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Revolving Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**3.06    Survival.**  All of the Borrowers' obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

**3.07    Designation of Lead Borrower as Borrowers' Agent.**

(a)     Each Borrower hereby irrevocably designates and appoints the Lead Borrower as such Borrower's agent to obtain Credit Extensions, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement.  As the disclosed principal for its agent, each Borrower shall be obligated to each Credit Party on account of Credit Extensions so made as if made directly by the applicable Credit Party to such Borrower, notwithstanding the manner by which such Credit Extensions are recorded on the books and records of the Lead Borrower and of any other Borrower.  In addition, each Loan Party other than the Borrowers hereby irrevocably designates and appoints the Lead Borrower as such Loan Party's agent to represent such Loan Party in all respects under this Agreement and the other Loan Documents.

(b)     Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers. Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers.

(c)     The Lead Borrower shall act as a conduit for each Borrower on whose behalf the Lead Borrower has requested a Credit Extension.  Neither the Agent nor any other Credit Party shall have any obligation to see to the application of such proceeds therefrom.

**ARTICLE IV**
**CONDITIONS PRECEDENT TO CREDIT EXTENSIONS**

**4.01    Conditions of Initial Credit Extension**.  The obligation of the Agent and each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a)     The Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif" via e-mail) (followed promptly by originals) unless otherwise specified, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Agent:

(i)     counterparts of this Agreement each properly executed by a Responsible Officer of the signing Loan Party and the Lenders sufficient in number for distribution to the Agent, each Lender and the Lead Borrower;

(ii)    a Note executed by the Borrowers in favor of each Lender requesting a Note;

(iii)   certificates of resolutions or other action, and incumbency certificates evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity,

authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv)    copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing, and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect;

(v)    [Reserved];

(vi)    a certificate of a Responsible Officer of the Lead Borrower certifying (A) that the conditions specified in Sections 4.02(a) and (b) have been satisfied, (B) that there has been no event or circumstance since the Petition Date that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (c) either that (1) subject to the entry of the Interim Borrowing Order, no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, or (2) that, in each case, all such consents, licenses and approvals have been obtained and are in full force and effect;

(vii)    evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(viii)    the Security Documents and certificates evidencing any stock being pledged thereunder, together with undated stock powers executed in blank, each duly executed by the applicable Loan Parties;

(ix)    such Collateral Access Agreements with respect to such locations of the Loan Parties and the Collateral as the Agent may require;

(x)    all other Loan Documents, each duly executed by the applicable Loan Parties and each other party thereto;

(xi)    results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases, satisfactions and discharges satisfactory to the Agent are being tendered concurrently with such extension of credit or other arrangements

satisfactory to the Agent for the delivery of such termination statements, releases, satisfactions and discharges have been made;

(xii)    (A)    all documents and instruments, including Uniform Commercial Code financing statements, required by law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Agent, (B) the Blocked Account Agreements required pursuant to Section 6.12 hereof shall have been obtained, and any deposit account control agreement in effect prior to the Closing shall have been irrevocably terminated and be of no force and effect, such that only the Blocked Account Agreement shall be in effect and enforceable with respect to any Blocked Account at any Blocked Account Bank, (C) control agreements with respect to the Loan Parties' securities and investment accounts have been obtained, and (D) the Interim Borrowing Order shall have been entered; and

(xiii)    such other assurances, certificates, documents, consents or opinions as the Agent reasonably may require.

(b)    The Agent shall have received a Borrowing Base Certificate dated the Closing Date, relating to week ended on June ___, 2013, which has been reviewed and verified by the field examiner previously retained by the Agent.

(c)    The Agent shall have received and be satisfied with (a) an initial Budget of the Loan Parties through the scheduled date of closing on a Permitted Sale as set forth in Section 6.21(h) confirming that sufficient Availability will exist to pay all administrative expenses and other obligations incidental to the Bankruptcy Case, including professional fees, as well as a reasonably detailed professional fee budget included within the Budget, and (b) such other information (financial or otherwise) reasonably requested by the Agent.

(d)    One or more Persons reasonably acceptable to the Agent (it being agreed that Balmoral Funds LLC or a Person Controlled thereby is acceptable to the Agent) shall have purchased and continue to hold 100% of the Pre-Petition Liabilities and such Persons shall have consented to the priming of the Liens securing the Pre-Petition Liabilities by the Agent's Liens and such other matters provided in the Interim Borrowing Order as Crystal may agree.

(e)    The Agent shall have received and reviewed all so-called "first-day" motions, declarations and other pleadings to be filed in the Bankruptcy Case, each of which shall be in form and substance reasonably satisfactory to the Agent.

(f)    All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Orders and this Agreement (including, without limitation, Bidding Procedures Motion and the Sale Order Motion) shall be in form and substance reasonably satisfactory to the Agent.  The Interim Borrowing Order and the Cash Management Order shall have

been entered, shall be in full force and effect, and shall not have been reversed, vacated or stayed, or modified without the prior written consent of the Agent, and all other necessary consents and approvals to the transactions contemplated hereby shall have been obtained and shall be reasonably satisfactory to the Agent.

(g)     The posture and status of the Chapter 11 Case and all related circumstances (including, without limitation, any pending or threatened appeals, objections, motions or filings) shall be satisfactory to the Agent in its sole discretion.

(h)     There shall not be any Indebtedness of the Loan Parties or their Subsidiaries outstanding immediately after the Closing Date other than Permitted Indebtedness.

(i)     Other than as a result of an Effect of Bankruptcy and except as provided in Schedule 5.25, there shall not have occurred any default under any Material Contract or Lease of any Loan Party which could reasonably be expected to result in a Material Adverse Effect.

(j)     Other than the Chapter 11 Case or as set forth on Schedule 5.06, there shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect (explicitly excluding litigation in which a Loan Party is the plaintiff and not a defendant with respect to any counter-claim).

(k)     Other than the Chapter 11 Case, no event or circumstance shall have occurred with respect to the Debtor that is adverse to the Agent, as determined by the Agent in its sole discretion.

(l)     The consummation of the transactions contemplated hereby shall not violate any Law or any Organization Document.

(m)     The Loan Parties shall be in compliance with all requirements of any Governmental Authority having jurisdiction over the Loan Parties, and all consents and approvals required by any Governmental Authority for the transactions contemplated hereby or the operation of the Loan Parties' business shall have been obtained.

(n)     All fees required to be paid to the Agent, the Lenders or any other party on or before the Closing Date shall have been paid in full.

(o)     The Borrowers shall have paid all fees, charges and disbursements of counsel to the Agent to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the Closing Date (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrowers and the Agent).

(p)      The Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the USA PATRIOT Act.

(q)      No material changes in governmental regulations or policies affecting any Loan Party or any Credit Party shall have occurred since the Petition Date and prior to the Closing Date.

(r)      The Agent shall have completed to its satisfaction an assessment of the pre-petition loss of employees suffered by the Borrower and confirmed to the Agent's satisfaction in its Permitted Discretion that the Borrower maintains sufficient employees, staffing, and management to adequately operate its business and comply with the terms and conditions of this Agreement, including without limitation, all reporting requirements hereunder.

(s)      The Agent shall have received and be satisfied with the form and substance of all Exhibits and Schedules to this Agreement.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02      Conditions to all Credit Extensions**.  The obligation of each Lender to honor any Revolving Loan Notice (including any Revolving Loan Notice on the Closing Date) is subject to the following conditions precedent:

(a)      the representations and warranties of each Loan Party contained in ARTICLE V or in any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects, and (iii) for purposes of this Section 4.02, the representations and warranties contained in subsections (a) and (b) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01;

(b)      no Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof;

(c)      the Agent shall have received a Revolving Loan Notice in accordance with the requirements hereof;

(d)    the Agent shall have received an updated Borrowing Base Certificate, reflecting the then balance of Eligible Trade Accounts as of the date of the Revolving Loan Notice (it being understood that Pallets and ineligible categories thereof shall only be required to be updated weekly);

(e)    no event or circumstance which could reasonably be expected to result in a Material Adverse Effect shall have occurred; and

(f)    after giving effect to the Credit Extension requested to be made on any such date and the use of proceeds thereof, Availability shall be greater than zero.

Each Revolving Loan Notice submitted by the Lead Borrower shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in Sections 4.02(a) and 4.02(b) have been satisfied on and as of the date of the applicable Credit Extension.  The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but until the Required Lenders otherwise direct the Agent to cease making Revolving Loans, the applicable Lenders will fund their Revolving Credit Facility Applicable Percentage of all Revolving Loans whenever made or issued, which are requested by the Lead Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this ARTICLE IV, agreed to by the Agent, provided, however, the making of any such Revolving Loans shall not be deemed a modification or waiver by any Credit Party of the provisions of this ARTICLE IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

## ARTICLE V
### REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Revolving Loans hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01    Existence, Qualification and Power**.  Each Loan Party and each Subsidiary thereof (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization or formation, (b) subject to the entry of the DIP Orders, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.  Schedule 5.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of

incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**5.02    Authorization; No Contravention**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) subject to the entry of the DIP Orders, any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon any asset of any Loan Party (other than Liens in favor of the Agent under the Security Documents); or (d) violate any Law.

**5.03    Governmental Authorization; Other Consents**.  Other than the entry of the DIP Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the first priority nature thereof) or (b) such as have been obtained or made and are in full force and effect.

**5.04    Binding Effect**.  This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto.  Subject to the entry of the DIP Orders, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05    Financial Statements; Initial Budget; No Material Adverse Effect.**

(a)    The unaudited annual Consolidated balance sheet of the Lead Borrower and its Subsidiaries dated December 31, 2012, unaudited quarterly balance sheet of the Debtor and its Subsidiaries dated March 31, 2013 and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for the fiscal period ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Debtor and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(b)     The initial Budget delivered to the Agent was prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Loan Parties' best estimate of their future financial performance.

(c)     Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(d)     To the best knowledge of the Borrowers, no Internal Control Event exists or has occurred since December 31, 2012 that has resulted in or could reasonably be expected to result in a misstatement in any material respect, (i) in any financial information delivered or to be delivered to the Agent or the Lenders, (ii) of the Borrowing Base, (iii) of covenant compliance calculations provided hereunder or (iv) of the assets, liabilities, financial condition or results of operations of the Lead Borrower and its Subsidiaries on a Consolidated basis.

**5.06     Litigation**.  Other than the Bankruptcy Case and except as set forth on Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby or thereby, or (b) either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect.

**5.07     No Default**.  Other than as an Effect of Bankruptcy and except as provided in Schedule 5.25, no Loan Party or any Subsidiary is in default under or with respect to, or party to, any Material Contract or any Material Indebtedness.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08     Ownership of Property; Liens.**

(a)     Each of the Loan Parties and each Subsidiary thereof has good record and marketable title in fee simple to or valid leasehold interests in, all Real Estate necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each of the Loan Parties and each Subsidiary has good and marketable title to, valid leasehold interests in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business.  The property of the Loan Parties and each Subsidiary thereof is subject to no Liens, other than Liens permitted by Section 7.01.

(b)     Schedule 5.08(b)(1) sets forth the address (including street address, county and state) of all Real Estate (excluding Leases) that is owned by the Loan Parties and each of their

Subsidiaries, together with a list of the holders of any mortgage or other Lien thereon as of the Closing Date.  Each Loan Party and each of its Subsidiaries has good, marketable and insurable fee simple title to the Real Estate owned by such Loan Party or such Subsidiary, free and clear of all Liens, other than Permitted Encumbrances.  Schedule 5.08(b)(2) sets forth the address (including street address, county and state) of all Leases of the Loan Parties, together with the name of each lessor and its contact information with respect to each such Lease as of the Closing Date.  Each of such Leases is in full force and effect and the Loan Parties are not in default of the terms thereof.

**5.09    Environmental Compliance.**

(a)      No Loan Party or any Subsidiary thereof (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)      (i) None of the properties currently or formerly owned or operated by any Loan Party or any Subsidiary thereof is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; (ii) there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials (other than decabromodiphenyl ether) are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any Subsidiary thereof or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party or Subsidiary thereof; (iii) there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or Subsidiary thereof; and (iv) Hazardous Materials (other than decabromodiphenyl ether) have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof.

(c)      No Loan Party or any Subsidiary thereof is undertaking, and no Loan Party or any Subsidiary thereof has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials (other than decabromodiphenyl ether) at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any Subsidiary thereof have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party or any Subsidiary thereof.

**5.10    Insurance**.  The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance and directors and

officers liability insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties or the applicable Subsidiary operates. Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Closing Date. As of the Closing Date, each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

      **5.11    Taxes**. Except as set forth on Schedule 5.11, the Loan Parties and their Subsidiaries have filed all federal, state, and other material tax returns and reports required to be filed, and have paid all federal, state, and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien has been filed and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation.  There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect.  No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

      **5.12    ERISA Compliance.**

          (a)    Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state Laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Borrowers, nothing has occurred which would prevent, or cause the loss of, such qualification. The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.  No Lien imposed under the Code or ERISA exists or is likely to arise on account of any Plan.

          (b)    There are no pending or, to the best knowledge of the Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

          (c)    (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan

Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

**5.13    Subsidiaries; Equity Interests**.  As of the Closing Date, the Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of <u>Schedule 5.13</u>, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary.  All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of <u>Schedule 5.13</u> free and clear of all Liens except for those created under the Security Documents and the Pre-Petition Credit Agreement.  Except as set forth in <u>Schedule 5.13</u>, there are no outstanding rights to purchase any Equity Interests in any Subsidiary.  As of the Closing Date, the Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of <u>Schedule 5.13</u>.  All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of <u>Schedule 5.13</u> free and clear of all Liens except for those created under the Security Documents and the Pre-Petition Credit Agreement.  The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to <u>Section 4.01</u> are true and correct copies of each such document, each of which is valid and in full force and effect.

**5.14    Margin Regulations; Investment Company Act.**

(a)    No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  None of the proceeds of the Credit Extensions shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Credit Extensions to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b)    None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15    Disclosure**.  Each Loan Party has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were

made, not misleading; _provided_ that, with respect to the Budget and other projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

      **5.16**    **Compliance with Laws**. Each of the Loan Parties and each Subsidiary is in compliance with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except (a) in such instances in which such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

      **5.17**    **Intellectual Property; Licenses, Etc**. The Loan Parties and their Subsidiaries own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are reasonably necessary for the operation of their businesses, without conflict with the rights of any other Person. To the best knowledge of the Borrowers, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary infringes upon any rights held by any other Person. No claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrowers, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

      **5.18**    **Labor Matters.** There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party or any Subsidiary thereof pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters except to the extent that any such violation could not reasonably be expected to have a Material Adverse Effect. No Loan Party or any of its Subsidiaries has incurred any liability or obligation under the Worker Adjustment and Retraining Act or similar state Law. All payments due from any Loan Party and its Subsidiaries, or for which any claim may be made against any Loan Party or any of its Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.18, no Loan Party or any Subsidiary is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party or any Subsidiary has made a pending demand for recognition. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party or any of its Subsidiaries. The consummation of the

transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any of its Subsidiaries is bound.

**5.19     Security Interest.**

Upon the entry of the DIP Orders, the Agent shall have a fully perfected first priority Lien on, and security interest in, all right, title and interest of the Loan Parties thereunder in the Collateral, in each case superior in right to any other Person, except for Permitted Encumbrances having priority under applicable law.  No further recording, filing or other action of any kind will be required in connection with the creation, perfection or enforcement of such security interests and Liens in favor of the Agent. No other claims having a priority superior or pari passu to that granted to or on behalf of the Agent or the Lenders shall be granted or approved while any of the Obligations or the Commitments remain outstanding.

**5.21     Reserved**.

**5.22     Deposit Accounts.**

Annexed hereto as Schedule 5.22 is a list of all DDAs maintained by the Loan Parties as of the Closing Date, which Schedule includes, with respect to each DDA (a) the name and address of the depository; (b) the account number(s) maintained with such depository; (c) a contact person at such depository; and (d) the identification of each Blocked Account Bank.

**5.23     Brokers**.  Except as set forth on Schedule 5.23, no broker or finder brought about the obtaining, making or closing of the Revolving Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.24     Customer and Trade Relations**.  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations.

**5.25     Material Contracts**.  Schedule 5.25 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Closing Date.  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent on or before the Closing Date.  Except as an Effect of Bankruptcy and except as provided in Schedule 5.25, the Loan Parties are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of the intention of any other party thereto to terminate any Material Contract. Each Material Contract is in full force and effect.

**5.26     Casualty**.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not

covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Revolving Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification claims for which a claim has not been asserted), the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each Subsidiary to:

**6.01    Financial Statements**.  Deliver to the Agent, in form and detail satisfactory to the Agent, as soon as available, but in any event within 30 days after the end of each Fiscal Month of each Fiscal Year of the Loan Parties, a Consolidated balance sheet of the Lead Borrower and its Subsidiaries as at the end of such Fiscal Month, and the related Consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Month, and for the portion of the Loan Parties' Fiscal Year then ended, setting forth in each case in comparative form the figures for (i) the corresponding Month of the previous Fiscal Year and (ii) the corresponding portion of the previous Fiscal Year, all in reasonable detail, certified by a Responsible Officer of the Lead Borrower as fairly presenting the financial condition, results of operations, Shareholders' Equity and cash flows of the Lead Borrower and its Subsidiaries as of the end of such Fiscal Month in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

**6.02    Certificates; Other Information**.  Deliver to the Agent, in form and detail satisfactory to the Agent:

(a)    [Reserved];

(b)    concurrently with the delivery of the financial statements referred to in Section 6.01, a duly completed Compliance Certificate signed by a Responsible Officer of the Lead Borrower, and in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Lead Borrower shall also provide a statement of reconciliation conforming such financial statements to GAAP and a copy of management's discussion and analysis with respect to such financial statements;

(c)    on Thursday of each week (or, if Thursday is not a Business Day, on the next succeeding Business Day), (i) a Borrowing Base Certificate showing the Borrowing Base as of the close of business as of the immediately preceding Friday including the application of all cash collections since the preceding Friday, (ii) a statement of all Reported Fee Accruals (as defined in a DIP Order), (iii) a thirteen (13) week cash flow projection for the Loan Parties, reflecting on a line-item basis, among other things, anticipated sales, cash receipts, inventory levels and expenditures, and (iv) a Variance Report, in each case to be certified as complete and correct by a Responsible Officer of the Lead Borrower;

(d)      [Reserved];

(e)      promptly upon receipt, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its independent public accounting firm in connection with the accounts or books of such Loan Party, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

(f)      the financial and collateral reports described on Schedule 6.02 hereto, at the times set forth in such Schedule;

(g)      promptly after the furnishing thereof, copies of any statement or report furnished to any holder of Material Indebtedness of any Loan Party or any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to Section 6.01 or any other clause of this Section 6.02;

(h)      as soon as available, but in any event within 30 days after the end of each Fiscal Year of the Loan Parties, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for the Lead Borrower and its Subsidiaries and containing such additional information as the Agent, or any Lender through the Agent, may reasonably specify;

(i)      at least seven days prior to the hearing for the entry of a Final Borrowing Order, a final Budget and business plan updating the initial Budget and business plan delivered prior to the Closing Date;

(j)      at least two Business Days prior to the furnishing or filing thereof, copies of any statement, report or pleading proposed to be furnished to or filed with the Bankruptcy Court or the Creditors' Committee in connection with the Bankruptcy Case;

(k)      promptly after the Agent's request therefor, copies of all Material Contracts, Leases and documents evidencing Material Indebtedness; and

(l)      promptly, such additional information as the Agent or any Lender may from time to time reasonably request.

**6.03    Notices**.  Promptly notify the Agent:

(a)      of the occurrence of any Default or Event of Default;

(b)      of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect,

(c)        of any breach or non-performance of, or any default under or termination of, a Material Contract, a Lease or with respect to Material Indebtedness of any Loan Party or any Subsidiary thereof;

(d)        of any dispute, litigation, investigation, proceeding or suspension between any Borrower or any Subsidiary thereof and any Governmental Authority; or the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable regulatory Laws or Environmental Laws;

(e)        of the occurrence of any ERISA Event;

(f)        of any material change in accounting policies or financial reporting practices by the Lead Borrower or any Subsidiary thereof;

(g)        of any change in any Loan Party's senior executive officers;

(h)        of the discharge by any Loan Party of its present independent public accounting firm or any withdrawal or resignation by such accounting firm;

(i)        of any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, the application for the certification of a collective bargaining agent, or the occurrence of any work stoppage under any such agreement or contract;

(j)        of the filing of any Lien for unpaid Taxes against any Loan Party;

(k)        of any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed;

(l)        of any transaction of the nature contained in ARTICLE VII hereof, occurring after the Closing Date;

(m)        of any product recalls initiated by a Loan Party or by any supplier of or vendor to a Loan Party of any product purchased by a Loan Party;

(n)        of any notice (whether written or oral) received by a Loan Party from any account debtor or other customer rejecting any Pallets delivered to such account debtor or customer or alleging that the Pallets delivered to such account debtor or customer did not conform to the specifications set forth in the lease or is not merchantable or fit for the purposes intended, if the circumstance would have the effect of rendering the subject Account ineligible in whole or in part;

(o)    of any failure by any Loan Party to pay rent at any of such Loan Party's locations if such failure continues for more than ten (10) days following the day on which such rent first came due; and

(p)    of the discharge or resignation of the Independent Consultant.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Lead Borrower setting forth details of the occurrence referred to therein and stating what action the Loan Parties have taken and/or propose to take with respect thereto;

**6.04    Payment of Obligations**.  To the extent required by the Bankruptcy Code, pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators, and carriers) which, if unpaid, would by Law become a Lien upon its property, and (c) all Material Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case, where (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (iii) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (iv) no Lien has been filed with respect thereto and (v) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.  Nothing contained herein shall be deemed to limit the rights of the Agent with respect to determining Reserves pursuant to this Agreement.

**6.05    Preservation of Existence, Etc**.  (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all material rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties.

**6.06    Maintenance of Properties**.  (a) Maintain, preserve and protect all of its material properties and Equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and

(b)    make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**6.07    Maintenance of Insurance**.  (a)  Maintain with financially sound and reputable insurance companies having an A.M. Best Rating of at least A or better or other companies reasonably acceptable to the Agent that are not Affiliates of the Loan Parties (it being agreed that Kinsale is acceptable with respect to the policies it provides on the Closing Date), insurance (including product liability insurance

and product recall insurance), with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to or required by the Agent.

(b)     Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will upon request by the Agent furnish the Agent certificates evidencing renewal of each such policy.

(c)     Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance satisfactory to the Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(d)     Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(e)     Cause business interruption policies (if separate from fire and extended coverage policies as set forth in clause (c) above) to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Closing Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, the Agent, the Agent or any other party shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(f)     Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(g)     Deliver to the Agent, prior to the cancellation, material reduction in scope or amount of coverage, or non-renewal of any such policy of insurance, evidence of renewal or replacement policy (including an insurance certificate) and, if requested by the Agent, a copy of such

renewal or replacement policy, together with evidence satisfactory to the Agent of payment of the premium therefor.

(h)      Permit any representatives that are designated by the Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.

(i)      None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07. Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees.  If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees.  The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

6.08     **Compliance with Laws**.  Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties in accordance with GAAP, (b) such contest effectively suspends enforcement of the contested Laws, and (c) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

6.09     **Books and Records; Accountants.**

(a)      Maintain (i) proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

(b)      At all times retain an independent public accounting firm which is reasonably satisfactory to the Agent and instruct such accounting firm to cooperate with, and be available to, the Agent or its representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such accounting firm, as may be raised by the Agent.

(c)    At all times, maintain all records required to be maintained by applicable Law or regulation and maintain all permits, licenses, franchises, certificates and other approvals or authorizations of Governmental Authorities as are required under applicable Laws and regulations as are applicable to the conduct of the Loan Parties' businesses.

**6.10    Inspection Rights.**

(a)    Permit representatives and independent contractors of the Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and accounting firm, and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Lead Borrower; provided, however, that when a Default or an Event of Default exists the Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time during normal business hours and without advance notice; and further provided that, without limiting the foregoing rights, the Agent may engage a consultant acceptable to the Agent to make up to two (2) unannounced visits in any twelve month period to inspect the Borrowers' premises, operations, and compliance with regulatory requirements.

(b)    Cause the senior management of the Borrowers to hold meetings with the Agent and Lenders via telephone conference on a quarterly basis, and once per twelve month period in person, to discuss the Borrowers' financial performance and projections.  The format and content of the meetings shall be acceptable to the Agent in its Permitted Discretion.

(c)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct commercial finance examinations and other evaluations, including, without limitation, of (i) the Borrowers' practices in the computation of the Borrowing Base, (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and (iii) the Loan Parties' business plan, forecasts and cash flows.

(d)    Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including appraisers which may be an Affiliate of (i) the Agent, (ii) any Lender, (iii) any Participant or (iv) any SPC, assignee or other participant permitted under Section 10.06) retained by the Agent to conduct appraisals of the Collateral, including, without limitation, the Pallets and other assets included in the Borrowing Base.  The Agent and Lenders acknowledge and agree that (i) Pallets are located in multiple locations and are sometimes in transit, and (ii) if the Agent desires to inspect or cause to be appraised any Pallets, the Loan Parties will cooperate with the Agent and make reasonable efforts to cause the Agent and its representatives or appraisers to have access to any Pallets that are located at sites owned or controlled by Persons other than the Loan Parties.

(e)    All fees and expenses of the Agent and the Lenders incurred in connection with this Section 6.10 shall be considered, for all purposes, Credit Party Expenses.

**6.11    Additional Loan Parties.**  Notify the Agent at the time that any Person becomes a Subsidiary, and promptly thereafter (and in any event within fifteen (15) days), cause any such Person (a) to (i) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement or a Joinder to the Facility Guaranty or such other documents as the Agent shall deem appropriate for such purpose, (ii) grant a Lien to the Agent on such Person's assets of the same type that constitute Collateral to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.01(a) and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness, in each case in form, content and scope reasonably satisfactory to the Agent.  In no event shall compliance with this Section 6.11 waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this Section 6.11 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Borrower or permit the inclusion of any acquired assets in the computation of the Borrowing Base.  Notwithstanding the foregoing, the Loan Parties shall not form any Subsidiary that is not a Domestic Subsidiary.

**6.12    Cash Management.**

(a)    On or prior to the Closing Date,

(i)    continue to maintain the Borrower's existing deposit account with JPMorgan Chase Bank N.A. (the "Lockbox Account") for the collection of the Loan Parties' Accounts and enter into an agreement with JPMorgan Chase Bank N.A.] (the "Lockbox Agreement") satisfactory in form and substance to the Agent; and

(ii)    either (x) enter into a Blocked Account Agreement satisfactory in form and substance to the Agent with each Blocked Account Bank (collectively, the "Blocked Accounts"), or (y) permanently close and discontinue use of any account that is not subject to a Blocked Account Agreement.

(b)    ACH or wire transfer in accordance with the usual and customary practices of each Blocked Account Bank, but in no event less frequently than weekly (and whether or not there are then any outstanding Obligations) (i) to the Lockbox Account, all proceeds received in the lockbox, and (ii) to a Blocked Account, all amounts on deposit in each DDA (net of any minimum balance as may be required to be kept in the subject DDA by the depository institution at which such DDA is maintained).

(c)    Cause the ACH or wire transfer to the deposit account maintained by the Agent and set forth on Schedule 5.21 (the "Collection Account"), in accordance with the usual and customary practices of each Blocked Account Bank, but in no event less frequently than weekly (and whether or not there are then any outstanding Obligations), all cash receipts and collections received by each Loan Party from all sources, including, without limitation, the following:

(i)      all available cash receipts from the sale of Inventory (including without limitation, proceeds of credit card charges) and other assets (whether or not constituting Collateral);

(ii)      all proceeds of collections of Accounts (including, without limitation, in respect of leases of rental pool Pallets);

(iii)      all Net Proceeds, and all other cash payments received by a Loan Party on account of any Extraordinary Receipt or from any Person or from any source or on account of any other transaction or event;

(iv)      the then contents of the Lockbox Account and each Blocked Account (net of any minimum balance as may be required to be kept in the subject Blocked Account by the Blocked Account Bank).

(d)      The Collection Account shall at all times be under the sole dominion and control of the Agent.  The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Collection Account, (ii) the funds on deposit in the Collection Account shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Collection Account shall be applied to the Obligations as provided in this Agreement; provided that, any funds remaining in the Collection Account after application to the Obligations shall be held by the Agent as cash collateral and may be released to the Borrowers prior to the Credit Parties making any additional Credit Extensions hereunder.  In the event that, notwithstanding the provisions of this Section 6.12, any Loan Party receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Collection Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

(e)      Upon the request of the Agent, cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

(f)      Notwithstanding the foregoing or anything to the contrary set forth herein, not later than 3:00 pm (prevailing ET) on Friday of each week Borrower shall cause the ACH or wire transfer to the Collection Account any amounts in all Blocked Accounts in excess of $500,000.

**6.13    Information Regarding the Collateral.**

(a)      Furnish to the Agent at least thirty (30) days prior written notice of any change in: (i) any Loan Party's name; (ii) the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new

office or facility); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization.  The Loan Parties shall not effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties.

(b)    Should any of the information on any of the Schedules hereto become inaccurate or misleading in any material respect as a result of changes after the Closing Date, advise the Agent in writing of such revisions or updates as may be necessary or appropriate to update or correct the same.  From time to time as may be reasonably requested by the Agent, the Loan Parties shall supplement each Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter arising after the Closing Date that, if existing or occurring on the Closing Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein).  Notwithstanding the foregoing, no supplement or revision to any Schedule or representation shall be deemed the Credit Parties' consent to the matters reflected in such updated Schedules or revised representations nor permit the Loan Parties to undertake any actions otherwise prohibited hereunder or fail to undertake any action required hereunder from the restrictions and requirements in existence prior to the delivery of such updated Schedules or such revision of a representation; nor shall any such supplement or revision to any Schedule or representation be deemed the Credit Parties' waiver of any Default or Event of Default resulting from the matters disclosed therein.

**6.14    Physical Inventories.**

(a)    Cause not less than 4 physical inventories of the Pallets to be undertaken each Fiscal Year, each at the expense of the Borrowers, consistent with past practices, conducted by such inventory takers as are satisfactory to the Agent and following such methodology as is consistent with the methodology used in the immediately preceding inventory or as otherwise may be satisfactory to the Agent. The Agent, at the expense of the Borrowers, may participate in and/or observe each scheduled physical count of Pallets which are undertaken on behalf of any Loan Party.    The Lead Borrower, within ten (10) days following the completion of such inventory, shall provide the Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(b)    Permit the Agent, in its discretion, if any Default or Event of Default exists, to cause additional such inventories to be taken as the Agent determines (each, at the expense of the Borrowers).

**6.15    Environmental Laws.**  Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

**6.16    Further Assurances**.

(a)    Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any Law, or which any Agent may request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b)    If any material assets are acquired by any Loan Party after the Closing Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien under the Security Documents upon acquisition thereof), notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by any Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.16, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.16(b) waive or be deemed a waiver or consent to any transaction giving rise to the need to comply with this Section 6.16(b) if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

**6.17    Compliance with Terms of Leaseholds**.  Except as otherwise expressly permitted hereunder or in connection with the rejection of such Leases during the Bankruptcy Case with the consent of the Agent, (a) except as may be occasioned as an Effect of Bankruptcy, make all payments and otherwise perform all obligations in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party, keep such Leases in full force and effect, (b) not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled except in the ordinary course of business, consistent with past practices, and (c) notify the Agent of any default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default.

**6.18     Material Contracts**.  (a) Except as may be occasioned as an Effect of Bankruptcy or the rejection of a Material Contract during the Bankruptcy Case with the consent of the Agent, and subject to those disclosures contained in Schedule 5.25 hereof, pperform and observe all the terms and provisions of each Material Contract to be performed or observed by it, (b) except as may be occasioned as an Effect of Bankruptcy or the rejection of a Material Contract during the Bankruptcy Case with the consent of the Agent, and subject to those disclosures contained in Schedule 5.25 hereof, maintain each such Material Contract in full force and effect except to the extent such Material Contract is no longer used or useful in the conduct of the business of the Loan Parties in the ordinary course of business, consistent with past practices, (c) enforce each such Material Contract in accordance with its terms, and, (d) upon reasonable request of the Agent, make such demands and requests for information and reports or for action from any other party to each such Material Contract as any Loan Party or any of its Subsidiaries is entitled to make under such Material Contract, and (e) cause each of its Subsidiaries to do the foregoing, except, in any case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect.

**6.19     Retention of Consultants; Communication with Accountants and Other Financial Advisors**.

(a)     The Loan Parties shall continue to retain the Independent Consultant, the scope and terms of such engagement to be reasonably satisfactory to the Agent (subject to Bankruptcy Court approval, to be obtained within ten (10) days after the Petition Date). Until such time as all Obligations have been repaid in full (or cash collateralized in accordance with the terms hereof) and all Commitments have been terminated, the Borrowers shall continue to retain the Independent Consultant to assist the Loan Parties with a Permitted Sale and with the preparation of the Budget and the other financial and Collateral reporting required to be delivered to the Agent pursuant to this Agreement.

(b)     The Loan Parties authorize the Agent to communicate directly with its independent certified public accountants, appraisers, financial advisors, investment bankers and consultants (including the Independent Consultant), which have been engaged from time to time by the Loan Parties, and authorize and shall instruct those accountants, appraisers, financial advisors, investment bankers and consultants to communicate to the Agent information relating to each Loan Party with respect to the business, results of operations, prospects and financial condition of such Loan Party.

(c)     Each Loan Party acknowledges that the Agent shall be permitted to engage such outside consultants and advisors (each, a "Lender Group Consultant"), for the sole benefit of Agent and the Lenders, as the Agent may determine to be necessary or appropriate in its sole discretion.  Each Loan Party covenants and agrees that (i) such Loan Party shall provide its complete cooperation with any Lender Group Consultant (including, without limitation, providing access to such Loan Party's business, books and records and senior management upon reasonable prior notice); (ii) all costs and expenses of any such Lender Group Consultant shall be Credit Party Expenses; and (iii) all reports, determinations

and other written and verbal information provided by any Lender Group Consultant shall be confidential and no Loan Party shall be entitled to have access to same.

**6.20   Performance within Budget**.   The Loan Parties shall strictly perform in accordance with the Budget subject to the following at all times following the Closing Date: (a) the Borrower's actual, aggregate cash receipts, calculated cumulatively from the Petition date, shall not be less than 90% of the projected amounts set forth in the Budget for the same period, and (b) the Borrower's actual, aggregate cash expenditures, calculated cumulatively from the Petition date, shall not be greater than 110% of the projected amounts set forth in the Budget for the same period.   Commencing with the second week after the Petition Date and continuing weekly thereafter during the Bankruptcy Case, the foregoing shall be tested on a cumulative basis each week pursuant to the Variance Report delivered for the immediately preceding week.   Notwithstanding the foregoing, if the Loan Parties fail to comply with the foregoing requirement and receive Net Proceeds of Subordinated Indebtedness (Variance) within three days after the date of such non-compliance, such Net Proceeds shall be deemed to, without duplication, either (x) have been added to the Borrower's actual sales and cash receipts or (y) have reduced Borrower's actual expenses and cash expenditures, in each case, for the applicable period.

**6.21   Permitted Sales Process**.

(a)   On the Petition Date, the Loan Parties shall have filed the following motions in the Bankruptcy Case with the Bankruptcy Court, each in form and substance acceptable to the Agent:

(i)   A motion (the "Bidding Procedures Motion") requesting an order from the Bankruptcy Court approving bidding procedures relating to a Permitted Sale; and

(ii)   A motion (the "Sale Order Motion") requesting an order from the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code authorizing the Loan Parties to consummate a Permitted Sale.

(b)   On or before June 16, 2013, the Bankruptcy Court shall have entered an order (the "Bidding Procedures Order") approving the bidding procedures set forth in the Bidding Procedures Motion, which Bidding Procedures Order shall be in form and substance acceptable to the Agent.

(c)   On or before June 28, 2013, the Loan Parties shall have received bids in accordance with the Bidding Procedures Order.

(d)   On or before June 30, 2013, the Loan Parties shall have selected a Stalking Horse Bid with respect to a Permitted Sale, which Stalking Horse Bid shall be in form and substance acceptable to the Agent.

(e)   On or before July 1, 2013, the Loan Parties shall have completed an auction for a Permitted Sale.

(f)     On or before July 2, 2013, the Bankruptcy Court shall have entered an order (the "Sale Order") approving a Permitted Sale as requested in the Sale Order Motion, which Sale Order shall be in form and substance acceptable to the Agent.

(g)     On or before July 9, 2013, the Loan Parties shall have closed on a Permitted Sale.

**6.22    Additional Bankruptcy Related Affirmative Covenants**.

(a)     The Loan Parties shall provide the Agent with a status report and such other updated information relating to a Permitted Sale as may be requested by the Agent, in form and substance acceptable to the Agent.

(b)     Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Loan Parties hereby irrevocably waive any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations other than as expressly set forth in a DIP Order.

(c)     The Loan Parties shall promptly, punctually, and faithfully perform all and singular the terms and conditions of the DIP Orders.

**6.23    Minimum Availability From Eligible Non-Damaged Pallets**.  On or before 5:00 pm on July 19, 2013 and at all times thereafter, the Loan Parties shall have a sufficient number of Eligible Non-Damaged Pallets maintained in a depot subject to a Collateral Access Agreement to generate not less than $3,000,000 of Availability under the Borrowing Base.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Revolving Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification claims for which a claim has not been asserted), no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01    Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

**7.02    Investments**.  Make any Investments, except Permitted Investments.

**7.03    Indebtedness; Equity Issuances**.  (a) Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; or (b) issue and sell any other Equity Interests unless (i) such Equity Interests provide that all dividends and other Restricted Payments in respect thereof shall be made solely in additional shares of such Equity Interests, in lieu of cash, (ii) such Equity Interests shall not be subject to redemption other than redemption at the option of the Loan Party (or such Subsidiary) issuing such Equity Interests and in accordance with the limitations contained in this Agreement, and (iii) all Restricted Payments in respect of such Equity Interests are expressly subordinated to the Obligations.

**7.04    Fundamental Changes**.  Merge, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing).

**7.05    Dispositions**.  Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

**7.06    Restricted Payments**.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except:

(a)    each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party; and

(b)    the Loan Parties and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person.

**7.07    Prepayments of Indebtedness**.  Except as expressly authorized herein and in the DIP Orders, prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness.

**7.08    Change in Nature of Business.**

Engage in any line of business substantially different from the business conducted by the Lead Borrower and its Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

**7.09    Transactions with Affiliates**.  Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than (a) transactions among the Loan Parties, (b) so long as it has been approved by the Lead Borrower's or its applicable Subsidiary's board of directors (or comparable governing body) in accordance with applicable law, the payment of reasonable compensation, severance, or employee benefit arrangements to employees, officers, and outside directors of the Lead Borrower and its Subsidiaries in the ordinary course of business and consistent with industry practice and past practice, and (c) other transactions on

fair and reasonable terms substantially as favorable to the Loan Parties as would have been obtainable by the Loan Parties at the time such transactions were made in a comparable arm's length transaction with a Person other than an Affiliate so long as such transactions are (i) fully disclosed to the Agent prior to the consummation thereof and (ii) approved in writing by the Agent prior to the consummation thereof if they involve one or more payments by a Loan Party or any Subsidiary thereof in excess of $10,000 for any single transaction or series of related transactions.

**7.10    Burdensome Agreements.**  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document or the Pre-Petition Liabilities) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

**7.11    Use of Proceeds.**  Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose; (b)(i) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of the Agent or, the Lenders or their rights and remedies under this Agreement and the other Loan Documents, including, without limitation, for the payment of any services rendered by the professionals retained by the Loan Parties or the Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the Liens securing same, (y) for monetary, injunctive or other affirmative relief against any Credit Party or the Collateral, or (z) preventing, hindering or otherwise delaying the exercise by any Credit Party of any rights and remedies under the Loan Documents or applicable Law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the court or otherwise) by any or all of the Credit Parties upon any of the Collateral; (ii) to make any distribution under a Bankruptcy Plan in the Bankruptcy Case; or (iii) to pay any fees or similar amounts to any Person who has proposed or may propose to purchase interests in any Loan Party without the prior written consent of the Agent; or (c) for any purposes other than (i) the acquisition of working capital assets of the Loan Parties in the ordinary course of business, (ii) to finance Capital Expenditures of the Loan Parties, (iii) for general corporate purposes of the Loan Parties, in each case, to the extent expressly permitted under Law and the Loan Documents, and solely in strict compliance with the Budget the DIP Orders.

**7.12    Amendment of Material Documents.**  Amend, modify or waive any of a Loan Party's (or any Subsidiary's) rights under (a) its Organization Documents in a manner materially adverse to the

Credit Parties, or (b) any Material Contract or Material Indebtedness, in each case, to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties, or otherwise would be reasonably likely to have a Material Adverse Effect.

7.13    **Fiscal Year.**   Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

7.14    **Deposit Accounts.**   Open new DDAs unless (a) the same is permitted by the Cash Management Order and (b) the Loan Parties shall have delivered to the Agent appropriate Blocked Account Agreements consistent with the provisions of <u>Section 6.12</u> and otherwise satisfactory to the Agent.  No Loan Party shall maintain any bank accounts other than the ones expressly contemplated herein or in <u>Section 6.12</u> hereof.

7.15    **Reserved**.

7.16    **Bankruptcy Related Negative Covenants**. **.** No Loan Party shall seek, consent to, or permit to exist any of the foregoing:

(a)    any order which authorizes the rejection or assumption of any Leases of any Loan Party without the Agent's prior consent, whose consent shall not be unreasonably withheld;

(b)    any modification, stay, vacation or amendment to the DIP Orders to which the Agent has not consented in writing;

(c)    a priority claim or administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331,  364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent and the Lenders in respect of the Obligations, except with respect to the Professional Fee Carve Out;

(d)    any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, other than with respect to the Professional Fee Carve Out;

(e)    any order which authorizes the return of any of the Loan Parties' property pursuant to Section 546(h) of the Bankruptcy Code;

(f)    any order which authorizes the payment of any Indebtedness (other than Indebtedness reflected in the approved Budget, and other Indebtedness approved by the Agent) incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien; or

(g)       any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01    Events of Default**.  Any of the following shall constitute an Event of Default:

(a)       <u>Non-Payment</u>.  The Borrowers or any other Loan Party fails to pay when and as required to be paid herein, (i) any amount of principal of, or interest on, any Revolving Loan, (ii) any fee due hereunder, or (iii) any other amount payable hereunder or under any other Loan Document; or

(b)       <u>Specific Covenants</u>.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of <u>Sections 6.01</u>, <u>6.02</u>, <u>6.03</u>, <u>6.05</u>, <u>6.07</u>, <u>6.10</u>, <u>6.11</u>, <u>6.12</u>, <u>6.13</u>, 6.17, 6.18, 6.19, 6.20, 6.21, 6.22 or <u>ARTICLE VII</u>; or

(c)       <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection <u>(a)</u> or <u>(b)</u> above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days; or

(d)       <u>Representations and Warranties</u>.  (i) Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party in any Borrowing Base Certificate in any document delivered in connection therewith shall be incorrect or misleading when made or deemed made; or (ii) any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document (excluding a Borrowing Base Certificate as to which clause (i) shall govern) shall be incorrect or misleading in any material respect when made or deemed made (except to the extent such representation or warranty is qualified by materiality in the text thereof, in which case it shall be incorrect or misleading in any respect); or

(e)       <u>Cross-Default</u>.  Except as a result of the commencement of the Bankruptcy Case or unless payment is stayed by the Bankruptcy Court, any Loan Party or any Subsidiary thereof (i) fails to make any payment when due (after giving effect to the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created) (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness, or (ii) fails to observe or perform any other agreement or condition relating to any Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any "change of control" (as defined in the documents governing such Material Indebtedness), whether or not such change of control shall constitute a default or event of default under such Material Indebtedness, occurs, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Material

Indebtedness or the beneficiary or beneficiaries of any Guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or

(f)       [Reserved]

(g)       [Reserved]

(h)       Judgments.  Following the Petition Date, there is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $500,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or

(i)       ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $500,000 or which would reasonably likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $500,000 or which would reasonably likely result in a Material Adverse Effect; or

(j)       Invalidity of Loan Documents.  (i)  Any material provision of any Loan Document or any provision of any DIP Order, at any time after its execution and delivery (or, in the case of a DIP order, entry) and for any reason, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document or any DIP order; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document or any DIP Order, or purports to revoke, terminate or rescind any provision of any Loan Document or DIP Order or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document or any DIP Order; or (ii) any Lien purported to be created under any Security Document or any DIP Order shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a

valid and perfected Lien on any Collateral, with the priority required by the applicable Security Document or DIP Order; or

(k)    [Reserved]

(l)    Cessation of Business.  (i) there occurs a work stoppage under any labor agreements, or (ii) except as otherwise expressly permitted hereunder, the Loan Parties, taken as a whole, shall take any action to suspend the operation of their business in the ordinary course, liquidate all or a material portion of their assets, or employ an agent or other third party to conduct a program of liquidations or "Going-Out-Of-Business" sales of any material portion of their business; or

(m)    Loss of Collateral.  There occurs any uninsured loss in excess of $350,000 to any material portion of the Collateral (other than as reflected in the "lost pallet accrual" maintained by the Loan Parties, so long as such accruals remain within historical norms); or

(n)    Breach of Contractual Obligation.  (i) Except as a result of the commencement of the Bankruptcy Case or unless payment is stayed by the Bankruptcy Court, and subject to those disclosures contained in Schedule 5.25 hereof, any Loan Party or any Subsidiary thereof fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Contract or (ii) fails to observe or perform any other agreement or condition relating to any such Material Contract or contained in any instrument or agreement evidencing, securing or relating thereto or any Material Contract or Lease is terminated; or

(o)    Indictment.  (i) Any Loan Party is (A) criminally indicted or convicted of a felony in connection with the Loan Parties' business, or (B) charged by a Governmental Authority under any law that would reasonably be expected to lead to forfeiture of any material portion of Collateral or (ii) any director or senior officer of any Loan Party after the Closing Date is (A) criminally indicted or convicted of a felony, unless such director or senior officer promptly resigns or is removed or replaced or (B) charged by a Governmental Authority under any law that would reasonably be expected to lead to forfeiture of any material portion of Collateral; or

(p)    [Reserved]

(q)    Material Adverse Events.  The occurrence of any event not otherwise specified herein which could reasonably be expected to result in a Material Adverse Effect.

(r)    Termination of Asset Purchase Agreement.  Termination of the Asset Purchase Agreement dated June 4, 2013 prior to the Closing Date.

(s)    DIP Orders. The entry of an order in the Bankruptcy Case which stays, modifies or reverses any DIP Order or which otherwise materially adversely affects, as determined by the

Agent, in its reasonable discretion, the effectiveness of any DIP Order without the express written consent of the Agent; or

(t)     Conversion.  Either (i) the appointment in the Bankruptcy Case of a trustee or of any examiner having expanded powers to operate all or any part of any Loan Party's business, or (ii) the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code; or

(u)     Final Borrowing Order.  The failure of the Bankruptcy Court to enter a Final Borrowing Order, in form and substance satisfactory to the Agent and the Lenders, within thirty (30) days after the Petition Date; or

(v)     Automatic Stay.   The entry of any order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code which permits any creditor to (i) realize upon, or to exercise any right or remedy with respect to (x) any portion of the Collateral included in (or eligible for inclusion in) the Borrowing Base or (y) any other Collateral, to the extent such realization or exercise of rights or remedies would be reasonably likely to have a Material Adverse Effect, or (ii) to terminate any license, franchise, or similar agreement, where such termination would reasonably be likely to have a Material Adverse Effect; or

(w)     Other Claims.   The filing of any application by any Loan Party without the express prior written consent of the Agent for the approval of any super-priority claim in the Bankruptcy Case which is pari passu with or senior to the priority of the claims of the Agent and the Lenders for the Obligations, or there shall arise any such super-priority claim under the Bankruptcy Code (other than the Professional Fees Carve Out); or

(x)     Prepayment of Pre-Petition Indebtedness.   The payment or other discharge by any Loan Party of any pre-petition Indebtedness, except as expressly permitted hereunder, under any DIP Order, or in the Budget or by order in the Bankruptcy Case to which order the Agent has provided its written consent; or

(y)     Pre-Petition Creditors.   The Persons owning the Pre-Petition Liabilities on the Closing Date (or any other Person consented to in writing by the Agent) shall no longer own 100% of the Pre-Petition Liabilities, or any such Persons (or any Affiliate thereof) shall at any time object to the priming of the Liens securing the Pre-Petition Liabilities by the Agent's Liens or any other matters provided in the Interim Borrowing Order or Final Order; or

(z)     Adequate Protection.  The entry of any order in the Bankruptcy Case which provides adequate protection, or the granting by any Loan Party of similar relief in favor of any one or more of a Loan Party's Pre-Petition creditors, except as provided in any DIP Order or the terms hereof; or

(aa)    <u>Cash Management Order/Sale Order</u>.  The failure of any Loan Party to (i) comply with each and all of the terms and conditions of any DIP Order or the Sale Order or (ii) comply in all material respects with the Cash Management Order, the Sale Motion Order or any other order entered in the Bankruptcy Case; or

(bb)    <u>Bankruptcy Matters</u>.  The filing of any motion (i)  by any Loan Party seeking, or the entry of any order in the Bankruptcy Case: (A) permitting working capital or other financing (other than ordinary course trade credit, unsecured debt) for any Loan Party from any Person (other than the Agent to pay all Obligations in full and the establishment of a reserve account for all indemnification obligations hereunder), (B) granting a Lien on, or security interest in (other than a Permitted Encumbrance) any of the Collateral, other than with respect to this Agreement (unless such Liens are granted in connection with a financing, the proceeds of which are applied to the payment in full of all Obligations and the cash collateralization of all indemnification obligations hereunder) as set forth in the DIP Orders, (C) except as permitted by this Agreement and the DIP Orders, permitting the use of any of the Collateral pursuant to Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent, (D) permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (E) dismissing the Bankruptcy Case or (ii) the entry of any order by the Bankruptcy Court in the Bankruptcy Case related to any motion by any party in interest or any Creditors' Committee appointed in the Bankruptcy Case) (x) seeking any of the matters specified in the foregoing clause (i) that is not dismissed or denied within thirty (30) days of the date of the filing of such motion (or such later date agreed to in writing by the Agent) or (y) seeking the reconsideration of any DIP Order; or

(cc)    <u>Plan of Reorganization</u>.  The filing of a motion by any Loan Party seeking approval of a Disclosure Statement and a Plan or Reorganization, or the entry of an order confirming a Plan of Reorganization, that does not require repayment in full in cash of all Obligations on the Consummation Date of such Bankruptcy Plan.

**8.02    Remedies Upon Event of Default**.  If any Event of Default occurs and is continuing, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(a)    declare the Commitments of each Lender to make Revolving Loans to be terminated, whereupon such Commitments shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Revolving Loans, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)    require that the Loan Parties post cash collateral in an amount reasonably determined by the Administrative Agent in respect of any indemnity claims or Credit Party

Expenses hereunder, which shall be returned to the Loan Parties six months after the payment in full of all other Obligations hereunder; and

(d)	whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties.

In addition to the exercise by the Agent of any or all of their rights and remedies after the occurrence and during the continuance of an Event of Default, the Agent may require, and upon request by the Agent, the Borrowers shall, undertake to liquidate the Collateral on behalf of the Agent in such manner as the Agent may require.  Such liquidation may be effected through a partial or complete manner consistent with the foregoing enumeration of the Agents' rights and remedies, and as otherwise permitted by the Bankruptcy Court.  The Agent and the Loan Parties shall endeavor to implement such a liquidation on mutually acceptable terms and conditions.  However, the Agent may by written notice to the Lead Borrower require the Loan Parties to:

(e)	file a motion seeking to retain one or more nationally recognized professional inventory liquidation agents reasonably acceptable to the Agent to sell, lease, or otherwise dispose of the Collateral on terms acceptable to the Agent;

(f)	file a motion or motions seeking to sell or otherwise dispose of any or all of the Real Property pursuant to Section 363 of the Bankruptcy Code, on terms acceptable to the Agent; and

(g)	file a motion or motions seeking to sell, assume, assign, or otherwise dispose of any or all of the Leases pursuant to Sections 363 and 365 of the Bankruptcy Code, on terms acceptable to the Agent.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

The Lead Borrower shall file such motion(s) within three (3) Business Days of the Agent's request and shall diligently prosecute such motion(s).  If the Lead Borrower fails to so file or diligently prosecute the motion(s), the Agent may file and prosecute such motion(s) in the name of the Lead Borrower.

**8.03	Application of Funds**.  After the exercise of remedies provided for in <u>Section 8.02,</u> any amounts received on account of the Obligations shall be applied by the Agent in the following order:

_First_, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent;

_Second_, to payment of that portion of the Obligations constituting indemnities, Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders (including Credit Party Expenses to the respective Lenders and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause _Second_ payable to them;

_Third_, to the extent not previously reimbursed by the Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances;

_Fourth_, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Revolving Loans and fees ratably among the Lenders in proportion to the respective amounts described in this clause _Fourth_ payable to them;

_Fifth_, to payment of that portion of the Obligations constituting unpaid principal of the Revolving Loans ratably among the Lenders in proportion to the respective amounts described in this clause _Fifth_ held by them;

_Sixth_, to payment of all other Obligations, ratably among the Credit Parties in proportion to the respective amounts described in this clause _Sixth_ held by them; and

_Last_, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

## ARTICLE IX
## THE AGENT

**9.01    Appointment and Authority.**  Each of the Lenders (in its capacity as a Lender) hereby irrevocably appoints Crystal to act on its behalf as the administrative agent and collateral agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Agent and the Lenders, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

**9.02    Rights as a Lender.**  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated

or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any Subsidiary or other Affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Lenders.

**9.03    Exculpatory Provisions**.  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or Law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

The Agent shall not be liable for any action taken or not taken by it (i) with the cconsent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties or a Lender.  In the event that the Agent obtains such actual knowledge or receives such a notice, the Agent shall give prompt notice thereof to each of the other Credit Parties.  Upon the occurrence of a Default or an Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders.  Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties.  In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in ARTICLE IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

9.04     **Reliance by Agent.**  The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.   In determining compliance with any condition hereunder to the making of a Revolving Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received written notice to the contrary from such Lender prior to the making of such Revolving Loan.  The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.05     **Delegation of Duties**.  The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent.  The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.

9.06     **Resignation of Agent**.  The Agent may at any time give written notice of its resignation to the Lenders and the Lead Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Lead Borrower, to appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent; underlined provided that if the Agent shall notify the Lead Borrower and the Lenders that no Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent

shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this Section.   Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).   The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Lead Borrower and such successor.   After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent hereunder.

       **9.07    Non-Reliance on Agent and Other Lenders**.   Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.   Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.   Except as provided in Section 9.11, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

       **9.08    [Reserved]**

       **9.09    Collateral and Guaranty Matters**.   The Credit Parties irrevocably authorize the Agent, at its option and in its discretion:

       (a)    to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with Section 10.01;

(b)      to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder or otherwise as expressly permitted by the Facility Guaranty.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this Section 9.09.  In each case as specified in this Section 9.09, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.09.

9.10    **Notice of Transfer.**  The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Assumption shall have become effective as set forth in Section 10.06.

9.11    **Reports and Financial Statements.**  By signing this Agreement, each Lender:

(a)      is deemed to have requested that the Agent furnish, and the Agent agrees to furnish, such Lender, promptly after they become available, copies of all Borrowing Base Certificates and financial statements required to be delivered by the Loan Parties hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "Reports");

(b)      expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(c)      expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(d)      agrees to keep all Reports confidential in accordance with the provisions of Section 10.07 hereof; and

(e)      without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the

indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Revolving Loan or Revolving Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.12    Agency for Perfection.**  Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other Law of the United States can be perfected only by possession or control.  Should any Lender (other than the Agent) obtain possession or control of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.13    Indemnification of Agent**.  Without limiting the obligations of Loan Parties hereunder, the Lenders and each Participant shall indemnify the Agent and any Related Party, as the case may be, ratably according to their Revolving Credit Facility Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent and its Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent and its Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's and its Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

**9.14    Relation Among Lenders**.  The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.  EACH LENDER IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE AGENT OR ANY OTHER LENDER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH LENDER IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  EACH LENDER AND THE AGENT AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION,

LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

       **9.15**    **Defaulting Lender.**

       (a)      If for any reason any Lender shall become a Defaulting Lender, then, in addition to the rights and remedies that may be available to the other Credit Parties, the Loan Parties or any other party at law or in equity, and not at limitation thereof, (i) such Defaulting Lender's right to participate in the administration of, or decision-making rights related to, the Obligations, this Agreement or the other Loan Documents shall be suspended during the pendency of such failure or refusal, (ii) a Defaulting Lender shall be deemed to have assigned any and all payments due to it from the Loan Parties, whether on account of outstanding Revolving Loans, interest, fees or otherwise, to the remaining non-Defaulting Lenders for application to, and reduction of, their proportionate shares of all outstanding Obligations, and (iii) at the option of the Agent, any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise) shall, in lieu of being distributed to such Defaulting Lender, be retained by the Agent as cash collateral for future funding obligations of the Defaulting Lender in respect of any Revolving Loan.  The Defaulting Lender's decision-making and participation rights and rights to payments as set forth in clauses (i), (ii) and (iii) hereinabove shall be restored only upon the payment by the Defaulting Lender of its Revolving Credit Facility Applicable Percentage of any Obligations, any participation obligation, or expenses as to which it is delinquent, together with interest thereon at the rate set forth in <u>Section 2.12</u> hereof from the date when originally due until the date upon which any such amounts are actually paid.

       (b)      The non-Defaulting Lenders shall also have the right, but not the obligation, in their respective, sole and absolute discretion, to cause the termination and assignment, without any further action by the Defaulting Lender for no cash consideration (<u>pro rata</u>, based on the respective Commitments of those Lenders electing to exercise such right), of the Defaulting Lender's Commitment to fund future Revolving Loans.  Upon any such purchase of the Revolving Credit Facility Applicable Percentage of any Defaulting Lender, the Defaulting Lender's share in future Credit Extensions and its rights under the Loan Documents with respect thereto shall terminate on the date of purchase, and the Defaulting Lender shall promptly execute all documents reasonably requested to surrender and transfer such interest, including, if so requested, an Assignment and Assumption.

       (c)      Each Defaulting Lender shall indemnify the Agent and each non-Defaulting Lender from and against any and all loss, damage or expenses, including but not limited to reasonable attorneys' fees and funds advanced by the Agent or by any non-Defaulting Lender, on account of a Defaulting Lender's failure to timely fund its Revolving Credit Facility Applicable Percentage of a Revolving Loan or to otherwise perform its obligations under the Loan Documents.

**ARTICLE X**

**MISCELLANEOUS**

**10.01   Amendments, Etc**.  (a)  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the consent of the Required Lenders, and the applicable Loan Party, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(i)        increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written consent of such Lender;

(ii)       as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Termination Date) of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written consent of such Lender, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Commitments hereunder or under any other Loan Document, without the written consent of such Lender;

(iii)      as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Revolving Loan held by such Lender, or (subject to clause (ii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written consent of such Lender; provided, however, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate;

(iv)      as to any Lender, change Section 2.12 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of such Lender;

(v)       change any provision of this Section or the definition of "Required Lenders," or any other provision hereof or of any Loan Document specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or under any other Loan Document or make any determination or grant any consent hereunder or thereunder, without the written consent of each Lender;

(vi)      except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written consent of each Lender;

(vii)    except for Permitted Dispositions or as provided in <u>Section 9.10</u>, release all or substantially all of the Collateral from the Liens of the Security Documents without the written consent of each Lender;

(viii)    increase the advance rates contained in, or otherwise change, the definition of the term "Borrowing Base" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Borrowers would be increased without the written consent of each Lender, *provided that* the foregoing shall not limit the discretion of the Agent to change, establish or eliminate any Reserves (including, without limitation, the EPA Reserve);

(ix)    modify the definition of Permitted Overadvance so as to increase the amount thereof or, except as otherwise provided in such definition, the time period for which a Permitted Overadvance may remain outstanding without the written consent of each Lender; and

(x)    except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written consent of each Lender;

and, <u>provided further</u>, that  no amendment, waiver or consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

(b)    Notwithstanding anything to the contrary in this Agreement or any other Loan Document, any Loan Document may be amended and waived with the consent of the Agent at the request of the Borrowers without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause any Loan Document to be consistent with this Agreement and the other Loan Documents.

**10.02    Notices; Effectiveness; Electronic Communications.**

(a)    <u>Notices Generally</u>.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection <u>(b)</u> below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service or sent by electronic mail or telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

          (i)        if to the Loan Parties or the Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

          (ii)       if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified on the signature pages hereto or in the Assignment and Assumption delivered by such Lender.

Notices sent by hand or overnight courier service shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

          (b)        Electronic Communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Agent that it is incapable of receiving notices under such Article by electronic communication. The Agent or the Lead Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

          Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

          (c)        Change of Address, Etc. Each of the Loan Parties and the Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Lead Borrower and the Agent. In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(d)    <u>Reliance by Agent and Lenders</u>.  The Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Revolving Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.  All telephonic notices to and other telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**10.03    No Waiver; Cumulative Remedies**.  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.  Without limiting the generality of the foregoing, the making of a Revolving Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at Law in connection with such enforcement shall be instituted and maintained exclusively by, the Agent in accordance with <u>Section 8.02</u> for the benefit of all the Credit Parties; provided, however, that the foregoing shall not prohibit (a) the Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, or (b) any Credit Party from exercising setoff rights in accordance with <u>Section 10.08</u> (subject to the terms of <u>Section 2.11</u>); and provided, further, that if at any time there is no Person acting as Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Agent pursuant to <u>Section 8.02</u> and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to <u>Section 2.11</u>, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**10.04    Expenses; Indemnity; Damage Waiver.**

(a)    <u>Costs and Expenses</u>.  The Borrowers shall pay all Credit Party Expenses.

(b)    <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing

Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or the administration of this Agreement and the other Loan Documents, (ii) any Revolving Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, or willful misconduct of such Indemnitee.

(c)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Revolving Loan or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(d)     Payments.  All amounts due under this Section shall be payable on demand therefor.

(e)     Survival.  The agreements in this Section shall survive the resignation of any Agent, the assignment of any Commitment or Revolving Loan by any Lender, the replacement of any

Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**10.05    Payments Set Aside**.  To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Agent upon demand its Revolving Credit Facility Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06    Successors and Assigns.**

(a)    <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of <u>Section 10.06(b)</u>, (ii) by way of participation in accordance with the provisions of subsection <u>Section 10.06(d)</u>, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>Section 10.06(f)</u> (and any other attempted assignment or transfer by any party hereto shall be null and void).   Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection <u>(d)</u> of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Revolving Loans at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)        in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Revolving Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B)        in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitments (which for this purpose includes Revolving Loans outstanding thereunder) or, if the Commitments are not then in effect, the principal outstanding balance of the Revolving Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 unless the Agent otherwise consents (such consent not to be unreasonably withheld or delayed);

(ii)        _Proportionate Amounts_.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Revolving Loans or the Commitment assigned;

(iii)        _Required Consents_.  No consent shall be required for any assignment except to the extent required in the definition of "Eligible Assignee" or by subsection (b)(i)(B) of this Section and, in addition, the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Commitment or Revolving Loan hereunder if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(iv)        _Assignment and Assumption_.  The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, _provided_, _however_, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, the Borrowers (at their expense) shall execute and deliver one or more Notes to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as

a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)    Register.  The Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Revolving Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Lead Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Revolving Loans; provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent, the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.   Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant. Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.01, and 3.04 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.11 as though it were a Lender.

(e)    Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent.

(f)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal

Reserve Bank; <u>provided</u> that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     <u>Electronic Execution of Assignments</u>.    The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)     <u>Assignment to SPV</u>.    Notwithstanding any provision to the contrary, any Lender may assign to one or more special purpose funding vehicles (each, an "<u>SPV</u>") all or any portion of its funded Revolving Loans (without the corresponding Commitment), without the consent of any Person or the payment of a fee, by execution of a written assignment agreement in a form agreed to by such Lender and such SPV, and may grant any such SPV the option, in such SPV's sole discretion, to provide the Borrowers all or any part of any Revolving Loans that such Lender would otherwise be obligated to make pursuant to this Agreement.  Such SPVs shall have all the rights which a Lender making or holding such Revolving Loans would have under this Agreement, but no obligations.  The Lender making such assignment shall remain liable for all its original obligations under this Agreement, including its Commitment (although the unused portion thereof shall be reduced by the principal amount of any Revolving Loans held by an SPV).  Notwithstanding such assignment, the Agent and Borrowers may deliver notices to the Lender making such assignment (as agent for the SPV) and not separately to the SPV unless the Agent and Borrowers are requested in writing by the SPV (or its agent) to deliver such notices separately to it.  The Borrowers shall, at the request of any such Lender, execute and deliver to such Person as such Lender may designate, a Note in the amount of such Lender's original Note to evidence the Revolving Loans of such Lender and related SPV.

(i)     <u>Assignments by Crystal Entities</u>.    Notwithstanding anything in this Agreement or the other Loan Documents, (x) no Crystal Entity shall be required to comply with Section 10.06(b) in connection with any transaction involving any other Crystal Entity or any of its or their lenders or funding or financing sources, none of the foregoing shall be considered an assignee hereunder and Crystal shall have no obligation to disclose any such transaction to any Person, and (y) there shall be no limitation or restriction on (I) the ability of any Crystal Entity to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, or any Obligation to any other Crystal Entity or any lender or financing or funding source of a Crystal Entity or (II) any such lender's or funding or financing source's ability to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, or any Obligation; provided, however, that Crystal shall continue to be liable as a "Lender" under this Agreement and the other Loan Documents unless such other Person complies with the provisions of this Agreement to become a "Lender."

(j)    <u>Defaulting Lenders; Non-Consenting Lenders</u>.    If any Lender is a Defaulting Lender or if any Lender (other than the Agent) does not consent (a "<u>Non-Consenting Lender</u>") to a proposed amendment, waiver, consent or release with respect to any Loan Document, the Agent or the Lead Borrower may replace such Defaulting Lender or such Non-Consenting Lender, as applicable, and require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, this <u>Section 10.06</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations; <u>provided</u> that if such replacement is of a Non-Consenting Lender, such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by this Section (together with all other such assignments required by the Lead Borrower to be made pursuant to this paragraph), <u>provided</u> further that such Defaulting Lender or Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its Revolving Loans accrued interest thereon, accrued fees (except that accrued fees shall not be payable to a Defaulting Lender) and all other amounts payable to it hereunder and under the other Loan Documents from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts).

**10.07    Treatment of Certain Information; Confidentiality**.  Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, Approved Funds, and to its and its Affiliates' and Approved Funds' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority), (c) to the extent required by Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (g) with the consent of the Lead Borrower, (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties, or (i) to any commercial finance examiner and any appraiser engaged by the Agent (which appraiser may be an Affiliate of (i) the Agent, (ii) any Lender, (iii) any Participant or (iv) any SPC, assignee or other participant permitted under Section 10.06) and such appraiser's affiliates, agents, advisors (legal or otherwise) or representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential).

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their

respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof.  In addition, the Agent may disclose to any agency or organization that assigns standard identification numbers to loan facilities such basic information describing the facilities provided hereunder as is necessary to assign unique identifiers (and, if requested, supply a copy of this Agreement), it being understood that the Person to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to make available to the public only such Information as such person normally makes available in the course of its business of assigning identification numbers. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with Law, including federal and state securities Laws.

In addition, and notwithstanding anything herein to the contrary, (i) the Credit Parties may provide information concerning the Loan Parties and the facilities established herein to Loan Pricing Corporation and/or other recognized trade publishers of information for general circulation in the loan market, and (ii) subject to the provisions of Section 10.19, the Credit Parties may use the name, logos, and other insignia of any of the Loan Parties and the maximum credit provided hereunder in any "tombstone" or comparable advertising, on its website or in other marketing materials of such Credit Party.

**10.08   Right of Setoff**.  If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) or other property at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrowers or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Lead Borrower and the Agent promptly after any such setoff and application, _provided_ that the failure to give such notice shall not affect the validity of such setoff and application.

- 100 -

**10.09   Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Law (the "<u>Maximum Rate</u>").  If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Revolving Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10   Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11   Survival**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Revolving Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.  Further, the provisions of Sections <u>3.01</u>, <u>3.04</u>, and <u>10.04</u> and <u>Article IX</u> shall survive and remain in full force and effect regardless of the repayment of the Obligations and the Commitments or the termination of this Agreement or any provision hereof.  In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as they shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, and (y) any Obligations that may thereafter arise under <u>Section 10.04</u> hereof.

**10.12   Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining

provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**10.13    Governing Law; Jurisdiction; Etc.**

(a)    <u>GOVERNING LAW</u>.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE BANKRUPTCY CODE AND THE LAW OF THE STATE OF NEW YORK.

(b)    <u>SUBMISSION TO JURISDICTION</u>.    EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE AGENT, ANY LENDER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE BANKRTUPCY COURT AND THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  EACH OF THE LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.    NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    <u>WAIVER OF VENUE</u>.  EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

**10.14    Waiver of Jury Trial**.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.15    No Advisory or Fiduciary Responsibility**.    In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (a) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (b) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (c) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (d) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (e) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.    Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties or against any commercial finance examiner and any appraiser engaged by the Agent (which appraiser may be an Affiliate of (i) the Agent, (ii) any Lender, (iii) any Participant or (iv) any SPC, assignee or other participant permitted under Section 10.06) with respect to any breach or alleged breach of agency or fiduciary duty.

**10.16   USA Patriot Act Notice**.  Each Lender that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Patriot Act.  No part of the proceeds of the Revolving Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.  The Loan Parties shall, promptly following a request by the Agent or any Lender, provide all documentation and other information that the Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**10.17   Foreign Asset Control Regulations**.  Neither of the advance of the Revolving Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "<u>Trading With the Enemy Act</u>") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "<u>Foreign Assets Control Regulations</u>") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "<u>Executive Order</u>") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)).  Furthermore, none of the Borrowers or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.18   Time of the Essence**.  Time is of the essence of the Loan Documents.

**10.19   Press Releases.**

(a)     Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and the Lead Borrower and without the prior written consent of the Agent unless (and only to the extent that) such Credit Party or Affiliate is required to do so under Law and then, in any event, such Credit Party or Affiliate will consult with the Agent before issuing such press release or other public disclosure.

(b)      Each Loan Party consents to the publication by the Agent or any Lender of advertising material relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo or trademark, but not including any confidential information of any Loan party or the covenants/pricing of the financing transactions contemplated by this Agreement.  If such information has not been previously publically disclosed, the Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Lead Borrower prior to the publication thereof.  The Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

**10.20    Additional Waivers.**

(a)      The Loan Parties are each Affiliates of each other and will benefit from the making of loans and other financial accommodations set forth herein to each other Loan Party.  The Obligations are the joint and several obligation of each Loan Party.  To the fullest extent permitted by Law, the obligations of each Loan Party shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Agent or any other Credit Party.

(b)      The obligations of each Loan Party shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations after the termination of the Commitments), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations after the termination of the Commitments).

(c)      To the fullest extent permitted by Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. The Agent and the other Credit Parties may, at their election, foreclose on any

security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and the Commitments have been terminated.  Each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)        Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior indefeasible payment in full in cash of all the Obligations and the termination of the Commitments. In addition, any indebtedness of any Loan Party now or hereafter held by any other Loan Party is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations and no Loan Party will demand, sue for or otherwise attempt to collect any such indebtedness.  If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.  Subject to the foregoing, to the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Revolving Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then the Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Borrowers.  As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (31) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

**10.21    No Strict Construction**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or

burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.22   Attachments**.   The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**10.23   DIP Orders**.  In the event of any inconsistency between the terms of the DIP Orders and the Loan Documents, the terms of the DIP Orders shall control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**BORROWERS**:

**IGPS COMPANY LLC**, as Lead Borrower, as a Borrower, as Debtor and as Debtor-in-Possession

By: _____

Name: ___Richard P. DiStasio___

Title: ___Chief Executive Officer___

**CRYSTAL FINANCIAL LLC,** as Agent and as a
Lender

By: _____

Name: Rebecca E. Tarby
Title:  Managing Director

**Schedule 5.01**

**Loan Parties; Organizational Information**

| Name per official filing | Jurisdiction of organization | Organization type | Organization number (if any) | Federal EIN |
|---|---|---|---|---|
| iGPS Company LLC | Delaware | Limited liability company | N/A | 20-4496297 |
| iGPS Company (Canada) LLC [dormant] * | Delaware | Limited liability company | N/A | 27-0637709 |
| iGPS Canada ULC [dormant] * | Nova Scotia | Unlimited liability corporation | 851923656 | N/A |

\* To be dissolved

## Schedule 5.06

## Litigation

1. ***iGPS COMPANY LLC  vs. SCHOELLER ARCA SYSTEMS SERVICES B.V. and SCHOELLER ARCA SYSTEMS INC., ICDR Case No. 50 154 T 00350 11.*** On May 27, 2011, iGPS filed a demand for arbitration in the American Arbitration Association against Schoeller Arca Systems Services B.V. and Schoeller Arca Systems Inc. (together, "SAS") in connection with the Third Amended And Restated Manufacturing Supply Agreement, dated July 9, 2008, among iGPS and SAS (the "Supply Agreement"). Pursuant to the Supply Agreement, SAS manufactures plastic pallets for iGPS's exclusive use. In its demand, iGPS alleged, among other things, that SAS breached the Supply Agreement by failing to honor the warranty provisions contained therein. iGPS also alleged that SAS breached certain other subsequent related agreements and fraudulently induced iGPS to enter into certain subsequent agreements. iGPS seeks money damages and a declaration interpreting the meaning of warranty contained in the Supply Agreement. On July 2, 2011, SAS filed an answer to iGPS's demand and asserted counterclaims. In its counter demand, SAS alleged that iGPS breached the Supply Agreement and fraudulently induced SAS to enter into certain agreements. Further, SAS seeks money damages and a declaration as to the meaning of the warranty contained in the Supply Agreement. iGPS and SAS have agreed that the arbitration to resolve its disputes should be bifurcated with liability determined first and, if necessary, damages second. A hearing to determine liability was held in October, 2012. The parties are expecting a final decision with respect to liability by February 27th, 2013. Discovery relating to damages will follow after a liability decision is rendered. The panel of arbitrators has not yet set a date for a hearing to determine damages, but we expect the hearing to occur during the summer of 2013.

2. ***BOBBY L. MOORE vs. IGPS Company LLC, Pegasus Capital Advisors LLP, Pegasus Partners III (AIV), L.P., Pegasus Investors III, L.P., Pegasus Investors III GP, L.L.C., Pegasus IGPS, LLC, IGPS Co-Investment LLC, IGPS Employee Participation, L.P., IGPS Executive (GP) LLC, PP IV IGPS Holdings, LLC, Kelso, KIA VIII (IGPS), L.P., KIA VIII (IGPS) GP, L.P., KEP VI AIV (IGPS), LLC, Kelso GP VIII,  LLC, Rich Weinberg, Craig Cogut, Frank Nickell, and Phil Berney, Index No. 651907/2011.*** On July 12, 2011, Bob Moore, the former CEO and Chairman of iGPS, brought an action in the Supreme Court of the State of New York, New York County, against iGPS and certain individuals and entities in connection with the termination of his employment at iGPS and the diminishment of his equity interests. Specifically, Mr. Moore alleged that iGPS breached his employment agreement by wrongly terminating him for cause. On September 2, 2011, iGPS moved to dismiss the complaint. On January 17, 2012, Mr. Moore amended the complaint. In the amended complaint, Mr. Moore alleged (1) breach of his employment agreement; (2) tortious interference with his employment agreement; (3) breach of fiduciary duty based on the forced dilution of Mr. Moore's purported equity stake in iGPS; (4) breach of fiduciary duty based on Mr. Moore's termination of employment; (5) fraudulent inducement to enter into the employment agreement; (6) conspiracy to commit fraud; (7) breach of the iGPS LLC Agreement; and (8) breach of the implied covenant of good faith and fair dealing. On February 14, 2012, iGPS moved to dismiss the amended complaint. iGPS moved to dismiss

claims two through six and eight of the Amended Complaint, but did not move to dismiss claims one and seven, although it vigorously disputes the allegations raised in these claims. On or about July 15, 2012, the Court issued an order on the motion to dismiss, dismissing two additional claims, but not dismissing four of Mr. Moore's claims, including those for tortious interference, fraudulent inducement, conspiracy to commit fraudulent inducement and breach of the implied covenant of good faith and fair dealing. On October 2, 2012, Moore filed a second amended complaint alleging similar but additional claims. iGPS filed a partial motion to dismiss the amended complaint. Discovery is still in the early stages, as the parties have been exchanging documents and taking depositions. A trial date has not yet been scheduled. iGPS believes that Mr. Moore's allegations are baseless and intends to vigorously defend against them.

3. ***iGPS COMPANY vs. BOBBY L. MOORE, No. 652431/2011.*** On September 2, 2011, iGPS filed a complaint against Bob Moore in the Supreme Court of the State of New York, New York County, alleging: (1) breach of the employment agreement; (2) breach of fiduciary duty; (3) conversion; (4) unjust enrichment; and (5) breach of the loan agreement between Moore and iGPS. Among other things, iGPS alleges that Mr. Moore breached his loan agreement with iGPS by transferring the collateral to the loan without notice to or permission from iGPS. On November 11, 2011, Mr. Moore filed an answer. On November 21, 2011, iGPS amended its complaint and on December 21, 2011, Mr. Moore filed an answer to the amended complaint. On October 2, 2012, iGPS filed a second amended complaint and iGPS has moved for partial summary judgment on its claims, but the motion is not yet fully briefed. Discovery has not yet begun. A trial date has not yet been scheduled.

4. ***iGPS Company LLC v. Pallet World Inc., General Mill Supply Company, Timothy B. Welch, Robert N. Rotenberg and Stuart Rotenberg, Case No. 2012-125012-CZ in the Circuit Court for the County of Oakland, State of Michigan.*** On February 12, 2012, iGPS filed a complaint against an Ohio-based pallet handling company called Pallet World, a Michigan-based plastic recycling company called General Mill Supply, and the owners and key officers of those companies, for misappropriating and destroying (by grinding down for recycling) about 38,000 iGPS pallets. The complaint asserts civil claims under Michigan law for (i) claim and delivery, (ii) conversion, (iii) statutory conversion, (iv) permanent injunction against further misappropriation, and (v) unjust enrichment. The Pallet World defendants and General Mill defendants both filed their Answers to the Complaint on April 9, 2012, and the General Mill defendants also filed a cross claim against the Pallet World Defendants asserting breach of contract, breach of warranty, implied contractual indemnification and common law indemnification. A significant amount of document discovery has occurred, and the parties are currently taking depositions of a number of witnesses on both sides. iGPS is claiming as damages the cost of replacing the 38,000 misappropriated pallets. In addition, under the Michigan statutory conversion claim, if iGPS is able to prove that the defendants were knowingly selling and buying stolen goods, then iGPS can also recover its costs and attorneys' fees and treble damages. A mediation was held on September 10, 2012, and again on February 19th, 2013, but no meaningful offer was made to iGPS and no settlement was reached. The parties continue to discuss a possible settlement. No trial date has been set.

5.  ***iGPS Company, LLC vs. South West Forest Products, et al., Maricopa County Case No. CV 2012-000169.***  This matter is pending in the Superior Court of the State of Arizona, County of Maricopa.  The nature of this dispute is the same as the above mentioned case pending in Michigan.  This matter involves the theft of approximately 8000 pallets.  The matter is in discovery with no trial date set.

6.  **Alterra Excess & Surplus Insurance Company v. iGPS Company, LLC, Case No. 2012-CA-14342.**  This matter is pending in the Ninth Judicial Circuit Court, Civil Division, of Florida.  The nature of this dispute is a declaratory action to determine the rights of the parties under a certain insurance agreement relating to the theft of pallets.  This matter has been stayed pending the outcome of the Michigan and Arizona pallet theft cases noted above.

7.  ***Neil Schultz v. iGPS Company LLC and Schoeller Arca Systems Inc., Case No. 10-cv-00071 in the United States District Court for the Northern District of Illinois.***  This matter is a consolidation of two separate suits, one originally filed by Neil Schultz against the Company in the United States District Court for the Central District of California and a related suit filed by **Schoeller** Arca Systems Inc. ("SAS") against Mr. Schultz in the United States District Court for the Southern District of New York.  Mr. Schultz alleged that the pallet manufactured by SAS for the Company infringes two patents owned by Mr. Schultz.  The Company and SAS filed a joint answer denying Mr. Schultz's claims.  Pursuant to the terms of the Third Amended and Restated Manufacturing Supply Agreement between the Company as buyer and SAS and its parent as supplier, SAS is obligated to indemnify and defend the Company in this matter.  The Court conducted a hearing on October 11th, 2012 on the parties' respective contentions regarding construction of certain terms in the relevant patent claims, which resulted in a favorable ruling for the Company.   As a result of this ruling, the parties have agreed on and filed a Stipulation for Entry of Order Granting Judgment of Non-infringement in which the Plaintiff has stipulated that the Court's construction of certain of the disputed terms will preclude a finding that the Defendants infringed any of the patent claims raised by Plaintiff in this suit.  The parties are now awaiting the Court's entry of the agreed judgment.  The Plaintiff has filed an appeal; case will continue pending a resolution of the appeal.

8.  ***Pepsico and Dole Indemnity Obligations.***  Over the past year, Round Rock Research LLC ("RRR") has threatened iGPS with patent infringement litigation involving at least 26 different patents involving radio frequency identification technology ("RFID").  RRR has made similar threats to several iGPS customers.  The patents at issue are not patents held by iGPS.  iGPS licenses these patents from others who have a contractual obligation to indemnify iGPS for actions brought in connection with the patents.  In view of RRR's accusations, iGPS has already made requests for indemnity to its own RFID suppliers.  While iGPS believes that it should be fully indemnified and therefore has no liability with respect to these patents, the indemnifying parties have refused to honor their indemnification obligations to date.  On December 14, 2011, RRR filed a patent infringement lawsuit in Delaware against Dole Food Company Inc., PepsiCo, Inc., American Apparel Inc., Fruit of the Loom Inc., Gap Inc. Hanesbrands Inc., J.C. Penney Company, Inc., VF Corporation, and Macy's Inc., which included two current or former iGPS customers, PepsiCo and Dole.  At this time, iGPS believes these lawsuits may implicate its pallet pooling products and services.

iGPS has assumed the defense of PepsiCo and is considering its indemnity obligations, if any, to Dole.  iGPS believes that its indemnification to Dole, if any, is capped at $57,500 pursuant to contract.  iGPS believes that it has been released from its indemnification obligations to Pepsi in its settlement with Pepsi re: lost pallets.  On April 24, 2012, the Court stayed the lawsuits against PepsiCo and Dole until at least April 5th, 2013 pending the outcome of the reexamination proceedings.   iGPS believes RRR's claims are baseless and intends to defend against RRR's accusations and any future litigation vigorously.

**<u>Schedule 5.08(b)(1)</u>**

**Owned Real Property**

None.

**Schedule 5.08(b)(2)**

**Leased Real Property**

| Property street address, city, state and ZIP | County | Lessor(s) and contact information | Description |
|---|---|---|---|
| 225 East Robinson Street Suite 200 Orlando, FL 32801 | Orange | HIW-KC Orlando, LLC c/o Highwoods Properties, Inc. 3100 Smoketree Court, Suite 600 Raleigh, NC 27604 ATTN: Corporate Counsel | Headquarters |
| 6801 Gaylord Parkway Suite 402 Frisco, TX 75034 | Collin | Hall 2600 Network Associates, Ltd. 6801 Gaylord Parkway, Suite 407 Frisco, TX 75034 ATTN: Mark Depker | Sublease property |
| 1302 Melissa Drive Bentonville, AR 72712 | Benton | 1302 Melissa, LLC 801 SW "O" Street Bentonville, AR 72712 | Sales service center |
| 11316 Boggy Creek Road Units 118 and 122 Orlando, FL 32824 | Orange | Straubinger, Inc. c/o Straubcos, LLC 1737 South Orange Ave. Orlando, FL 32804 ATTN: Paul G. Straubinger, President | Warehouse |

## Schedule 5.10

### Insurance

| Insured party | Broker | Underwriter | Type(s) of coverage | Coverage amounts | Annual policy premiums |
|---|---|---|---|---|---|
| iGPS Company LLC | Aon | Travelers | Property, General Liability and Umbrella | $5.2MM, $1MM and $15MM, respectively | $86,350 |
| iGPS Company LLC | Aon | Travelers | Automobile | $1MM | 25,759 |
| iGPS Company LLC | Aon | Travelers | International Liability | $1MM | 4,095 |
| iGPS Company LLC | Aon | Travelers | Workers Comp | Statutory | 45,981 |
| iGPS Company LLC | Aon | Chartis | Directors and Officers | $10MM | 22,057 |
| iGPS Company LLC | Aon | Chartis | Employment Practices Liability | $3MM | 17,052 |
| iGPS Company LLC | Aon | Chartis | Fiduciary | $1MM | 1,539 |
| iGPS Company LLC | Aon | Chartis | Crime | $3MM | 10,336 |
| iGPS Company LLC | BB&T | Chubb | Inland Marine Main | $5MM Mfg/Retail, $2.5MM Depots, $5MM named Depots | 282,056 |
| iGPS Company LLC | BB&T | Federal Insurance Company | Inland Marine Transport | $25K | 1,000 |
| iGPS Company LLC | BB&T | Indian Harbor Insurance Company | Inland Marine Excess | $15MM Excess Layer named Depots | 51,444 |
| iGPS Company LLC | BB&T | Kinsale Insurance Company | Inland Marine CA Earthquake | $5MM | 25,812 |
| | | | | **TOTAL** | **$573,481** |

**Schedule 5.11**

**Taxes**

| Description of tax | Taxing entity | Amount not being paid timely |
|---|---|---|
| 2012 property tax * | Various jurisdictions | 228,096.36 |
| 2012 corporate tax | Pennsylvania Dept. of Revenue | 5,500.00 |
| 2012 corporate tax | Vermont Dept. of Taxes | 250.00 |
| 2012 corporate tax | Connecticut Commissioner of Revenue | 250.00 |
| 2012 corporate tax | Wisconsin Dept. of Revenue | 25.00 |
| 2012 corporate tax | North Carolina Dept. of Revenue | 250.00 |
| 2012 corporate tax | Minnesota Revenue | 2,000.00 |
| 2012 corporate tax | Tennessee Dept. of Revenue | 7,000.00 |
| 2012 corporate tax | Kentucky State Treasurer | 500.00 |
| 2012 corporate tax | Texas State Comptroller | 93,000.00 |
| 2012 corporate tax | California Franchise Tax Board | 800.00 |
| 2012 corporate tax | Alabama Dept. Of Revenue | 400.00 |
| **TOTAL** | | **$338,071.36** |

* See schedule below for property-tax detail.

| Due date | Taxing entity | Amount |
|---|---|---|
| 04/30/2013 | WA YAKIMA COUNTY | 5,252.57 |
| 04/30/2013 | WA YAKIMA COUNTY | 19.20 |
| 04/30/2013 | WA YAKIMA COUNTY | 188.23 |
| 04/30/2013 | WA YAKIMA COUNTY | 1.04 |
| 05/01/2013 | NE MADISON COUNTY | 2,093.42 |
| 05/01/2013 | MA LITTLETON TOWN | 6,992.84 |
| 05/10/2013 | IN DEARBORN COUNTY | 2,671.34 |
| 05/10/2013 | IN HANCOCK COUNTY | 238.86 |
| 05/10/2013 | IN HANCOCK COUNTY | 3,499.16 |
| 05/10/2013 | IN HENDRICKS COUNTY | 5,611.64 |
| 05/10/2013 | IN HENDRICKS COUNTY | 965.16 |
| 05/10/2013 | IN MORGAN COUNTY | 4,424.16 |
| 05/10/2013 | IN NOBLE COUNTY | 2,809.10 |
| 05/10/2013 | IN NOBLE COUNTY | 97.48 |
| 05/10/2013 | IN WELLS COUNTY | 3,072.16 |
| 05/10/2013 | IN GRANT COUNTY | 7,395.90 |
| 05/10/2013 | IN GRANT COUNTY | 1,396.50 |
| 05/10/2013 | IN SCOTT COUNTY | 7,970.10 |
| 05/15/2013 | IN SCOTT COUNTY | 5.00 |

| 05/10/2013 | OK PITTSBURG COUNTY | 14.84 |
|---|---|---|
| 05/10/2013 | IN ALLEN COUNTY | 54.68 |
| 05/10/2013 | IN ALLEN COUNTY | 9,820.78 |
| 05/10/2013 | IN ALLEN COUNTY | 7.30 |
| 05/10/2013 | IN ALLEN COUNTY | 18.14 |
| 05/10/2013 | IN ALLEN COUNTY | 418.04 |
| 05/10/2013 | IN ALLEN COUNTY | 3,585.90 |
| 05/10/2013 | IN ALLEN COUNTY | 14.44 |
| 05/10/2013 | IN ALLEN COUNTY | 162.30 |
| 05/10/2013 | IN DEKALB COUNTY | 4,785.50 |
| 05/10/2013 | IN KNOX COUNTY | 150.64 |
| 05/10/2013 | IN PORTER COUNTY | 197.08 |
| 05/10/2013 | IN PORTER COUNTY | 5.00 |
| 05/10/2013 | IN SHELBY COUNTY | 133.97 |
| 05/10/2013 | IN SHELBY COUNTY | 4,105.14 |
| 05/10/2013 | IN SHELBY COUNTY | 13.24 |
| 05/10/2013 | IN SHELBY COUNTY | 12.20 |
| 05/10/2013 | IN TIPPECANOE COUNTY | 28.18 |
| 05/10/2013 | IN TIPPECANOE COUNTY | 68.64 |
| 05/10/2013 | IN VANDERBURGH COUNTY | 109.14 |
| 05/10/2013 | IN VANDERBURGH COUNTY | 5.00 |
| 05/10/2013 | IN WAYNE COUNTY | 715.24 |
| 05/10/2013 | IN MARION COUNTY | 55,623.90 |
| 05/10/2013 | IN MARION COUNTY | 419.02 |
| 05/10/2013 | IN MARION COUNTY | 238.50 |
| 05/10/2013 | IN MARION COUNTY | 10.96 |
| 05/10/2013 | IN MARION COUNTY | 51.28 |
| 05/10/2013 | IN MARION COUNTY | 1,063.44 |
| 05/10/2013 | IN MARION COUNTY | 2,656.50 |
| 05/10/2013 | IN MARION COUNTY | 14,747.39 |
| 05/10/2013 | IN MARION COUNTY | 2,920.65 |
| 05/10/2013 | IN MARION COUNTY | 34.04 |
| 05/10/2013 | IN MARION COUNTY | 8.88 |
| 05/10/2013 | IN MONROE COUNTY | 1,563.32 |
| 05/10/2013 | IN WAYNE COUNTY | 2,017.86 |
| 05/10/2013 | IN WHITLEY COUNTY | 1,408.71 |
| 05/10/2013 | IN HAMILTON COUNTY | 778.46 |
| 05/10/2013 | IN CASS COUNTY | 58.20 |
| 05/10/2013 | IN BARTHOLOMEW COUNTY | 133.16 |
| 05/10/2013 | IN BOONE COUNTY | 5,821.32 |
| 05/10/2013 | IN DELAWARE COUNTY | 856.50 |
| 05/10/2013 | IN DELAWARE COUNTY | 464.10 |
| 05/15/2013 | IN DELAWARE COUNTY | 1,980.72 |
| 05/10/2013 | IN DELAWARE COUNTY | 5.00 |
| 05/10/2013 | IN ELKHART COUNTY | |

| | | |
|---|---|---|
| 05/10/2013 | IN ELKHART COUNTY | 41.46 |
| 05/10/2013 | IN ELKHART COUNTY | 309.52 |
| 05/10/2013 | IN ELKHART COUNTY | 5.00 |
| 05/10/2013 | IN FLOYD COUNTY | 9.22 |
| 05/10/2013 | IN FLOYD COUNTY | 10.98 |
| 05/10/2013 | IN HUNTINGTON COUNTY | 2,715.46 |
| 05/10/2013 | IN JACKSON COUNTY | 39.00 |
| 05/10/2013 | IN JASPER COUNTY | 1,648.14 |
| 05/10/2013 | IN JASPER COUNTY | 5.00 |
| 05/10/2013 | IN JOHNSON COUNTY | 76.44 |
| 05/10/2013 | IN JOHNSON COUNTY | 62.70 |
| 05/10/2013 | IN LAKE COUNTY | 377.40 |
| 05/10/2013 | IN LAKE COUNTY | 28.74 |
| 05/10/2013 | IN PUTNAM COUNTY | 1,551.50 |
| 05/10/2013 | IN ST JOSEPH COUNTY | 18.06 |
| 05/10/2013 | IN ST JOSEPH COUNTY | 375.58 |
| 05/10/2013 | IN ST JOSEPH COUNTY | 8.71 |
| 05/10/2013 | IN VIGO COUNTY | 21.41 |
| 05/28/2013 | ME WELLS TOWN | 123.90 |
| 04/09/2013 | VA HENRICO COUNTY | 18.06 |
| 04/18/2013 | TN WILLIAMSON COUNTY | (6,889.69) |
| 04/30/2013 | ME AUBURN TOWN | (8.00) |
| 04/30/2013 | ME BOURNE TOWN | (3.40) |
| | APRIL BANK SERVICE CHARGE | (5.81) |
| MAILED | MS RANKIN COUNTY | 14.00 |
| MAILED | MS RANKIN COUNTY | 14.45 |
| MAILED | MS RANKIN COUNTY | 6.64 |
| MAILED | MS RANKIN COUNTY | 0.21 |
| 04/20/2013 | CO ADAMS COUNTY | 0.41 |
| 04/20/2013 | CO ADAMS COUNTY | 263.80 |
| 04/20/2013 | CO DENVER CITY/COUNTY | 85.40 |
| 04/20/2013 | NE BOX BUTTE COUNTY | 588.50 |
| 04/20/2013 | NE BUFFALO COUNTY | 127.10 |
| 04/20/2013 | NE CHASE COUNTY | 79.78 |
| 04/20/2013 | NE DAKOTA COUNTY | 173.92 |
| 04/20/2013 | NE LINCOLN COUNTY | 153.64 |
| 04/20/2013 | WA BENTON  COUNTY | 4,636.08 |
| 04/20/2013 | WA BENTON  COUNTY | 64.39 |
| 04/20/2013 | WA CHELAN COUNTY | 53.21 |
| 04/20/2013 | WA CLARK COUNTY | 158.94 |
| 04/20/2013 | WA CLARK COUNTY | 537.43 |
| 04/20/2013 | WA CLARK COUNTY | 95.15 |
| 04/20/2013 | WA CLARK COUNTY | 149.83 |
| 04/20/2013 | WA COWLITZ COUNTY | 55.09 |
| 04/20/2013 | WA COWLITZ COUNTY | 15.78 |

| 04/20/2013 | WA DOUGLAS COUNTY | 38.59 |
| 04/20/2013 | WA FRANKLIN COUNTY | 39.92 |
| 04/20/2013 | WA FRANKLIN COUNTY | 97.58 |
| 04/20/2013 | WA GRAYS HARBOR COUNTY | 76.06 |
| 04/20/2013 | WA KING COUNTY | 465.06 |
| 04/20/2013 | WA KING COUNTY | 11.97 |
| 04/20/2013 | WA KING COUNTY | 70.35 |
| 04/20/2013 | WA KING COUNTY | 6.64 |
| 04/20/2013 | WA KING COUNTY | 1,133.76 |
| 04/20/2013 | WA KING COUNTY | 23.63 |
| 04/20/2013 | WA KING COUNTY | 5,486.92 |
| 04/20/2013 | WA KING COUNTY | 20.67 |
| 04/20/2013 | WA KING COUNTY | 1,744.63 |
| 04/20/2013 | WA KING COUNTY | 1,927.00 |
| 04/20/2013 | WA KING COUNTY | 23.32 |
| 04/20/2013 | WA KITSAP COUNTY | 208.30 |
| 04/20/2013 | WA KITTITAS COUNTY | 10.24 |
| 04/20/2013 | WA LEWIS COUNTY | 38.44 |
| 04/20/2013 | WA PIERCE COUNTY | 31.73 |
| 04/20/2013 | WA PIERCE COUNTY | 100.05 |
| 04/20/2013 | WA PIERCE COUNTY | 4,882.17 |
| 04/20/2013 | WA PIERCE COUNTY | 3,873.92 |
| 04/20/2013 | WA PIERCE COUNTY | 1,180.24 |
| 04/20/2013 | WA PIERCE COUNTY | 39.48 |
| 04/20/2013 | WA PIERCE COUNTY | 348.14 |
| 04/20/2013 | WA PIERCE COUNTY | 847.48 |
| 04/20/2013 | WA PIERCE COUNTY | 3,880.82 |
| 04/20/2013 | WA PIERCE COUNTY | 851.04 |
| 04/20/2013 | WA PIERCE COUNTY | 5,444.13 |
| 04/20/2013 | WA PIERCE COUNTY | 79.63 |
| 04/20/2013 | WA PIERCE COUNTY | 1,151.27 |
| 04/20/2013 | WA PIERCE COUNTY | 78.92 |
| 04/20/2013 | WA PIERCE COUNTY | 191.90 |
| 04/20/2013 | WA PIERCE COUNTY | 6,644.89 |
| 04/20/2013 | WA SKAGIT COUNTY | 41.51 |
| 04/20/2013 | WA SNOHOMISH COUNTY | 757.11 |
| 04/20/2013 | WA SPOKANE COUNTY | 988.69 |
| 04/20/2013 | WA SPOKANE COUNTY | 63.91 |
| 04/20/2013 | WA SPOKANE COUNTY | 56.94 |
| 04/20/2013 | WA SPOKANE COUNTY | 1,568.31 |
| 04/20/2013 | WA SPOKANE COUNTY | 31.77 |
| 04/20/2013 | WA SPOKANE COUNTY | 72.79 |
| 04/20/2013 | WA SPOKANE COUNTY | 125.76 |
| 04/20/2013 | WA STEVENS COUNTY | 5.12 |
| 04/20/2013 | WA THURSTON COUNTY | 8.28 |

| 04/20/2013 | WA THURSTON COUNTY | 79.77 |
| 04/20/2013 | WA THURSTON COUNTY | 2,225.12 |
| 04/20/2013 | WA THURSTON COUNTY | 152.33 |
| 04/20/2013 | WA WALLA WALLA COUNTY | 61.06 |
| 04/20/2013 | WA WHATCOM COUNTY | 205.17 |
| 04/20/2013 | WA CLALLAM COUNTY | 150.62 |
| 04/20/2013 | WA CLALLAM COUNTY | 16.71 |
| 04/20/2013 | WA GRANT COUNTY | 196.52 |
| 04/20/2013 | MA HUDSON TOWN | 25.71 |
| 04/20/2013 | GA WAYCROSS CITY | 22.22 |
| 04/20/2013 | IN SPENCER COUNTY | 290.72 |
| 03/25/2013 | LESS OVER FUNDING ON TRANS #8 | (3.00) |
| | MARCH BANK WIRE CHARGE | 45.00 |
| | MARCH BANK SERVICE CHARGE | 14.00 |
| | | |
| **TOTAL PROPERTY TAXES 2012** | | **$228,096.36** |

**Schedule 5.13**

**Subsidiaries; Other Equity Investments**

None.

## <u>Schedule 5.18</u>

**Collective Bargaining Agreements**

| Loan party or subsidiary | Party to or bound by: (indicate yes or no) | | | | | |
|---|---|---|---|---|---|---|
| | Collective-bargaining agreement | Management agreement | Employment agreement | Bonus, restricted-stock, stock-option or stock-appreciation plan or agreement | Other similar plan or agreement | Comments |
| iGPS Company LLC | No | No | Yes | Yes | No | Subject to employment, bonus and stock agreements between Company and several of its employees |

## Schedule 5.22

### DDAs; Collection Account

| Name of institution | Address, city, state and ZIP code | Account number | Contact name | Purpose |
|---|---|---|---|---|
| JPMorgan Chase Bank, N.A. | Northeast Market P O Box 659754 San Antonio, TX 78265-9754 | 000000590404431 | Lisa Crowley | Disbursement account |
| JPMorgan Chase Bank, N.A. | Northeast Market P O Box 659754 San Antonio, TX 78265-9754 | 000000836985465 | Lisa Crowley | Lockbox deposit account |
| JPMorgan Chase Bank, N.A. | Northeast Market P O Box 659754 San Antonio, TX 78265-9754 | 000000590409220 | Lisa Crowley | Money-market account |
| Bank of America, N.A. | P.O. Box 25118 Tampa, FL 33622-5118 | 898013199314 | Catherine Wertenberger | Payroll account |
| Bank of America, N.A. | P.O. Box 25118 Tampa, FL 33622-5118 | 4427615171 | Catherine Wertenberger | Credit-card account |
| Suntrust Bank | P O Box 622227 Orlando, FL 32862-2227 | 10000091127208 | Justin Belanger | Money-market account |

**Schedule 5.23**

**Brokers**

| Description | Broker or finder name | Fee calculation |
|---|---|---|
| Transaction fee for DIP loan | Houlihan Lokey, Inc. | $125,000 |

**Schedule 5.25**

**Material Contracts**

| Counterparty | Description of contract | In probable breach or default |
|---|---|---|
| Chobani | Receiving and iDepot agreement | Yes |
| Costco | iDepot business agreement | Yes |
| Dillon Companies, Inc. dba King Soopers, Inc. | Receiving and iDepot agreement | Yes |
| Family Dollar Distribution LLC | Receiving and iDepot agreement | Yes |
| Fareway Stores, Inc. | Receiving and iDepot agreement | Yes |
| Food Lion, LLC | Receiving and iDepot agreement | Yes |
| Fresh & Easy | Receiving and iDepot agreement | Yes |
| Gerawan Farming | Receiving and iDepot agreement | Yes |
| Giant Eagle Inc. | Retailer agreement with respect to the receipt, use and return of pallets | Yes |
| Hannaford Brothers Company | Receiving and iDepot agreement | Yes |
| HEB Grocery Company, LP | Retailer agreement with respect to the receipt, use and return of pallets | Yes |
| Hy-Vee Inc. | Retailer agreement with respect to the receipt, use and return of pallets | Yes |
| Ingles Markets, Inc. | Receiving and iDepot agreement | Yes |
| Kamps Pallets | Receiving and iDepot agreement | Yes |
| Marsh Supermarkets, LLC | Receiving and iDepot agreement | Yes |
| McLane/Company, Inc. | Receiving and iDepot agreement | Yes |
| McLane/Mid-Atlantic, Inc. | Receiving and iDepot agreement | Yes |
| McLane/Midwest, Inc. | Receiving and iDepot agreement | Yes |
| McLane/Mid-Atlantic, Inc. | Receiving and iDepot agreement | Yes |
| McLane/Midwest, Inc. | Receiving and iDepot agreement | Yes |
| McLane/Eastern, Inc. | Receiving and iDepot agreement | Yes |
| McLane Company, Inc. | Receiving and iDepot agreement | Yes |
| McLane/Eastern, Inc. | Receiving and iDepot agreement | Yes |
| McLane/Suneast, Inc. | Receiving and iDepot agreement | Yes |
| McLane Company, Inc. | Receiving and iDepot agreement | Yes |
| McLane/Southern, Inc. | Receiving and iDepot agreement | Yes |
| McLane Company, Inc. | Receiving and iDepot agreement | Yes |
| McLane/Suneast, Inc. | Receiving and iDepot agreement | Yes |
| McLane/Western, Inc. | Receiving and iDepot agreement | Yes |
| McLane Company, Inc. | Retailer/wholesaler agreement with respect to the receipt, use and return of pallets | Yes |
| McLane Company, Inc. | Receiving and iDepot agreement | Yes |
| McLane/Suneast, Inc. | Receiving and iDepot agreement | Yes |
| Meijer Distribution, Inc. | Receiving and iDepot agreement | Yes |

| Plaza Provision Company | iDepot agreement | Yes |
|---|---|---|
| Safeway Inc. | Retailer agreement with respect to the receipt, use and return of pallets | Yes |
| Sam's East, Inc. and Sam's West, Inc. | Reverse-logistics services agreement | Yes |
| Schnuck Markets, Inc. | Receiving and iDepot agreement | Yes |
| Wawa, Inc. | Receiving and iDepot agreement | Yes |
| Wegmans Food Markets, Inc. | Receiving and iDepot agreement | Yes |
| Weis Markets, Inc. | Receiving and iDepot agreement | Yes |
| Winco Foods, LLC | Receiving and iDepot agreement | Yes |
| Winn-Dixie Stores, Inc. | Receiving and iDepot agreement | Yes |
| Imperial Woods Enterprise | Receiving and iDepot agreement | Yes |
| Merchants Distributors Inc. | Receiving and iDepot agreement | Yes |
| Target Corporation | Agreement with respect to the receipt, use and return of pallets | Yes |
| Publix Super Markets, Inc. | Services agreement with respect to the receipt, use and return of pallets | Yes |
| Florida Legislative Associates, LLC | Agreement for representation of Debtor's interest before the Florida Legislature | Yes |
| Global Public Affairs | Confirmation of engagement as a consultant to the Debtor to provide governmental relations and public affairs support in Canada | Yes |
| Growth Squared, LLC | Master consulting services agreement to provide strategic advisory services related to government relations, advocacy and outreach services; rates were adjusted per e-mail confirmation on March 4, 2013 | Yes |
| Husch Blackwell, LLP | Agreement to serve as consultant to MWW Group, which has a separate agreement with the Debtor, to provide monitoring and lobbying activity on Debtor's behalf related to HB 550 before the Missouri legislature | Yes |
| MWW Group | Agreement to provide public relations, web site development and design and media-kit development; rates govered by this agreement were updated in a separate document on March 2013 | Yes |
| Kahn, Soares & Conway, LLP | Professional services agreement to provide administrative and legislative representation to the Debtor | Yes |

| | | |
|---|---|---|
| Morrill & Associates PC | Agreement to serve as consultant to MWW Group, which has a separate agreement with the Debtor, to provide monitoring and lobbying activity before the Illinois General Assembly, which amends the original agreement dated February 28, 2012 | Yes |
| Theodore W. Popely, PC | Independent-contractor agreement to serve as consultant to MWW Group, which has a separate agreement with the Debtor, with respect to lobbying and govermental relations in Alaska | Yes |
| Sirotkin & Necrason PLC | Lobbying-services agreement with the Debtor to represent its legislative interests in the state of Vermont. | Yes |
| Tonkon Torp LLP | Engagement letter with the Debtor to represent it in connection with government relations before the Oregon State Legislature | Yes |
| Wiener Associates, PLC | Consulting agreement to perform for the Debtor various lobbying an dconsulting services with respect to governmental affairs and legislative and regulatory strategies in the state of Michigan | Yes |
| Wilson, Elser, Moskowitz, Edelman & Dicker LLP | Agreement to serve as consultant to MWW Group, which has a separate agreement with the Debtor, to provide legislative advocacy services before the legislative and executive branches of the state of New York. | Yes |
| National Strategies, LLC | Client consulting agreement to track for the Debtor various state legislative and and regulatory issues | Yes |
| epcSolutions, Inc. | Software license agreement | Yes |
| epcSolutions, Inc. | Agreement granting right to sublicense to end-users | Yes |
| epcSolutions, Inc. | Software development and reservation of rights agreement | Yes |
| epcSolutions, Inc. | Software maintenance and support agreement | Yes |
| epcSolutions, Inc. | Term sheet to amend governing documents | Yes |
| epcSolutions, Inc. | First amendment to party agreements | Yes |
| Ryder Integrated Logistics, Inc. | Equipment management schedule | Yes [*] |
| AIM Logistic Services, LLC | Depot facility service provider | Yes |

| | agreement | |
|---|---|---|
| Asset Management Service | Master recycler service provider agreement | Yes |
| APS and Sons | Master recycler service provider agreement | Yes |
| Rehrig Pacific Logistics | Master recycler service provider agreement | Yes |
| SB Pallets | Master recycler service provider agreement | Yes |
| Taly Pallet | Master recycler service provider agreement | Yes |
| HIW-KC Orlando. LLC | Agreement of lease for Debtor's use of nonresidential real property | No |
| HIW-KC Orlando. LLC | First amendment to lease agreement for Debtor's use of nonresidential real property | No |
| HIW-KC Orlando. LLC | Second amendment to lease agreement for Debtor's use of nonresidential real property | No |
| HIW-KC Orlando. LLC | Third amendment to lease agreement for Debtor's use of nonresidential real property | No |
| HIW-KC Orlando. LLC | Fourth amendment to lease agreement for Debtor's use of nonresidential real property | No |
| HIW-KC Orlando. LLC | Fifth amendment to lease agreement for Debtor's use of nonresidential real property | No |
| HIW-KC Orlando. LLC | Sixth amendment to lease agreement for Debtor's use of nonresidential real property | No |
| HIW-KC Orlando. LLC | Seventh amendment to lease agreement for Debtor's use of nonresidential real property | No |
| 1302 Melissa, LLC | Business lease for Debtor's use of nonresidential real property | No |
| Straubinger, Inc. | Warehouse lease for Debtor's use of nonresidential real property | No |
| Straubinger, Inc. | Lease modification agreement for Debtor's use of nonresidential real property | No |
| Salesforce.com | Master subscription agreement | Yes |
| Gary Glass | Employment agreement | No |
| Jack Sparn | Offer letter to be employed at the Debtor | No |

| Microsoft Licensing, GP | Software license agreement | Yes * |
|---|---|---|
| AT&T Corporation | Managed internet service agreement | Yes |
| AT&T Corporation | Teleconferencing services agreement | Yes |
| AT&T Corporation | Business Network Express bundle agreement | Yes |
| Velocity, The Greatest Phone Company Ever, Inc. | Telecommunications master services agreement | Yes |
| Numerex Solutions, LLC | Purchase and resale agreement | Yes |
| Stomp Web Media | Software and professional-services agreement | Yes |
| TIBCO Software | Software license and services agreement | Yes |
| Enfora, Inc. | Supply agreement | Yes |
| Grantek Systems Integration Corp. | Development services agreement | Yes |
| JYP Orlando, L.L.C. (d/b/a DataSite Orlando) | Colocation master services agreement | No |
| JYP Orlando, L.L.C. (d/b/a DataSite Orlando) | Addendum to colocation master services agreement | No |
| Plásticos Técnicos Mexicanos S.A. de C.V. | Pallet purchase agreement | Yes |
| SunTrust Bank | 401(k) directed trustee agreement | No |
| United of Omaha Life Insurance Company | Agreement to provide dental insurance to employees | No |
| United of Omaha Life Insurance Company | Agreement to provide life insurance to employees | No |
| United of Omaha Life Insurance Company | Agreement to provide long-term disability insurance to employees | No |
| United of Omaha Life Insurance Company | Agreement to provide short-term disability insurance to employees | No |
| United of Omaha Life Insurance Company | Agreement to provide life and AD&D insurance to employees | No |
| Blue Cross Blue Shield Of Florida | Master contract for employee medical insurance | No |
| EcoArk, Inc. | iDepot agreement | Yes |
| Nice Pak Products, Inc. | iDepot agreement | Yes |
| Sysco Corporation | Receiving and iDepot agreement | Yes |
| Club Chef | Receiving and iDepot agreement | Yes |

* Indicates Company has received a notice of breach from vendor.

**Schedule 7.01**

**Existing Liens**

| Lienholder | Address, city, state and ZIP code | Filing date | Collateral covered per UCC financing statement |
|---|---|---|---|
| Bank of America, N.A. [Agent] | 300 Galleria Parkway, N.W. Suite 800 Atlanta, GA 30339 | 11/19/2009 | All of Debtor's personal property, whether now owned or existing or hereafter created, acquired or arising and wherever located, including, without limitation, all of Debtor's accounts, general intangibles, documents, instruments, chattel paper, goods (including, without limitation, inventory, equipment and fixtures), deposit accounts, investment property, letter-of-credit rights and commercial tort claims; all proceeds, products and supporting obligations of each of the foregoing; and all books and records related to any of the foregoing. |
| Bank of America, N.A. [Agent] | 300 Galleria Parkway, N.W. Suite 800 Atlanta, GA 30339 | 11/30/2009 | [Same as above, followed by:]<br><br>This UCC financing statement is in addition to, and not in lieu or replacement of, any other UCC financing statement naming Secured Party as secured party and Debtor as debtor of record in any filing office or jurisdiction in the United States of America. |
| Bank of America, N.A. [Agent] | 300 Galleria Parkway, N.W. Suite 800 Atlanta, GA 30339 | 11/30/2009 | All of Debtor's right, title and interest in and to any commercial tort claim arising out of any alleged unlawful sale of Debtor's pallets, including, without limitation, all tort claims that have been, or that under applicable law could have been, asserted in the action styled iGPS Company, LLC v. Wholesalepallets.com, LLC, Lori Learmont, and Salvador Altamirando, Case Number 2:09-cv-01194-SJO-SS, in the United States District Court for the Central District of California, Western Division.<br><br>This UCC financing statement is in addition to, and not in lieu or replacement of, any other UCC financing statement naming Secured Party as secured party and Debtor as debtor of record in any filing office or jurisdiction in the United States of America. |

| Saxon Business Systems | 625 First Avenue Cedar Rapids, IA 52401 | 6/25/2010 | Various Xerox Copier, Printer and Fax systems and all products, proceeds and attachments. This UCC-1 is filed pursuant to section 9-505 of the Uniform Commercial Code for informational purposes only. This transaction is intended by the lessor and lessee to be a lease. |
|---|---|---|---|
| Bank of America, N.A. [Agent] | 300 Galleria Parkway, N.W. Suite 800 Atlanta, GA 30339 | 6/12/2012 | All of Debtor's right, title and interest in and to any commercial tort claims against SAS Services B.V., a company formed under the laws of The Netherlands ("SAS"), Schoeller Arca Systems N.V., a company formed under the laws of The Netherlands ("Schoeller"), Schoeller Arca Systems Inc., a Delaware corporation ("Schoeller US"), or any affiliate or subsidiary thereof (collectively, "Defendants"), including, without limitation, any and all causes of action that Debtor may have or assert against any Defendant arising out of or related in any way to any agreement, document, contract or instrument evidencing or entering into in connection with the transactions described in that certain Third Amended and Restated Manufacturing Supply Agreement dated July 9, 2008, by and among the Debtor, Schoeller and Schoeller U.S., as the same may be amended, modified, restated or otherwise supplemented from time to time, whether now or hereafter existing, including that certain Technology Licensing Agreement dated May 25, 2007, by and among the Debtor, Schoeller and SAS, as the same may be amended, modified, restated, or otherwise supplemented from time to time, or which arise out of or relate in any way to any of the Debtor's pallets, and all cash and non-cash proceeds of any of the foregoing.<br><br>All of Debtor's right, title, and interest in and to any commercial tort claims against Bobby L. Moore, and all cash and non-cash proceeds of any of the foregoing.<br><br>This UCC financing statement is in addition to, and not in lieu or replacement of, any other UCC financing statement naming Secured Party as secured party and Debtor as debtor of record in any filing office or jurisdiction in the United States of America. |

| U.S. Bank Equipment Finance | 1310 Madrid Street Marshall, MN 56258 | 11/12/2012 | 13 Medius Readsoft and Mediusflow ERP user licenses; together with all replacements, parts, repairs, additions, accessions and accessories incorporated therein or affixed or attached thereto and any and all proceeds of the foregoing, including, without limitation, insurance recoveries. |
|---|---|---|---|
| Bank of America, N.A. [Agent] | 300 Galleria Parkway, N.W. Suite 800 Atlanta, GA 30339 | 1/24/2013 | All of Debtor's right, title and interest in and to any cause of action for negligence, conversion or other breach of duty that constitutes a tort under applicable law and arises from pallets of Debtor that were lost or misplaced by Pepsico, Inc. ("Pepsico") and Pepsico's rejection of and refusal to pay certain of Debtor's invoices related to such lost or misplaced pallets, and all cash and non-cash proceeds of any of the foregoing.<br><br>This UCC financing statement is in addition to, and not in lieu or replacement of, any other UCC financing statement naming Secured Party as secured party and Debtor as debtor of record in any filing office or jurisdiction in the United States of America. |

**Schedule 7.02**

**Existing Investments**

None.

**Schedule 7.03**

**Existing Indebtedness**

| Creditor | Address, city, state and ZIP code | Description of indebtedness |
|---|---|---|
| Branch Banking and Trust Company | 255 South Orange Avenue<br>Orlando, FL 32801 | Senior secured revolving credit facility |
| JPMorgan Chase Bank, N.A. | 270 Park Avenue<br>44th Floor<br>New York, NY 10017 | Senior secured revolving credit facility |
| Suntrust Bank | 303 Peachtree Street<br>Atlanta, GA 30308 | Senior secured revolving credit facility |
| Morgan Stanley Bank, N.A. | One Utah Center<br>201 South Main Street<br>Fifth Floor<br>Salt Lake City, UT 84111 | Senior secured revolving credit facility |
| TD Bank, N.A. | 317 Madison Avenue<br>Third Floor<br>New York, NY 10017 | Senior secured revolving credit facility |
| Barclays Bank PLC | 745 Seventh Avenue<br>26th Floor<br>New York, NY 10119 | Senior secured revolving credit facility |
| Wells Fargo Bank, N.A. | 800 North Magnolia Avenue<br>Suite 800<br>Orlando, FL 32803 | Senior secured revolving credit facility |
| Bank of America, N.A. [Agent] | 300 Galleria Parkway, N.W.<br>Suite 800<br>Atlanta, GA 30339 | Senior secured revolving credit facility |

**Schedule 10.02**

**Agent's Office; Certain Addresses for Notices**

| Party | Address, city, state and ZIP code | Telephone number | Fax number | E-mail address |
|---|---|---|---|---|
| Crystal Financial Inc. | Two International Place 17th Floor Boston, MA 02110 | +1 (617) 428-8709 | +1 (617) 428-8701 | rtarby@crystalfinco.com |
| iGPS Company LLC | 225 East Robinson Street Orlando, FL 32801 | +1 (321) 281-9200 | +1 (407) 423-4741 | gglass@igps.net |

## Exhibit "2"

## Budget

## [to come]

2780702_3

Exhibit "3"

**Carve Out Budget**

[to come]

2780702_3