IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| iGPS COMPANY LLC,[1] | ) | Case No. 13-11459 (    ) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DECLARATION OF WALTER MYERS IN
## SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS

I, Walter Myers, being duly sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      On June 4, 2013 (the "Petition Date"), iGPS Company LLC, as debtor and debtor in possession ("iGPS", the "Company" or the "Debtor"), commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in this Court. I am Vice President of Finance of iGPS. As such, I am familiar with the day-to-day operations, business and financial affairs of the Debtor.

2.      I submit this Declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of the first day motions and applications (collectively, the "First Day Motions").[2] Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information provided to me by certain of the Debtor's employees, my review of relevant documents or my opinion based upon my experience, knowledge and

---

[1]      The last four digits of iGPS Company LLC's federal tax identification number are 6297. The location of iGPS Company LLC's corporate headquarters and the service address is 225 E. Robinson Street, Suite 200, Orlando, Florida.

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the applicable First Day Motion.

information concerning the operations and financial affairs of the Debtor. If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration.

3.　　This Declaration is divided into two sections. Section I provides a brief description of the Debtor's current organizational structure and operations, its current financial condition and the events giving rise to this case. Section II sets forth those facts which are most germane to this Court's determination of the Debtor's various First Day Motions.

## I.
## BACKGROUND AND EVENTS LEADING TO
## THE COMMENCEMENT OF THE CHAPTER 11 CASE

### A.　　Overview of Business Operations

4.　　iGPS Company LLC[3] is the first and only plastic pallet pooling rental and leasing company in the United States, offering shippers and receivers advanced and cost-efficient pallet-based shipping solutions. iGPS was founded in 2006 and is headquartered in Orlando, Florida with a state-of-the art National Sales and Innovation Center located in Bentonville, Arkansas and serves over 100 manufacturers and over 2,000 retailers.

5.　　iGPS's innovative, lightweight, 100 percent recyclable plastic pallets (which are 35 percent lighter than wood pallets) provide significant environmental benefits over traditional pallets and are embedded with radio-frequency identification ("RFID") tags that facilitate the cost-effective shipment of products from manufacturers to distributors and retailers. The RFID technology in the iGPS pallets enables customers to track shipments in real time, which reduces the logistical cost of shipping and permits shippers and receivers to track, trace and monitor shipments across the supply chain. The Company's largest customers include SC

---

[3]　　iGPS is an acronym for Intelligent Global Pooling Systems.

Johnson and Kraft Foods, as well as many of the country's largest retail receivers, such as Costco and Wal-Mart.

6.      Although the cost of an iGPS pallet is significantly greater than the cost of a wood pallet, because iGPS pallets are more durable and require less maintenance over their lifespan, iGPS is able to rent its pallets at a cost competitive with those made of wood. Each iGPS pallet will be in service longer and used with greater frequency than a wood pallet, reducing the long-term cost to iGPS and its customers.

7.      The Company generates revenue through two pallet pooling rental systems (the "Pooling Systems"). Under the traditional pallet pooling system (the "Traditional Pooling System"), iGPS rents the pallets to its customers and charges its customers for their specific usage fees, which include pallet rental fees. In the Traditional Pooling System, a manufacturer enters an order for pallets into the Company's Internet-based system and the order is sent to Ryder Integrated Logistics, Inc. ("Ryder"), a third party transportation, logistics and supply chain management company, for sourcing and optimization of freight. The order is then scanned at the optimal iGPS third party depot location (the "Third Party Depots") and sent to the manufacturer's facility.[4] At the manufacturer's facility, the pallets are loaded with goods, scanned, and shipped to a retailer's distribution center or other location. The retailer uses the pallets in its facility and returns the pallets to a Third Party Depot after the retailer is finished using the pallets for that specific shipment. The pallets are then scanned back into the system upon receipt at the Third Party Depot.

---

[4]      The Debtor currently utilizes Belacon Pallet Services, LLC ("Belacon"), pursuant to that certain Depot Facility Service Provider Agreement dated July 1, 2009, to locate and provide management to oversee the operations of the Debtor's Third Party Depots.

8.      In addition to the Traditional Pooling System, which utilizes Third Party Depots for the distribution and collection of iGPS's pallets, iGPS has also instituted an i-Depot program in order to reduce the amount of time a pallet remains at a Third Party Depot. Under the i-Depot program, retailers agree with iGPS to become i-Depots,[5] and each respective retailer (i.e., an "i-Depot") scans, sorts, inspects, cleans and segregates the pallets at its facility. Like the Third Party Depots, i-Depots fulfill orders and ship pallets directly to manufacturers. In exchange, i-Depot operators receive a per-pallet handling and inspection fee from the Company. In essence, the i-Depot program operates like the Traditional Pooling System, but reduces the need for Third Party Depots and improves the overall efficiency of the Pallet Pooling Systems.

9.      iGPS operates a nationwide network of approximately 10 million pallets,[6] and as of the Petition Date, approximately 50 retailers were serving as i-Depots, providing approximately 165 depot locations in addition to approximately 45 Third Party Depot locations. The Pooling Systems implemented by iGPS allow customers to contract for the exact number of pallets they need, rather than having to stock for peak seasons and keep unused pallets in storage. Furthermore, the consistent weight and uniform dimensions of iGPS's plastic pallets allow customers to plan their shipments to closer specifications and improve the volume of goods moved per load.

10.     Prior to the Petition Date, the Company employed approximately 140 employees. Immediately prior to the Petition Date, however, the Company reduced its workforce significantly, and as of the Petition Date employs approximately 54 employees (the

---

[5]      Approximately one-half of the i-Depots have contracted with the Debtor to provide i-Depot services, and the remaining i-Depots operate as i-Depots pursuant to a general understanding between the Debtor and the i-Depot.

[6]      As discussed below, however, a significant number of pallets are damaged and unusable and, as a result of the pallet manufacturer's failure to honor its warranty obligations, such pallets have not yet been repaired or replaced.

4

"Remaining Employees"). As of the Petition Date, iGPS had gross revenues of approximately

$153,919,000, $172,189,000, and $118,457,000 for 2010, 2011, and 2012 respectively.

### B.      Capital and Debt Structure

11.      Prepetition Credit Facility. On November 24, 2009, iGPS entered into that

certain Loan and Security Agreement, dated as of November 24, 2009 (as amended,

supplemented, modified or otherwise in effect from time to time, the "Prepetition Credit

Facility"), among iGPS, as borrower, certain financial institutions from time to time party

thereto, as lenders (collectively, the "Prepetition Lenders"), JPMorgan Chase Bank, N.A. and

Suntrust Bank, as Co-Syndication Agents, Banc of America Securities LLC, J.P. Morgan

Securities Inc. and Suntrust Robinson Humphrey, Inc., as Joint Lead Arrangers and Joint Book

Running Managers, and Bank of America, N.A., as Administrative and Collateral Agent (the

"Prepetition Agent").[7] The Prepetition Credit Facility is an asset-based lending facility used by

iGPS for working capital and capital expenditures and initially provided iGPS with a borrowing

capacity of $250,000,000.[8]

12.      As of the Petition Date, the principal amount outstanding under the

Prepetition Credit Facility was approximately $148.8 million. The maturity date, or Revolver

Termination Date (as defined in the Prepetition Credit Facility), is November 22, 2013. iGPS's

obligations under the Prepetition Credit Facility are secured by substantially all of iGPS's assets,

---

[7]      As described more fully below, the Prepetition Agent and the Prepetition Lenders sold their claims and interests under the Prepetition Credit Facility immediately prior to the Petition Date.

[8]      Pursuant to the Forbearance Agreement (defined below) and amendments thereto, the Prepetition Agent, on behalf of the Prepetition Lenders, subsequently reduced the borrowing capacity under the Prepetition Credit Facility to approximately $151,000,000 (or such other amount as set forth in a budget approved in connection with the Forbearance Agreement). Second Amendment to Forbearance Agreement dated January 18, 2013, § 2(d).

including goods and inventory (e.g., the pallets), intellectual property, and all of iGPS's deposit accounts.

13.     As of the Petition Date, iGPS estimates that it has no, or virtually no, unrestricted cash or cash equivalents and approximately $400,000 of cash collateral in its accounts. During the Cash Dominion Period (as defined in the Prepetition Credit Facility), all of iGPS's cash or cash equivalent were swept on a daily basis from its JP Morgan lockbox account as a result of its default (as described below) under the Prepetition Credit Facility. Accordingly, prior to the Petition Date, iGPS's cash or cash equivalents were swept during the Cash Dominion Period (except during the forbearance period, described below) on a daily basis to pay down the amount outstanding on the Prepetition Credit Facility, and the Prepetition Lenders, with 100% consent or a waiver from 51%, would allow the iGPS to draw down additional funds to pay its operating expenses as they came due.

14.     Equity. iGPS is a privately-held Delaware limited liability company. Substantially all of iGPS's voting membership interests are held by various funds managed or advised by Pegasus Capital Advisors, L.P. or Kelso & Company, L.P.

## C.     Events Leading to the Commencement of the Chapter 11 Case

15.     Recently the Company has encountered significant challenges due to higher than forecasted numbers of unreturned and damaged pallets, which resulted in an event of default under the Prepetition Credit Facility. Accordingly, the Prepetition Agent, on behalf of the Prepetition Lenders, asserted that it was no longer obligated to provide funding under the Prepetition Credit Facility.

*1. Damaged Pallets and Dispute With Pallet Manufacturer*

16.     In 2006, iGPS entered into a Manufacturing Supply Agreement (as subsequently amended, the "Supply Agreement") with Schoeller Arca Systems Services, B.V. and Schoeller Arca Systems, Inc. (together "SAS") under which SAS would manufacture, supply and repair pallets for use by iGPS. The Supply Agreement included a product warranty by SAS that required SAS to replace damaged pallets.

17.     The pallets supplied to the Company by SAS incurred damages at a higher rate than the Company predicted. Over time, as the number of of damaged pallets rose, the Company thereafter notified SAS it was in material breach of the Supply Agreement. iGPS and SAS engaged in settlement discussions in 2011 to resolve their dispute, and entered into a number of subsequent amendments to the Supply Agreement. The parties were unable to resolve these issues, and consequently, proceeded to arbitration in May 2011 in accordance with the terms of the Supply Agreement asserting, among other things, that SAS had breached the Supply Agreement.

18.     A panel of arbitrators held a hearing from October 24, 2012 through October 31, 2012, and on or about March 20, 2013, entered its Partial Final Award of Arbitrators finding, among other things, that SAS breached the Supply Agreement and, as such, is liable to iGPS for the resulting damages to the business and is also required to honor its warranty obligations or pay monetary damages for its failure to perform. The amount of damages is to be determined at a later hearing.

*2. Notice of Default and Subsequent Negotiations With the Prepetition Lenders*

19.     In late 2011, iGPS advised the Prepetition Agent that it was unable to locate approximately 1,500,000 of its pallets, and on or about January 18, 2012, iGPS reported to

the Prepetition Agent and the Prepetition Lenders that it needed to adjust its accounting estimates

of unaccounted for pallets. As a consequence, on January 20, 2012, the Prepetition Agent

delivered a notice of default to iGPS claiming that certain material events of default had occurred

under various provisions of the Prepetition Credit Facility.

20.     Specifically, the Prepetition Agent alleged that events of default had

occurred by reason of: (i) the Company's alleged breach of its representations and warranties

under Section 9.2 of the Prepetition Credit Facility (i.e., no Prepetition Credit Facility document

contains any untrue statement of a material fact), and (ii) the Company's alleged failure to keep

accurate and complete records of its pallets, in breach of Section 8.3.1 of the Prepetition Credit

Facility. Additionally, the Prepetition Agent alleged that additional events of default *may* have

occurred by reason of: (i) a "loss" of collateral (consisting of unaccounted for pallets) in an

amount that exceeds insurance coverage therefor by more than $5,000,000, in breach of Section

11.1(h) of the Prepetition Credit Facility, and (ii) unintentional inaccuracies in certain

"Borrowing Base Certificates" as a result of the adjustment in accounting methodology and the

inclusion on such Borrowing Base Certificates of the unaccounted for pallets. As a result of the

alleged events of default, the Prepetition Agent demanded that iGPS make mandatory

prepayments under the Prepetition Credit Facility, thereby causing the Company to fully deplete

its available cash, which at the time was in excess of $20 million.

21.     The Prepetition Lenders subsequently granted a limited waiver of the

aforementioned defaults pursuant to that certain Third Amendment to Loan and Security

Agreement dated May 30, 2012,[9] but iGPS failed to comply with its 2011 financial reporting

---

[9]     There have been six amendments to the Prepetition Credit Facility. The first amendment was dated as of
May 25, 2010, the second dated as of July 13, 2010, the third dated as of May 30, 2012, the fourth dated as of
October 9, 2012, the fifth dated as of December 26, 2012, and the sixth dated as of April 16, 2013.

obligations, as required by Section 10.1.2 of the Prepetition Credit Facility, which resulted in an additional event of default of the Prepetition Credit Facility. iGPS's failure to timely provide such financial reports, however, was due to Ernst & Young LLP's delay in issuing the reports due to certain concerns expressed by iGPS's former CEO and founder, Bob Moore, who is currently litigating against iGPS in an employment dispute. These concerns were ultimately resolved, but the delay nonetheless resulted in an additional default. As a result of these defaults, all of iGPS's cash or cash equivalents during the Cash Dominion Period were swept on a daily basis from its JP Morgan lockbox account by the Prepetition Agent.

22.    Following the additional event of default for failure to comply with the 2011 financial reporting obligations, iGPS met with the Prepetition Lenders in an attempt to reach a consensual resolution of the alleged events of default and related disputes. As negotiations continued, on October 9, 2012, the parties entered into a Forbearance Agreement and Fourth Amendment to Loan and Security Agreement (as subsequently amended, the "Forbearance Agreement") pursuant to which the Prepetition Lenders agreed to forbear from exercising remedies under the Prepetition Credit Facility through December 14, 2012. By separate amendments to the Forbearance Agreement, the forbearance period was subsequently extended through April 15, 2013. Notably, however, the Prepetition Agent and the Prepetition Lenders did not agree to any further waiver of any events of default under the Prepetition Credit Facility.

23.    The extended forbearance period provided the parties with additional time to explore and consider all alternatives to maximize the value of the Company's assets and business, including an additional equity infusion, refinancing of the obligations under the Prepetition Credit Facility, or a sale of the Company's assets as a going concern. Forbearance

Agreement § 4(h). Ultimately the Company, together with its advisors, and after consultation with the Prepetition Agent and the Prepetition Lenders and their respective advisors, determined that a sale of substantially all of the Company's assets as a going concern would provide the maximum value for all stakeholders.

24.     To that end, the Prepetition Agent, on behalf of the Prepetition Lenders, required as a condition to forbearance that the Company (i) promptly undertake to develop and diligently pursue a strategic plan to maximize value which includes a budget and timeline for the sale of the Company's business as a going concern and the repayment of the Company's obligations under the Prepetition Credit Facility, and (ii) periodically provide a report to the Prepetition Agent and the Prepetition Lenders concerning the Company's progress in the development of such strategic plan, budget, and timeline. Pursuant to subsequent amendments to the Forbearance Agreement, the Prepetition Agent further required that (i) on or before January 25, 2013, the Prepetition Agent shall have received the confidential information memorandum that would be used by iGPS in connection with the solicitation of bids for the sale of the business or substantially all of iGPS's assets, and (ii) on or before February 15, 2013, the Agent shall have received a signed letter of intent from a prospective purchaser satisfactory to both the Company and the Prepetition Agent. Second Amendment to Forbearance Agreement § 2(b), (c). As detailed below, the Company satisfied its obligations under the Forbearance Agreement.

    3.  *The Marketing and Sale Process*

25.     In December 2012, the Company retained Houlihan Lokey ("Houlihan") as its investment banker to assist the Company in marketing the Company's assets and otherwise pursuing a strategic plan to maximize the value of the Company's business as a going concern. After being retained, Houlihan began an extensive marketing of the Company's assets.

Specifically, Houlihan prepared marketing materials, including a confidential information memorandum (the "CIM"), and contacted over 190 potential financial and strategic investors.

26.    Thereafter, Houlihan distributed the marketing materials and continued to communicate with potential buyers. Of the potential investors contacted by Houlihan, approximately 75 parties executed a confidentiality agreement, received the CIM, and were provided access to confidential materials via an online data room. Houlihan received ten non-binding "indication of interest" letters form potential buyers interested in purchasing substantially all of the Company's assets. For several weeks thereafter, Houlihan facilitated due diligence with these potential buyers and continued to entertain inquiries from additional interested parties.

27.    Following the extensive marketing and diligence process, the Company, in consultation with its advisors diligently negotiated the terms of an asset purchase agreement with Balmoral Funds LLC ("Balmoral"), but the parties ultimately were unable to reach a final agreement within the time constraints imposed by the Company's lack of liquidity.

4.   *The Prepetition Lenders Limit Funding Under the Prepetition Credit Facility*

28.    Notwithstanding the Company's cooperation and diligent pursuit of a sale of substantially all of its assets, on or about February 25, 2013, the Prepetition Agent, on behalf of the Prepetition Lenders, notified the Company that they would not agree to increase the aggregate principal balance of the Revolver Loan (as defined in the Prepetition Credit Facility) above $151 million (the "Revolver Cap"). Without an increase in the Revolver Cap, the Company anticipated that it would not be able to meet its operating expenses.

11

5.  *Purchase of the Company's Debt and Assets*

29.    Immediately prior to the Petition Date, the Prepetition Agent and the Prepetition Lenders agreed to sell their claims and interests under the Prepetition Credit Facility to iGPS Logistics LLC (the "Purchaser"), a Delaware limited liability company formed as a joint venture by and among Balmoral, One Equity Partners, a shareholder of SAS, and Jeff and Robert Liebesman.  Simultaneously therewith, the Purchaser and the Company entered into that certain Asset Purchase Agreement, dated as of June 4, 2013 (as amended from time to time), pursuant to which the Purchaser has agreed to serve as the stalking horse bidder for the sale of substantially all of the Debtor's assets in a competitive and public chapter 11 auction process before this Court.  Moreover, as discussed further below, the Debtor has obtained the agreement of Crystal Financial LLC to provide the Debtor with a $12 million debtor in possession facility to fund the Debtor's operations during and after the chapter 11 sales process.

30.    In light of the foregoing, the Company has determined that the commencement of this chapter 11 case and implementation of the auction process with the Purchaser is the best path to preserving the Debtor's business as a going concern and providing recoveries to creditors that otherwise would be unavailable.

## II.
## FACTS IN SUPPORT OF FIRST DAY MOTIONS

31.    Concurrently with the filing of its chapter 11 petition, the Debtor has filed the First Day Motions.  The Debtor requests that the relief sought in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in maximizing value for the benefit of all parties in interest.

**A.    Debtor's Motion for an Order (I) Authorizing Continued Use of Existing (A) Cash Management System and Bank Accounts and**

**(B) Business Forms; and (II) Waiving Investment and Deposit
Requirements (the "Cash Management Motion")**

32.     By the Cash Management Motion, the Debtor seeks (i) authority to

continue to use the Debtor's existing (a) Cash Management System and Bank Accounts and

(b) business forms; and (ii) a waiver of investment and deposit requirements.

33.     In the ordinary course of business and prior to the Petition Date, the

Debtor in large part utilized a cash management system that provides for well-established

mechanisms for the collection, concentration, management and disbursement of funds used in the

Debtor's business operations (the "Cash Management System"). A list of the Debtor's bank

accounts (the "Bank Accounts") is set forth on Exhibit "A" to the Cash Management Motion.

Through the Cash Management System, the Debtor is able to monitor its cash position on a daily

basis, monitor the collection and disbursement of funds and maintain control over the

administration of the various Bank Accounts required to effect the collection, disbursement and

movement of cash.

34.     As reflected in Exhibit "A" to the Cash Management Motion, the Debtor

maintains several Bank Accounts, which are primarily maintained at Bank of America, N.A.

("Bank of America") and JPMorgan Chase Bank, N.A. ("JPMorgan").[10]  Specifically, the

Debtor's Cash Management System primarily consists of (a) a lockbox account for accounts

receivables, (b) a checking account for general operating purposes and disbursements, and (c) a

checking account for payroll expenses.

---

[10]     The Debtor currently maintains a money market account with JPMorgan and a money market account with
SunTrust (together, the "Money Market Accounts"). The Debtor is in the process of closing the Money Market
Accounts and believes that, as of the Petition Date, the Money Market Accounts contain only enough funds to cover
the administrative fee associated with maintaining such accounts.

35.    <u>Lockbox</u>. Substantially all of the Debtor's accounts receivable payments are collected in a so-called "lockbox" maintained by JPMorgan (the "Lockbox Account"). Though the Debtor maintains a single Lockbox Account, funds may be delivered to branch locations in both Atlanta and Chicago, thereby enabling customers of the Debtor to mail their payments to a nearby location and reducing the time that payments remain in float. Although a majority of payments are received by check to the Lockbox Account, some payments are also made by direct wire transfer. As of the Petition Date, the Debtor's Prepetition Lenders exercise dominion over the Lockbox Account and the cash is swept daily to pay down the Prepetition Credit Facility. Under the proposed DIP Facility, the DIP Lender will exercise dominion over the Lockbox Account.

36.    <u>Operating Account</u>. The Debtor maintains an operating account held by JPMorgan (the "Operating Account"). Typically, the Operating Account receives funding from the Lockbox Account. However, because of a default under the Prepetition Credit Facility, the Prepetition Lenders exercised dominion over the Lockbox Facility and the Debtor is unable to move cash from the Lockbox Account to the Operating Account. Therefore, as of the Petition Date, the Operating Account receives funding by the Prepetition Lenders upon request by the Debtor to provide funds necessary to cover expenses. Disbursements from this account typically include disbursements for the payment of operating expenses and other accounts payable, including payroll expenses.[11]

---

[11]    Previously, the Debtor transferred an amount sufficient to make payroll payments for each semi-monthly period, from the Operating Account, to a separate payroll account maintained with Bank of America (the "Payroll Account"). Because the Debtor used a third-party payroll administrator, the semi-monthly payroll amounts were subsequently transferred to the third-party payroll administrator for disbursement to the Debtor's employees. In the days leading up to the Petition Date, the third-party payroll administrator has required the Debtor to fund payroll by direct wire transfer from the Operating Account. The Debtor maintains *a de minimis* balance in the Payroll Account.

14

37.    Credit Card Account.  The Debtor also maintains an account at Bank of America to fund the daily charges processed with respect to the Bank of America corporate credit cards (the "Credit Card Account").  The Debtor transfers funds on a weekly basis from the JPMorgan Operating Account to maintain a balance of approximately $100,000 in the Credit Card Account, and Bank of America draws funds on the Credit Card Account to fund the previous day's credit card charges.

38.    The Debtor's Cash Management System constitutes ordinary course and essential business practices providing significant benefits to the Debtor, including the ability to control funds, ensure the maximum availability of funds when and where necessary and reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.  The Debtor submits that the cost and expense of changing the Bank Accounts and implementing a new cash management system would not only force the Debtor to incur significant costs and expenses, but would impair the operation of the Debtor's business, cause confusion, introduce inefficiency at a time when efficiency is most critical and place a strain on the Debtor's relationships with its customers and vendors.  The Debtor intends to continue to maintain strict accounting records, including with respect to receipts and disbursements, so that the U.S. Trustee and parties in interest may readily monitor the Debtor's financial activities.

39.    Similarly, the Debtor and its employees and vendors would suffer great hardship if the Debtor was required to substitute new debtor-in-possession bank accounts for the existing Bank Accounts.[12]  Substitution of the Debtor's Bank Accounts would essentially render

---

[12]    Maintenance of the Cash Management System is a condition to both the closing of and funding under the DIP Facility.

15

this Court's approval of the continuation of cash management procedures, if granted, meaningless, and inevitably lead to the same delays, confusion and disruption of the Debtor's business, including significant slowdown in the collection of receivables, that would result from a discontinuation of the cash management procedures.

40. <u>Business Forms</u>. In addition, the Debtor does not print its own business forms and stationery. Thus, substantial time and expense would be required if the Debtor were required to print new business forms and stationery merely to indicate "debtor in possession." Changing the business forms at this critical, early stage of its chapter 11 case would be unduly burdensome to the administration of the Debtor's estate and present an unnecessary distraction and disruption to the Debtor's business operations.

41. <u>Waiver of Investment and Deposit Requirement</u>. Finally, the Debtor requests waiver of strict application of the requirements of section 345 of the Bankruptcy Code. The financial institutions at which the Debtor maintains its Bank Accounts are financially stable banking institutions. The Debtor respectfully requests authority to maintain its cash in its Bank Accounts in a safe and prudent manner, in accordance with its existing deposit and investment practices pending a final hearing on the Cash Management Motion, if one is requested.

**B. Debtor's Motion for Authority to Pay Prepetition Wages, Compensation and Employee Benefits (the "Employee Motion")**

42. By the Employee Motion, the Debtor seeks authority to pay certain prepetition obligations owing to the Debtor's employees (as specifically set forth and defined in the Employee Motion, the "Prepetition Employee Obligations"). The Debtor seeks authority to pay Prepetition Employee Obligations in an amount not to exceed $100,000 in the aggregate. The Debtor seeks to honor such obligations because payment of such obligations is critical and essential to employee morale and future business needs.

16

**Wages, Salaries and Other Compensation**

43.    Employees.  Prior to the Petition Date, the Debtor employed approximately 140 employees.[13]  Immediately prior to the Petition Date, however, the Debtor reduced its workforce significantly, and as of the Petition Date the Debtor employs approximately 54 employees (the "Remaining Employees").

44.    Payroll Obligations.  The Debtor seeks authorization to honor all outstanding payroll obligations.  Approximately 19% of the Debtor's payroll costs represent compensation paid to "Senior Executives,"[14] with the remaining 81% representing compensation to middle management or rank and file employees.

45.    The Debtor's employees are paid on a semi-monthly basis current through the date of the applicable pay day and, prior to the Petition Date, the Debtor's payroll obligations averaged approximately $550,000 in the aggregate prior to the reduction in workforce and is expected to be approximately $220,000 after the reduction in workforce.  The Debtor's last regular payroll date was May 31, 2013 (the "Last Payroll"), through the end of the month.  The next payroll date is scheduled for June 14, 2013.

46.    The Debtor's payroll is processed through Automatic Data Processing, Inc. ("ADP").  To ensure timely payment of payroll obligations, payroll is funded by the Debtor several days prior to the applicable pay day through a transfer of funds from the Debtor's payroll account to an ADP account from which employee checks and direct deposits are made.  The Debtor believes that, as of the Petition Date, no more than $50,000 in payroll obligations have

---

[13]    From time to time, the Debtor also employed interns who were paid on an hourly basis.

[14]    As of the Petition Date, the Debtor employed approximately two "Senior Executives," which, solely for the purposes of this Motion, is defined to include the corporate officers, presidents and chief operating officer of the Debtor.

MIAMI 973487 (2K)

accrued but not yet been paid, with no one employee is owed in excess of $12,475 on account of payroll checks in float. [15]

47.    <u>Vacation, Sick Leave and Bereavement</u>.  In addition to wages and salary, certain of the Debtor's employees accrue paid vacation time based on length of service in addition to paid sick time and paid bereavement.  The Debtor intends to permit Remaining Employees to continue to use any such accrued but unused time off in the ordinary course. Employees who are terminated would normally be entitled to receive cash in lieu of accrued but unused vacation upon separation, but are not entitled to payment for unused sick time or bereavement time upon separation.   The Debtor intends to continue paying all accrued and unused vacation to terminated employees upon separation in the ordinary course of business.

**Allowances and Reimbursable Business Expenses**

48.    Prior to the Petition Date and in the ordinary course of its business, the Debtor indirectly reimburses certain employees for certain business expenses incurred in the scope of their employment.  Generally, the Debtor, through Bank of America, N.A. ("Bank of America") and American Express, will continue to provide the Remaining Employees with corporate credit cards (the "Corporate Cards") to be used solely in connection with expenses incurred within the scope of their employment by the Debtor relating to, among other things, business related travel expenses, business meals, car rentals and a variety of miscellaneous expenses (collectively, the "Reimbursable Expenses").  The Debtor manages and approves all Reimbursable Expenses on a bi-weekly basis through a third party, Concur Technologies, Inc. ("Concur").  Approximately two days after the Reimbursable Expenses are approved by the

---

[15]    As discussed below, section 507(a)(4) of the Bankruptcy Code affords priority distribution for up to $12,475 in wages, salaries, or commissions earned by an individual.  11 U.S.C. § 507(a)(4).

Debtor, the Debtor transfers funds to Concur, who remits payment for these Reimbursable Expenses directly to Bank of America, American Express, or the employee as appropriate. The Debtor also maintains an account at Bank of America to fund the daily charges processed with respect to the Bank of America corporate credit cards (the "BOA Card Account"). The Debtor transfers funds on a weekly basis from the Debtor's operating account at JPMorgan to maintain a balance of approximately $100,000 in the BOA Card Account, and Bank of America draws funds on the BOA Card Account to fund the previous day's credit card charges.

49.    Based upon historical averages, employees incur Reimbursable Expenses aggregating on average approximately $300,000 per month. Such amount, however, will be significant lower going forward as a result of the reduction in workforce. All of the Reimbursable Expenses were incurred on the Debtor's behalf in connection with employment by the Debtor and in reliance by the Debtor's employees that such expenses would be paid directly by the Debtor. Although the Debtor believes it is current on prepetition Reimbursable Expenses, it is possible that some Reimbursable Expenses remain owing due to the lag time between when an employee incurs an expense and when Bank of America or American Express submit invoices to the Debtor for payment. The Debtor seeks the Court's authority to pay any such Reimbursable Expenses and to continue the use of the Corporate Cards in the ordinary course of business.

**Employee Benefits**

50.    In the ordinary course of its business, and as is customary for most large companies, the Debtor has established various employee benefit plans and policies that provide employees with medical, dental, prescription, disability and life insurance and other similar

benefits (collectively, the "Employee Benefits"). The Employee Benefits are generally described below.

51.    Health Insurance. An important element of the Employee Benefits is medical and similar health insurance. The Debtor offers fully-insured medical coverage through Blue Cross and Blue Shield of Florida, Inc. (the "Medical Plan"). Prior to the Petition Date, the average monthly cost of the Medical Plan was approximately $120,000, all of which was borne by the Debtor. Such amount, however, will be significant lower going forward as a result of the reduction in workforce. The Debtor believes that it is current on all payments related to the Medical Plan; however, to the extent that any amounts remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a prepetition obligation, the Debtor seeks to be authorized, but not directed, to pay such amounts.

52.    Dental Coverage. The Debtor offers fully-insured dental coverage through Mutual of Omaha Insurance Company (the "Dental Plan"). Prior to the Petition Date, the average monthly cost of the Dental Plan was approximately $12,100, all of which was borne by the Debtor. Such amount, however, will be significant lower going forward as a result of the reduction in workforce. The Debtor believes that it is current on all payments related to the Dental Plan; however, to the extent that any amounts remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a prepetition obligation, the Debtor seeks to be authorized, but not directed, to pay such amounts.

53.    Miscellaneous Benefits. The Debtor provides all of its eligible full-time employees, including the Remaining Employees with fully funded life and accidental death and dismemberment insurance. Additionally, the Debtor provides certain employees with short and long term disability insurance. Prior to the Petition Date, the average monthly cost to the Debtor,

in the aggregate, for these additional benefits was approximately $6,200. The Debtor believes

that it is current on all such payments; however, to the extent that any amounts remain unpaid as

of the Petition Date or any portion of the current month's payment may be characterized as a

prepetition obligation, the Debtor seeks to be authorized, but not directed, to pay such amounts.

**Retirement and Worker's Compensation Benefits**

   54. 401(K) Contributions. The Debtor offers all eligible employees an

opportunity to participate in a 401(k) plan (the "401(k) Plan"). Participating employees may

contribute a percentage of their compensation per payroll period, up to the annual statutory limit,

to the 401(k) Plan. An employee is eligible to participate in the 401(k) Plan if the employee has

completed three months of service.

   55. The Debtor has established a limited 401(k) contribution program of 3%

of gross pay (the "Debtor Contributions"). Prior to the Petition Date, the average amount of

monthly Debtor Contributions was approximately $35,000. Such amount, however, will be

significant lower going forward as a result of the reduction in workforce. The Debtor estimates

that, as of the Petition Date, no more than $5,000 in Debtor Contributions have accrued but not

yet been contributed to the 401(k) Plan. The Debtor submits that it is essential for the morale

and maintenance of trust of the Remaining Employees that necessary steps are taken to protect

the employees' 401(k) Plan, including Debtor Contributions.

   56. Workers' Compensation. In the ordinary course of business, the Debtor

maintains workers' compensation coverage under which it is liable to current and former

employees. The Debtor purchases a fully-insured, premium-based workers' compensation

insurance policy from Travelers for which the Debtor pays an annual premium of approximately

$45,980 (the "Workers' Compensation Obligations"). The annual premium is payable in

quarterly installments of $11,495, the next of which is due on June 8, 2013.  As of the Petition

Date, the Debtor believes it is current with respect to such Workers' Compensation Obligations;

however, to the extent that any Workers' Compensation Obligations remain unpaid as of the

Petition Date or any portion of the payment may be characterized as a prepetition obligation, the

Debtor seeks to be authorized, but not directed, to pay such amounts.

57.    In some states, if the Debtor fails to pay the Workers' Compensation

Obligations in a timely manner, then the applicable state agency may intervene, pay such

obligation, and then assert a priority claim against the Debtor for reimbursement, penalties

and/or assessments.  In addition, some applicable state agencies may challenge the Debtor's

authority to continue to do business for failure to remain current on workers' compensation

claims.

**Administrative Service Providers**

58.    As is customary in the case of most large companies in the ordinary course

of their business, the Debtor uses third parties to administer employee benefits, the 401(k) Plan,

workers' compensation and payroll services (the "Administrative Service Providers").  In order

to timely fund the Debtor's payroll obligations, the Debtor must deposit such funds with the

appropriate Administrative Service Provider several days in advance.  The Debtor estimates that

the average monthly cost of the Administrative Service Providers' services is approximately

$1,500 in the aggregate.  The continued support of the Administrative Service Providers is

crucial to the Debtor's ability to maintain accurate and meaningful books and records, including,

but not limited to, books and records reflecting the Debtor's employee benefit and payroll

obligations.  The Debtor believes that it is current with respect to amounts owing to the

Administrative Service Providers; however, to the extent that any amounts remain unpaid as of

MIAMI 973487 (2K)

the Petition Date or any portion of the current month's payment may be characterized as a

prepetition obligation, the Debtor seeks to be authorized, but not directed, to pay such amounts.

The Debtor also seeks authority to pay any amounts due to Administrative Service providers that

arise postpetition in the ordinary course of business.

**Withholdings from Employee Paychecks**

59.     The Debtor, through its third party payroll administrator, ADP, deducts

certain amounts from its employees' paychecks for the payment of certain health and welfare

insurance premiums, 401(k) deductions, and other miscellaneous amounts (collectively, the

"Employee Deductions"). The Employee Deductions comprise property of the Debtor's

employees and are forwarded by the Debtor to ADP in connection with semi-monthly payroll,

and the Employee Deductions are then forwarded by ADP to the appropriate third-party

recipients.

60.     The Debtor may also be in possession of various withholdings from its

employees' paychecks, including, among other things, payroll taxes, social security,

garnishments and child support payments (together with the Employee Deductions, the

"Deductions"). It is likely that funds have been deducted from employee wages but have not yet

been forwarded to the appropriate third-party recipients. Without authority to forward the

Deductions to the appropriate parties, the Debtor exposes its officers and directors to personal

liability. Accordingly, the Debtor seeks authority to forward the Deductions to the appropriate

parties.

61.     Honoring the Prepetition Employee Obligations will encourage the

majority of the Debtor's Remaining Employees to remain with the Debtor by minimizing the

hardship that employees certainly will endure if payroll or benefits are interrupted and provide

23

the necessary comfort of the reasonable expectation that compensation for services rendered will be met. In contrast, failure to honor the Prepetition Employee Obligations likely will result in a large number of the Remaining Employees leaving the Debtor in favor of more certain employment opportunities. Thus, payment of the Debtor's Prepetition Employee Obligations is critical to the Debtor's ability to maximize value.

63. The relief sought in the Employee Wage Motion is in the best interests of the Debtor's estate and creditors and will allow the Debtor to continue to operate its business with minimal disruption and proceed with the important task of stabilizing its operation.

**C.    Debtor's Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service to the Debtor, (II) Deeming Utility Companies Adequately Assured of Future Payment, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utilities Motion")**

63. By the Utilities Motion, the Debtor seeks entry of an order (i) prohibiting Utility Companies from altering, refusing or discontinuing service to the Debtor, (ii) deeming the Utility Companies adequately assured of future payment, and (iii) establishing procedures for determining requests for additional adequate assurances of payment.

64. In connection with the operation of its business and management of its properties, the Debtor procures telephone, Internet, air card and similar services (together, the "Utility Services") from a number of different utility companies (the "Utility Companies"). A list identifying all or substantially all of the Utility Companies providing services to the Debtor is attached to the Utilities Motion as Exhibit "A".

65. Historically, the Debtor has paid all amounts owing to the Utility Companies on a timely basis. To the best of the Debtor's knowledge, the Debtor is current with respect to all of their undisputed invoices for Utility Services provided by the Utility Companies,

except where the commencement of this chapter 11 case may have interrupted some of these payments. Prior to the Petition Date, the average aggregate monthly cost of Utility Services provided by the Utility Companies was approximately $76,000.

66.     If the Utility Companies are permitted to terminate Utility Services, the Debtor's operations will be irreparably harmed and the value of the assets would be diminished. It is therefore essential that the Utility Services continue uninterrupted.  Accordingly, to avert a potentially disastrous situation, the Debtor has sought the relief requested in the Utilities Motion.

67.     To provide adequate assurance of payment for future services to the Utility Companies, the Debtor proposes to deposit with certain of the Utility Companies an amount equal to 50% of the Debtor's estimated cost of monthly utility consumption for each such Utility Company (a "Utility Deposit").  The aggregate amount of all such deposits for the Utility Companies listed on Exhibit "A" to the Utilities Motion would be approximately $38,000 The Debtor proposes that the Utility Deposits be made within fifteen days after the entry of an order granting the Utilities Motion.  In addition, by the Utilities Motion, the Debtor seeks to establish reasonable procedures by which a Utility Company may request additional adequate assurance of future payment, in the event that such Utility Company believes that the assurance of future payment proposed by the Debtor is insufficient.

68.     The Debtor submits that granting the relief requested in the Utilities Motion is both necessary and appropriate.  The relief requested in the Utility Motion will afford the Debtor an opportunity to preserve the value of its operations and will not prejudice the rights of the Utility Companies under section 366 of the Bankruptcy Code.

**D.     Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to (A) Maintain Insurance Program, (B) Pay Insurance Premiums in the Ordinary Course, and (C) Pay All Obligations Associated Therewith; and (II) Preventing Insurance Companies from Giving Any Notice of**

MIAMI 973487 (2K)

**Termination or Otherwise Modifying Any Insurance Policy Without
Obtaining Relief from the Automatic Stay (the "Insurance Motion")**

69.    By the Insurance Motion, the Debtor seeks authority to (a) maintain

insurance coverage levels required under its corporate risk program, including authority to

revise, extend, supplement, renew or change insurance coverage as needed, (b) pay insurance

premiums in the ordinary course of business, (c) pay any prepetition and postpetition obligations

associated therewith; and (d) prevent insurance companies from giving any notice of termination

or otherwise modifying or cancelling any insurance policies without first obtaining relief from

the automatic stay

70.    In the ordinary course of business, the Debtor maintains a corporate risk

program pursuant to which the Debtor procures numerous insurance policies (each, as may be

revised, extended, supplemented, renewed or changed, an "Insurance Policy").  The Debtor

maintains the Insurance Policies in amounts and types of coverage in accordance with laws

governing the multiple jurisdictions in which the Debtor does business, as well as in accordance

with its numerous contractual obligations.  The Insurance Policies provide coverage for, among

other things, personal property, commercial general liability, commercial automobile liability,

inland marine , umbrella liability, criminal liability, worker's compensation, employment

practices liability, fiduciary and director's and officer's liability.

71.    The total annual premiums under the Debtor's 2013 Insurance Policies

equal approximately $573,481.  The current carriers of the Insurance Policies (as may be revised,

extended, supplemented, renewed or changed, the "Insurance Carriers") are set forth in Exhibit

"A" to the Insurance Motion, along with the corresponding type of coverage and individual

annual premiums.  As of the Petition Date, the Debtor estimates that premiums of approximately

26

$112,000 are owing under the corporate risk program for the remainder of the current policy period, on account of annual premiums for the Debtor's Insurance Policies.

72.     It is critical that the Debtor maintains its Insurance Policies in order to provide a comprehensive range of coverage that protects its business and property. Significantly, the Debtor's Insurance Policies provide coverage of its property and assets in certain "force majeur" types of event. Without such coverage, the Debtor would incur substantial costs associated with repairing the damage caused by such event. The Debtor's current coverage also is necessary to replace loss of business income after the occurrence of a major loss event that involves any type of business interruption. As noted above, many of the coverage requirements are mandated by law or by the contracts governing the Debtor's commercial activities. If these policies were allowed to lapse or be cancelled, the Debtor would be exposed to substantial liability for any damages resulting to persons and property of the Debtor and others. [16]

73.     Further, if the Debtor is unable to pay the premiums necessary to maintain the Insurance Policies, it may be unable to find alternative insurance carriers willing to offer them similar insurance at a competitive price. Based upon the foregoing, the relief requested in the Insurance Motion is amply justified.

**E.      Debtor's Motion for Authority to (I) Maintain Certain Customer Rebate Programs and (II) Honor or Pay Related Prepetition Obligations in Respect Thereof (the "Customer Rebate Program Motion")**

74.     By the Customer Rebate Program Motion, the Debtor seeks authority to maintain certain customer rebate programs and honor or pay certain related prepetition obligations to its customers.

---

[16]     Maintenance of the Insurance Policies is also a condition to both the closing of and funding under the DIP Facility.

MIAMI 973487 (2K)

75.     Prior to the Petition Date, and in the ordinary course of its business, the Debtor maintains a rebate program (the "Customer Rebate Program") to develop and sustain positive reputations in the marketplace for its products and services. The Customer Rebate Program results in periodic disbursements of cash as a rebate to certain participating customers with respect to certain fees, including issuance fees, transfer fees, and rental fees, paid by the customers. The Debtor estimates that, as of the Petition Date, the outstanding amounts accrued on account of the Customer Rebate Program amount to approximately $221,000. On average, in any one month, approximately $30,000 accrues on account of the Customer Rebate Program.

76.     The Debtor seeks to continue the Customer Rebate Program as the program has proven to be successful business strategy in the past and responsible for generating valuable goodwill, repeat business, and net revenue increases. The Debtor believes that continuing the Customer Rebate Program throughout the chapter 11 case is essential to preserve critical business, customer relationships and goodwill for the benefit of the estate, and maintain the value of the Debtor's estate as a going concern.

77.     Honoring the obligations under or paying amounts owed under the Customer Rebate Program is necessary to prevent the immediate and irreparable damage to the Debtor's business operations and going concern value that would result from the Debtor's inability to maintain goodwill and preserve relationships with customers.

**F.      Debtor's Motion for Entry of an Order (I) Enforcing the Turnover Provisions of the Bankruptcy Code and Requiring Any Entity in Possession of Property of the Estate to Deliver Such Property to the Debtor and (II) Enforcing the Automatic Stay (the "Turnover Motion")**

78.    By the Turnover Motion, the Debtor seeks enforcement of (i) the turnover provisions of the Bankruptcy Code, including requiring all persons in possession of property of the estate to deliver such property to the Debtor, and (ii) the automatic stay.

79.    The Debtor operates a nationwide network of approximately 10 million pallets through its Pooling Systems. From time to time, retailers and other entities may come into possession of the pallets and delay returning such pallets to the Pooling Systems or fail to return the Pallets altogether. The Debtor believes that these entities, either due to a lack of familiarity with the protections afforded to chapter 11 debtors under sections 362 and 542 of the Bankruptcy Code, or otherwise, may refuse to continue to return the Pallets in their possession, or may sell the Pallets to third parties, or otherwise conceal property of the estate, if the Court does not enter an order expressly implementing such protections.[17] The Debtor's inability to recover Pallets in the possession of third parties during this chapter 11 case could cause disruptions to the operation of the Debtor's business, including reducing the value of the Debtor's estate. It is critical that the Debtor have immediate access to all of its assets, including the Pallets, to preserve its going concern value.

80.    The purpose of the relief requested herein is to aid in the administration of the Debtor's bankruptcy case and to preserve the value of the business operation. The Debtor deals with many entities who may be unfamiliar with or unwilling to abide by the protections afforded to chapter 11 debtors under the Bankruptcy Code and, consequently, requires that an order implementing such protections be entered by this Court.

---

[17]    The Debtor reserves the right to commence criminal actions under section 152(1) of title 18 of the United States Code (the "Criminal Code") against any entity that fails to return the Pallets to the Debtor. Section 152(1) of the Criminal Code imposes fine, imprisonment not more than 5 years, or both against entities that knowingly and fraudulently conceals property of the estate. See 18 U.S.C. § 152(1).

**G.**    **Debtor's Motion for Authority to Pay Prepetition Trust Fund Taxes**
**in the Ordinary Course of Business (the "Trust Fund Taxes Motion")**

81.    By the Trust Fund Taxes Motion, the Debtor seeks authority to pay certain prepetition trust fund taxes in the ordinary course of business.

82.    In the ordinary course of business, the Debtor collects certain trust fund type taxes, including sales, use, employee-related withholding, personal property and license (however denominated, the "Trust Fund Taxes") from its customers, employees and other parties, and subsequently remit such taxes to the appropriate federal, state and local taxing authorities (each, a "Taxing Authority"). For instance, the Debtor withholds certain taxes (including FICA and Medicare taxes) from employees' paychecks, which amounts are remitted periodically to the appropriate federal, state and local Taxing Authorities. Furthermore, by virtue of its business operations, the Debtor is required to charge, depending on the jurisdiction, sales tax and/or other applicable taxes on all rental purchases made by customers ("Sales Taxes"), and remit such Sales Taxes collected to the respective states and local taxing jurisdictions. The Debtor estimates that the total amount of prepetition Sales Taxes owing to the various Taxing Authorities as of the Petition Date is approximately $350,000.

83.    The process by which the Debtor remits the Trust Fund Taxes varies, depending on the nature of the tax at issue and the Taxing Authority to which the relevant tax is to be paid. There is often a lag-time between the time when the Debtor incurs an obligation to pay the Trust Fund Taxes and the date when payment of such taxes is due. Various governmental units may therefore have claims against the Debtor for Trust Fund Taxes that have accrued, but are unpaid and not yet due, as of the Petition Date. The relevant Taxing Authority may also make retrospective adjustments to determine any payment deficiency or surplus for a particular period resulting in a demand for further payment from or refund to the taxpayer. The

MIAMI 973487 (2K)

Debtor estimates that the total amount of prepetition Trust Fund Taxes owing to the various Taxing Authorities as of the Petition Date will not exceed $350,000.

84.     Because the Trust Fund Taxes do not constitute estate property, their payment will not adversely affect the Debtor or its creditors.  Moreover, I have been informed that many Taxing Authorities may impose personal liability on the officers and directors of corporations to the extent such taxes are collected but not remitted, and that the Debtor's officers and directors may be subject to civil or even criminal liability as a result of such non-payment. The prosecution of such actions during the pendency of this case would be a significant distraction, and therefore, be detrimental to preserving the Debtor's operation and going concern value.

85.     Finally, some, if not all, of the Taxing Authorities may audit the Debtor if the Trust Fund Taxes are not paid forthwith.  Such audits needlessly would divert the Debtor's attention away from the chapter 11 process and diminish the estate.  The Trust Fund Taxes represent a relatively *de minimis* portion of the Debtor's unsecured liabilities.  Accordingly, the Debtor seeks authority to continue to pay such Trust Fund Taxes in full in the ordinary course of business.  For all of the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate and in the best interest of the Debtor, its estate and creditors.

86.     As set forth above, proposed payment on account of the Trust Fund Taxes is critically important to prevent irreparable damage to the Debtor's operations.

MIAMI 973487 (2K)

H.    **Debtor's Motion for Interim and Final Orders
(A) Authorizing the Debtor to Obtain Postpetition
Financing, (B) Authorizing the Debtor to Use Cash
Collateral, and (C) Granting Adequate Protection to
Purchasing Secured Party (the "DIP Financing and Cash
Collateral Motion")**

87.    The Debtor seeks entry of an interim order (substantially in the form

attached to the DIP Financing and Cash Collateral Motion as Exhibit "A", the "Interim Order")

and a final order (the "Final Order" and together with the Interim Order, the "DIP Orders") (i)

(authorizing the Debtor to enter into a senior secured, superpriority debtor-in-possession

financing facility, in an amount up to $12 million (as amended, modified or otherwise in effect

from time to time, the "DIP Facility"), substantially on the terms set forth in the debtor-in-

possession credit agreement attached as Exhibit "A" to the Interim Order (as amended,

supplemented, or otherwise modified and in effect from time to time, the "DIP Credit

Agreement," together with all other agreements, documents, notes, certificates, and instruments

executed and/or delivered with, to or in favor of the DIP Lender, the "DIP Financing

Agreements") and (b) granting, in favor of the DIP Lender priming first priority, continuing,

valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security

interests and liens (collectively, the "DIP Liens"), and a superpriority administrative expense

claim (the "DIP Superpriority Claim"); (ii) authorizing the interim use of Cash Collateral on a

consensual basis on the terms set forth in the Interim Order; (iii) granting "adequate protection"

to the joint venture formed by Balmoral Funds LLC and Schoeller Arca Systems Holding B.V.

for the purchase of the Debtor's debt held by the Prepetition Lenders (the "Purchasing Secured

Party"); (iv) modifying the automatic stay as imposed by section 362 of the Bankruptcy Code to

the extent necessary to implement and effectuate the terms of the DIP Facility and the DIP

Orders; and (v) scheduling a final hearing with respect to the relief requested in the Cash Collateral Motion (the "Final Hearing").

88.     The Debtor is seeking to sell substantially all of its assets to the Purchasing Secured Party under section 363 of the Bankruptcy Code, subject to higher or better offers pursuant to a court supervised auction process.  Assuming the Court approves such sale on the schedule proposed by the Debtor, the Debtor expects to consummate the sale within approximately 30 to 45 days.

89.     During that time, the Debtor requires the use of cash, which comprises the cash collateral of the Purchasing Secured Parties securing the Prepetition Debt within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"), and the proceeds of the proposed $12 million DIP Facility, mainly to fund day-to-day operations and maintain and preserve the going concern value of the Debtor's business (including the Prepetition Collateral), pending the sale of the Debtor's assets, in all cases for the benefit of the Debtor's estate and creditors, including the Purchasing Secured Parties.  The availability to the Debtor of sufficient working capital and liquidity to finance its operations, subject to the budget contained in the DIP Facility (the "DIP Budget"), is vital to its ability to maintain its operations and is necessary for the preservation and maximization of the value of the estate as a whole pending the sale of the Debtor's assets.

90.     The Debtor seeks authority during the interim period, and pursuant to the terms of the Interim Order, to use Cash Collateral.  It further seeks authority to borrow up to $12 million under the proposed DIP Facility.

91.     As indicated above, the financing requested is being requested for only a short period of time, as the Debtor contemplates a sale of substantially all of its assets within

approximately 35 days.  Despite the proposed expedited term of the Chapter 11 Case, however, such financing is critical to the Debtor's operation and its ability to preserve the value of the assets pending the auction and approval of such a sale.  The proposed financing under the DIP Facility is needed to maintain an appropriate level of liquidity and help fund the Debtor's day-to-day operations.  Furthermore, the DIP Facility was negotiated as part of the prepetition negotiations with the Purchasing Secured Party, and in connection with the marketing process for the Debtor's estate; if the Debtor is unable to obtain approval of the proposed DIP Facility and use of Cash Collateral on an interim and final basis, the ability to consummate the sale will be jeopardized.

92.     The Debtor requires sufficient liquidity during the Chapter 11 Case to fund working capital and general corporate requirements for essential, day-to-day operations, to preserve and maintain the value of the Debtor's assets (including the Prepetition Collateral) and fund the marketing and sale efforts in an amount consistent with the Debtor's receivables and payables, in accordance with the Agreed Budget for the benefit of the estate and creditors, including the Purchasing Secured Parties.

93.     The Debtor requires the immediate use of cash on hand, the DIP Facility, and other income generated from its commercial activities in order to maintain the day-to-day business operations and pay employees and vendors on a timely basis pending a sale of the Debtor's assets.  Absent such relief from the Court, the Debtor will not have sufficient liquidity to ensure uninterrupted business operations and will suffer a substantial loss of asset value to the detriment of all parties in interest.  It is therefore critical that the Debtor have the initial $6 million of the DIP Facility in place on an interim basis in order to ensure that the Debtor has enough cash to operate the business.  Moreover, it is necessary that the Debtor be able to

demonstrate to its customers, who rely on the Debtor for the timely delivery of pallets for the customer's shipping and delivery of goods, that the business will continue without interruption and that the Debtor will continue to pay vendors in the ordinary course of business. Absent such a showing—and in the event of any interruption or delay in the business—the Debtor's customers will likely pursue opportunities with competitors, which would cripple the Debtor's business. Finally, the DIP Facility was negotiated in consideration of the marketing and sale process; if the Debtor is unable to obtain interim approval of the DIP Facility and use of Cash Collateral on an interim and final basis, the ability to consummate the sale will be jeopardized.

94.     The interests of the Purchasing Secured Party will be protected and enhanced by the Debtor's use of Cash Collateral and the DIP Facility because such relief will ensure the uninterrupted operation of the Debtor's business and operations that secure the Purchasing Secured Party's claims, thus protecting the Debtor's revenue streams and protecting the going concern value of the Debtor. In the absence of approval of the DIP Facility, the Debtor's customers, for whom time is of the essence, would likely discontinue working with the Debtor if the Debtor's operations were halted, even briefly, and the Debtor was unable to timely fulfill customer requests. The DIP Facility is critical to the Debtor's ability to continue to operate during the chapter 11 process. Moreover, employees, customers and trade creditors will expect the Debtor to have more than ample access to liquidity in order to continue operations.

95.     The ability of the Debtor to finance its operations and the availability to the Debtor of sufficient working capital and liquidity is vital to its ability to maintain operations. If the Debtor is unable to obtain such financing and to use Cash Collateral for such purposes, the recoveries to all creditors, including the Purchasing Secured Parties, would be greatly reduced because the value of the Debtor's estate would decline dramatically. Entry of the Interim Order

MIAMI 973487 (2K)

is therefore (i) critical to the Debtor's ability to sell its assets pursuant to the Bankruptcy Code, (ii) in the best interests of the Debtor and its estate and (iii) necessary to avoid irreparable harm to the Debtor, its creditors, and its assets, business, goodwill, reputation and employees.

96.    The Debtor's assets are subject to the Prepetition Liens asserted by the Purchasing Secured Party. Because of the Debtor's prepetition debt, obtaining the financing needed as unsecured debt on an administrative priority basis, or as debt which would be secured solely by liens junior to the liens of the Purchasing Secured Party, was not a viable option, especially from a third party who did not already have a financial interest in the Debtor to protect. Moreover, the Purchasing Secured Party would not have consented to the granting of senior or pari passu liens to a new third party debtor-in-possession lender. In fact, the DIP Facility here was negotiated with the Purchasing Secured Parties in connection with the proposed sale of substantially all of the Debtor's assets. The Debtor thus concluded that adequate alternative financing terms more favorable than those to be provided by the DIP Lender under the DIP Facility are currently unobtainable.

**The DIP Facility is Fair, Reasonable, and in the Best Interest of the Estate**

97.    The Debtor believes that the terms and conditions of the DIP Facility are fair and reasonable. The DIP Facility is necessary to support the Debtor's ongoing operations pending approval and consummation of a sale will signal the Debtor's continued strength to compete in the marketplace for new business. The DIP Facility will also ensure the continued support of the Debtor's customers and critical suppliers. Furthermore, as is more fully explained in the Declaration, the Debtor, with Winter Harbor LLC's assistance, undertook an effort to obtain the best available terms for debtor-in-possession financing. Based upon these efforts, the interest rates and fees appear to be consistent with the existing market for debtor-in-possession

loans of this nature.  The Debtor believes that the proposed DIP Facility is the best financing available and well within the exercise of sound business judgment.

98.     Moreover, the Debtor has made a concerted good faith effort to obtain credit on the most favorable terms available.  Specifically, in connection with the marketing of the Debtor's assets, the Debtor also sought debtor in possession financing from interested parties, none of whom would agree to provide financing on a junior or pari passu basis. The DIP Facility was ultimately determined to provide the requisite liquidity on the most advantageous terms given that the Purchasing Secured Party expressed its lack of consent to a senior or pari passu third party debtor-in-possession lender.  Absent such consent, distracting and costly litigation over the propriety of any priming or pari passu third party debtor-in-possession financing would likely have ensued, with potentially severe consequences for the Debtor, its estate, and creditors. Against this backdrop, the Debtor carefully evaluated the proposed financing structure from the DIP Lender, engaged in negotiations with the DIP Lender regarding the proposed terms, and eventually agreed to the DIP Lender's proposal as the proposal best suited to the Debtor's needs. The terms and conditions of the DIP Facility were negotiated by the parties (and their legal and financial advisors) in good faith and at arms' length and, as outlined above, were instituted for the purpose of enabling the Debtor to meet ongoing operational expenses while in chapter 11 and to preserve the going concern status of the Debtor as well as the value of the Prepetition Collateral.

**The Use of Cash Collateral is Appropriate Under the Current Circumstances and Should be Authorized**

99.     The Court should authorize the Debtor to use Cash Collateral, whether existing as of the Petition Date or arising thereafter based on the conversion of existing non-cash collateral into cash.   It is essential to the continued operation of the Debtor that it obtains

authority to use Cash Collateral to fund payroll and other operating needs, including the costs of administration of this Chapter 11 Case. Currently, the Debtor has little or no available cash or assets readily convertible into cash that are not likely subject to the Purchasing Secured Party's asserted liens and security interests.

100.    If the Debtor is permitted to use Cash Collateral to fund ongoing business operations and administration of this Chapter 11 Case, the Debtor will preserve the value of the Debtor's assets as a going concern. Thus, the Debtor can continue to run its business successfully, but only if it is allowed to use Cash Collateral in the course of the day-to-day operations. Without such use, the detrimental result to the estate will be rapid and ultimately disastrous, given the nature of the Debtor's business. Access to Cash Collateral is crucial to the Debtor's ability to avoid immediate and irreparable harm to the estate, creditors, and ongoing business both before and after the Final Hearing.

101.    The Debtor respectfully submits that the proposed use of Cash Collateral, in conjunction with the DIP Facility, is necessary for the Debtor to have sufficient liquidity during the chapter 11 process to preserve the value of its business as a going concern, its assets and property (including the Prepetition Collateral). The Debtor's proposed use of Cash Collateral thus prejudices no one; it affirmatively and directly benefits the Debtor's estates and creditors, including the Purchasing Secured Party, and enhances the prospects of a successful outcome of this Case.

I.    **Debtor's Motion for Entry of an Order Authorizing Payment of Postpetition Administrative Expense Priority Claims of Certain Essential Service Providers (the "Essential Service Provider Motion")**

102.    By the Essential Supplier Motion, the Debtor seeks authority to pay the post-petition claims of certain Essential Service Providers on a weekly basis.

103.    In the ordinary course of business, prior to the Petition Date, the Debtor

relied on the Essential Service Providers to provide services that the Debtor could not operate

without or could not replace without incurring exorbitant costs.  The services provided by these

Essential Service Providers include, among other things, the storage and transportation of pallets

throughout the Debtor's pallet pooling systems.  The services provided by the Essential Service

Providers will likely be necessary to ensure uninterrupted operation of the Debtor's business.

*1.  The Transportation Providers*

104.    Specifically, the Debtor utilizes Ryder Integrated Logistics, Inc.

("Ryder"), a third party transportation, logistics and supply chain management company, for

sourcing and optimization of freight through the Debtor's Pooling Systems.  Although Ryder is

not the end provider of services and does not take physical custody of the pallets, it hires and

manages third party carriers (the "Network Carriers") to transport the pallets, who then submit

invoices to Ryder.[18]  Ryder audits the invoices of the Network Carriers and then bills the Debtor

on a weekly basis for the total amount of all Network Carrier invoices received (the "Carrier

Fees"), typically four to six weeks in arrears.  iGPS typically remits payment to Ryder

approximately 21 days after receipt of the invoices from Ryder.  The average amount paid to

Ryder on a weekly basis is approximately $500,000 to $700,000 per week.  In addition to

passing through the Carrier Fees to the Debtor, Ryder also charges a per-pallet management fee

(the "Ryder Management Fee"), for which Ryder bills iGPS on a monthly basis.  The average

amount of the Ryder Management Fee is approximately $200,000 to $250,000 per month.

---

[18]    The Debtor and Ryder entered into an agreement regarding the Standard Terms and Conditions date June 14, 2006, and certain schedules thereto regarding, among other things, the management of Network Carriers by Ryder.

MIAMI 973487 (2K)

105.    The Debtor also utilizes recyclers (the "Recyclers", and collectively with Ryder and the Network Carriers, the "Transportation Providers") to recover pallets retailers and manufacturers not within the Debtor's Pooling Systems.  Each Recycler is responsible for, among other things, (i) arranging for the retrieval of pallets within a designated territory, (ii) providing a driver and a truck to recover pallets and transporting such pallets to the Recycler's facility, (iii) negotiating for the recovery of pallets with business in possession of the pallets, and (iv) providing adequate, secure and dedicated space to store recovered pallets.  Recyclers typically invoice the Debtor on a weekly basis for pallets recovered and certain reimburseable expenses, and the Debtor pays such invoices within approximately 30 days of receipt of the invoice.  Payments to Recyclers average approximately $80,000 per month in the aggregate.

2.  *The Storage Providers*

106.    In addition to the Transportation Providers, the Debtor also utilizes Belacon Pallet Services, LLC ("Belacon"), pursuant to that certain Depot Facility Service Provider Agreement dated July 1, 2009 (the "Belacon Service Agreement"), [19] to locate and provide management to oversee the operations of the Debtor's third party depots (the "Third Party Depots") for the storage and maintenance of pallets.  Specifically, Belacon (through various Third Party Depots) is required to, among other things, (i) provide adequate, secure, dedicated space for the receipt and storage of iGPS pallets, (ii) handle, receive, inspect, sort, store indoors, blow or wipe contamination as may be required, and ship pallets to customers, (iii) routinely and timely scan in and scan out pallets upon issue to customers or transfer between

---

[19]    Contemporaneously with the filing of the Essential Service Provider Motion, the Debtor is filing a motion seeking authority to reject the Belacon Service Agreement. Nevertheless, the Debtor believes that it will need to continue utilizing Belacon's services during the transition period prior to rejection.

depots, and (iv) segregate any pallet found to be defective, damages or unfit for use and collect and return it to a designated warranty service center. For its services, Belacon invoices the Debtor for several fees, including: (i) a handling and inspection fee for receipt, scanning, unloading and inspection of the pallets and, for outbound pallets, blowing or hand wiping contamination, (ii) a storage fee for each pallet stored at a Third Party Depot, (iii) a maintenance fee for specific maintenance as may be required, (iv) and a per pallet fee for washing pallets, as may be required (collectively, the "Depot Service Fees").

107.    Belacon provides the Debtor with an invoice on a monthly basis setting forth a summary of the pallets received and inspected, pallets issued, pallets stored, pallets maintained, and pallets washed. As a "management fee", Belacon retains a portion of the Depot Service Fees for itself after satisfying the invoices of the Third Party Depots. The average amount paid by the Debtor to Belacon on a monthly basis was approximately $1,700,000 to $2,200,000 per month.

108.    In addition to the Third Party Depots, the Debtor has also instituted an "i-Depot" program in order to reduce the amount of time a pallet remains at a Third Party Depot. Under the i-Depot program, retail customers also agree with iGPS to operate as storage depots (the "i-Depots",[20] and collectively with Belacon and the Third Party Depots, the "Storage Providers"), and each i-Depot scans, sorts, inspects, cleans and segregates the pallets at its facility. Like the Third Party Depots, i-Depots fulfill orders and ship pallets directly to manufacturers. In exchange, i-Depot operators receive a per-pallet handling and inspection fee from the Debtor. As of the Petition Date, approximately 50 retailers were serving as i-Depots,

---

[20]    Approximately one-half of the i-Depots have contracted with the Debtor to provide i-Depot services, and the remaining i-Depots operate as i-Depots pursuant to a general understanding between the Debtor and the i-Depot.

providing an additional approximately 165 depot locations. Payments to i-Depots are made on a monthly basis and average approximately $350,000 to $400,000 in the aggregate per month.

109.    Non-debtor parties to exeutory contracts, pending assumption or rejection by the Debtor, can be compelled by the Debtor to perform their obligations thereunder. Nevertheless, the Debtor believes that these Essential Service Providers may refuse to continue to provide services if the Debtor does not promptly pay such Essential Service Providers during the course of this chapter 11 case or provide an advance deposit as adequate assurance for postpetition services to be performed. The Debtor's inability to maintain its existing relationships with its Eessential Service Providers during the early stages of this chapter 11 case could cause severe disruptions to the Debtor's business if such parties cease providing services, even for a short period of time. If the Essential Service Providers, including the Network Carriers, Third Party Depots or i-Depots ceased to provide services, the Debtor would be forced to find immediate alternative storage or shipping for its pallet inventory. Such a disruption to the Debtor's business could be catastrophic, irreparably damaging the Debtor's relationships with its manufacturer and retail customers, who are the foundation of the Debtor's business.

110.    Although the Debtor seeks authorization to make such payments, the Debtor seeks at this time the authority to pay no more than (i) $900,000 in the aggregate per week to the Transportation Providers (not including the Ryder Management Fee) on account of postpetition services, (ii) $300,000 per month on account of the Ryder Management Fee, and (iii) $600,000 in the aggregate per week to the Storage Providers on account of postpetition services.

MIAMI 973487 (2K)

111.    The Debtor proposes that it be authorized to make payments to Essential Service Providers on a weekly basis subject to the following conditions (the "Claim Payment Conditions"):

(a)     By accepting payment on account of its Essential Service Provider Claim, the Essential Service Provider must continue doing business with the Debtor in the ordinary course of business according to terms no less favorable to the Debtor than those in place prior to the Petition Date (except as such terms are modified by any order entered on the Motion);

(b)     To the extent that it has not already done so, the Essential Service Provider must waive its right to file or otherwise assert against the Debtor, its estate, or the Debtor's customers, any claim or lien related to any amounts allegedly owed to the Essential Service Provider by the Debtor at the time of payment of the Essential Service Provider Claim arising from agreements or other arrangements entered into prior to the Petition Date;

(c)     To the extent the Essential Service Provider has already obtained or asserted any such claim or lien, it must take all necessary actions to withdraw such claim or lien; and

(d)     To the extent that an Essential Service Provider paid pursuant to any order entered on the Motion refuses to continue doing business with the Debtor in the ordinary course, it must immediately disgorge any payments made on account of its Essential Service Provider Claims to the Debtor's estates.

112.    Although the Debtor does not pay the Network Carriers and Third Party Depots directly, but rather, remits such payments through Ryder and Belacon, respectively, the Debtor also requests that, prior to making any postpetition payments to Ryder or Belacon on account of Essential Service Provider Claims, Ryder and Belacon be required to provide the Debtor with documentation reasonably satisfactory to the Debtor, that any previous payment made hereunder has been remitted to the appropriate Network Carriers or Third Party Depots, as the case may be.  To the extent any payments to Ryder or Belacon hereunder are not timely remitted to the appropriate Network Carrier or Third Party Depot, the Debtor requests that Ryder or Belacon, as the case may be, be required to immediately (i) remit such payments to the

43

appropriate Network Carrier or Third Party Depot or (ii) disgorge such payments to the Debtor's

estate, which shall then be authorized to make such payment directly to the appropriate Network

Carrier or Third Party Depot.

113.    The Debtor believes that the relief requested in the Essential Service

Providers Motion is warranted, necessary and reasonable under the circumstances.  Preservation

of the existing logistics network is critical to the continued operation of the business and will

maximize the value of the Debtor's estate for the benefit of all parties in interest.  The Debtor

submits that good relations with its Essential Service Providers are essential to the continued

operation of its business during the pendency of this chapter 11 case.  Thus, the relief sought in

the Essential Service Providers Motion is vital to preserving the Debtor's value.

J.      **Debtor's Application for an Order Authorizing and
        Approving the Employment and Retention of
        AlixPartners, LLC as Claims and Noticing Agent *Nunc
        Pro Tunc* to the Petition Date (the "Claims and Noticing
        Agent Application")**

114.    By the Claims Agent Application, the Debtor requests entry of an order,

pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f) authorizing and approving the

employment and retention of AlixPartners, LLC ("AlixPartners") as claims and noticing agent

(the "Claims and Noticing Agent") in the Debtor's chapter 11 case, to be effective *nunc pro tunc*

to the Petition Date, to, among other things, serve as the Court's noticing agent and mail notices

to the Debtor's creditors and other parties in interest and provide claims, claims objections and

balloting services.

115.    Subject to the Court's approval, AlixPartners will provide the services set

forth in the Claims and Noticing Agent Application pursuant to the terms of the engagement

letter dated March 26, 2013, which is attached to the Claims and Noticing Agent Application as Exhibit C.

116.    The Debtor estimates that there are approximately 250 creditors in this chapter 11 case.  Consequently, the Debtor expects to need assistance in managing and addressing the myriad of claims and noticing related issues amongst the Debtor and the parties in interest that will likely arise in this chapter 11 case.

117.    The Debtor seeks to retain AlixPartners as the claims and noticing agent because of AlixPartners' experience in serving in such capacity in chapter 11 cases of this size and the reasonableness of its fees.  In preparing for this case, AlixPartners has become familiar with the Debtor's business and affairs and many of the potential issues that may arise in the context of this case.  Accordingly, AlixPartners is both well qualified and uniquely able to represent the Debtor as the Claims and Noticing Agent.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

MIAMI 973487 (2K)

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Executed this _5_ day of June, 2013.

iGPS Company LLC

By:_____
　　Walter Myers
　　Vice President of Finance