## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| iGPS COMPANY LLC,[1] | Case No. 13-11459 (KG) |
| Debtor. | **Objection Deadline: TBD** |
| | **Hearing Date: TBD** |

**DEBTOR'S MOTION FOR ENTRY OF AN (I) ORDER (A) AUTHORIZING AND APPROVING BID PROCEDURES TO BE EMPLOYED IN CONNECTION WITH THE PROPOSED SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR; (B) APPROVING CERTAIN BID PROTECTIONS; (C) SCHEDULING AN AUCTION AND SALE HEARING; (D) AUTHORIZING AND APPROVING ASSIGNMENT PROCEDURES TO BE EMPLOYED IN CONNECTION WITH THE IDENTIFICATION AND ASSUMPTION OF CERTAIN CONTRACTS, LEASES AND INTELLECTUAL PROPERTY RIGHTS; AND (E) APPROVING THE MANNER AND FORM OF NOTICE OF THE AUCTION, SALE HEARING AND ASSIGNMENT PROCEDURES; AND (II) ORDER (A) APPROVING THE AGREEMENT FOR THE SALE AND PURCHASE OF THE ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, SUBJECT TO HIGHER AND/OR OTHERWISE BETTER OFFERS AND (B) GRANTING RELATED RELIEF**

iGPS Company LLC, as the debtor and debtor in possession in the above-captioned chapter 11 case ("iGPS", the "Debtor", or the "Seller"), hereby files this motion (the "Motion") for entry of (i) an order, substantially in the form attached hereto as Exhibit "A" (the "Bid Procedures Order"), pursuant to sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 2002, 6004 and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 6004-1 and 9006-1(c) of the Local Rules (the "Local Rules") of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (a) authorizing and approving bid procedures (the "Bid Procedures") to be employed in connection with the proposed sale (the "Sale") of substantially all of the assets (the "Purchased Assets") of the Seller

---

[1]    The last four digits of iGPS Company LLC's federal tax identification number are 6297. The location of iGPS Company LLC's corporate headquarters and the service address is 225 E. Robinson Street, Suite 200, Orlando, Florida.

to iGPS Logistics LLC (the "Purchaser," and together with Seller, the "Parties"), a joint venture

by and among Balmoral, One Equity Partners, and Jeff and Robert Liebesman, or another bidder;

(b) authorizing the Debtor to offer certain bid protections to the Purchaser (the "Bid

Protections"), including payment of a break-up fee not to exceed $1,050,000 (the "Break-Up

Fee") and reimbursement of actual and documented out-of pocket expenses incurred by the

Purchaser in connection with the Agreement in an amount not to exceed $400,000 (the "Expense

Reimbursement"), to be paid to the Purchaser, among other things, upon and subject to

consummation of a sale with a party other than the Purchaser; (c) scheduling an auction (the

"Auction") and a hearing (the "Sale Hearing") to consider approval of the Sale; (d) authorizing

and approving procedures (the "Assignment Procedures") to be employed in connection with the

identification and assumption of certain contracts (the "Assumed Contracts"), leases (the

"Assumed Leases") and intellectual property (the "Intellectual Property Rights"); and

(e) approving the manner and form of notice of the Auction, the Sale Hearing and the

Assignment Procedures, substantially in the form attached to the Bid Procedures Order as

Exhibit "2" (the "Sale Notice"), Exhibit "3" (the "Publication Notice") and Exhibit "4" (the

"Assumption Notice"); and (ii) an order, substantially in the form attached hereto as Exhibit "B"

(the "Sale Order"), pursuant to sections 105 and 363 of the Bankruptcy Code, Bankruptcy

Rules 2002(a)(2), 6004 and 9008 and Local Rules 2002-1, 6004-1 and 9006-1 (a) approving that

certain Asset Purchase Agreement (including all exhibits, schedules and ancillary agreements

related thereto, and as may be amended from time to time, the "Agreement"), substantially in the

form attached to the Bid Procedures Order as Exhibit "1", by and between Seller and the

Purchaser, pursuant to which Seller has agreed, among other things, to sell the Purchased Assets

to the Purchaser; (b) authorizing and approving the Sale of the Purchased Assets free and clear of

all liens, claims, encumbrances and interests (collectively, the "Liens") other than certain

liabilities that will be assumed by the Purchaser pursuant to Section 2.4 of the Agreement (the "Assumed Liabilities") and certain Permitted Liens;[2] and (c) granting related relief.  In support of the Motion, the Debtor submits the Declaration of Walter Myers in Support of First Day Motions and Applications (the "Myers Declaration"), filed contemporaneously herewith and incorporated herein by reference, and respectfully represents as follows:

## Background

### A. General Background

1.       On June 4, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.       To date, no creditors' committee has been appointed in this case by the Office of the United States Trustee.  No trustee or examiner has been requested or appointed in the Debtor's chapter 11 case as of the date hereof.

3.       Additional background facts on the Debtor, including an overview of the Debtor's business, information on the Debtor's debt structure and information on the events leading up to the Debtor's bankruptcy case are contained in the Myers Declaration.

### B. Prepetition Marketing of the Purchased Assets

4.       Prior to the commencement of this chapter 11 case (the "Chapter 11 Case"), the Debtor's operations were funded, in part, with the proceeds of that certain Prepetition Credit Facility ("the Prepetition Credit Facility") among iGPS, as borrower (the "Borrower"), certain financial institutions from time to time party thereto, as lenders (collectively, the "Prepetition Lenders"), and Bank of America, N.A., as administrative and collateral agent (the

---

[2]       Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement, and, if not otherwise defined herein or in the Agreement, the meanings ascribed to them in the Sale Order.

"Prepetition Agent"). The indebtedness of the Debtor under the Prepetition Credit Facility (the "Prepetition Debt") is secured by liens on substantially all of the Debtor's assets (the "Prepetition Collateral").

5.      The Debtor, together with its advisors, and after consultation with the Prepetition Agent and the Prepetition Lenders and their respective advisors, determined that a sale of substantially all assets of the Debtor's business would maximize the value of the business for all parties in interest. In December 2012, the Debtor retained Houlihan Lokey ("Houlihan") as its investment banker to assist the Debtor in the marketing and sale, merger or other transaction involving of all of the equity interest in, or substantially all of the assets of, the Debtor. After being retained, Houlihan undertook an extensive marketing of the Debtor's assets.

6.      Specifically, Houlihan prepared marketing materials, including a confidential information memorandum (the "CIM"), and contacted over 190 potential financial and strategic investors. Thereafter, Houlihan distributed the marketing materials and continued to communicate with potential buyers. Of the potential investors contacted by Houlihan, approximately 75 parties executed a confidentiality agreement, received the CIM, and were provided access to confidential materials via an online data room. Houlihan received ten non-binding "indication of interest" letters from potential buyers interested in purchasing substantially all of the Debtor's assets. For several weeks thereafter, Houlihan facilitated due diligence with these potential buyers and continued to entertain additional inquiries from interested parties.

7.      Immediately prior to the Petition Date, the Prepetition Agent and the Prepetition Lenders agreed to sell their claims and interests under the Prepetition Credit Facility to the Purchaser. Simultaneously therewith, the Purchaser and the Company entered into the Agreement pursuant to which the Purchaser has agreed to serve as the stalking horse bidder for

the sale of substantially all of the Debtor's assets in a competitive and public chapter 11 auction process before this Court.

8.      Given the extensive marketing and diligence process prior to the execution of the Agreement, the Debtor, in consultation with its advisors, has determined that the Purchaser provides the best offer to purchase substantially all of the Debtor's assets on the terms and conditions contained in the Agreement.  The Parties negotiated the terms of the Agreement at arm's length and the Debtor submits that, pending a higher or better offer pursuant to the sale process contemplated by this Motion, the Sale reflects the best outcome available to the Debtor under the circumstances.

**C.  Need for an Expedited Sale of the Debtor's Assets**

9.      Given the Debtor's severe liquidity constraints and lack of long-term financing, the Debtor and its advisors have determined that a sale of the Debtor's assets is the only way for the Debtor to preserve its business as a going concern and provide recoveries to the estate that otherwise would be unavailable.  Further, it is essential that the sale of the Debtor's assets occur on an expedited basis.  Simply put, the Debtor is operating on an extremely tight budget and is only able to continue to operate as a going concern through an expedited sales process.  Moreover, the Debtor's financial situation cannot support any additional debt.

10.     Importantly, the Debtor's DIP Facility requires that a going concern sale be consummated on an expedited basis, and the Debtor would not have been able to obtain the DIP Facility without agreeing to an expedited auction process.  Without an expedited sale, the Debtor would have had no alternative other than to cease operations and liquidate its assets.  Moreover, given the Debtor's severe liquidity constraints, the estate runs the substantial risk of being unable to bear the administrative burden of a successful liquidating plan and corresponding distribution to unsecured creditors if the auction process is delayed.  In addition, any delay and

the corresponding risk of administrative insolvency could jeopardize the Debtor's operations, and therefore the sale process, and significantly impact the possible recoveries for the Debtor's creditors.

11.    Accordingly, the Debtor respectfully requests that the Court hold a hearing on the Bid Procedures as soon as reasonably practical, so that there is ample time to provide notice to parties in interest, including potential bidders, regarding the Bid Procedures, the proposed Sale Hearing, and the deadline for objections, conduct an Auction (if necessary) and, following the conclusion of the Sale Hearing and the entry of the Sale Order, close the Sale transaction. The Debtor notes that under the proposed DIP Facility there is a requirement that the Bid Procedures Order be entered on or before June 16, 2013, unless waived.

## D. Overview of the Agreement

### 1. Material Terms of the Agreement

12.    The salient terms of the Sale of the Purchased Assets to the Purchaser are set forth in the Agreement and can be summarized as follows:[3]

- Purchaser. Purchaser is iGPS Logistics LLC (Agreement, at 1.)

- Seller. Seller is iGPS Company LLC. (Agreement, at 1.)

- Purchase Price. As set forth in more detail in the Agreement, the consideration for the Purchased Assets (the "Consideration") shall be (i) a credit bid of the Secured Indebtedness in an amount equal to $36,000,000; (ii) $1,000,000 in cash; (iii) an amount equal to the DIP Facility Satisfaction Amount; and (iv) the assumption of the Assumed Liabilities (together with the Cash Purchase Price, the "Purchase Price"). (Agreement, at § 2.7.)

- Purchased Assets. The Purchased Assets include, but are not limited to, (a) all Inventory of Seller as of the Closing Date; (b) all Equipment of Seller located as of the Closing Date at the property covered by the Assumed Leases or otherwise primarily related to the Business; (c) the Assumed Contracts, to the extent set forth in Schedule 2.1(c) to the Agreement, and all rights thereunder, (d) the

---

[3]    This summary of the terms of the Agreement is provided solely for the convenience of the Bankruptcy Court and interested parties. Interested parties should refer to the Agreement for the complete and detailed terms thereof. In the event of any inconsistencies between this summary and the Agreement, the Agreement shall govern.

Assumed Leases and all rights thereunder; (e) all Intellectual Property Rights owned by or licenses to (in whole or in part) the Seller, worldwide, that are used in connection with the Business; (f) all Books and Records; (g) customer and vendor lists used by Seller in the Business, including all available names, addresses and telephone numbers of customers and vendors; (h) federal, state or local governmental or regulatory permits, licenses, consents, authorizations, grants, approvals and franchises held by Seller in connection with the operation of the Business or the ownership of the Purchased Assets, to the extent assignable to the Purchaser; (i) Seller's advertising, sales and customer materials, forms, labels, promotional materials, manuals and supplies used in the operation of the Business; (j) insurance proceeds, condemnation awards or other compensation in respect of loss or damage to any Purchased Asset; (k) Seller's interests in warranties, representations and guarantees made by suppliers, manufacturers and contractors in connection with products or services of the Business, or affecting the Purchased Assets including, for the avoidance of doubt, the SAS Rights; (j) the "iGPS" name and logos and all other names and logos used by the Seller now or in the past and all goodwill associated therewith; and (k) Seller's trade accounts receivable, excluding Former Customer Claims, relating to the Business and other rights to payment from customers of the Business and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of platforms leased to customers of the Business, issue fees, fuel surcharges and transfer fees; (l) the Transferring Avoidance Claims; (m) all rights relating to loans to employees of Seller; (n) all rights, claims, actions and causes of action of Seller against any Third Party other than those constituting Excluded Assets; (o) all local, state, and federal tax refunds other than local, state, and federal tax refunds relating to Taxes which are not Assumed Liabilities; (p) the Tax records of Seller, and all rights to or claims for refunds, credits, overpayments or rebates of Taxes for taxable periods (or portions thereof) ending on or prior to the Closing Date other than any such Tax records, and all rights to or claims for refunds, credits, overpayments or rebates of Taxes relating to Taxes which are not Assumed Liabilities; (q) all cash and cash equivalents. (Agreement, at § 2.1.) The Purchased Assets do not include certain "Excluded Assets" listed in Section 2.2 of the Agreement.

- <u>Assumed Liabilities</u>. Pursuant to Section 2.4 of the Agreement, the Purchaser will assume at Closing, the Assumed Liabilities which include, but are not limited to, (i) all Liabilities arising by reason of or from the Purchaser's operations after the Closing under the Purchased Assets, including any Inventory, Assumed Contracts and Assumed Leases; (ii) the Assumed Employee Liabilities; (iii) any trade payables of Seller incurred prior to the Petition Date which are specifically set forth on Schedule 2.4(c) to the Agreement; (iv) all Liabilities for sales/use and payroll withholding Taxes accrued or attributable to any of the Purchased Assets before or after the Closing Date; (v) all payables outstanding to iDepots, Costco and Walmart; and (vi) the Cure Payment Liabilities. The Purchaser will not be assuming the "Excluded Liabilities" listed in Section 2.5 of the Agreement or any other Liabilities of Seller other than the Assumed Liabilities.

- Closing Conditions. The obligations of Seller and/or the Purchaser to consummate the Closing are subject to the satisfaction of certain conditions, which are set forth in detail in Sections 7.1 and 7.2 of the Agreement. The obligations of Seller and the Purchaser to consummate the Closing are subject to the satisfaction of conditions, including but not limited to, the following: (i) the entry of a final and nonappealable Sale Order by the Bankruptcy Court (Agreement, at § 7.1(e)), (ii) no Material Adverse Effect (Agreement, at § 7.2.(c).), (iii) no Action by any Governmental Authority or any other Person shall have been instituted which questions the validity or legality of the Transactions, and there shall be no law or order that makes the Transaction illegal or otherwise prohibited which is not satisfied or resolved or preempted by the Sale Order, (Agreement, at § 7.2.(d).), and (iv) all requisite clearances or approvals (or applicable waiting periods) under any Antitrust Laws, trade regulations or other applicable Laws for the Transaction shall have been obtained or, in the case of the applicable waiting period, expired, (Agreement, at §§ 7.1(f), 7.2(f).).

- Termination. Termination events are listed in Section 9.1 of the Agreement and include but are not limited to termination (i) by mutual written agreement of Seller and the Purchaser; (ii) by Seller or the Purchaser, if the Closing shall not have been consummated on or before two days following the date of entry of the Sale Order (the "Outside Date"); (iii) by Seller or the Purchaser if a court or other Governmental Authority shall have issued a non-appealable final Order, decree or ruling or take any other action having the effect of permanently restraining, enjoining or otherwise prohibiting the consummation of the Transaction; (iv) by Seller, if there is a material breach by the Purchaser of any representation or warranty of the Purchaser or of any covenant or agreement to be complied with or performed by the Purchaser which would result in a failure of a condition to Seller's obligations under the Agreement; (v) by the Purchaser, if there is a material breach by Seller of any representation or warranty of Seller or of any covenant or agreement to be complied with or performed by Seller which would result in a failure of a condition to the Purchaser's obligations under the Agreement; (vi) by the Purchaser, if the Bankruptcy Court shall fail to enter the Bid Procedures Order on or prior to the day that is ten Business Days after the Petition Date; (vii) by the Purchaser, if the Purchaser is the Successful Bidder and the Hearing has not been commenced on or prior to the earlier of the fifth Business Day after completion of the Auction and the date specified in the Sale Procedures Order; (viii) by the Purchaser, if the Seller's Chapter 11 Case is converted to a liquidation proceeding under chapter 7 of the Bankruptcy Code; (ix) by the Purchaser or Seller, if the Bankruptcy Court shall have stated unconditionally that it will not enter the Sale Order; (x) by either the Purchaser or Seller if (a) the Auction has occurred and the Purchaser was not the Successful Bidder or (b) the bankruptcy Court otherwise approves a Competing Transaction; and (xi) by Seller, if (a) all conditions to Closing have been satisfied or waived (other than conditions that can only be satisfied as of the Closing), (b) Seller is willing and able to consummate the Closing, and (c) the Purchaser fails to consummate the Closing within five Business Days after the date the Closing should have occurred pursuant to the terms of the Agreement; (xii) by the

Purchaser, if (a) all conditions to Closing have been satisfied or waived (other than conditions that can only be satisfied as of the Closing), (b) the Purchaser is willing and able to consummate the Closing, and (c) Seller fails to consummate the Closing within five (5) Business Days after the date the Closing should have occurred pursuant to the terms of the Agreement; (xiii) by the Purchaser, subject to certain exceptions, if there is a failure of the condition set forth in Section 7.2(c) of the Agreement; or (xiv) by the Purchaser, if there is a failure of the condition set forth in Section 7.1(g) of the Agreement. (Agreement, at § 9.1.)

- **Breakup Fee and Expense Reimbursement**. The Bid Procedures Order, attached hereto as Exhibit A, and Section 9.2 of the Agreement govern the Purchaser's entitlement to a Breakup Fee and Expense Reimbursement. (Agreement, at §§ 3.1, 9.2; Bid Proc. Order, at ¶ 5.)

- **Executory Contracts**. The Assumed Contracts and Assumed Leases will be assumed by Seller and assigned to the Purchaser at Closing and the Purchaser will be responsible for all Cure Payment Liabilities related to the Assumed Contracts and Assumed Leases. (Agreement, at 2.4(g).)

- **Depot Order**. If, and only if, Buyer requests a Depot Order in accordance with Section 3.4 of the Agreement, Seller shall have obtained the Depot Order and the Depot Order shall be in form and content satisfactory to Buyer in Buyer's sole and absolute discretion.

- **Post-Closing Contracts and Assets**. On or before the Closing, the Purchaser may, from time to time, update the Schedules hereto listing Purchased Assets to add or remove a Contract to or from such Schedules. (Agreement, at § 6.10(a).) Within ninety (90) days after the Closing Date, the Purchaser may, by written notice to Seller indicating which of the Excluded Contracts, if any, shall be assumed by Seller and assigned to Buyer, subject to the procedures outlined in Section 6.10 of the Agreement. (Agreement, at § 6.10(b).) Seller shall not reject, seek to reject, terminate, amend, modify, supplement, transfer, dispose or otherwise encumber any Retained Contract from and after the date of the Agreement until the 90th day after the Closing Date in each case, unless otherwise agreed in writing by the Purchaser. (Agreement, at § 6.10(c).). Buyer shall indemnify and hold harmless Seller for any breach of a Retained Contract by Buyer in connection with its performance of such Retained Contract in accordance with Section 6.10. (Agreement, at § 6.10(c).). During the Retention Period, Seller shall notify Buyer of any reasonable, out-of-pocket costs and expenses incurred for the reasonable maintenance, preservation and/or performance of the Retained Contracts at least three Business Days prior to the date of payment for such costs and expenses. If Buyer does not pay Seller such amount at least one Business Day prior to the date of payment for such costs and expenses or if Buyer informs such Seller that it does not want such Retained Contract to be a Post-Closing Contract, Seller may reject such Retained Contract.

## 2. Compliance with Local Rule 6004-1(b)

13.    The Agreement contains the following terms, conditions and provisions that are to be highlighted pursuant to Local Rule 6004-1(b):

- Sale to Insider: The Purchaser is not an insider of the Debtor.

- Agreements with Management:  The Purchaser has no obligation to employ members of Seller's existing management following Closing.

- Releases The Agreement does not provide for any release in favor of the Purchaser, *provided*, *however*, that the Agreement does contemplate the Purchaser's acquisition of claims against SAS, which claims serve as collateral for the Prepetition Debt.  (Agreement, at § 2.1(p)).

- Private/Sale No Competitive Bidding The Agreement does not contemplate a private sale and provides for a public auction of the Debtor's assets.

- Closing and Other Deadlines The deadlines requested herein, and subject to approval of the Court, are as follow:

  - Bid Deadline:            June 28, 2013
  - Designation Deadline:    June 30, 2013
  - Closing Date:            July 9, 2013
  - Outside Date:            Two (2) days after the entry of the Sale Order

- Good Faith Deposit: The Purchaser is required to pay 10 percent of the Purchase Price as a deposit.

- Interim Arrangements with Purchaser: The Agreement does not contemplate interim arrangements with the Purchaser.

- Use of Proceeds: The cash proceeds of the Purchase Price shall be paid (a), with respect to the $1,000,000 Cash Consideration, to the Bankruptcy Estate without restriction thereon; and (b), with respect to the DIP Facility Satisfaction Amount, to satisfy the outstanding indebtedness under the DIP Facility.

- Record Retention: Seller and the Purchaser are obligated to preserve and keep the records held by them relating to the Purchased Assets, the Assumed Liabilities, the Excluded Assets and the Excluded Liabilities for a period of three (3) years from the Closing Date (or, in the case of Seller, such shorter period as determined by the Trustee upon notice to the Purchaser before any such records are destroyed), and shall make

such records available to the other party and the Trustee as may be reasonably requested by such other party or the Trustee. From the Closing until the closing of the Seller Chapter 11 Case, the Purchaser shall provide, at the Purchaser's sole cost and expense, document storage at the Purchaser's facility for all records that are Excluded Assets. (Agreement, at § 6.3.)

- Sale of Avoidance Actions: The Purchaser shall acquire from seller those claims or causes of action available to Seller under chapter 5 of the Bankruptcy Code relating to (a) any customer, vendor or other Third Party with whom Seller is doing business as of the Closing Date or has done business in the three (3) year period prior to the Closing Date; (b) any Transferred Employee; or (c) providers of Depot, pallet repair and storage services. (Agreement, at § 2.1(n).)

- Requested Findings as to Successor Liability: Except as otherwise specifically set forth in the Asset Purchase Agreement, the Purchaser shall not assume or be obligated to pay, perform or otherwise discharge any debts, obligations and liabilities of the Seller arising pursuant to the Seller's ownership or operation of its facilities prior to the date of the applicable Closing, including, but not limited to, any Successor Liabilities in respect of the Successor Liability Documents, Statutes and Claims or otherwise. The Purchaser has given substantial consideration under the Asset Purchase Agreement for the benefit of the holders of Encumbrances. The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders of the Encumbrances against the Seller or the Purchased Assets. (Sale Order, at 9.)

- Sale Free and Clear of Unexpired Leases: The Purchaser will acquire all of Seller's right, title and interest of any nature whatsoever in the Purchased Assets free and clear of all Liens, other than Permitted Liens and those Liens assumed by Buyer pursuant to the Agreement, to the maximum extent permitted by section 363 of the Bankruptcy Code. (Agreement, at § 2.1.)

- Credit Bid: The Purchaser, in its capacity as successor in interest to the Prepetition Lenders, will credit bid $36,000,000 under the Agreement and pursuant to section 363(k) of the Bankruptcy Code.

- Relief from Bankruptcy Rule 6004(h): By this Motion the Debtor requests a waiver of Bankruptcy Rule 6004(h) with respect to the Sale.

### E.  The Bid Procedures

#### 1.  Outline of the Bid Procedures

14.    The Debtor proposes to establish the Bid Procedures in connection with the Auction of the Purchased Assets, which procedures are designed to maximize the value of the Purchased Assets for the Debtor's estate, creditors and other interested parties.  The Bid Procedures describe, among other things, the Purchased Assets, the manner in which prospective bidders may gain access to due diligence materials, the manner in which bidders may submit qualified bids and become qualified bidders, the process for conducting the Auction and the ultimate selection of the buyer, and the date and time of the Auction and Sale Hearing.  The Agreement contemplates that the Debtor will obtain entry of the Bid Procedures Order as a means of implementing the Sale to the Purchaser.  The Court and parties in interest are referred to the Bid Procedures Order for the entirety of the Bid Procedures for which the Debtors seek approval.  The Bid Procedures establish, among other things:[4]

  i.    The terms and conditions of the Agreement, which is attached to the Bid Procedures Order (See Bid Proc. Order, at Exhibit "1")

  ii.   The deadline and requirements for submitting a Qualified Bid (See Bid Proc. Order, at ¶ 4(a));

  iii.  The methodology for valuing Qualified Bids (See Bid Proc. Order, at ¶ 4(b));

  iv.   The criteria by which an Auction shall be triggered and the timing, location, and procedures for conducting an Auction (See Bid Proc. Order, at ¶ 4(c));

  v.    The methodology for selecting a Successful Bid and a Back-Up Bid (See Bid Proc. Order, at ¶ 4(d), (e));

  vi.   The timing of the Sale Hearing and certain provisions of the Sale Order (See Bid Proc. Order, at ¶ 6); and

  vii.  Additional general matters relating to the Auction and Sale process, including the return of deposits (See Bid Proc. Order, at ¶ 4(e)).

---

[4]    The summary description of the Bid Procedures herein is provided for the convenience of the Bankruptcy Court and parties in interest.  To the extent that there are any inconsistencies among this summary, the Agreement, and the Bid Procedures Order, the Bid Procedures Order shall govern.

## 2. Compliance with Local Rule 6004-1(c)

15.    The Bid Procedures contain the following provisions that are to be

highlighted pursuant to Local Rule 6004-1(c):

- Provisions Governing Qualification of Bidders: Any initial overbid for the Purchased Assets must be in an amount (in cash) of at least $2,000,000 greater than the amount equal to the Purchase Price, and with each subsequent overbid providing an incremental amount of at least $250,000 of value to Seller, or such greater amount as designated by Seller from time to time in consultation with the DIP Lender. In the event that Seller shall reasonably determine that such bid is a higher and/or better bid than that set forth in the Agreement, the Purchaser shall have the right to amend the Agreement as necessary in its reasonable discretion in order to cause the Purchaser's bid to be comparable to such higher and/or better bid. The Purchaser shall be entitled to a credit bid for the full amount of the Break-Up Fee and Expense Reimbursement in connection with any further bids made by the Purchaser. Only those persons who have submitted a Qualified Bid in compliance with this Bid Procedures Order including, to the extent applicable, the DIP Lender, shall be a "Qualified Bidder." Each Qualified Bidder shall be invited to attend the Auction at the office of Seller's counsel, White & Case LLP, 200 South Biscayne Boulevard, Miami, Florida 33131, which Auction must be attended in person.

- Provisions Governing Qualified Bids: Each competing bidder shall, on or before June 28, 2013, deliver to Seller: (a) a cash deposit of 10% of the cash purchase price (the "Deposit"), (b) reasonable proof acceptable to Seller, in consultation with the DIP Lender, of the interested party's ability to consummate a purchase of the Purchased Assets and assumption of the Assumed Liabilities, including copies of such party's annual, quarterly and monthly financial statements for the most recently ended fiscal periods, certified to be true, correct, and complete in all material respects and evidence of sufficient financing, and (c) an executed Asset Purchase Agreement on substantially the terms of, or on more favorable terms than those set forth in, the Agreement, which Asset Purchase Agreement shall (i) specify the amount of cash or other consideration offered by the competing bidder for the Purchased Assets, (ii) not be subject to unperformed due diligence, nor provide for an expense reimbursement or break-up amount, (iii) constitute an irrevocable offer by such competing bidder to complete its proposed purchase upon the terms set forth therein, and must be irrevocable until closing of the sale of the Purchased Assets to the Successful Bidder (defined below), (iv) provide for the purchase of substantially all of the Purchased Assets; and (v) be accompanied by a marked-up version of such Asset Purchase Agreement reflecting changes from the Agreement (a "Qualified Bid"). Upon receipt the Seller shall distribute copies of all bids received to the Purchaser. Copies of all Bids received by the Seller shall be sent to the DIP Lender and its counsel within one (1) day of receipt.

- **Provisions Providing Bid Protections to "Stalking Horse" Bidder**

  In the event that the Agreement is terminated as a result of a higher and better Qualified Bids from another Qualified Bidder and a closing occurs and is concluded with a Successful Bidder other than the Purchaser, then Seller shall pay to the Purchaser (i) the Expense Reimbursement and (ii) the Break-Up Fee, in each case to be paid at such closing and prior to any payments to Seller's creditors, whether secured or otherwise, out of the proceeds of, such higher and better Qualified Bid, and upon receipt by Seller and the DIP Lender of evidence, reasonably satisfactory to them, of the actual out-of-pocket expenses incurred by the Purchaser in connection with the Agreement.

- **Modification of Bidding and Auction Procedures:** The Seller, in consultation with the DIP Lender, may increase the required incremental overbid amount (but not the initial overbid amount) without further order of the Court, and the Seller may adjourn the Auction from time to time upon an announcement of such adjournment on the date scheduled for the Auction.

- **Closing with Alternative Backup Bidders:** If the Successful Bidder fails to consummate the Sale, breaches the Asset Purchase Agreement executed by the Successful Bidder or otherwise fails to perform, (i) the Seller may consummate the proposed sale with the next highest or best bidder at the Auction without the need for further Court approval, (ii) the Seller will retain the Deposit of such bidder, and (iii) the Debtor will maintain the right to pursue all available remedies against such bidder.

- **Provisions Governing the Auction:** The Auction shall commence at 10:00 a.m. (Eastern Time) on July 1, 2013. The Purchased Assets shall be sold free and clear of all liens, claims, and encumbrances to the fullest extent allowed under section 363(f) of the Bankruptcy Code. The following rules shall govern the Auction:

  - Subject to the limitations set forth in the Bid Procedures, the opening price at such Auction shall be the highest and/or best offer of a Qualified Bidder or of the Purchaser (if the Purchaser amends the Agreement pursuant to the Bid Procedures).

  - Only Qualified Bidders, including the Purchaser, may bid at the Auction. If multiple Qualified Bids are received, each Qualified Bidder shall have the right to continue to improve its Qualified Bid at the Auction.

  - At the conclusion of the Auction, after consultation with the DIP Lender and subject to Court approval following the Auction, the successful bidder shall be selected and announced by the Debtor (the "Successful Bidder"), and the backup bidder shall be selected and announced by the Debtor (the "Backup Bidder").

- If no Qualified Bids are received for the Purchased Assets, the Debtor may seek Court approval of the Agreement with the Purchaser without offering the Purchased Assets for sale at the Auction.

- The Auction may be adjourned from time to time without further notice other than an announcement of such adjournment by the Debtor at the Auction on the date scheduled for the Auction.

■ <u>Successful Bidder</u>. The Seller may base the selection of the Successful Bidder and Backup Bidder on the following factors, among others: purchase price; liabilities assumed in the bid; and the markup of the Asset Purchase Agreement submitted with the bid. In consultation with the DIP Lender, the Debtor may (a) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Seller, its estate, and creditors; and/or (b) refuse to consider any bid that fails to comply with the Bid Procedures. After the determination of the Successful Bidder, Seller shall promptly execute the Asset Purchase Agreement previously executed and submitted by such Successful Bidder, together with any changes thereto necessitated by the parties' actions at the Auction.

■ <u>Credit Bids</u>. The Purchaser shall be entitled to a credit bid for the full amount of the Break-Up Fee and Expense Reimbursement in connection with any further bids made by the Purchaser.

## F. Bid Protections

16.    The Purchaser has expended, and likely will continue to expend, considerable time, money and energy pursuing the Sale and has engaged in extended arm's length and good faith negotiations. In recognition of this expenditure of time, energy and resources, and the benefits of securing a stalking horse or opening bid, the Debtor has agreed to provide customary bid protections to the Purchaser. Specifically, the Debtor seeks, among other things, approval of the Break-Up Fee and Expense Reimbursement, subject to Bankruptcy Court approval as to reasonableness, up to a maximum aggregate amount of $1,450,000.

17.    The Bid Protections were a material inducement for, and a condition of, the Purchaser's entry into the Agreement. The Debtor believes that they are fair and reasonable in view of, among other things, (a) the intensive analysis, due diligence investigation, and

negotiations undertaken by the Purchaser in connection with the Sale; and (b) the fact that the efforts of the Purchaser have increased the chances, through the auction process, that Seller will receive even higher value for the Purchased Assets, to the benefit of the Debtor, its estate, its creditors, and all other parties in interest.

18.    The Purchaser is unwilling to commit to holding open its offer to purchase the Purchased Assets under the terms of the Agreement unless the Bid Procedures Order authorizes payment of the Break-Up Fee. Thus, absent entry of the Bid Procedures Order and approval of the Bid Protections, Seller may lose the opportunity to obtain the highest and best offer for the Purchased Assets.

19.    As set forth more fully below, the Debtor believes that the Bid Procedures and Bid Protections are fair and reasonable and, combined with the Purchaser's offer to acquire the Purchased Assets, will maximize the value realized by the Debtor's estate.

### G. Assumption and Assignment Procedures for Executory Contracts and Unexpired Leases

20.    The Debtor proposes to establish the Assignment Procedures to be employed in connection with the identification and assumption of Assumed Contracts, Assumed Leases and Intellectual Property Rights, which are designed to maximize value for the Debtor's estate, creditors, and other interested parties. The Agreement contemplates that the Debtor will obtain entry of the Bid Procedures Order as a means of approving the Assignment Procedures. Accordingly, the Debtor seeks approval of the following Assignment Procedures:[5]

   a.   Not later than fourteen (14) days prior to the Sale Hearing, Seller shall file with the Bankruptcy Court a list identifying the Assumed Contracts, Assumed Leases and Intellectual Property Rights and the amounts necessary to cure defaults under each of such Assumed Contracts, Assumed Leases and Intellectual Property Rights determined by Seller. Seller shall serve all counterparties to all Assumed

---

[5]    The summary description of the Assignment Procedures herein is provided for the convenience of the Bankruptcy Court and parties in interest. To the extent that there are any inconsistencies among this summary, the Agreement, and the Bid Procedures Order, the Bid Procedures Order shall govern.

Contracts and Intellectual Property Rights with the Assumption Notice, specifically stating that Seller is or may be seeking the sale, assumption and assignment of the Assumed Contracts, Assumed Leases and Intellectual Property Rights and notifying such parties of the deadline for objecting to the amount of any Cure Payment Liability related to such Assumed Contracts, Assumed Leases and Intellectual Property Rights, as of June 27, 2013, which deadline is not less than three (3) Business Days prior to the Sale Hearing, so as to enable any such party to object to the proposed Cure Payment Liability and the Bankruptcy Court to determine such Cure Payment Liability as promptly as reasonably possible.

b. In cases in which Seller is unable to establish that a default exists, the relevant Cure Payment Liability shall be set at $0.00 in the Assumption Notice.

21.    To ensure adequate notice and pursuant to the Assignment Procedures, the Seller shall serve all counterparties to all Assumed Contracts, Assumed Leases and Intellectual Property Rights with the Assumption Notice in the manner and form outlined above, substantially in the form attached to the Bid Procedures Order as Exhibit "4", specifically stating that Seller is or may be seeking the sale, assumption and assignment of the Assumed Contracts, Assumed Leases and Intellectual Property Rights. Furthermore, the Assumption Notice shall provide that the deadline for objecting to assumption and assignment of the Assumed Contracts, Assumed Leases and Intellectual Property Rights shall be June 27, 2013, which deadline is not less than three (3) Business Days prior to the Sale Hearing.

## H.  Proposed Sale Hearing and Related Deadlines

22.    The Debtor requests that the Court schedule the Sale Hearing for July 2, 2013, or as soon thereafter as the Court's calendar may permit. The Debtor requests that the Court set the deadline to file and serve any objection and supporting evidence with respect to the proposed Sale of assets free and clear of all liens, claims, rights, encumbrances and interests as June 25, 2013 (5 business days prior to the Sale Hearing).

## I.  Notice

23.    The Debtor respectfully requests that the Court approve the form and manner of notice described in the following paragraphs as reasonable, sufficient, and in

accordance with the Bankruptcy Code and Bankruptcy Rules with respect to the relief requested in the Motion.

### 1. Service of the Motion

24.     The Debtor has served or is in the process of serving this Motion and all exhibits and declarations attached hereto by email, facsimile, or next business day delivery on: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Purchaser; (c) the Debtor's 30 largest unsecured creditors on a consolidated basis (including counsel if known); (d) counsel to the DIP Lender; (e) the non-Debtor parties to any active UCC financing statements on file against the Debtor; (f) the non-Debtor parties who hold any tax or judgment liens; (g) entities previously identified by Houlihan as potentially interested in a transaction with the Debtor; (h) the state and federal agencies required by Bankruptcy Rule 2002(j); (i) the Attorneys General in each State where the Purchased Assets are located; (j) the Environmental Protection Agency; (k) all parties required under Local Rule 2002(b); and (l) all parties that have requested notice of matters in this case (collectively, the "Service Parties").

### 2. Service of the Sale Notice

25.     Within two (2) business days of entry of the Bid Procedures Order, the Debtor intends to serve the Sale Notice attached as Exhibit "2" to the Bid Procedures Order, by email, facsimile, or first class mail on the Service Parties, and on all known creditors of the Debtor. At such time, or as soon as practicable thereafter, the Debtor also intends to submit for publication the Publication Notice, substantially in the form attached to the Bid Procedures Order as Exhibit "3", with one national publication and post the same on the Debtor's restructuring website established by the Debtor's claims and noticing agent http://www.igpsinfo.com. The Debtor submits that the manner, form and scope of the Sale Notice is reasonably calculated to provide all interested parties with timely and appropriate notice of the Sale, the Bid Procedures, the Auction and the Sale Hearing. Moreover, the Debtor believes that publication of the Publication Notice as set forth in this

Motion and the Bid Procedures Order is reasonably calculated to provide all unknown creditors and parties not otherwise required to be served with a copy of the Sale Notice pursuant to the Bid Procedures Order with proper notice of the Sale, the Bid Procedures, the Auction and the Sale Hearing. Thus, the Debtor submits that the notice as outlined herein constitutes good and sufficient notice of the relief requested herein.

## Jurisdiction

26.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

27.     By this Motion, the Debtor requests the entry of two orders. First, the Debtor requests entry of the Bid Procedures Order, substantially in the form attached hereto as Exhibit A,

>    (i)     authorizing and approving Bidding Procedures in connection with the receipt and analysis of competing bids for the Purchased Assets substantially in the form and manner set forth in the Bid Procedures Order;
>
>    (ii)    approving the form and manner of notice of the Bidding Procedures, Auction and Sale and hearing thereon, substantially in the form attached as Exhibit 2 to the Bidding Procedures Order and the Publication Notice attached as Exhibit 3 to the Bidding Procedures Order;
>
>    (iii)   establishing the following dates and deadlines, subject to modification as needed, relating to competitive bidding and approval of the Sale:[6]
>
>        ▪   Bid Deadline. June 28, 2013 at 5:00 p.m. (prevailing Eastern Time) as the deadline by which all Submitted Bids must actually be received pursuant to the Bidding Procedures (the "Bid Deadline");
>
>        ▪   Auction. July 1, 2013 at 10:00 a.m. (prevailing Eastern Time) as the date and time the Auction, if one is required, which will be held at the

---

[6]     All hearing dates and objection deadlines set forth herein are subject to the Court's availability and approval. A notice with the confirmed dates and times for such hearing dates and objection deadlines will be separately filed.

offices of White & Case LLP, 200 Biscayne Boulevard, Suite 4900, Miami, Florida 33131;

- Sale Objection Deadline. June 25, 2013 at 4:00 p.m. (prevailing Eastern Time) as the deadline to object to the Sale (the "Sale Objection Deadline"); and

- Sale Hearing. July 2, 2013 at 10:00 a.m. (prevailing Eastern Time) as the date and time of the Sale Hearing.

28.     Second, the Debtor requests that, at or after the Sale Hearing, the Bankruptcy Court enter the Sale Order, substantially in the form attached hereto as Exhibit B approving (a) the Agreement, which provides for the Sale free and clear of all Liens other than the Assumed Liabilities and certain Permitted Liens, pursuant to the terms thereof to the Purchaser or such other party submitting the highest and/or otherwise best bid for the Purchased Assets at the Auction; and (b) granting other related relief.

## Basis for Relief

### A.    Approval of the Bid Procedures is Warranted

29.     The Bid Procedures will allow the Debtor to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtor will receive the best possible consideration for the Purchased Assets. The Bid Procedures will also allow the Debtor to undertake the Auction process in as expeditious a manner as possible, which the Debtor believes is essential to maintaining and maximizing the value of its estate. Indeed, other bankruptcy courts in this district have routinely approved similar bid procedures. See, e.g., In re Centaur, LLC, Case No. 10-10799 (KJC) (Bankr. D. Del. July 28, 2010); In re RNI Winddown Corp., Case No. 06-10110 (CSS) (Bankr. D. Del. Feb. 24, 2006); In re Nobex Corp., Case No. 05-20050 (MFW) (Bankr. D. Del. Jan. 23, 2006); Russell-Stanley Holdings, Inc., Case No. 05-12339 (BLS) (Bankr. D. Del. Sept. 8, 2005); In re Pharm. Formulations Inc., Case No. 05-11910 (MFW) (Bankr. D. Del. Aug. 8, 2005); In re Proxim

Corp., Case No. 05-11639 (KG) (Bankr. D. Del. July 1, 2005); In re AAIPharma Inc., Case No. 05-11341 (CSS) (Bankr. D. Del. June 8, 2005).  Accordingly, approval of the Bid Procedures is warranted.

### B.  Bid Protections Are Warranted

30.    The Purchaser and its parent companies have engaged in arm's length and good faith negotiations with the Debtor and have expended, and likely will continue to expend, considerable time, money and energy pursuing the Sale.  To compensate the Purchaser for serving as a "stalking horse" whose bid will be subject to higher and/or otherwise better offers, the Debtor and the Purchaser seek authority for the Debtor to provide the Purchaser with the Break-Up Fee and Expense Reimbursement as set forth in the Agreement if Seller, inter alia, enters into a definitive agreement with a Qualifying Bidder (other than the Purchaser) that represents a higher and better offer other than as a result of the Purchaser's breach of the Agreement.

31.    The Break-Up Fee and Expense Reimbursement were an essential inducement and condition relating to the Purchaser's entry into, and continuing obligations under, the Agreement.  The Debtor believes the Break-Up Fee and Expense Reimbursement (i) are reasonable and appropriate in light of the size and nature of the proposed Sale and comparable transactions and the considerable efforts and resources that have been and will be expended by the Purchaser; (ii) has been negotiated by the Parties and their respective advisors at arm's length and in good faith; and (iii) are necessary to induce the Purchaser to continue to pursue the Sale and to continue to be bound by the Agreement.

32.    Moreover, unless it is assured that the Bid Protections will be available, the Purchaser is unwilling to remain obligated to consummate the Sale or otherwise be bound under the Agreement (including the obligations to maintain its committed offer while such offer

is subject to higher or otherwise better offers as contemplated by the Bid Procedures). Thus, absent an entry of the Bid Procedures Order and approval of the Break-Up Fee and Expense Reimbursement, the Debtor may lose the opportunity to obtain what may be the highest and best available offer for the Purchased Assets.

33.     The Debtor and the Purchaser believe that the Bid Protections are (i) reasonable, given the benefits to the Debtor's estate of having a definitive purchase and sale agreement and the risk to the Purchaser that an alternative buyer's offer ultimately may be accepted; and (ii) necessary to preserve and enhance the value of Debtor's estate. The paramount goal in any proposed sale of property of a debtor is to maximize the proceeds received by the estate. See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand."). To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales. See In re Wintz Cos., 230 B.R. 840, 846 (B.A.P. 8th Cir. 1999), aff'd, 219 F.3d 807 (8th Cir. 2000) (noting that break-up fees are generally permitted when they create an incentive for higher bids).

34.     Bidding incentives encourage a potential buyer to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant in the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. At least one court has acknowledged that some bankruptcy courts have approved bidding incentives similar to the Bid Protections under the "business judgment rule," which prescribes against judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See, e.g., Calpine Corp. v. O'Brien

Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533-35 (3d Cir. 1999)

(noting that even though bidding incentives are measured against a business judgment standard

in nonbankruptcy transactions and by some bankruptcy courts, the administrative expense

provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context and,

accordingly, to be approved, bidding incentives must provide some benefit to the debtor's

estate).

      35.     Approval of break-up fees and expense reimbursement provisions in

connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has

become an established practice in chapter 11 cases. See, e.g., In re Centaur, LLC, Case No. 10-

10799 (KJC) (Bankr. D. Del. July 28, 2010) In re RNI Winddown Corp., Case No. 06-10110

(CSS) (Bankr. D. Del. Feb. 24, 2006); Russell-Stanley Holdings, Inc., Case No. 05-12339 (BLS)

(Bankr. D. Del. Sept. 8, 2005); In re Pharm. Formulations Inc., Case No. 05-11910 (MFW)

(Bankr. D. Del. Aug. 8, 2005); In re AAIPharma Inc., Case No. 05-11341 (CSS) (Bankr. D. Del.

June 8, 2005).

      36.     Historically, courts have evaluated break-up fees by considering whether

the parties engaged in self-dealing or manipulation of the bidding process, whether the fee

encouraged or inhibited bidding, and whether the fee was reasonable in proportion to the contract

purchase price. See, e.g., In re Integrated Res., Inc., 147 B.R. 650, 657 (S.D.N.Y. 1992). The

Third Circuit has stated that a break-up fee may be approved when it is necessary to preserve the

value of a debtor's estate. O'Brien, 181 F.3d at 536. In O'Brien, the Third Circuit determined,

inter alia, that a break-up fee provides an actual benefit to a debtor's estate if "assurance of a

break-up fee promote[s] more competitive bidding, such as by inducing a bid that otherwise

would not have been made and without which bidding would have been limited." Id. at 537; see

also Wintz Cos., 230 B.R. at 846. Alternatively, a break-up fee may be approved under O'Brien

if it serves as a minimum or a floor bid upon which other bidders may rely, thereby increasing the likelihood that the price at which the debtor sells its assets reflects their true worth. O'Brien, 181 F.3d at 537.

37.     The Break-Up Fee and its attendant benefits to the Debtor's estate should encourage bidding. Many potential purchasers would be unwilling to enter into a purchase and sale agreement without the protection provided by the Break-Up Fee. The Bid Protections induced the Purchaser to submit a bid that will serve as the minimum or floor bid for the Purchased Assets on which the Debtor can use in conjunction with marketing the assets, and on which the Debtor's creditors and other bidders can rely. The Purchaser has provided a material benefit to the Debtor and its creditors by increasing the likelihood that the best possible purchase price for the Purchased Assets will be received. Accordingly, the Bid Protections are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtor's estate. The bid made by the Purchaser will encourage fair and competitive bidding by setting a minimum price for the Sale while subjecting the Purchaser's offer to a competitive bidding process as a result of the Debtor's marketing efforts and the Auction, if any, for the Purchased Assets in accordance with the Bid Procedures.

38.     The amount of the Break-Up Fee as proposed herein would be $1,050,000 in cash. Additionally, the Debtor proposes to only consider bids that offer at least $2,000,000 more than the consideration offered by the Purchaser in exchange for the Purchased Assets. Thus, the Debtor believes that the Break-Up Fee constitutes both a fair and reasonable percentage of the proposed Consideration and a valid means of ensuring that the Auction will maximize the value of the Purchased Assets. In re S.N.A. Nut Co., 186 B.R. 98, 103 n.5 (Bankr. N.D. Ill. 1995); see also O'Brien, 181 F.3d at 537.

39.     Additionally, a Break-Up Fee that is 2.8% of the Purchase Price is within the range of precedent established by bankruptcy courts within this District. See, e.g., In re Maxide Acquisition, Inc., Case No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (approving break-up fee of 3.0%, or $2.25 million in connection with a $75 million sale); In re Am. Classic Voyages Co., Case No. 01-10954 (EIK) (Bankr. D. Del. Mar. 20, 2002) (approving break-up fee of 6.67%, or $250,000 in connection with a $3.75 million sale); In re Fruit of the Loom, Inc., Case No. 99-04497 (PJW) (Bankr. D. Del. Dec. 11, 2001) (approving break-up fee of 3.0%, or $25 million, in connection with $835 million sale).

40.     Under O'Brien, break-up fees are evaluated under the same standard as general administrative expenses. Id. at 535 ("[T]he allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."). Because the requested Break-Up Fee is fair and reasonable and is intended to maximize the value of Seller's estate, the Debtor submits that approval of the Break-Up Fee is warranted.

41.     In sum, the Debtor's ability to offer the Bid Protections enables it to ensure the sale of the Purchased Assets to a contractually committed bidder at a price it believes to be fair while, at the same time, providing it with the potential of obtaining even greater benefit to the estate. Accordingly, the Bid Protections should be approved.

**C. Approval of the Assignment Procedures Is Warranted**

42.     The Debtor proposes the adoption of the Assignment Procedures, as set forth in the proposed Bid Procedures Order annexed hereto as Exhibit A, that permit the identification and assumption of the Assumed Contracts, Assumed Leases and the Intellectual Property Rights.

43.     Section 365(b)(1) of the Bankruptcy Code sets forth the following

requirements that a debtor in possession must satisfy before it may assume an executory contract:

> If there has been a default in an executory contract . . . of the debtor, the trustee may not assume such contract . . . unless, at the time of assumption of such contract . . . , the trustee –
>
> > (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract . . . , for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

44.     Further, Bankruptcy Code section 365(f)(2) provides that a debtor may

assign an executory contract after satisfying the following requirements:

> The trustee may assign an executory contract . . . of the debtor only if –
>
> > (A)     the trustee assumes such contract . . . in accordance with the provisions of this section; and
> >
> > (B)     adequate assurance of future performance by the assignee of such contract . . . is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2); see also In re ANC Rental Corp., Inc., 277 B.R. 226, 238 (Bankr. D. Del.

2002) ("Having met the threshold requirement of a sound business purpose, the Debtors must

also cure any existing defaults and provide adequate assurance of future performance of the

assigned contracts.").

45.     "The phrase 'adequate assurance of future performance' . . . is to be given

a practical, pragmatic construction based upon the facts and circumstances of each case. . . .

Although no single solution will satisfy every case, the required assurance will fall considerably

short of an absolute guarantee of performance." Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (quoting In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985); see also Cinicola v. Scharffenberger, 248 F.3d 110, 120 n.10 (3d Cir. 2001) (quoting Carlisle); In re Decora Indus., Inc., No. 00-4459 JJF, 2002 WL 32332749, at *8 (D. Del. May 20, 2002).

      46.    One factor courts consider when determining whether the debtor has provided adequate assurance of future performance is "the willingness and ability of the debtor or its proposed assignee to fund cure payments." See In re Am. the Beautiful Dreamer, Inc., Case No. 05-47435, 2006 WL 2038646, at *2 (Bankr. W.D. Wash. May 18, 2006); In re Embers 86th St., Inc., 184 B.R. 892, 902 (Bankr. S.D.N.Y. 1995); see also In re NII Holdings, Inc., 288 B.R. 356, 375-76 (Bankr. D. Del. 2002) (implying in confirmation order that also constituted an order approving assumptions and assignments of executory contracts and unexpired leases that obligation to pay cure amount could be held by a debtor or its assignee).  Pursuant to the Assignment Procedures, the Purchaser shall assume all Cure Payment Liabilities in full and complete satisfaction of section 365(f) of the Bankruptcy Code.  The Debtor believes that the Assignment Procedures are fair and equitable and are necessary to ensure the efficient identification and assumption of the Assumed Contracts, Assumed Leases and the Intellectual Property Rights.  Accordingly, the Debtor respectfully requests that the Bankruptcy Court approve the Assignment Procedures.

## D. The Proposed Sale is Within the Debtor's Sound Business Judgment and Should Therefore Be Approved

      47.    The relief requested by this Motion is appropriate under the Bankruptcy Court's equitable powers under section 105(a) of the Bankruptcy Code and authority to approve non-ordinary course transactions under section 363(b) of the Bankruptcy Code.

48.     Section 105(a) provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Section 105 confers broad powers on bankruptcy courts:

> [Section] 105 [is] 'an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case. The basic purpose of § 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction. . . .'

Davis v. Davis (In re Davis), 170 F.3d 475, 492 (5th Cir. 1999) (citation omitted).  The Debtor recognizes that section 105(a) of the Bankruptcy Code "may be used only to carry out the provisions of Title 11." In re CoServ, L.L.C., 273 B.R. 487, 494 n.9 (Bankr. N.D. Tex. 2002). The major premise of chapter 11, however, is the continued and uninterrupted operation of the debtor in possession to the greatest extent possible.  Thus, the Debtor's requested relief is consistent with the "furtherance of the provisions of the Bankruptcy Code." Id.; see also In re Southmark Corp., 113 B.R. 280, 281 (Bankr. N.D. Tex. 1990) (stating that "the court may use [section] 105(a) to fashion orders that are necessary or appropriate to further a substantive provision of the [IRC]").

49.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); Cajun Elec. Power Coop., Inc. v. Official Comm. of Unsecured Creditors (In re Cajun Elec. Power Coop., Inc.), 119 F.3d 349, 354 (5th Cir. 1997).

50.     A sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for such a sale.  See, e.g., In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (noting that the "sound business purpose" test set forth in Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d

Cir. 1983) is one of two tests for supporting a section 363 sale but declining to decide which is the Third Circuit's official test); see also In re Trans World Airlines, Inc., No. 01-00056 (PJW), 2001 WL 1820326, at *13 (Bankr. D. Del. Apr. 2, 2001).

51.     In determining whether a sound business justification exists, the court may consider the following factors:  (i) whether fair and reasonable consideration is provided; (ii) whether the purchaser has acted in good faith; and (iii) whether adequate and reasonable notice of the sale was given to interested parties. See Del. & Hudson Ry., 124 B.R. at 176.  As set forth below, these factors are satisfied with respect to the Sale.

### 1.   A Sound Business Justification Exists for the Sale of the Purchased Assets at the Early Stages of the Bankruptcy Case

52.     The Debtor respectfully submits that a sound business purpose exists to justify the Sale.  A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of the assets for the debtor's estate, its creditors or interest holders. See, e.g., In re Lionel Corp., 722 F.2d 1063.  In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See Food Barn Stores, 107 F.3d at 564-65 (stating that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Res., Inc., 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

53.     There is more than adequate business justification to sell the Purchased Assets to the Purchaser or to a higher and better Qualified Bidder.  Based upon an analysis of the Debtor's ongoing and future business prospects, the Debtor's management and its advisors believe that the sale of the Purchased Assets at or above the minimum bid pursuant to the terms

and conditions set forth in the Agreement is in the best interests of the estate. Absent an expedited sale process in bankruptcy, the going concern value of the Debtor's business will continue to diminish and could lead to a fire sale liquidation, to the detriment of all stakeholders. Under these circumstances, sound business reasons exist that justify the sale of the Purchased Assets outside of the ordinary course of business.

### 2.    The Proposed Consideration Offered is Fair and Reasonable

54.    To dispel any doubt concerning the market value of the Debtor's assets, the Debtor is subjecting the Sale to competing bids at the Auction, thereby ensuring that the Debtor will receive the highest and/or otherwise best value for the Purchased Assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtor will ultimately be demonstrated by a "market check" through an auction process, which the Debtor believes is the best means for establishing whether a fair and reasonable price is being paid for the Purchased Assets.

### 3.    The Agreement Has Been Negotiated in Good Faith

55.    Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in *good faith* . . . ." 11 U.S.C. § 363(m) (emphasis added).

56.    While the Bankruptcy Code does not define "good faith," the Third Circuit has stated that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)).

57.    The Agreement was intensely negotiated at arm's length with all parties involved acting in good faith.  The Debtor has fully disclosed and requested the Bankruptcy Court's approval of all the terms and conditions of the proposed Sale and intends to provide notice as directed by the Bankruptcy Court.  Furthermore, the Debtor will be prepared to introduce evidence at the Sale Hearing regarding the conduct of the Auction and the negotiation of the Agreement.  In the event there is a higher and better Qualified Bidder other than the Purchaser, the Debtor intends to present evidence to show that the higher and better Qualified Bidder is entitled to the same finding under section 363(m) of the Bankruptcy Code. Accordingly, the Sale pursuant to the Agreement has been proposed and is in good faith, and the Debtor requests that the Bankruptcy Court find that the Purchaser or the higher and better Qualified Bidder, as applicable, is a "good faith" buyer under section 363(m) of the Bankruptcy Code with respect to the Agreement.

### 4.  Adequate Notice of the Sale is Being Provided

58.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private or by public auction.  Fed. R. Bankr. P. 6004(f)(1).  Further, pursuant to Bankruptcy Rule 2002(a)(2), this Bankruptcy Court may, for cause shown, shorten or direct another method of giving notice regarding the general twenty-one (21) day by mail period for the proposed use, sale, or lease of property of the estate other than in the ordinary course of business.  See Fed. R. Bankr. P. 2002(a)(2).  Subject to Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections.  See Fed. R. Bankr. P. 2002(c)(1).

Moreover, the notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property. Id.

59.     As stated above, this Motion will be served upon all Service Parties. Furthermore, within two (2) business days after entry of the Bid Procedures Order, the Debtor intends to serve the Sale Notice upon the Service Parties. Moreover, the Debtor also intends to submit for publication the Publication Notice on the website of the Debtor's claims and noticing agent, AlixPartners, LLP, within three (3) business days after the entry of the Bid Procedures Order.

60.     The Debtor submits that such notices and procedures set forth herein and in the Bid Procedures Order satisfy the notice requirements of Bankruptcy Rules 2002 and 6004 and section 363(b) of the Bankruptcy Code, and constitute good and sufficient notice and that no other or further notice is required. Accordingly, the Debtor respectfully submits that this Bankruptcy Court should not only approve the manner and form of the Sale Notice and Publication Notice but also find that the notice described herein constitutes good and sufficient notice of the relief requested in the Motion.

**E. Sale of the Purchased Assets Should be Granted Free and Clear of Substantially All Liens, Claims, Interests and Encumbrances**

61.     Under section 363(f) of the Bankruptcy Code, a debtor may sell property "under subsection (b) and (c) free and clear of any interest in such property of an entity other than the estate." In particular, section 363(f) authorizes a debtor to sell property free and clear if

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed Sale of the Purchased Assets. In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002); see also Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 257 (3d Cir. 2000) (discussing how section 363(f) authorizes the sale of a debtor's assets free and clear of all liens, claims and interests if "any one of [the] five prescribed conditions" is met).

62.     With respect to each current or prospective Lien on the Purchased Assets, the Debtor can satisfy at least one of the five conditions set forth in section 363(f). First, the Debtor anticipates that the Purchaser, as the successor in interest to the Prepetition Agent and Lenders, will consent to the Sale free and clear of all Liens. Additionally, the Debtor believes that in such capacity, if the Purchased Assets are sold to a party other than the Purchaser, the Purchaser would consent to the Sale free and clear of its Lien. Furthermore, the proposed Sale Order provides that all Liens attach to the proceeds of the Sale ultimately attributable to the Purchased Assets against or in which such Liens are asserted, or other specifically dedicated funds, in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to any rights, claims and defenses the Debtor or its estate, as applicable, may possess with respect thereto.[7] See Sale Order ¶ 10. Accordingly, section 363(f)(2) or (f)(5) is satisfied.

---

[7]     For the avoidance of doubt, if not already satisfied directly by Purchaser at Closing, the proceeds of the Purchased Assets received by Seller under the Assets Purchase Agreement shall be applied first to satisfy in full all amounts then outstanding under the DIP Facility, including, without limitation, all accrued but unpaid interest and other charges.

63.     Accordingly, the Debtor submits that the sale of the Purchased Assets free and clear of any Liens on the Purchased Assets satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

**F.  Bankruptcy Rules 6004(h) and 6006(d) Should Be Waived**

64.     Bankruptcy Rule 6004(h) stays an order authorizing an asset sale as follows: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, *unless the court orders otherwise.*" Fed. R. Bankr. P. 6004(h) (emphasis added). Similarly, Bankruptcy Rule 6006(d) stays an order authorizing the assignment of executory contracts as follows: "An order authorizing the trustee to assign an executory contract or unexpired lease under§ 365(f) is stayed until the expiration of 14 days after the entry of the order, *unless the court orders otherwise.*" Fed. R. Bankr. P. 6006(d) (emphasis added).

65.     Given the necessary speed by which the Sale must occur in order to maximize sale value and minimize sale administration, the Debtors submit that a waiver of the fourteen-day stay requirement with respect to any sale that is approved by this Court hereunder should be waived.

<u>Notice</u>

66.     Notice of this Motion has been provided to each of the Service Parties. The Debtor submits that no other or further notice need be provided. No previous motion for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests entry of an order (i) granting the

relief requested herein and (ii) granting the Debtor such other and further relief as the

Bankruptcy Court deems just and proper.

Dated:   June 5, 2013
        Wilmington, Delaware

<div style="margin-left:40%;">

FOX ROTHSCHILD LLP

By:
     Jeffrey M. Schlerf (No. 3047)
     Citizens Bank Center, Suite 1600
     919 North Market Street
     Wilmington, DE 19801
     Telephone:  (302) 654-7444

              – and –

     John K. Cunningham
     Richard S. Kebrdle
     Kevin McGill
     Fan B. He
     WHITE & CASE LLP
     Southeast Financial Center
     200 South Biscayne Boulevard, 49th Floor
     Miami, Florida 33131
     Telephone:  (305) 371-2700
     Facsimile:  (305) 358-5744

     *Proposed Attorneys for the Debtor and
     Debtor in Possession*

</div>