# EXHIBIT A1

**EXECUTION COPY**

===================================================================

DATED JUNE 4, 2013

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

iGPS LOGISTICS LLC,

As Buyer

AND

iGPS COMPANY LLC,

As Seller

===================================================================

Table of Contents

ARTICLE I        DEFINITIONS....................................................................................... 1

    Section 1.1        Definitions............................................................................... 1
    Section 1.2        Other Terms ........................................................................... 9
    Section 1.3        Interpretation ....................................................................... 10
    Section 1.4        Time ..................................................................................... 10

ARTICLE II       PURCHASE AND SALE OF ASSETS AND EQUITY INTERESTS......... 11

    Section 2.1        Purchased Assets.................................................................. 11
    Section 2.2        Excluded Assets ................................................................... 13
    Section 2.3        Conveyance.......................................................................... 14
    Section 2.4        Assumed Liabilities ............................................................. 14
    Section 2.5        Excluded Liabilities ............................................................ 15
    Section 2.6        Sales Tax Obligations ......................................................... 16
    Section 2.7        Purchase Price...................................................................... 16
    Section 2.8        Allocation of Purchase Price................................................ 16
    Section 2.9        Ad Valorem Personal Property Taxes.................................. 17

ARTICLE III      BANKRUPTCY MATTERS.................................................................. 17

    Section 3.1        Bid Protections..................................................................... 17
    Section 3.2        Sales Procedures and Sale Motion; The Hearing; Related
                          Matters ................................................................................. 17
    Section 3.3        Order Regarding Depot Arrangements ................................. 17

ARTICLE IV      REPRESENTATIONS AND WARRANTIES OF SELLER........................ 18

    Section 4.1        Seller Corporate Matters...................................................... 18
    Section 4.2        Validity of Agreement and Conflict with Other Instruments ........... 18
    Section 4.3        Exclusivity of Representations ............................................ 19

ARTICLE V       REPRESENTATIONS AND WARRANTIES OF BUYER......................... 19

    Section 5.1        Corporate Matters ................................................................ 19
    Section 5.2        Validity of Agreement and Conflict with Other Instruments ........... 19
    Section 5.3        Independent Investigation.................................................... 19
    Section 5.4        Ability to Satisfy Obligations .............................................. 20

ARTICLE VI      COVENANTS ..................................................................................... 20

    Section 6.1        Actions Pending Closing...................................................... 20
    Section 6.2        Access to Information; Cooperation ..................................... 21
    Section 6.3        Preservation of Records ....................................................... 22
    Section 6.4        Further Assurances............................................................... 22
    Section 6.5        Consents and Approvals; Closing Conditions ..................... 22
    Section 6.6        Disclaimer of Warranties ..................................................... 23
    Section 6.7        Required Approvals .............................................................. 23
    Section 6.8        Publicity ............................................................................... 24
    Section 6.9        Sale Process ......................................................................... 25
    Section 6.10       Post-Closing Contracts and Assets ...................................... 25

Section 6.11    Employee and Labor Matters.................................................. 27
Section 6.12    Real Property ....................................................................... 28

ARTICLE VII    CONDITIONS TO CLOSING ..................................................... 28

Section 7.1    Conditions on Behalf of Seller............................................. 28
Section 7.2    Conditions to Obligations of Buyer .................................... 29

ARTICLE VIII    CLOSING ................................................................................ 30

Section 8.1    The Closing........................................................................... 30
Section 8.2    Actions at the Closing ......................................................... 30

ARTICLE IX    TERMINATION........................................................................ 31

Section 9.1    Termination .......................................................................... 31
Section 9.2    Effect of Termination........................................................... 33

ARTICLE X    RISK OF LOSS; NO SURVIVAL ................................................ 34

Section 10.1    Risk of Loss ......................................................................... 34
Section 10.2    Seller's Covenants, Representations and Warranties; Survival......... 34

ARTICLE XI    MISCELLANEOUS .................................................................. 35

Section 11.1    Notices ................................................................................. 35
Section 11.2    Sale Order ............................................................................ 36
Section 11.3    Assignment ........................................................................... 36
Section 11.4    Expenses .............................................................................. 37
Section 11.5    Entire Agreement ................................................................. 37
Section 11.6    Governing Law ..................................................................... 37
Section 11.7    Waiver................................................................................... 37
Section 11.8    Severability .......................................................................... 37
Section 11.9    No Third Party Beneficiaries ............................................... 37
Section 11.10    Counterparts......................................................................... 37
Section 11.11    Knowing and Voluntary Agreement.................................... 37
Section 11.12    Legal Representation ........................................................... 38
Section 11.13    Name Change....................................................................... 38

EXHIBITS:

Exhibit A        Form of Sale Procedures and Sale Motion
Exhibit B        Form of Sale Order
Exhibit C        Form of Sale Procedures Order

SCHEDULES:

Schedule 1.1(a)        List of Assumed Contracts
Schedule 1.1(b)        List of Assumed Leases

Schedule 1.1(c)      List of Excluded Contracts
Schedule 2.1(c)      List of Purchased Deposits
Schedule 2.2(l)      List of Other Excluded Assets
Schedule 2.4(c)      List of Assumed Payables
Schedule 6.10(b)     List of Retained Contracts
Schedule 6.12        List of Leased Real Property

EAST\56139161.4

NEWYORK 8862656 v6 (2K)

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("**Agreement**") is made and entered into this 4th day of June, 2013, by and between iGPS Company LLC, a Delaware limited liability company ("**Seller**") and iGPS Logistics LLC, a Delaware limited liability company ("**Buyer**") (Seller and Buyer are referred to herein as the "**Parties**").

## RECITALS

WHEREAS, Seller, known as "iGPS", is engaged in the business of leasing plastic shipping platforms with embedded radio frequency identification tags to manufacturers of consumer goods (as currently conducted, the "**Business**");

WHEREAS, Seller anticipates commencing a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") by filing a voluntary petition for relief (the "**Seller Chapter 11 Case**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on or about June 5, 2013 (the date that the Seller Chapter 11 Case is commenced, the "**Petition Date**");

WHEREAS, prior to the date of this Agreement, Buyer has acquired all of the right, title and interest of the Lenders (as defined below) under the Secured Indebtedness;

WHEREAS, Buyer has agreed to fund Seller's ordinary course operations while this Transaction (as defined below) is pending, subject to the terms and conditions and otherwise as more particularly set forth below;

WHEREAS, Seller has agreed to transfer to Buyer, and Buyer has agreed to purchase and assume, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Purchased Assets and Assumed Liabilities (each as defined below), upon the terms and subject to the conditions contained in this Agreement (the "**Transaction**"), including obtaining an order of the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code authorizing the Transaction; and

WHEREAS, the Parties acknowledge and agree that the purchase by Buyer of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of Seller.

NOW, THEREFORE, based upon the foregoing recitals, and the representations, warranties, covenants and agreements contained herein, and for good and valuable consideration, the receipt and sufficiency of which are acknowledged by the Parties, the Parties, intending to be legally bound hereby, do hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  When used in this Agreement, the following terms shall have the respective meanings specified therefor below:

-1-

"**Accounts Receivable**" shall have the meaning set forth in Section 2.1(k).

"**Action**" shall mean any claim, as defined in the Bankruptcy Code, action, complaint, suit, litigation, audit, arbitration, appeal, petition, inquiry, hearing, order, decree, legal proceeding, investigation or other legal dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Authority.

"**Administrative Expense Claims**" shall mean claims for costs and expenses of administration of the Seller Chapter 11 Case that is allowed under Sections 328, 330, 363, 364(c)(1), 365, 503(b), or 507(a)(2) of the Bankruptcy Code.

"**Affiliate**" shall mean, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such Person. For purposes of this definition, "control" (including, with correlative meaning, the terms "controlling" and "controlled") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"**Agreement**" shall have the meaning set forth in the Preamble.

"**Antitrust Laws**" shall mean the Sherman Act, as amended; the Clayton Act, as amended; the HSR Act; the Federal Trade Commission Act, as amended; and all other federal, state and foreign statutes, rules, regulations, orders, decrees, administrative and judicial doctrines, and other Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

"**Assumed Contracts**" shall mean the Contracts set forth on Schedule 1.1(a) hereto, as the same may be amended in accordance with Section 6.10, which Contracts shall be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, the Sale Order or other order of the Bankruptcy Court.

"**Assumed Employee Liabilities**" shall have the meaning set forth in Section 2.4(b).

"**Assumed Leases**" shall mean the Leased Real Property set forth on Schedule 1.1(b) hereto, which leases shall be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, the Sale Order or other order of the Bankruptcy Court.

"**Assumed Liabilities**" shall have the meaning set forth in Section 2.4.

"**Assumed Payables**" shall have the meaning set forth in Section 2.4(c).

"**Assumption Agreement**" shall mean each assignment and assumption agreement to be executed and delivered with respect to certain Purchased Assets and Assumed Liabilities, each of which shall be in form and content reasonably satisfactory to the Parties.

EAST\56139161.4

NEWYORK 8862656 v6 (2K)

"**Auction**" shall have the meaning ascribed to such term in the Sale Procedures Order.

"**Bankruptcy Code**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Estate**" shall have the meaning set forth in Section 6.2(b).

"**Bills of Sale**" shall mean one or more bills of sale to be executed and delivered with respect to the Purchased Assets, each of which shall be in form and content reasonably satisfactory to the Parties.

"**Books and Records**" means all documents of, or otherwise in the possession, custody or control of Seller to the extent used in connection with, or relating to, the Purchased Assets, the Assumed Liabilities, or the operations of the Seller's Business, including all books of account, ledgers, general, financial, accounting and personnel records, files, invoices, customers' and suppliers' lists, other distribution lists, billing records, sales and promotional literature, manuals, customer and supplier correspondence, data, reports, plans, mailing lists, supplier lists, customer lists, price lists, marketing information and procedures, advertising and promotional materials, equipment records, warranty information, records of operations, standard forms of documents, manuals of operations or business procedures and other similar procedures (including all disks, tapes and other media-storage containing such information).

"**Breakup Fee**" shall mean an amount in cash equal to $1,050,000.

"**Business**" shall have the meaning set forth in the Recitals.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or obligated to close under applicable Laws.

"**Buyer**" shall have the meaning set forth in the Preamble.

"**Cash Consideration**" shall have the meaning set forth in Section 2.7.

"**Closing**" shall have the meaning set forth in Section 8.1.

"**Closing Date**" shall have the meaning set forth in Section 8.1.

"**COBRA**" shall mean the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

"**Competing Transaction**" shall mean any transaction or series of transactions involving any material portion of the Purchased Assets, including, but not limited to, a

EAST\56139161.4

liquidation (but only in the event that the liquidation is at a price greater than the consideration offered herein) and any plan of reorganization in the Seller Chapter 11 Case.

"**Consent**" shall mean any consent, approval, concession, grant, waiver, exemption, license, entitlement, franchise, development right, certificate, variance, registration, permit, order or other authorization of or notice of any Person.

"**Contract**" shall mean any legally binding agreement, contract or instrument, including all amendments thereto.

"**Costco**" shall mean and refer to Costco Wholesale Corporation.

"**Credit Bid Amount**" shall have the meaning set forth in Section 2.7.

"**Cure Payment Liabilities**" shall have the meaning set forth in Section 2.4(g).

"**Depot**" shall mean a facility owned by a Third Party where Seller's plastic platforms are stored, scanned, sorted, inspected, cleaned, and segregated.

"**DIP Facility**" is defined within the body of the definition of Material Adverse Effect below.

"**DIP Facility Satisfaction Amount**" shall have the meaning set forth in Section 8.2(a)(i)(y).

"**Disclosure Letter**" shall have the meaning set forth in Article IV.

"**Equipment**" shall mean all machinery, equipment, apparatus, appliances, implements, property, furniture, fixtures, furnishings, vehicles, spare parts, leasehold improvements, artwork, desks, chairs, tables, computer and computer-related hardware, software and firmware, files, documents, network and internet and information technology systems-related equipment, copiers, telephone lines and numbers, facsimile machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies, maintenance equipment, tools, signs and signage, and other tangible and intangible property.

"**Excluded Assets**" shall have the meaning set forth in Section 2.2.

"**Excluded Contracts**" shall mean the Contracts set forth on Schedule 1.1(c) hereto, as the same may be amended in accordance with Section 6.10, and any other Contracts that are not Assumed Contracts.

"**Excluded Liabilities**" shall have the meaning set forth in Section 2.5.

"**Expense Reimbursement**" shall mean an amount equal to $400,000.

"**Extraordinary Loss**" shall have the meaning set forth in Section 10.1.

-4-

EAST\56139161.4

"**Governmental Authority**" shall mean any domestic, foreign, federal, state, provincial or local authority, legislative body, court, government, regulatory agency, self-regulatory organization (including any securities exchange), commission, board, arbitral or other tribunal, or any political or other subdivision, department or branch of any of the foregoing.

"**Hearing**" shall mean the hearing to be held by the Bankruptcy Court to consider the Sale Procedures Order, in one instance, and the Sale Order and the approval of the Transaction in another.

"**HSR Act**" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"**iDepots**" means and refers to those Depots located at the Seller's retailers and/or any other companies or entities heretofore designated or referred to by the Seller as iDepots.

"**Indebtedness**" of any Person shall mean (a) indebtedness for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money, (b) indebtedness evidenced by any note, bond, debenture, mortgage or other debt instrument or debt security, or (c) any accrued and unpaid interest owing by such Person with respect to any indebtedness of a type described in clauses (a) or (b); provided, that Indebtedness shall not include accounts payable to trade creditors, accrued expenses arising in the ordinary course of the Business, the endorsement of negotiable instruments for collection in the ordinary course of the Business, or capitalized lease obligations.

"**Intellectual Property Rights**" shall mean any of the following rights in any jurisdiction: (a) patents and patent applications, (b) trademarks, service marks, trade dress, corporate, trade, and business names, brands, slogans, and other indicia of origin whether registered or unregistered, and all registrations and applications for the same and all associated goodwill, (c) all Internet domain names, (d) all works of authorship, whether registered as copyrights or unregistered, and all pending applications for the same and all associated moral rights and special rights of authorship, (e) trade secrets, and (f) all other legally recognized intellectual property and proprietary rights.

"**Inventory**" shall mean (a) the plastic platforms (whether active, damaged or in research and development process), and (b) plastic-platforms-related technology hardware, including Radio Frequency Identification, Global Positioning System tracking technology hardware, temperature sensing technology hardware, repair and handling materials and equipment and other equipment, in each case, to which Seller has title that are in the possession or custody of Seller or in the possession or custody of any Third Party and to the extent used or held for use in connection with any of the Purchased Assets or the Business. For the avoidance of any doubt, Inventory shall include any regrind, parts-of, believed-to-be-lost and/or complete plastic platforms and pallets, regardless of who possesses or controls them and wherever the same are located.

"**Laws**" shall mean all statutes, laws (including common law), regulations, rules, ordinances, codes and other requirements of any Governmental Authority.

EAST\56139161.4

"**Leased Real Property**" shall have the meaning set forth in Section 6.12.

"**Liability**" shall mean any liability, Indebtedness, guaranty, claim, loss, damage, deficiency, assessment, responsibility, "claim" (as defined in Section 101(5) of the Bankruptcy Code) or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or determinable, whether choate or inchoate, whether secured or unsecured, whether matured or not yet matured) and including all costs, fees and expenses relating thereto.

"**Liens**" shall mean any liens, security interests, mortgages, encumbrances, easements, licenses or charges of any kind.

"**Material Adverse Effect**" shall mean any change or effect having a material adverse effect on the Business, Purchased Assets and/or Assumed Liabilities, taken as a whole including, without limitation, a termination of, or an Event of Default (as defined therein) to the extent not waived in writing or timely cured under, the Debtor-in-possession financing facility provided by any court-approved post-petition lender (the "DIP Facility"); provided, however, that none of the following shall be taken into account (whether alone or in combination) in determining whether there has been, or would be, a Material Adverse Effect: (a) changes in general economic or financial market conditions to the extent that such changes do not have a disproportionate impact on the Purchased Assets or Assumed Liabilities relative to other companies in the industries in which the Business operates, (b) the outbreak or escalation of hostilities, the declaration of war, the occurrence of any calamity or natural disaster, or acts of terrorism, sabotage, military action, armed hostilities or any escalation or worsening thereof, whether or not occurring or commenced before or after the date of this Agreement, to the extent that the foregoing events do not have a disproportionate impact on the Purchased Assets or Assumed Liabilities relative to other companies in the industries in which the Business operates, (c) changes in (or proposals to change) any Laws or GAAP or interpretation thereof after the date hereof, but only so long as such changes do not have a disproportionate impact on the Purchased Assets, Assumed Liabilities, or the Business, (d) any failure, in and of itself, by Seller to meet any projections or estimates (including internal projections or estimates) of revenues, earnings or performance for any period ending after the date of this Agreement and prior to the Closing, (e) the announcement of, or compliance by Seller with, the terms of this Agreement, or actions taken or not taken with the prior written consent of Buyer, or the consummation of the Transaction, (f) any change, event or development to the extent arising merely by reason of the filing of the Seller Chapter 11 Case or from compliance by Seller with the terms of the Sale Procedures Order, (g) changes affecting industries, markets or geographical areas in which Seller conducts its business, (h) seasonal changes in the results of operations of Seller, or (i) any matter known to Buyer as of the date of this Agreement, but excluding any material worsening thereof after the date hereof.

"**Order**" shall mean any order, writ, judgment, injunction, decree, stipulation, determination, decision, verdict, ruling, subpoena, or award entered by or with any Governmental Authority (whether temporary, preliminary or permanent).

EAST\56139161.4

"**Outside Date**" shall have the meaning set forth in <u>Section 9.1(b)</u>.

"**Parties**" shall have the meaning set forth in the Preamble.

"**Permits**" shall have the meaning set forth in <u>Section 2.1(g)</u>.

"**Permitted Liens**" shall mean any Liens that are senior to the Secured Indebtedness owned by Buyer and are not extinguished by the Sale Order under applicable Laws, it being understood that the Sale Order shall extinguish Liens to the maximum extent permissible under applicable Laws.

"**Permitted Personal Property Liens**" shall mean (a) Permitted Liens, and (b) Liens to the extent senior to the Liens securing the Secured Indebtedness, in each case encumbering the Purchased Assets as security for ad valorem personal property taxes for the 2013 calendar year and any prior calendar years payable with respect to such Purchased Assets.

"**Person**" shall mean any individual, partnership, limited liability company, corporation, trust, joint venture, association, joint stock company, unincorporated organization, Governmental Authority or other entity, and the successors and assigns thereof or the heirs, executors, administrators or other legal representatives of an individual.

"**Petition Date**" shall have the meaning set forth in the Recitals.

"**Post-Closing Contracts**" shall have the meaning set forth in <u>Section 6.10(b)</u>.

"**Purchase Price**" shall have the meaning set forth in <u>Section 2.7</u>.

"**Purchased Assets**" shall have the meaning set forth in <u>Section 2.1</u>.

"**Representative**" shall mean, with respect to a particular Person, any director, officer, manager, partner, member, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants, and financial advisors.

"**Retained Contracts**" shall have the meaning set forth in <u>Section 6.10(b)</u>.

"**Retention Period**" shall have the meaning set forth in <u>Section 6.10(d)</u>.

"**Sale Procedures and Sale Motion**" shall mean a motion substantially in (and in any case no less favorable to Buyer than) the form attached hereto as <u>Exhibit A</u>.

"**Sale Order**" shall mean a final, non-appealable order of the Bankruptcy Court, substantially in (and in any case no less favorable to Buyer than) the form attached hereto as <u>Exhibit B</u> (with such changes as may be agreed to by Buyer and Seller), that has not been stayed, vacated or stayed pending appeal, authorizing, in addition to the matters referred to in <u>Section 3.3</u>, the sale of the Purchased Assets to Buyer upon the terms and subject to the conditions contained in this Agreement and the consummation of the Transaction.

EAST\56139161.4

NEWYORK 8862656 v6 (2K)

"**Sale Procedures Order**" shall mean a final, non-appealable order of the Bankruptcy Court that has not been stayed, vacated or stayed pending appeal, substantially in, and in any case no less favorable to Buyer than in the form attached hereto as Exhibit C.

"**SAS**" shall mean Schoeller Arca Systems Services, B.V., Schoeller Arca Systems, Inc., One Equity Partners, L.P., and any officers, directors, employees, members, and affiliates thereof.

"**SAS Claims**" shall mean any and all Actions against SAS, including, without limitation, (i) the arbitration proceeding pending before the International Centre for Dispute Resolution, styled In the Matter of Arbitrations between: iGPS Company, LLC, and Schoeller Arca Systems Services, B.V., Schoeller Arca Systems, Inc., Case No. 50 154 T 00350 11, and (ii) any and all claims now existing or arising in the future under the agreements between SAS and the Seller (including, without limitation, the warranty claims relating to the Purchased Assets).

"**SAS Rights**" shall have the meaning set forth in Section 2.1(i).

"**Secured Indebtedness**" shall mean all indebtedness evidenced, memorialized and secured by that certain Loan and Security Agreement, dated November 24, 2009, by and among Seller, the lenders parties thereto (collectively, the "**Lenders**"), Bank of America, N.A., as administrative and collateral agent for the Lenders ("**Agent**"), JPMorgan Chase Bank, N.A. and Suntrust Bank, as Co-Syndication Agents and other parties to the agreement from time to time, as amended by that certain First Amendment to Loan and Security Agreement, dated May 25, 2010; that certain Second Amendment to Loan and Security Agreement, dated July 13, 2010; that certain Third Amendment to Loan and Security Agreement, dated May 30, 2012; that certain Forbearance Agreement and Fourth Amendment to Loan and Security Agreement, dated October 9, 2012; and that certain Fifth Amendment to Loan and Security Agreement, dated December 26, 2012 (collectively, as so modified and amended, the "**Credit Agreement**"), and all promissory notes, agreements (including, without limitation, pledge and security agreements), financing statements, guaranties, documents, and other instruments executed, delivered, and/or filed or otherwise relating to the Credit Agreement or the Indebtedness thereunder.

"**Seller**" shall have the meaning set forth in the Preamble.

"**Seller Chapter 11 Case**" shall have the meaning set forth in the Recitals.

"**Seller's Counsel**" shall mean White & Case LLP.

"**Subsidiary**", with respect to any Person, shall mean (a) any corporation more than fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is owned by such Person directly or indirectly through one or more subsidiaries of such Person and (b) any partnership, association, joint venture or other entity in which such Person directly or indirectly through one or more subsidiaries of such Person has more than a fifty percent (50%) equity interest.

EAST\56139161.4

"**Successful Bidder**" shall mean the Person who prevails at the Auction conducted by Seller in accordance with the Sale Procedures Order.

"**Taxes**" shall mean all taxes, including any interest or penalties that may become payable in respect thereof (other than interest or penalties resulting from Buyer's failure to file accurate and timely Tax returns), imposed by any federal, state, provincial, local or foreign taxing authority, which taxes shall include, without limiting the generality of the foregoing, all income taxes, payroll and employee withholding taxes, unemployment insurance, social security, sales and use taxes, excise taxes, profits taxes, capital taxes, net worth taxes, franchise taxes, gross receipts taxes, occupation taxes, real and personal property taxes, stamp taxes, transfer taxes, withholding taxes, workers' compensation, occupancy, ad valorem, value added, custom duties and other obligations of the same or of a similar nature.

"**Third Party**" shall mean any Person that is not a Party or an Affiliate of a Party.

"**Transaction**" shall have the meaning set forth in the Recitals.

"**Transferred Employees**" shall have the meaning set forth in Section 6.11(a).

"**Transferring Avoidance Claims**" shall have the meaning set forth in Section 2.1(l).

"**Trustee**" shall have the meaning set forth in Section 6.2(b).

"**Walmart**" shall mean and refer to Walmart Stores, Inc.

"**WARN Act**" shall mean the federal Worker Adjustment and Retraining Notification Act or any similar state, local or foreign Law (including any state Laws relating to plant closings or mass layoffs).

Section 1.2    Other Terms.  As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable Law, will be deemed also to refer to all rules and regulations promulgated thereunder and all amendments or modifications thereto, unless the context requires otherwise.  The words "include," "includes," and "including" will be deemed to be followed by "without limitation."  The words "ordinary course of the Business" will be deemed to be followed by "consistent with past practice".  Pronouns in masculine, feminine, or neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  References to "this Agreement" shall include all Exhibits, Schedules and other agreements, instruments or other documents attached hereto.  The words "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.  References in this Agreement to "Articles", "Sections", "Sections of the Disclosure Letter", "Schedules", "Exhibits", the "Preamble" and "Recitals" are references to articles, sections, sections of the Disclosure Letter, schedules, exhibits, the preamble and recitals of this Agreement, as applicable.  References to the consent or approval of either Party shall mean the written consent or approval of such Party, which may be withheld, conditioned or delayed in such Party's sole and absolute discretion,

EAST\56139161.4

except to the extent otherwise specified herein. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. Any agreement, instrument or statute defined or referred to herein shall mean such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way limit or modify the provisions of this Agreement and shall not affect the interpretation hereof. Unless otherwise specified herein, payments that are required to be made under this Agreement shall be paid by wire transfer of immediately available funds to an account designated in advance by the Party entitled to receive such payment. All references to "dollars" or "$" or "US$" in this Agreement shall mean U.S. dollars.

Section 1.3   Interpretation.   The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring either Party because of the authorship of any provision of this Agreement.

Section 1.4   Time.   Except as expressly set out in this Agreement, the computation of any period of time referred to in this Agreement shall exclude the first day and include the last day of such period. If the time limited for the performance or completion of any matter under this Agreement expires or falls on a day that is not a Business Day, the time so limited shall extend to the next following Business Day. Whenever action must be taken (including the giving of notice, the delivery of documents or the funding of money) under this Agreement, prior to the expiration of, by no later than or on a particular date, unless otherwise expressly provided in this Agreement, such action must be completed by 5:00 P.M., New York City time, on such date (except for the filing of papers with the Bankruptcy Court or the entry of any Order by the Bankruptcy Court, which must be completed on such date by the deadline set forth in the rules of the Bankruptcy Court or any Order of the Bankruptcy Court). The time limited for performing or completing any matter under this Agreement may be extended or abridged by an agreement in writing by the Parties. All references herein to time are references to New York City time, unless otherwise specified herein.

ARTICLE II

PURCHASE AND SALE OF ASSETS AND EQUITY INTERESTS

Section 2.1   Purchased Assets.   Subject to the terms and conditions of this Agreement, at the Closing, Seller shall sell, assign, transfer, deliver and convey to Buyer, and Buyer shall purchase, acquire, assume and accept from Seller, free and clear of all Liens, other than Permitted Liens and those Liens, if any, expressly assumed by Buyer pursuant to this Agreement, all right, title and interest of any nature whatsoever of Seller as of the Closing Date in and to any and all assets of Seller whatsoever, except as otherwise provided in Section 2.2,

-10-

EAST\56139161.4

including, all of Seller's right, title and interest in and to the following (collectively, the **"Purchased Assets"**):

(a)     all Inventory of Seller as of the Closing Date;

(b)     all Equipment of Seller located as of the Closing Date on Seller's premises or otherwise primarily related to the Business;

(c)     the Assumed Contracts and all rights thereunder, and the credits for prepaid amounts and any security or similar deposits listed on Schedule 2.1(c);

(d)     the Assumed Leases and all rights thereunder, including all options to renew, purchase, expand or lease (including rights of first refusal, first negotiation and first offer), and all credit for the prepaid rent associated therewith and all security deposits made in respect of such Assumed Leases and any real property improvements thereon;

(e)     all Intellectual Property Rights owned by or licensed to Seller worldwide (in whole or in part), that are used or useable in connection with the Business;

(f)     without limiting the inclusion of all Intellectual Property Rights of Seller, the "iGPS" name and logos and all other names and logos used by the Seller now or in the past and all goodwill associated therewith;

(g)     all Books and Records (other than Books and Records related exclusively to the Excluded Assets), provided that Sellers shall be permitted to retain a copy of such Books and Records to the extent related to the Excluded Assets;

(h)     customer and vendor lists used by Seller in the Business, including all available names, addresses, electronic mail addresses, and telephone numbers of customers and vendors and such other customary information as Buyer may reasonably request be included in such lists;

(i)     Seller's advertising, sales and customer materials, forms, labels, promotional materials, manuals and supplies used in the operation of the Business;

(j)     federal, state or local governmental or regulatory permits, licenses, consents, certifications, authorizations, grants, approvals and franchises held by Seller in connection with the operation of the Business or the ownership of the Purchased Assets, to the extent assignable to Buyer (collectively, **"Permits"**);

(k)     any and all insurance proceeds, condemnation awards or other compensation in respect of loss or damage to any Purchased Asset subject to Section 10.1 to the extent occurring after the date hereof, and, subject to Section 10.1, all right and claim of the Sellers to any such insurance proceeds, condemnation awards or other compensation not paid by the Closing;

EAST\56139161 4

(l)      Seller's interests in warranties, representations and guarantees made by suppliers, manufacturers and contractors in connection with products or services of the Business, or affecting the Purchased Assets, including, for the avoidance of doubt, all such interests relating to that certain Third Amended and Restated Manufacturing Supply Agreement, dated July 9, 2008, by and between Seller and SAS (the "**SAS Rights**");

(m)      all of Seller's trade accounts receivable relating to the Business and other rights to payment from customers of the Business (including any sales tax or similar remittances owing to Seller) and the full benefit of all security for such accounts or rights to payment, including but not limited to all trade accounts receivable representing amounts receivable in respect of platforms leased to customers of the Business, lost pallet charges, lost equipment charges and receivables from SAS (collectively, "**Accounts Receivable**");

(n)      to the extent the same relate to: (x) any customer, vendor or other Third Party with whom Seller is doing business as of the Closing Date or has done business in the three (3) year period prior to the Closing Date; (y) any Transferred Employee; or (z) providers of Depot, pallet repair and storage services, all bankruptcy claims or causes of action available to Seller under chapter 5 of title 11, under Sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, including without limitation, any claims that Seller may have against "insiders" of Seller (as such term is defined in Section 101(31) of the Bankruptcy Code) (collectively, the "**Transferring Avoidance Claims**");

(o)      all rights relating to loans to employees of Seller;

(p)      all rights, claims, actions and causes of action of Seller against any Third Party (including, without limitation, all rights to loans from Seller to Third Parties and all rights to the SAS Claims), except only for such claims and causes of action as are expressly reserved to Seller in Section 2.2 below or otherwise relate to an Excluded Asset.

(q)      all local, state, and federal tax refunds other than local, state, and federal tax refunds relating to Taxes which are not Assumed Liabilities;

(r)      the Tax records (including Tax returns and supporting work papers) of Seller, and all rights to or claims for refunds, credits, overpayments or rebates of Taxes for taxable periods (or portions thereof) ending on or prior to the Closing Date other than any such Tax records (including Tax returns and supporting work papers), and all rights to or claims for refunds, credits, overpayments or rebates of Taxes relating to Taxes which are not Assumed Liabilities; and

(s)      all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, securities, securities entitlements, instruments and other investments and all bank accounts and securities accounts, including any cash collateral that is collateralizing any letters of credit, and all bank accounts of Seller, other than any such cash or cash equivalents necessary to cover checks or similar draws outstanding on the Closing Date.

Section 2.2   Excluded Assets.  Subject in all respects to the provisions of Section 2.1 hereof and the assets, properties and rights included in the Purchased Asset pursuant thereto, Seller shall retain all right, title and interest to, in and under all assets other than the Purchased Assets (such assets to be so retained, collectively, the "**Excluded Assets**"), which Excluded Assets consist of the following assets, properties and rights of Seller:

(a)   the equity interests in Seller;

(b)   Seller's deposits and rights to refunds in respect of utilities, insurance and otherwise, except as such arise under Assumed Contracts;

(c)   the company seal, minute books, charter documents, stock or equity records books and such other books and records as pertain to the organization, existence or capitalization of Seller;

(d)   the Excluded Contracts, any and all rights thereunder;

(e)   other than the Transferring Avoidance Claims, any bankruptcy avoidance claims and recoveries or causes of action available to Seller under chapter 5 of title 11, under Sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, including any claims that Seller may have against "insiders" of Seller (as such term is defined in Section 101(31) of the Bankruptcy Code);

(f)   all claims that Seller may have against any Third Party with respect to any Rejected Contract and Excluded Asset, claims or causes of action against former and current officers and directors of Seller that do not become employees, officers or directors of Buyer after the Closing, claims against auditors and other professional service providers of the Seller, claims and causes of action against pallet recyclers, and claims pending on the date hereof (other than, without limitation, the claim against SAS and the Transferring Avoidance Claims);

(g)   any assets of Seller in a directors and officers liability insurance policy, executive or incentive compensation, bonus, deferred compensation, pension, profit sharing, savings, retirement, stock option, stock purchase, group life, health or accident insurance or other employee benefit plan;

(h)   Seller's rights under this Agreement and under any other documents contemplated hereby and all cash and non-cash consideration payable or deliverable to or for the account of Seller pursuant and subject to the terms of this Agreement;

(i)   Seller's rights under or related to the debtor in possession loan facility entered into by Seller and the lenders party thereto, subject in all respects to Bankruptcy Court approval of such loan facility; and

(j)   All of Seller's right, title and interest in and to the assets, if any, described on Schedule 2.2(l).

EAST\56139161.4

Section 2.3    Conveyance. Without limiting the provisions of this Agreement relating to sale, transfer, assignment, conveyance or delivery, the Purchased Assets and Assumed Liabilities shall be sold, transferred, assigned, conveyed and delivered by Seller to the Buyer, and the Buyer shall assume and accept the same, by appropriate instruments of transfer, bills of sale, endorsements, assignments and deeds, in form and content reasonably acceptable to Buyer and in recordable form, as appropriate, but, in all events, only to the extent that the same do not impose monetary obligations on Buyer or otherwise increase Buyer's obligations hereunder beyond those provided in the other provisions of this Agreement.

Section 2.4    Assumed Liabilities. Pursuant to the Sale Order and to the extent permitted by applicable Laws and subject to the last two sentences of this Section 2.4, on the Closing Date, Buyer shall assume and agree to pay, perform and discharge as and when due, the following Liabilities of Seller to the extent not paid, performed, or discharged at or prior to the Closing (collectively, the "**Assumed Liabilities**"):

(a)    all Liabilities (including warranty, product liability, safety or other similar Liabilities) arising by reason of or from Buyer's operations after the Closing under the Purchased Assets, including any Inventory, Assumed Contracts and Assumed Leases;

(b)    all Liabilities owing to Transferred Employees for vacation and sick pay accrued or incurred on or before the Closing (the "**Assumed Employee Liabilities**") and Liabilities assumed by Buyer pursuant to Section 6.11;

(c)    any trade payables of Seller incurred prior to the Petition Date which are specifically set forth on Schedule 2.4(c) hereto (collectively, "**Assumed Payables**");

(d)    [Intentionally Omitted];

(e)    all Liabilities for sales/use and payroll withholding Taxes accrued or attributable to any of the Purchased Assets before or after the Closing Date; provided that, for the avoidance of doubt, Buyer's sole and only obligation hereunder with respect to Permitted Personal Property Liens and similar Taxes is as set forth in Section 2.9, below;

(f)    all payables outstanding to iDepots, Costco and Walmart; and

(g)    all Liabilities of Seller for cure payments payable to the counterparties to the Assumed Contracts and Assumed Leases ("**Cure Payment Liabilities**"), including, without limitation, the payment of Houlihan Lokey's professional fees and costs in an amount not to exceed $200,000.00 pursuant to that certain agreement between Buyer and Houlihan Lokey dated May 31, 2013.

Section 2.5    Excluded Liabilities. Notwithstanding anything in this Agreement to the contrary, Buyer shall not assume, and shall not be deemed to have assumed, or be bound by any duties, responsibilities, or Liabilities of Seller of any kind arising from or related to the following or any other Liabilities other than those expressly assumed by Buyer under the other provisions of this Agreement (collectively, the "**Excluded Liabilities**"):

EAST\56139161.4

NEWYORK 8862656 v6 (2K)

(a)    any Liability arising out of facts or circumstances in existence prior to the Closing Date and from or related to any breach, default under, failure to perform, torts related to the performance of, violations of Laws, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of Seller under any Contract to which Seller is a party prior to the Closing Date (other than any Cure Payment Liabilities to the extent the Buyer is required to assume the same pursuant to the other provisions of this Agreement);

(b)    any Liability arising from or related to the operation or condition of the Purchased Assets or the Assumed Liabilities prior to the Closing or facts, actions, omissions, circumstances or conditions existing, occurring or accruing with respect to the Purchased Assets or the Assumed Liabilities prior to the Closing;

(c)    any Liability in respect of Indebtedness of Seller or any other Liability related to, arising under or in connection with the Indebtedness of Seller;

(d)    except as set forth in Section 2.4 and Section 6.11 and except for Assumed Employee Liabilities, any Liability with respect to any current and former directors, officers, employees, agents and independent contractors that (i) is incurred prior to the Closing Date, or (ii) is incurred at any time under any employment, severance, retention, termination or other similar agreement or arrangement with respect to any employee, director, officer, employee, agent or independent contractor who does not become a Transferred Employee, which Liability arises out of or relates to the employment or performance of services for, or termination of employment or services for, Seller, including in respect of wages, other remuneration, holiday or vacation pay, bonus, severance (statutory or otherwise), separation, termination or notice pay or benefits (including under COBRA), actions for workers' compensation, or any other form of accrued or contingent compensation (including vacation, sick days, personal days or other leave entitlements), irrespective of whether such Liabilities or Actions are incurred under the WARN Act or are paid or made, as applicable, on, before or after Closing (other than, for purposes of clarification, any Liabilities in respect of post-Closing service of Transferred Employees after the Closing);

(e)    any and all financial or other liability incurred by the Seller prior to the Closing under the WARN Act emanating from the termination of any iGPS Company, LLC employees as of the date of Closing;

(f)    any unpaid obligation of Seller to any broker or finder arising out of or in connection with the negotiation and preparation of this Agreement and the consummation and performance of the Transaction;

(g)    except only as provided in Sections 2.6 and  2.9 below,  all Liabilities for Taxes attributable to the Purchased Assets on or before the Closing Date; and

(h)    any Liability of Seller under this Agreement.

Section 2.6    Sales Tax Obligations.  All federal, state, local or foreign sales, use, transfer, stamp or similar Taxes payable in connection with the sale of the Purchased Assets to Buyer pursuant to this Agreement shall be paid by Buyer; provided that, for the avoidance of all doubt, Buyer's sole and only obligation hereunder with respect to ad valorem personal property and similar Taxes is as set forth in Section 2.9, below

Section 2.7    Purchase Price.  Subject to the terms and conditions hereof and the entry and effectiveness of the Sale Order, the purchase price to be paid by Buyer ("**Purchase Price**") for the purchase, sale assignment and conveyance of Seller's right, title and interest in, to and under the Purchased Assets shall consist of (i) Buyer's credit bid of a portion of the Secured Indebtedness in an amount equal to $36,000,000, (the "**Credit Bid Amount**"), which Credit Bid Amount shall not be capped, plus, (ii) cash in the amount of $1,000,000, payable by wire transfer of immediately available funds on the Closing Date (the "**Cash Consideration**"), plus (iii) an amount equal to the DIP Facility Satisfaction Amount, which amount Buyer shall have the right, at its option, to pay directly to the then lender(s) under the DIP Facility, rather than paying such amount through the Seller (provided, that, for the avoidance of all doubt, and unless agreed to otherwise in writing by Buyer and Seller (which agreement either Buyer or Seller may grant or withhold in their respective sole discretion), nothing in this Agreement shall be deemed to obligate Buyer to pay any amounts in excess of the Cash Consideration), plus (iv) the assumption of the Assumed Liabilities.

Section 2.8    Allocation of Purchase Price.  Buyer and Seller agree that Buyer shall prepare and provide to Seller a draft allocation of the Purchase Price among the Purchased Assets within ninety (90) days after the Closing Date.  Such allocation to any Purchased Assets shall be made in accordance with Section 1060 of the Code. Seller shall notify Buyer within thirty (30) days of receipt of such draft allocation of any objection Seller may have thereto. Buyer and Seller agree to negotiate in good faith to resolve any disagreement with respect to such allocation.  In addition, Buyer and Seller hereby undertake and agree to file timely any information that may be required to be filed pursuant to Treasury Regulations promulgated under Section 1060(b) of the Code, and shall use the allocation determined pursuant to this Section 2.8 in connection with the preparation of Internal Revenue Service Form 8594 as such form relates to the transactions contemplated by this Agreement.  Neither Buyer nor Seller shall file any Tax return or other document or otherwise take any position which is inconsistent with the allocation determined pursuant to this Section 2.8 except as may be adjusted by subsequent agreement following an audit by the IRS or by court decision.

Section 2.9    Ad Valorem Personal Property Taxes.  Buyer shall acquire the Purchased Assets subject only to those *ad valorem* personal property Taxes of Seller for calendar year 2013 and any prior calendar years secured by the Permitted Personal Property Liens.

ARTICLE III

BANKRUPTCY MATTERS

Section 3.1    Bid Protections.  Upon the occurrence of the events described in the Sale Procedures Order and subject to the conditions set forth therein, Buyer shall be entitled

EAST\56139161.4

to receive the Breakup Fee and Expense Reimbursement from Seller.  Buyer's entitlement to the Breakup Fee and Expense Reimbursement (including the right and conditions thereto and the timing of and manner of payment) shall be governed by the Sale Procedures Order, which shall provide that the Breakup Fee and Expense Reimbursement shall be payable out of proceeds of a Competing Transaction upon consummation of such transaction.

Section 3.2     Sales Procedures and Sale Motion; The Hearing; Related Matters. Sellers shall, by no later than two (2) Business Days after the Petition Date, file with the Bankruptcy Court the Sale Procedures and Sale Motion seeking, among other things, entry of the Sale Procedures Order, to be filed in the Seller Chapter 11 Case.  Furthermore, Sellers, through the Sale Procedures and Sale Motion, shall seek a hearing within 30 days after the Sale Procedures and Sale Motion is filed to approve the results of the Auction, authorization and direction to consummate the Transaction with the Successful Bidder and entry of the Sale Order. Seller shall diligently pursue the Sale Procedures and Sale Motion and seek the relief sought therein.

Section 3.3     Order Regarding Depot Arrangements.     Immediately upon commencement of the Seller Chapter 11 Case, Seller shall file a motion to reject the Belacon Contract.  To the extent requested by the Buyer, Seller shall file a motion seeking an order of the Bankruptcy Court addressing, among other things, continued storage and handling of the Inventory by, and removal of Inventory from, the Depots, terms of payment of the Depots pending Closing, and access to the Depots and pallets comprising part of the Inventory for inspection or otherwise by Seller, Buyer, and Qualified Bidders (as defined in the Bid Procedures) (the "**Depot Order**").

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the disclosure letter delivered as of the date hereof by the Seller to Buyer (the "**Disclosure Letter**") (it being understood that any matter disclosed in any Section of the Disclosure Letter will be deemed to be disclosed in any other Section of the Disclosure Letter to the extent that it is reasonably apparent on the face of such disclosure that such disclosure is applicable to the other Section), Seller hereby represents and warrants to Buyer as follows:

Section 4.1     Seller Corporate Matters.  Seller is duly organized, validly existing and in good standing under the Laws of the State of Delaware, and Seller has all requisite limited liability company power and authority to own, operate and lease its properties and assets and to carry on the Business as currently conducted (subject to the provisions of the Bankruptcy Code). Except as set forth in Section 4.1 of the Disclosure Letter, Seller is the only business organization through which the Business is conducted, or which owns, leases or uses assets related to the Business.

Section 4.2     Validity of Agreement and Conflict with Other Instruments.  Seller has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder (subject, in the case of the obligation to carry out the Transaction, to the entry of the

-17-

Sale Order). Subject to the entry of the Sale Order, the execution and delivery of this Agreement and the consummation of the Transaction have been duly authorized by Seller. This Agreement has been duly executed and delivered by Seller and, assuming the due authorization, execution and delivery by Buyer, is a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms (subject, in the case of the obligation to carry out the Transaction, to the entry of the Sale Order). Except as set forth in <u>Section 4.2</u> of the Disclosure Letter, the execution, delivery and performance by Seller of this Agreement does not, and the consummation by Seller of the Transaction (upon entry of the Sale Order), will not, (i) conflict with or result in the breach of any provision of the organizational documents of Seller, (ii) conflict with, violate or result in the breach by Seller of any applicable Laws, (iii) require Seller to make any filing with or give notice to, or obtain any Consent from any Governmental Authority or any Third Party, (iv) conflict with, violate, result in the breach or termination of or the loss of a benefit under, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right of termination, cancellation, payment or acceleration) or adverse modification of any material terms or material rights under, any Assumed Contract or Assumed Lease (subject, in the case of the assumption and assignment to Buyer of any Assumed Contract or Assumed Lease that by its terms requires consent to assignment, to the entry of the Sale Order and the terms and conditions of this Agreement) or any material agreement to which Seller is a party, or (v) result in any Lien (except for Permitted Liens) on any of the Purchased Assets, other than, with respect to each of (ii) through (v) above, any of the foregoing that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.3    <u>Exclusivity of Representations.</u>  The representations and warranties made by Seller in this Article IV are the exclusive representations and warranties made by Seller with respect to Seller, the Purchased Assets and the Assumed Liabilities. Seller hereby disclaims any other express or implied representations or warranties with respect to the same. Seller is not, directly or indirectly, making any representations or warranties regarding any pro-forma financial information, financial projections or other forward-looking statements. It is understood that any due diligence materials made available to Buyer or its Affiliates or their respective Representatives do not, directly or indirectly, and shall not be deemed to, directly or indirectly, contain representations or warranties of Seller or be deemed to constitute disclosures by Seller.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

Section 5.1    <u>Corporate Matters.</u>    Buyer is a limited liability company duly formed and validly existing and in good standing under the Laws of Delaware.

Section 5.2    <u>Validity of Agreement and Conflict with Other Instruments.</u>  Buyer has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder (subject, in the case of the obligation to carry out the Transaction, to the entry of the Sale Order). The execution and delivery of this Agreement and the consummation of the Transaction have been duly authorized by Buyer. This Agreement has been duly executed and

-18-

delivered by Buyer and, assuming the due authorization, execution and delivery by Seller, is a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms (subject, in the case of the obligation to carry out the Transaction, to the entry of the Sale Order). The execution, delivery and performance by Buyer of this Agreement does not, and the consummation by Buyer of the Transaction (upon entry of the Sale Order), will not, (i) conflict with or result in the breach of any provision of the organizational documents of Buyer, (ii) conflict with, violate or result in the breach by Buyer of any applicable Law, (iii) require Buyer to make any filing with or give notice to, or obtain any Consent from any Governmental Authority or any Third Party, (iv) conflict with, violate, result in the breach or termination of or the loss of a benefit under, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right of termination, cancellation, payment or acceleration) or adverse modification of any material terms or material rights under, any Contract to which Buyer is a party, or (v) result in any Lien on any of the assets of Buyer.

Section 5.3    Independent Investigation.  Buyer acknowledges and affirms that it has completed its own independent investigation, analysis and evaluation of the Purchased Assets, that it has made all such reviews and inspections as it deems necessary and appropriate, and that in making its decision to enter into this Agreement and consummate the Transaction, it has relied on its own investigation, analysis, and evaluation with respect to all matters without reliance upon any express or implied representations or warranties except as expressly set forth in this Agreement.

Section 5.4    Ability to Satisfy Obligations.  Buyer has and will, at the Closing, have the resources (including unrestricted cash available to it) and capabilities (financial or otherwise) to perform its obligations hereunder, including payment of the Purchase Price and the Assumed Liabilities. Buyer has not incurred any obligation, commitment, restriction or Liability of any kind that would materially impair Buyer's ability to satisfy its payment and funding obligations under this Agreement.

ARTICLE VI

COVENANTS

Section 6.1    Actions Pending Closing.  From the date hereof until the earlier of Closing and termination of this Agreement in accordance with Section 9.1, except (1) as required by Law (including the Bankruptcy Code), (2) as otherwise contemplated by this Agreement, (3) as set forth in Section 6.1 of the Disclosure Letter, (4) with the express prior written consent of Buyer, or (5) as specifically required by the Sale Procedures Order:

(a)    Seller shall conduct its operations in all material respects only in the ordinary course of the Business, as such may be limited or altered by application of the Bankruptcy Code or the Sale Procedures Order;

(b)    Seller shall not:

-19-

EAST\56139161.4

(i)       make any change in or amendment to its governing documents in a manner that would reasonably be expected to materially delay or impede Seller's ability to consummate the Transaction;

(ii)      acquire or move any Equipment or other fixed assets that would be Purchased Assets, except for any such acquisition in replacement of Equipment and/or fixed assets as required in the ordinary course of the Business or pursuant to any Contract in effect as of the date hereof;

(iii)     amend in any material respect or terminate any material Contract or enter into a Contract which, had it been entered into prior to the date hereof, would have been a material Contract;

(iv)     authorize, declare or pay any dividends on or make any distribution with respect to its outstanding equity interests (whether in cash, assets, or securities);

(v)      other than in the ordinary course of the Business, enter into any transaction that would constitute an Assumed Liability;

(vi)     collect Accounts Receivable or incur trade payables (to the extent such payables would be included among the Assumed Liabilities) other than in the ordinary course of Business;

(vii)    authorize any of, or commit or agree to take any of, the foregoing actions in respect of which it is restricted by the provisions of this Section 6.1;

(viii)   terminate any current employees of the Seller (other than for cause and Part-Time Employees (as defined under the WARN Act)) as of the date of this Agreement, unless Buyer waives this restriction in writing with respect to specific employees;

(ix)     promise to customers or retailers that Seller will be delivering Gen1.1 or Gen2.0 pallets; or

(x)      with the exception of the settlements between the Seller and Kraft Foods Global, Inc., settle, compromise or otherwise dispose of rights or claims of Seller on account of lost pallets, unscanned pallets, damage to pallets, or the like, against customers, retailers or other Persons in possession of or to whom pallets have been issued.

Section 6.2      Access to Information; Cooperation

(a)      From the date hereof until the Closing Date, Seller shall (i) permit Buyer and its Representatives to have reasonable access during normal business hours and upon reasonable advance notice to the books, records, facilities and employees of Seller; provided, that Buyer and its Representatives shall not disrupt the Business as a result of

such access, and (ii) cooperate with Buyer and use Seller's reasonable best efforts to insure that, at the Closing, Buyer will have possession, dominion and control of and over the Inventory. Seller shall, following the reasonable request therefor by Buyer, use its commercially reasonable efforts to arrange meetings and telephone conferences with material suppliers, customers, licensors, licensees or other business partners of Seller as may be reasonably requested by Buyer and necessary and appropriate for Buyer to coordinate transition of such Persons following the Closing. Notwithstanding the foregoing, prior to the Auction, Buyer shall not be permitted to contact any customers, suppliers, licensors, licensees or other business partners of Seller about the Seller Chapter 11 Case without Seller's prior consent other than as part of the Seller Chapter 11 Case.

(b)     From and after the Closing Date, Buyer shall give Seller and the United States Trustee (the "**Trustee**") and their respective Representatives reasonable access during normal business hours and upon reasonable advance notice to the books, records, facilities (including telephone, internet, and facsimile access), employees, documents (including, without limitation, any documents included in the Purchased Assets) and other files of Buyer pertaining to (i) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date or (ii) the Excluded Assets and Excluded Liabilities; provided, that Seller, the Trustee and their respective Representatives shall not disrupt or interfere with the Business in any material respect as a result of such access. Without limiting the generality of the foregoing, Buyer shall, at its own expense, and shall cause each of its officers, directors, employees (including the Transferred Employees) and other Representatives to, cooperate with the reasonable requests of Seller, the Trustee and their respective Representatives with respect to (v) assistance with liquidating the Excluded Assets, (w) winding down the bankruptcy estate of Seller (the "**Bankruptcy Estate**"), (x) pursuing or processing any Action with respect to the Bankruptcy Estate or the Excluded Liabilities, (y) filing Tax returns, compromising any Tax assessments with respect to any pre-Closing period and confirming the purchase price allocation under Section 2.8 and (z) any other matter reasonably requested by Seller, the Trustee, or any of their respective Representatives. Notwithstanding anything to the contrary in this Section 6.2(b), nothing herein shall be deemed to obligate Buyer to cooperate or allow access as provided in this Section 6.2(b) to the extent Buyer reasonably determines such access or cooperation would disrupt or interfere with Buyer's operation of the Business in any material respect. Buyer's obligations under this Section 6.2(b) shall terminate upon the earlier of (i) two (2) years following the Petition Date and (ii) the closing of the Seller Chapter 11 Case.

Section 6.3     Preservation of Records. Seller and Buyer agree that each of them shall preserve and keep the records held by them relating to the Purchased Assets, the Assumed Liabilities, the Excluded Assets and the Excluded Liabilities, as the case may be, in the manner in which the Seller or the Buyer, as the case may be, maintains its own business records and for a period of three (3) years from the Closing Date (or, in the case of Seller, such shorter period as determined by the Trustee upon notice to the Buyer before any such records are destroyed), and shall make such records available to the other party and the Trustee as may be reasonably requested by such other party or the Trustee in connection with, among other things, winding up the Bankruptcy Estate, any insurance claims by, Actions or Tax audits against or investigations

EAST\56139161.4

by any Governmental Authority of the Bankruptcy Estate or Buyer or in order to enable Seller or Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. From the Closing until the closing of the Seller Chapter 11 Case, Buyer shall provide, at Buyer's sole cost and expense, document storage at the Buyer's facility for all records that are Excluded Assets (which records shall be stored in a manner comparable to that in which Buyer maintains its own dormant business records) and Seller shall hold Buyer harmless for any loss of or damage to the records held by Buyer.

Section 6.4    Further Assurances. After the Closing, the Parties shall execute and deliver or shall cause to be executed and delivered such further documents, and shall take or cause to be taken such other action, as reasonably required to more effectively implement and carry into effect the Transaction; provided, that nothing herein shall require the Parties to execute any such document or take or cause any further action to the extent the same would impose any monetary cost or expense on such Party or otherwise increase the obligations of such Party beyond those imposed upon that Party pursuant to the other provisions of this Agreement.

Section 6.5    Consents and Approvals; Closing Conditions. Each of Buyer and Seller shall use its commercially reasonable efforts to (a) obtain all consents and approvals of Third Parties, if any, required on its part to consummate the Transaction, and (b) cause each of the conditions set forth in Section 7.1 and Section 7.2, respectively, to be satisfied prior to the Outside Date.

Section 6.6    Disclaimer of Warranties. Notwithstanding anything contained in this Agreement, it is the explicit intent of each Party that Seller is not making any representation or warranty, express or implied, beyond those given in Article IV (including with respect to income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any personal property comprising Purchased Assets or which is the subject of any Assumed Lease or Assumed Contract, the environmental condition or other matters relating to the physical condition of any Leased Real Property, the zoning of any Leased Real Property, the value of the Purchased Assets, the transferability of the Purchased Assets, the terms, amount, validity, collectability or enforceability of any Assumed Liabilities or any Assumed Lease or Assumed Contract, the title to any Purchased Assets, the merchantability or fitness of any Purchased Assets for any particular purpose, or any other matter relating to the Purchased Assets, and it is understood that, except for such representations and warranties, Buyer takes the Purchased Assets "AS IS", "WHERE IS", and "WITHOUT FAULTS". Without limiting the generality of the immediately foregoing, except for the representations and warranties specifically contained in Article IV, Seller hereby expressly disclaims and negates any representation or warranty, express or implied, at common law, by statute, or otherwise, relating to the Purchased Assets, it being the intention of the Parties that the Purchased Assets are to be accepted by Buyer at Closing in their present condition and state of repair.

Section 6.7    Required Approvals.

(a)    Prior to the Closing, upon the terms and subject to the conditions of this Agreement, and except as contemplated by this Agreement, the Sale Procedures Order or

EAST\56139161.4

the Sale Order, the Parties shall take, or cause to be taken, all actions, and do, or cause to be done all things necessary, proper or advisable to consummate the Closing and the Transaction as promptly as reasonably practicable, including the preparation and filing of all forms, registrations and notices required pursuant to applicable Laws to be filed to consummate the Closing and the Transaction and the taking of such actions as are necessary to obtain any requisite approvals, authorizations, Consents, releases, orders, licenses, Permits, qualifications, exemptions or waivers by any Governmental Authority. In furtherance of the foregoing, the Parties agree that as promptly as reasonably practicable following the execution of this Agreement, the Parties shall make all premerger notification filings, if any, required under (i) the HSR Act (which shall, if required, be made within five (5) Business Days after the date of this Agreement), (ii) the pre-merger notification rules in any other jurisdiction in which the Parties agree applicable Laws require a premerger notification filing (which filing shall be made promptly following such determination), and (iii) comply at the earliest practical date with any request under the HSR Act for additional information, documents or other materials received by each of them or any of their respective Affiliates from the Federal Trade Commission or the Antitrust Division of the Department of Justice in respect of such filings, whether such request is formal or informal. Subject to applicable Laws, each Party shall promptly inform the other Party of any oral communication with, and provide copies of written communication with, any Governmental Authority regarding any such filings. No Party shall independently participate in any substantive meeting or discussion, either in person or by telephone, with any Governmental Authority in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend and/or participate. Subject to applicable Laws, the Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or any other Antitrust Law, if any.

(b)     Buyer shall use its commercially reasonable efforts to obtain any required approval from any Governmental Authority and resolve any objection, assertion or Action by any Governmental Authority challenging this Agreement, the consummation of the Transaction or the performance of any obligations hereunder under any Antitrust Law.

(c)     Buyer shall not, and shall cause its Affiliates not to, acquire or agree to acquire, by merging with or into or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets, if entering into a definitive agreement relating to, or the consummation of such acquisition, merger or consolidation could reasonably be expected to: (i) impose any delay in the obtaining of, or increase the risk of not obtaining, any consents of any Governmental Authority necessary to consummate the Transaction or the expiration or termination of any applicable waiting period; (ii) increase the risk of any Governmental Authority entering an Order prohibiting the

EAST\56139161.4

NEWYORK 8862656 v6 (2K)

consummation of the transactions contemplated hereby; (iii) increase the risk of not being able to remove any such Order on appeal or otherwise; or (iv) delay or prevent the consummation of the transactions contemplated hereby.

(d)    Each Party shall be responsible for the payment of their respective fees and expenses in respect of any required premerger notification filings and all other fees and expenses, including legal fees and expenses, in complying with any request for additional information or documentary material from any Governmental Authority.

Section 6.8    Publicity.    Except as required by applicable Laws (including any Order by the Bankruptcy Court) or filings by Seller with, or in any proceeding before the Bankruptcy Court prior to the Sale Procedures Order, neither Party shall issue any press release, provide any notice to customers or suppliers unless in coordination with the Seller or its Representatives, or make any public announcement concerning this Agreement or the Transaction without the other Party's consent, such consent not to be unreasonably withheld delayed or conditioned; provided, that Seller may issue any such press release or make any such public announcement in connection with the Auction after having provided Buyer at least one (1) Business Day to review and comment on such release or announcement (which comments shall be reasonably considered by Seller). Nothing in this Section 6.8 shall prohibit either Party from making any public statement without prior consultation of the other Party as may be required by applicable Laws or by obligations pursuant to any listing agreement with any national securities exchange, nor shall anything herein be deemed to limit Buyer's right and ability, subject to the terms of the Confidentiality Agreement, dated January 31, 2013, between Balmoral Funds LLC, an Affiliate of Buyer, and Seller, to (i) fully discuss and disclose the Transaction, the Business, and the Purchased Assets with Buyer's existing and potential financing sources, investors, co-investors, partners, joint venturers, regulators, consultants, Representatives and their respective professionals, or customers, employees or vendors of the Business, or (ii) continue discussing with any parties to whom Buyer has been or may hereafter be introduced by Seller or its Representatives such parties' continuing/future relationships with the Buyer and transition of the Business and applicable relationship to Buyer.

Section 6.9    Sale Process.    Seller shall not and Seller shall cause its Representatives (including Houlihan Lokey Howard & Zukin, Seller's Counsel, Winter Harbor LLC and Seller's Affiliates) not to, directly or indirectly, at any time prior to the earlier of the entry of the Sale Procedures Order by the Bankruptcy Court and the termination of this Agreement in accordance with Section 9.1: (i) solicit; (ii) discuss Transaction pricing, structure, terms, conditions or approaches relating to: or (iii) negotiate or enter into any letter of intent, memorandum of understanding (or the like), definitive asset purchase or sale agreement with respect to, any sale, merger, restructuring, reorganization or capital infusion into Seller or any similar transaction with respect to any of the capital stock, debt or assets of Seller, with any parties. Notwithstanding the foregoing, nothing in this Agreement shall prohibit Seller from: (a) subject to Section 6.8, providing any Person with the bidding procedures for the sale of the Purchased Assets and any related documents (including this Agreement), answering questions about the bidding procedures for the sale of the Purchased Assets (including this Agreement); (b) discussing, negotiating and entering into non-disclosure agreements relating to the sale of the assets of Seller or amendments to existing non-disclosure agreements, in each case to the extent

-24-

EAST\56139161.4

permitted by the requirements of the bidding procedures for the sale of the assets; (c) providing access to the data room or other diligence materials to Persons (and their Representatives) who have entered into a non-disclosure agreement with Seller and responding to diligence requests of such Persons; or (d) otherwise responding to any inquiry or offer to acquire the Purchased Assets in a manner consistent with the Sale Procedures Order.  From and after the entry of the Sale Procedures Order and until the entry of the Sale Order, Seller shall not take any of the foregoing restricted actions except pursuant to the Auction and in accordance with the Sale Procedures Order.

Section 6.10    <u>Post-Closing Contracts and Assets</u>.

(a)    On or before the Closing, Buyer may, from time to time, update the Schedules hereto listing Purchased Assets to add or remove a Contract to or from such Schedules.  Any lease added to <u>Schedule 1.1(b)</u> shall become an Assumed Lease, and shall be deemed a Purchased Asset for all purposes of this Agreement.  All obligations arising under such lease which would have been Assumed Liabilities if such lease had been an Assumed Lease as of the Closing Date, shall become Assumed Liabilities for all purposes of this Agreement.  Any Contract added to <u>Schedule 1.1(a)</u> shall become an Assumed Contract, and shall be deemed a Purchased Asset for all purposes of this Agreement.  All obligations arising under such Contract which would have been Assumed Liabilities if such Contract had been an Assumed Contract as of the Closing Date, shall become Assumed Liabilities for all purposes of this Agreement.  Any Contract or lease removed from the applicable Schedule hereto listing a Purchased Asset shall become Excluded Assets for all purposes of this Agreement; <u>provided</u>, that without Seller's prior written consent, Buyer may not remove from <u>Schedule 1.1(a)</u> (and make corresponding changes to <u>Schedule 1.1(c)</u> with respect to) any Contract that was entered into by Seller on or after the Petition Date or any Contract that was previously assumed by Seller.

(b)    Within ninety (90) days after the Closing Date, Buyer may, by written notice to Seller indicating which of the Excluded Contracts listed on <u>Schedule 6.10(b)</u> attached hereto and incorporated herein by this reference (collectively, the "**Retained Contracts**"), if any, shall be assumed by Seller and assigned to Buyer, subject to the procedures outlined below in this <u>Section 6.10</u> (such Retained Contracts so designated by Buyer for assignment and assumption are referred to herein as "**Post-Closing Contracts**").  In such case, Seller shall provide notice to the applicable landlords or Contract counterparties promptly.

(c)    Seller shall not reject, seek to reject, terminate, amend, modify, supplement, transfer, dispose or otherwise encumber any Retained Contract from and after the date hereof until the 90th day after the Closing Date in each case, unless otherwise agreed in writing by Buyer.  Any applicable Cure Payment Liabilities for the assumption and assignment of a Post-Closing Contract shall be paid by Buyer.  Buyer shall timely pay and perform, or shall cause to be paid and performed, at its sole cost and expense, on behalf of Seller, any and all obligations of Seller under each Retained Contract during such 90-day period, and thereafter with respect to each Post-Closing

EAST\56139161.4

Contract that has actually been assumed by Seller, including all obligations relating to the period from and after the Closing until such Post-Closing Contract has been assumed and assigned to Buyer. All Post-Closing Contracts that have actually been assumed will be deemed to be an Assumed Contract for all purposes hereunder. Buyer shall indemnify and hold harmless Seller for any breach of a Retained Contract by Buyer in connection with its performance of such Retained Contract in accordance with this Section 6.10.

(d)     During the period after the Closing Date and prior to the ninetieth (90th) day following the Closing Date (the "**Retention Period**"), Seller shall notify Buyer of any reasonable, out-of-pocket costs and expenses incurred for the reasonable maintenance, preservation and/or performance of the Retained Contracts at least three Business Days prior to the date of payment for such costs and expenses. If Buyer does not pay Seller such amount at least one Business Day prior to the date of payment for such costs and expenses or if Buyer informs such Seller that it does not want such Retained Contract to be a Post-Closing Contract, Seller may reject such Retained Contract.

(e)     Buyer and Seller shall effect the transfer of each Post-Closing Contract pursuant to a conveyance document comparable to the one(s) which have been used for the transfer of other Contracts of the same character.

(f)     With respect to any Post-Closing Contract, by or on the second Business Day after the date on which Buyer provides written notice(s) to Seller, Seller shall take all actions, at Buyer's sole cost and expense, reasonably necessary to assume and assign any Post-Closing Contract to Buyer pursuant to Section 365 of the Bankruptcy Code (provided, that any applicable cure cost shall be satisfied by Buyer), and assign any Post-Closing Contract, in each case, as set forth in the Buyer's notice(s). Seller shall request that the Bankruptcy Court enter an Order approving such assumption and assignment in form and substance reasonably satisfactory to the Buyer.

(g)     From and after the effective date of the assignment for each Post-Closing Contract, such Post-Closing Contract shall be deemed to be an Assumed Lease (in the case of a Post-Closing Contract that is a real property lease) or Assigned Contract (in the case of any Post-Closing Contract that is not a real property lease) and scheduled on the applicable Schedule hereto.

(h)     Seller agrees and acknowledges that notwithstanding anything to the contrary in this Agreement, the covenants contained in this Section 6.10 shall survive the Closing.

Section 6.11   Employee and Labor Matters.

(a)     Except as prohibited by applicable Law, Seller has made available to Buyer a list of the date hereof of all employees employed in the conduct of the Business containing the following information for each such employee: (i) name and location; (ii) part-time or full-time status; (iii) title; (iv) annual base salary or hourly wage; and (v) available bonus or other contingent compensation.

-26-

EAST\56139161.4

(b)     Seller is not a party or subject to any union or collective bargaining agreement.

(c)     After reasonable notice to Seller, Buyer shall have the right to interview Seller's employees at any reasonable time during normal business hours; provided, that Buyer conducts such interviews in a manner that is not disruptive to the Business. For all employees who accept an offer of employment from Buyer (any employees so hired, "**Transferred Employees**"), the terms and conditions of employment that are offered to such persons (including salary, wages, benefits and position held) shall be such terms and conditions as Buyer may determine. Notwithstanding anything in Section 2.4 or Section 2.5 of this Agreement to the contrary, at the Closing, Buyer agrees to assume, or cause an Affiliate of Buyer to assume, those Liabilities of Seller in respect of Transferred Employees with respect to Assumed Employee Liabilities. Subject to any restrictions that may be imposed by applicable Laws, Seller shall provide Buyer access to employee personnel files and information on medical and workers' compensation claims with respect to each Transferred Employee. Nothing contained in this Section 6.11 is intended to confer upon any employees any right to continued employment after the Closing. Notwithstanding any other provision of this Agreement, the Parties do not intend to create any third-party beneficiary rights respecting any employees or former employees as a result of the provisions herein and specifically hereby negate any such intention.

(d)     Intentionally Omitted.

(e)     Buyer shall have no obligation created by this Agreement to provide severance benefits, retention payments (or the like) to any employees of Seller, whether or not such employees are Transferred Employees.

(f)     Subject to any restrictions that may be imposed by applicable Laws, Buyer and Seller shall complete and furnish to each other such other employee data as shall be reasonably required from time to time for each Party to perform and fulfill its obligations under this Section 6.11.

(g)     All payments and obligations of Seller to Rex Lowe incurred from the Petition Date through and including the Closing Date shall be paid and satisfied in full, unless Buyer designates Rex Lowes's agreement with Seller as an Excluded Contract.

Section 6.12   Real Property.   Attached as Schedule 6.12 is a list as of the date hereof of all leases, subleases and other occupancy Contracts, including all amendments in respect of real property to which Seller is a party (whether as a lessee or lessor) (collectively, the "**Leased Real Property**").

EAST\56139161.4

NEWYORK 8862656 v6 (2K)

ARTICLE VII

CONDITIONS TO CLOSING

Section 7.1    Conditions on Behalf of Seller. The obligation of Seller to proceed with the Closing is subject to the satisfaction or waiver in writing by Seller (prior to or simultaneously with the Closing) of each of the following conditions:

(a)    Representations and Warranties. The representations and warranties of Buyer made in Article V hereof shall be, at and as of the Closing, true in all material respects as though such representations and warranties have been made or given at and as of the Closing (other than those representations and warranties made as of a specified date, which representations and warranties shall be true in all material respects as of such specified date), except for changes contemplated or permitted by or under this Agreement.

(b)    Performance of Agreements. Buyer shall have performed and complied in all material respects with all agreements, covenants and conditions required to be performed by Buyer or complied with by Buyer prior to or at the Closing.

(c)    Payment of Purchase Price. Buyer shall have paid the Purchase Price (including the credit bid of a portion thereof and the assumption of the Assumed Liabilities), all in accordance with the provisions of Article II hereof.

(d)    Actions, Statutes, Rules or Regulations. No Action by any Governmental Authority or any other Person shall have been instituted which questions the validity or legality of the Transaction. There shall not be any Law or Order that makes the Transaction illegal or otherwise prohibited and which is not satisfied or resolved or preempted by the Sale Order.

(e)    Bankruptcy Matters. After notice and a Hearing, the Bankruptcy Court shall have entered the Sale Order, and such Sale Order: (i) shall not have been stayed, stayed pending appeal or vacated: (ii) shall not have been amended, supplemented or otherwise modified in a manner that results in such Sale Order no longer being an order of the Bankruptcy Court; and (iii) shall be in form and substance reasonably satisfactory to Seller.

(f)    Other Approvals. All requisite clearances or approvals (or applicable waiting periods) under any Antitrust Laws, trade regulations or other applicable Laws for the Transaction shall have been obtained or, in the case of an applicable waiting period, expired.

Section 7.2    Conditions to Obligations of Buyer. The obligation of Buyer to proceed with the Closing is subject to the satisfaction or waiver in writing by Buyer (prior to or simultaneously with the Closing) of each of the following conditions:

EAST\56139161 4

(a)     Representations and Warranties.  The representations and warranties of Seller made in Article IV hereof shall be, at and as of the Closing, true in all respects as though such representations and warranties have been made or given at and as of such date (other than those representations and warranties made as of a specified date, which representations and warranties shall be true in all respects as of such specified date), except for changes contemplated or permitted by or under this Agreement, and except where the failure of such representations and warranties to be true have not had, individually or in the aggregate, a Material Adverse Effect.

(b)     Performance of Agreements.  Seller shall have performed and complied in all material respects with all agreements, covenants and conditions required to be performed by Seller or complied with by Seller on or before the Closing.

(c)     Material Adverse Effect.  Between the date hereof and the Closing Date, there shall not have been a Material Adverse Effect.

(d)     Actions, Statutes, Rules or Regulations.  No Action by any Governmental Authority or any other Person shall have been instituted which questions the validity or legality of the Transaction.  There shall not be any Law or Order that makes the Transaction illegal or otherwise prohibited and which is not satisfied or resolved or preempted by the Sale Order.

(e)     Bankruptcy Matters.  After notice and a Hearing, the Bankruptcy Court shall have entered the Sale Order, and such Sale Order: (i) shall not have been stayed, stayed pending appeal or vacated; (ii) shall not have been amended, supplemented or otherwise modified in a manner that results in such Sale Order no longer being an order of the Bankruptcy Court; and (iii) shall, in all material respects, be substantially in the form of the Sale Order attached hereto as Exhibit B.

(f)     Other Approvals.  All requisite clearances or approvals (or applicable waiting periods) under any Antitrust Laws, trade regulations or other applicable Laws for the Transaction shall have been obtained or, in the case of an applicable waiting period, expired.

(g)     Depot Order.  If, and only if, Buyer requests a Depot Order in accordance with Section 3.4 above, Seller shall have obtained the Depot Order and the Depot Order shall be in form and content satisfactory to Buyer in Buyer's sole and absolute discretion.

ARTICLE VIII

CLOSING

Section 8.1     The Closing.   Within two (2) Business Days following the satisfaction or waiver of the conditions set forth in Sections 7.1 and 7.2 hereof, the Parties shall cause the closing of the Transaction (the "**Closing**") to take place at the premises of Seller's Counsel in New York, at 1155 Avenue of the Americas, New York, New York 10036 or at such

EAST\56139161.4

other place to be agreed between Seller and Buyer, or on such later date as Buyer and Seller mutually agree in writing (the "**Closing Date**").

        Section 8.2     Actions at the Closing.

    (a)     At the Closing, Buyer shall deliver to Seller:

        (i)     the (x) Cash Consideration, and (y) an amount sufficient to enable the Seller to pay and satisfy in full all amounts then outstanding (including, without limitation, all accrued but unpaid interest and other charges) under the DIP Facility (the "**DIP Facility Satisfaction Amount**");

        (ii)    reasonable evidence that Buyer has credit bid the Credit Bid Amount and that, effective upon the Closing (and only upon the Closing), Buyer waives its deficiency claim for the excess of the Secured Indebtedness over and above the Credit Bid Amount and all Liens of Buyer on the Purchase Price and/or any of the Excluded Assets;

        (iii)   a certificate executed on behalf of Buyer certifying that the conditions set forth in Sections 7.1(a) and 7.1(b) have been satisfied; and

        (iv)   one or more Assumption Agreements, duly executed by Buyer.

    (b)     At the Closing, Seller shall deliver to Buyer:

        (i)     a certificate executed on behalf of Seller certifying that the conditions set forth in Sections 7.2(a) and 7.2(b) have been satisfied;

        (ii)    one or more Bills of Sale, each duly executed by Seller;

        (iii)   one or more Assumption Agreements, each duly executed by Seller; and

        (iv)   one (1) certified copy of the Sale Order entered by the Bankruptcy Court.

## ARTICLE IX

## TERMINATION

        Section 9.1     Termination.  This Agreement may be terminated at any time prior to the Closing as follows:

    (a)     by mutual written consent of Buyer and Seller;

    (b)     by either Buyer or Seller if the Closing shall not have occurred by 5:00 P.M. New York City time, on the date that is  two (2) calendar days following the entry of the Sale Order (the "**Outside Date**"); provided, that if all conditions to Closing, other

than the conditions set forth in <u>Section 7.1(f)</u> or <u>Section 7.2(f)</u>, shall have been satisfied or are capable of being satisfied at the time, the Outside Date may be extended upon written notice by either Buyer or Seller, in the case of the conditions set forth in <u>Section 7.1(f)</u> or <u>Section 7.2(f)</u>, but such extension shall not exceed ten (10) calendar days (and the last date thereafter shall ultimately be deemed the Outside Date hereunder); <u>provided</u>, <u>further</u>, that the right to terminate this Agreement under this <u>Section 9.1(b)</u> shall not be available to either Party if any failure by such Party to fulfill any of its obligations under this Agreement has been the cause of or resulted in the failure of the Closing to occur on or before such date;

(c)    by either Buyer or Seller if a court of competent jurisdiction or other Governmental Authority shall have issued a non-appealable final Order, decree or ruling or taken any other action, in each case having the effect of permanently restraining, enjoining or otherwise prohibiting the consummation of the Transaction;

(d)    [Intentionally Omitted]

(e)    by Seller, at its option, if there is a material breach by Buyer of any representation or warranty of Buyer set forth herein or of any covenant or agreement to be complied with or performed by Buyer pursuant to the terms of this Agreement which, individually or in the aggregate with all other such inaccuracies or breaches, would result in a failure of a condition set forth in <u>Section 7.1(a)</u> or <u>Section 7.1(b)</u> which cannot be cured in all material respects within the earlier of (x) thirty (30) calendar days after written notice thereof and (y) the Outside Date; <u>provided</u>, that Seller shall not have the right to terminate this Agreement under this <u>Section 9.1(e)</u> at a time when Buyer has (or would have after the passage of time) the right to terminate this Agreement under <u>Section 9.1(f)</u> or Section 9.1(n);

(f)    by Buyer, if there is a material breach by Seller of any representation or warranty of Seller set forth herein or any covenant or agreement to be complied with or performed by Seller pursuant to the terms of this Agreement which, individually or in the aggregate with all other such inaccuracies or breaches, would result in a failure of a condition set forth in <u>Section 7.2(a)</u> or <u>Section 7.2(b)</u> which cannot be cured in all material respects within the earlier of (x) thirty (30) calendar days after written notice thereof and (y) the Outside Date; <u>provided</u>, that Buyer shall not have the right to terminate this Agreement under this <u>Section 9.1(f)</u> at a time when Seller has (or would have after the passage of time) the right to terminate this Agreement under <u>Section 9.1(e)</u> or <u>Section 9.1(m)</u>;

(g)    by Buyer, if the Bankruptcy Court shall fail to enter the Sale Procedures Order on or prior to the date that is ten (10) Business Days after the Petition Date or such later date subject to availability on the Bankruptcy Court calendar; <u>provided</u>, that the failure to obtain the entry of the Sale Procedures Order is not the result of or caused by Buyer's material breach of this Agreement, and <u>provided</u>, <u>further</u>, that the termination right set forth in this <u>Section 9.1(g)</u> shall be deemed irrevocably waived unless Buyer

exercises such right of termination within three (3) Business Days after the date upon which the Sale Order shall have been entered;

(h)    by Buyer, if Buyer is the Successful Bidder and the Hearing has not been commenced on or prior to the earlier of the fifth (5th) Business Day after completion of the Auction and the date specified in the Sale Procedures Order; provided, that the failure of the Hearing to commence on or prior to such time is not the result of or caused by Buyer's material breach of this Agreement; and provided, further that the right of termination specified in this Section 9.1(h) shall be deemed irrevocably waived unless Buyer exercises such right of termination within three (3) Business Days after Buyer first becomes entitled to terminate this Agreement pursuant to this Section 9.1(h);

(i)    by Buyer, if Winter Harbor, the CRO, and certain Professionals exceed the line item amount for professional fees and costs contained in the DIP Budget attached to the DIP Financing Order, if, at any time prior to a sale of substantially all of the Debtor's assets pursuant to 11 U.S.C. § 363, the Chapter 11 administrative expenses exceed the total amount of the DIP Budget, if the Professionals fail to timely provide Buyer with weekly flash reports reflecting the services rendered, time expended and dollar value ascribed to the professional services performed during the prior week for each week the DIP Financing Order and DIP Budget remain in effect, or if there is an Event of Default under the DIP Facility and/or DIP Financing Order that is not waived in writing or timely cured.

(j)    by Buyer, if the Seller Chapter 11 Case is converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code;

(k)    by either Buyer or Seller, if the Bankruptcy Court shall have stated unconditionally that it will not enter the Sale Order; provided, that such statement of the Bankruptcy Court is not a result of or caused by the terminating Party's material breach of this Agreement;

(l)    by either Buyer or Seller if (x) the Auction has occurred and Buyer was not the Successful Bidder or (y) the Bankruptcy Court otherwise approves a Competing Transaction, in each case, except to the extent that the Sale Procedures Order requires or contemplates the maintenance of binding back-up bids in case a Competing Transaction does not close;

(m)    by Seller, if (i) all conditions to Closing set forth in Article VII have been satisfied or waived (other than conditions that can only be satisfied as of the Closing) and nothing has occurred and no condition exists that would cause any of the conditions set forth in Article VII to fail to be satisfied, (ii) Seller is willing and able to consummate the Closing, such matters to be confirmed in writing to Buyer by an executive officer of Seller, and (iii) Buyer fails to consummate the Closing within five (5) Business Days after the date the Closing should have occurred pursuant to Articles VII and VIII;

(n)    by Buyer, if (i) all conditions to Closing set forth in Article VII have been satisfied or waived (other than conditions that can only be satisfied as of the Closing) and

EAST\56139161.4

nothing has occurred and no condition exists that would cause any of the conditions set forth in Article VII to fail to be satisfied, (ii) Buyer is willing and able to consummate the Closing, such matters to be confirmed in writing to Seller by an executive officer of Buyer, and (iii) Seller fails to consummate the Closing within five (5) Business Days after the date the Closing should have occurred pursuant to Articles VII and VIII; or

      (o)      by Buyer, if there is a failure of the condition set forth in Section 7.2(c); provided, however, that Buyer shall conclusively be deemed to have waived such termination right by reason of a particular occurrence constituting a Material Adverse Effect (but not other or different occurrences constituting a Material Adverse Effect) in the event that Buyer obtains actual knowledge of such occurrence and fails to exercise its right to terminate this Agreement by reason thereof within two (2) Business Days following its obtaining actual knowledge of the particular occurrence.

      (p)      By Buyer, if there is a failure of the condition set forth in Section 7.1(g) above.

      Section 9.2    Effect of Termination.  In the event of any termination of this Agreement as permitted by Section 9.1 hereof, this Agreement (other than the provisions set forth in this Section 9.2, Seller's right to reduction of the Secured Indebtedness by the amount of $1,450,000 (the "Liquidated Debt Reduction"), and Buyer's right to the Expense Reimbursement and the Breakup Fee under the circumstances provided in this Section 9.2 and/or in the Sale Procedures Order) shall forthwith become void and no Party shall have any Liability or further obligation to any other Party under or by reason of this Agreement or the Transaction, except for any breach of this Agreement occurring prior to or as a result of a termination of this Agreement and except that each Party shall return to the other Party all documents, work papers, and other material of any other Party relating to the Transaction, whether so obtained before or after the execution hereof.  In the event of any termination of this Agreement for any reason other than Buyer's breach or default hereunder, Buyer shall be entitled to receive from Seller the Expense Reimbursement, by wire transfer of immediately available funds in accordance with the Sale Procedures Order.  If this Agreement is terminated pursuant to Section 9.1(f) or Section 9.1(n), Buyer shall be entitled to receive from Seller the Breakup Fee, by wire transfer of immediately available funds in accordance with the Sales Procedures Order.  Seller's payment of the Expense Reimbursement and/or Breakup Fee, as the case may be, shall be Seller's sole liability and entire obligation and the Buyer's sole and exclusive remedy for failure to consummate the Transaction for any reason; provided, however, Seller acknowledges that nothing in this provision shall be deemed to limit Buyer's right to specific performance of this Agreement in the event that Buyer elects not to terminate by reason of Seller's breach hereof, unless Seller's estate is administratively insolvent as determined by the Bankruptcy Court.

ARTICLE X

RISK OF LOSS; NO SURVIVAL

      Section 10.1    Risk of Loss.  From the date hereof through the Closing Date, all risk of loss or damage to the Purchased Assets shall be borne by Seller, and thereafter shall be

EAST\56139161.4

borne by Buyer. If any significant portion of the Purchased Assets is destroyed or damaged by fire or by any other cause prior to the Closing Date other than use, wear, damage or loss in the ordinary course of the Business that does not cause a Material Adverse Effect (an "**Extraordinary Loss**"), Seller shall give written notice to Buyer, as soon as practicable after discovery of such Extraordinary Loss, regarding the amount of insurance, if any, covering such Purchased Assets and the amount, if any, which Seller is otherwise entitled to receive as a consequence. Prior to the Closing Date, Buyer shall have the option, which shall be exercised by written notice to Seller within five (5) calendar days after receipt of Seller's notice or if there is not five (5) calendar days prior to the Closing Date, as soon as practicable prior to the Closing Date, of (a) accepting such Purchased Assets in their destroyed or damaged condition in which event Buyer shall be entitled to the proceeds of any insurance or other proceeds payable with respect to such Extraordinary Loss, and the full Purchase Price shall be paid for such Purchased Assets, or (b) excluding such Purchased Assets from this Agreement, in which event the Purchase Price shall be reduced by the amount attributable to the replacement cost of such Purchased Assets that were subject to an Extraordinary Loss. If Buyer accepts such Purchased Assets, then after the Closing, any insurance or other proceeds shall belong to, and shall be assigned to, Buyer without any reduction in the Purchase Price; otherwise, such insurance proceeds shall belong to Seller. For the purpose of this Section 10.1, reference to a "significant" portion of Purchased Assets lost or damaged shall mean Purchased Assets lost or damaged having, in the aggregate, a repair cost or replacement cost in excess of $200,000.

Section 10.2   Seller's Covenants, Representations and Warranties; Survival. The representations and warranties made hereunder by Seller shall survive the Closing. The covenants and agreements hereunder to be performed at or before the Closing by Seller, shall not survive the Closing. Except only as set forth expressly to the contrary in this Section 10.2 and in Sections 6.2(b), 6.3, 6.4, 6.8, and 6.10 hereof, Seller shall have no obligations hereunder to Buyer after the Closing; provided, that Buyer's sole and exclusive remedy against Seller for any violation of Sections 6.3 or 6.4 shall be to obtain injunctive relief or specific performance, and that in no event shall Seller be liable to Buyer for any monetary damages in connection with Sections 6.3 or 6.4.

## ARTICLE XI

## MISCELLANEOUS

Section 11.1   Notices. Except as otherwise provided herein, all notices, requests, claims, demands, waivers and other communications hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email transmission (in the case of facsimile or email transmission, with copies by overnight courier service or registered mail) to the respective Parties as follows (or, in each case, as otherwise notified by any Party) and shall be effective and deemed to have been given (i) immediately when sent by facsimile or email between 9:00 A.M. and 6:00 P.M. (New York City time) on any Business Day (and when sent outside of such hours, at 9:00 A.M. (New York City time) on the next Business Day), and (ii) when received if delivered by hand or overnight courier service or certified or registered mail on any Business Day:

EAST\56139161.4

NEWYORK 8862656 v6 (2K)

If to Seller:

    iGPS Company LLC
    Landmark Center Two
    225 East Robinson Street
    Orlando, Florida 32801
    Attention: Gary B. Glass
    Fax: (407) 423- 4741
    Email: GGlass@iGPS.net

With a copy (which shall not constitute notice) to:

    White & Case LLP
    200 South Biscayne Boulevard, Suite 4900
    Miami, Florida 33131
    Attention: John K. Cunningham
    Fax: (305) 358-5744
    Email: jcunningham@whitecase.com

With a copy (which shall not constitute notice) to:

    White & Case LLP
    1155 Avenue of the Americas
    New York, New York 10036
    Attention: Daniel M. Latham
    Fax: (212) 354-8113
    Email: dlatham@whitecase.com

If to Buyer:

    c/o Balmoral Funds LLC
    11150 Santa Monica Blvd.
    Suite 825
    Los Angeles, California 90025
    Attn: Jonathan Victor and Robin Nourmand
    Fax: 310-479-1740

With a copy (which shall not constitute notice) to:

    Pachulski Stang Ziehl & Jones LLP
    10100 Santa Monica Blvd., 13th Floor
    Los Angeles, CA  90067
    Attention: Jeffrey N. Pomerantz, Esq.
    Fax: (310) 201-0760
    E-Mail: jpomerantz@pszjlaw.com

With a copy (which shall not constitute notice) to:

EAST\56139161.4

NEWYORK 8862656 v6 (2K)

DLA Piper LLP (US)
200 South Biscayne Boulevard – Suite 2500
Miami, Florida 33131
Attention: Craig V. Rasile
Fax: 305-513-5769
Email: craig.rasile@dlapiper.com


Notices sent by multiple means, each of which is in compliance with the provisions of this Agreement will be deemed to have been received at the earliest time provided for by this Agreement.

Section 11.2    Sale Order.    Subject to the Closing and consummation of the Transaction set forth in this Agreement, the Sale Order shall be made expressly binding (based upon language satisfactory to Buyer) upon any trustee or other estate representative in the event of conversion of the Seller Chapter 11 Case to Chapter 7 or upon the appointment of a Chapter 11 Trustee in the Seller Chapter 11 Cases.

Section 11.3    Assignment.    No Party may sell, transfer, assign, pledge or hypothecate its rights, interests or obligations under this Agreement without the prior written consent of the other Party, except that Buyer may assign its rights to any wholly-owned Subsidiary of Buyer (it being understood that any such assignment shall not release Buyer from its obligations hereunder, including, but not limited to, its obligation to assume the Assumed Liabilities pursuant to documents reasonably satisfactory to Seller and to guarantee the performance by such affiliate of the obligations hereunder of Buyer, on terms reasonably satisfactory to Seller).    Any attempted transfer, assignment, pledge or hypothecation without such prior consent shall be void.

Section 11.4    Expenses.    Except as otherwise set forth herein, each Party agrees to pay the costs incurred by such Party incident to the preparation and execution of this Agreement and the performance of its obligations hereunder.

Section 11.5    Entire Agreement.    This Agreement constitutes the entire agreement and understanding between the Parties relating to the subject matter hereof and supersedes all prior representations, communications and arrangements, whether oral, written or inferred, between the Parties relating to the subject matter hereof.    This Agreement may not be modified or amended, except upon a written instrument executed by a duly authorized representative of each of the Parties.

Section 11.6    Governing Law.    This Agreement shall be governed by and construed and enforced in accordance with the Laws of the State of New York, except to the extent that such Laws are superseded by the Bankruptcy Code.

Section 11.7    Waiver.    The waiver of any breach of any term or condition of this Agreement shall be in writing, and shall not be deemed to constitute the waiver of any other breach of the same or of any other term or condition of this Agreement.

EAST\56139161 4

Section 11.8  <u>Severability</u>.    Any provision hereof that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 11.9  <u>No Third Party Beneficiaries</u>.  Except to the extent that a Third Party is expressly given rights herein, any agreement contained, expressed or implied in this Agreement shall be only for the benefit of the Parties and their respective successors and permitted assigns, and such agreements shall not inure to the benefit of the obligees of any Indebtedness of either Party, it being the intention of the Parties that no Person shall be deemed a Third Party beneficiary of this Agreement, except to the extent that a Third Party is expressly given rights herein.

Section 11.10  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 11.11  <u>Knowing and Voluntary Agreement</u>.  Each Party acknowledges that it has entered into this Agreement knowingly and voluntarily of its own free will and under no duress of any nature.

Section 11.12  <u>Legal Representation</u>.  Each of the Parties acknowledges that it has been represented by, and has relied upon the advice of, separate legal counsel with respect to the negotiation and drafting of this Agreement.

Section 11.13  <u>Name Change</u>.  No later than fifteen (15) days following the Closing, Seller shall take all steps necessary to formally change its name (in all jurisdictions where Seller is registered) to a name that does not include "iGPS" or any similar word, acronym or terminology and shall cease any further use thereof.

*[signature page follows]*

EAST\56139161 4

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**SELLER:**

IGPS COMPANY LLC

By: _____
   Name:  Richard P DiStasio
   Title:  Chief Executive Officer

**BUYER:**

iGPS LOGISTICS LLC

By: _____
   Name:  Jonathan A. Victor
   Title:   Authorized Signer

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**SELLER:**

IGPS COMPANY LLC

By:  _____
       Name:
       Title:


**BUYER:**

iGPS LOGISTICS LLC

By:  _____
       Name:  Jonathan A. Victor
       Title:  Authorized Signer

*[Signature Page to Asset Purchase Agreement]*

## EXHIBIT A

### Form of Sale Procedures and Sale Motion

See attached.

## EXHIBIT B

**Form of Sale Order**

See attached.

## EXHIBIT C

### Form of Sale Procedures Order

See attached.

## Schedule 1.1(a)

### List of Assumed Contracts

| *Party* | *Description* |
|---|---|
| Chobani | Receiving and iDepot agreement |
| Costco | iDepot business agreement |
| Dillon Companies, Inc. dba King Soopers, Inc. | Receiving and iDepot agreement |
| Family Dollar Distribution LLC | Receiving and iDepot agreement |
| Fareway Stores, Inc. | Receiving and iDepot agreement |
| Food Lion, LLC | Receiving and iDepot agreement |
| Fresh & Easy | Receiving and iDepot agreement |
| Gerawan Farming | Receiving and iDepot agreement |
| Giant Eagle Inc. | Retailer agreement with respect to the receipt, use and return of pallets |
| Hannaford Brothers Company | Receiving and iDepot agreement |
| HEB Grocery Company, LP | Retailer agreement with respect to the receipt, use and return of pallets |
| Hy-Vee Inc. | Retailer agreement with respect to the receipt, use and return of pallets |
| Ingles Markets, Inc. | Receiving and iDepot agreement |
| Kamps Pallets | Receiving and iDepot agreement |
| Marsh Supermarkets, LLC | Receiving and iDepot agreement |
| McLane/Company, Inc. | Receiving and iDepot agreement |
| McLane/Mid-Atlantic, Inc. | Receiving and iDepot agreement |
| McLane/Midwest, Inc. | Receiving and iDepot agreement |
| McLane/Mid-Atlantic, Inc. | Receiving and iDepot agreement |
| McLane/Midwest, Inc. | Receiving and iDepot agreement |
| McLane/Eastern, Inc. | Receiving and iDepot agreement |
| McLane Company, Inc. | Receiving and iDepot agreement |
| McLane/Eastern, Inc. | Receiving and iDepot agreement |
| McLane/Suneast, Inc. | Receiving and iDepot agreement |
| McLane Company, Inc. | Receiving and iDepot agreement |
| McLane/Southern, Inc. | Receiving and iDepot agreement |
| McLane Company, Inc. | Receiving and iDepot agreement |
| McLane/Suneast, Inc. | Receiving and iDepot agreement |
| McLane/Western, Inc. | Receiving and iDepot agreement |
| McLane Company, Inc. | Retailer/wholesaler agreement with respect to the receipt, use and return of pallets |
| McLane Company, Inc. | Receiving and iDepot agreement |
| McLane/Suneast, Inc. | Receiving and iDepot agreement |
| Meijer Distribution, Inc. | Receiving and iDepot agreement |
| Plaza Provision Company | iDepot agreement |
| Safeway Inc. | Retailer agreement with respect to the receipt, use and return of pallets |

**Schedule 1.1(a) – continued**

**List of Assumed Contracts**

| Party | Description |
|---|---|
| Sam's East, Inc. and Sam's West, Inc. | Reverse-logistics services agreement |
| Schnuck Markets, Inc. | Receiving and iDepot agreement |
| Wawa, Inc. | Receiving and iDepot agreement |
| Wegmans Food Markets, Inc. | Receiving and iDepot agreement |
| Weis Markets, Inc. | Receiving and iDepot agreement |
| Winco Foods, LLC | Receiving and iDepot agreement |
| Winn-Dixie Stores, Inc. | Receiving and iDepot agreement |
| Imperial Woods Enterprise | Receiving and iDepot agreement |
| Merchants Distributors Inc. | Receiving and iDepot agreement |
| Target Corporation | Agreement with respect to the receipt, use and return of pallets |
| Publix Super Markets, Inc. | Services agreement with respect to the receipt, use and return of pallets |
| Asset Management Service | Master recycler service provider agreement |
| APS and Sons | Master recycler service provider agreement |
| Rehrig Pacific Logistics | Master recycler service provider agreement |
| SB Pallets | Master recycler service provider agreement |
| Taly Pallet | Master recycler service provider agreement |
| Salesforce.com | Master subscription agreement |
| Microsoft Licensing, GP | Software license agreement |
| EcoArk, Inc. | iDepot agreement |
| Nice Pak Products, Inc. | iDepot agreement |
| Sysco Corporation | Receiving and iDepot agreement |
| Club Chef | Receiving and iDepot agreement |

## Schedule 1.1(b)

**List of Assumed Leases**

None.

## Schedule 1.1(c)

### List of Excluded Contracts

| Party | Description |
| --- | --- |
| Florida Legislative Associates, LLC | Agreement for representation of Debtor's interest before the Florida Legislature |
| Global Public Affairs | Confirmation of engagement as a consultant to the Debtor to provide governmental relations and public affairs support in Canada |
| Growth Squared, LLC | Master consulting services agreement to provide strategic advisory services related to government relations, advocacy and outreach services; rates were adjusted per e-mail confirmation on March 4, 2013 |
| Husch Blackwell, LLP | Agreement to serve as consultant to MWW Group, which has a separate agreement with the Debtor, to provide monitoring and lobbying activity on Debtor's behalf related to HB 550 before the Missouri legislature |
| MWW Group | Agreement to provide public relations, web site development and design and media-kit development; rates govered by this agreement were updated in a separate document on March 2013 |
| Kahn, Soares & Conway, LLP | Professional services agreement to provide administrative and legislative representation to the Debtor |
| Morrill & Associates PC | Agreement to serve as consultant to MWW Group, which has a separate agreement with the Debtor, to provide monitoring and lobbying activity before the Illinois General Assembly, which amends the original agreement dated February 28, 2012 |
| Theodore W. Popely, PC | Independent-contractor agreement to serve as consultant to MWW Group, which has a separate agreement with the Debtor, with respect to lobbying and govermental relations in Alaska |
| Sirotkin & Necrason PLC | Lobbying-services agreement with the Debtor to represent its legislative interests in the state of Vermont. |
| Tonkon Torp LLP | Engagement letter with the Debtor to represent it in connection with government relations before the Oregon State Legislature |

**Schedule 1.1(c) – continued**

**List of Excluded Contracts**

| Party | Description |
|-------|-------------|
| Wiener Associates, PLC | Consulting agreement to perform for the Debtor various lobbying an dconsulting services with respect to governmental affairs and legislative and regulatory strategies in the state of Michigan |
| Wilson, Elser, Moskowitz, Edelman & Dicker LLP | Agreement to serve as consultant to MWW Group, which has a separate agreement with the Debtor, to provide legislative advocacy services before the legislative and executive branches of the state of New York. |
| National Strategies, LLC | Client consulting agreement to track for the Debtor various state legislative and and regulatory issues |
| Ryder Integrated Logistics, Inc. | Carrier management schedule to outline carrier management services provided to the Debtor |
| Ryder Integrated Logistics, Inc. | Equipment management schedule |
| AIM Logistic Services, LLC | Depot facility service provider agreement |
| Great America Leasing Corporation | Office equipment lease |
| GE Capital c/o Ricoh USA Program | Office equipment lease |
| Gary Glass | Employment agreement |
| Richard P. DiStasio | Offer letter to be employed at the Debtor |
| Richard P. DiStasio | Employment agreement |
| Richard P. DiStasio | Retention agreement |
| Richard P. DiStasio | Severance agreement |
| Jack Sparn | Offer letter to be employed at the Debtor |
| AT&T Corporation | Managed internet service agreement |
| AT&T Corporation | Teleconferencing services agreement |
| AT&T Corporation | Business Network Express bundle agreement |
| Velocity, The Greatest Phone Company Ever, Inc. | Telecommunications master services agreement |
| Numerex Solutions, LLC | Purchase and resale agreement |
| Soaring Eagle Consulting, LLC | Remote database support services agreement |
| Stomp Web Media | Software and professional-services agreement |
| Intelleflex Corporation | Terms and conditions of sale |
| Enfora, Inc. | Supply agreement |
| PID Technologies, Inc. | RFID recovery services agreement |

**Schedule 1.1(c) – continued**

**List of Excluded Contracts**

| *Party* | *Description* |
|---|---|
| Decision First Technologies Inc | Software license agreement and product use rights schedule using SAP contract language |
| Decision First Technologies Inc. | Addendum to quote |
| Tribridge Holdings, LLC | Master services agreement |
| Red Gate Software Ltd. | Software license agreement |
| Telerik Inc. | End user license agreement |
| VeriSign | Master services agreement |
| VeriSign | Service-order form subject to the master services agreement |
| Crowe Chizek and Company LLC | Software purchase agreement for Microsoft Dynamics |
| Venture Research, Inc. | Master services agreement |
| Venture Research, Inc. | Statement of work subject to master services agreement |
| Medius Software, Inc. | Software and services agreement |
| SunTrust Bank | 401(k) directed trustee agreement |
| Websense, Inc. | Software license agreement |
| Antivia Limited | Software license agreement |
| Antivia Limited | Amendment to software license agreement |
| Oracle America, Inc. | Sales order form and license to use Taleo software |
| Oracle America, Inc. | Annual license renewal of Taleo software |
| Intelius Screening Solutions LLC (d/b/a "TalentWise") | FCRA subscriber agreement |
| Intelius Screening Solutions LLC (d/b/a "TalentWise") | End user and services agreement |
| Michael Swain | Separation and release agreement |
| Kevin Berg | Separation and release agreement |
| Kenneth Brabender | Separation and release agreement |
| Ralph Donatantonio | Separation and release agreement |
| Roger Hurst | Separation and release agreement |
| Lesley Kristeff | Separation and release agreement |
| Cecilia Sunday | Separation and release agreement |
| InterMedia.net, Inc. | Master service agreement |
| LeadLander | Order form for one year of web-site reporting service |
| BurrellesLuce | Agreement to renew annual subscription |
| IntraLinks | Agreement for services |
| VAR Resources, Inc. | Master lease agreement for Medius Group |

## Schedule 1.1(c) – continued

### List of Excluded Contracts

| Party | Description |
|---|---|
| Paul Siebert | Bonus agreement |
| Meredith Neizer | Bonus agreement |
| Dianne Giannetto | Bonus agreement |
| Gary B. Glass | Bonus agreement |
| Phil Prain Jr. | Bonus agreement |
| Lewis Taffer | Bonus agreement |
| Walter Myers | Bonus agreement |
| Tod Sizemore | Bonus agreement |

## Schedule 2.1(c)

### List of Purchased Deposits

*As of April 30, 2013*

| Description | Amount |
|---|---|
| Escrow Assoc. | 1,500 |
| Windstream Communications | 150 |
| Canada GST | 5,000 |
| State of Nevada Sales Tax Deposit | 18,096 |
| Boggy Creek Deposit | 4,000 |
| International Appraisers - AP Account | 10,000 |
| VAR Resources (Medius) | 3,600 |
| BOA credit-card deposit | 171,594 |
| **TOTAL** | **213,940** |

## Schedule 2.2(l)

### List of Other Excluded Assets

*As of April 30, 2013*

#### Retainers

| Description | Amount |
|---|---|
| White & Case LLP | 202,287 |
| Fox Rothschild LLP | 25,000 |
| Winter Harbor LLC | 175,000 |
| AlixPartners, LLP | 15,000 |
| **TOTAL** | **417,287** |

#### Note receivable and accrued interest

| Description | Amount |
|---|---|
| Principal balance, Bobby L. Moore loan | 1,960,784 |
| Accrued interest, Bobby L. Moore loan | 880,747 |
| **TOTAL** | **2,841,531** |

#### Litigation

| Description |
|---|
| BOBBY L. MOORE vs. IGPS Company LLC, Pegasus Capital Advisors LLP, Pegasus Partners III (AIV), L.P., Pegasus Investors III, L.P., Pegasus Investors III GP, L.L.C., Pegasus IGPS, LLC, IGPS Co-Investment LLC, IGPS Employee Participation, L.P., IGPS Executive (GP) LLC, PP IV IGPS Holdings, LLC, Kelso, KIA VIII (IGPS), L.P., KIA VIII (IGPS) GP, L.P., KEP VI AIV (IGPS), LLC, Kelso GP VIII, LLC, Rich Weinberg, Craig Cogut, Frank Nickell, and Phil Berney, Index No. 651907/2011 |
| iGPS COMPANY vs. BOBBY L. MOORE, No. 652431/2011 |
| iGPS Company LLC v. Pallet World Inc., General Mill Supply Company, Timothy B. Welch, Robert N. Rotenberg and Stuart Rotenberg, Case No. 2012-125012-CZ in the Circuit Court for the County of Oakland, State of Michigan |
| iGPS Company, LLC vs. South West Forest Products, et al., Maricopa County Case No. CV 2012-000169 |
| Alterra Excess & Surplus Insurance Company v. iGPS Company, LLC, Case No. 2012-CA-14342 |
| Neil Schultz v. iGPS Company LLC and Schoeller Arca Systems Inc., Case No. 10-cv-00071 in the United States District Court for the Northern District of Illinois |
| Potential Ernst & Young claim |

#### Professionals and Advisors

| Party |
|---|
| White & Case LLP |
| Fox Rothschild LLP |
| Winter Harbor LLC |
| AlixPartners, LLP |

Houlihan Lokey, Inc.

**Agreement**

That certain Letter Agreement Regarding Employee Claims, dated June 4, 2013, by and among the Agent, the Lenders, Buyer and Seller.

EAST\56139161.4

NEWYORK 8862656 v6 (2K)

## Schedule 2.4(c)

### List of Assumed Payables

**FEMSA/PTM:** $640,000 purchase order for 16,000 pallets

**Fastenal Company:** $227,697, comprised of the following invoices:

| Transaction text | Invoice date | Amount |
|---|---|---|
| FASTENAL COMPANY - FL0R66875 | 4/5/2013 | 12,896.01 |
| FASTENAL COMPANY - FL0R66882 | 4/5/2013 | 9,991.94 |
| FASTENAL COMPANY - FL0R66881 | 4/5/2013 | 9,992.42 |
| FASTENAL COMPANY - FLOR66873 | 4/5/2013 | 12,522.92 |
| FASTENAL COMPANY - FL0R66874 | 4/5/2013 | 11,483.68 |
| FASTENAL COMPANY - FLOR66878 | 4/5/2013 | 10,057.51 |
| FASTENAL COMPANY - FLOR66877 | 4/5/2013 | 5,495.26 |
| FASTENAL COMPANY - FL0R66900 | 4/5/2013 | 9,611.50 |
| FASTENAL COMPANY - FLOR66880 | 4/5/2013 | 10,036.47 |
| FASTENAL COMPANY - FL0R66879 | 4/10/2013 | 10,837.67 |
| FASTENAL COMPANY - FLOR66876 | 4/10/2013 | 10,141.94 |
| FASTENAL COMPANY - FLOR67091 | 4/26/2013 | 2,646.91 |
| FASTENAL COMPANY - FLOR67137 | 5/3/2013 | 4,609.33 |
| FASTENAL COMPANY - FLOR67146 | 5/3/2013 | 11,117.45 |
| FASTENAL COMPANY - FLOR67142 | 5/3/2013 | 13,213.17 |
| FASTENAL COMPANY - FLOR67145 | 5/3/2013 | 7,717.82 |
| FASTENAL COMPANY - FLOR67141 | 5/3/2013 | 13,114.67 |
| FASTENAL COMPANY - FLOR67143 | 5/3/2013 | 8,178.06 |
| FASTENAL COMPANY - FLOR67139 | 5/9/2013 | 25,004.87 |
| FASTENAL COMPANY - FLOR67138 | 5/9/2013 | 29,027.17 |
| **TOTAL** | | **$227,696.77** |

**Pallet-audit service providers:** $157,836, comprised of the following invoices:

| Transaction text | Invoice date | Amount |
|---|---|---|
| RGIS INVENTORY SPECIALIST - 01-720789 | 3/1/2013 | 2,420.82 |
| RGIS INVENTORY SPECIALIST - 01-726477 | 5/3/2013 | 14,286.65 |
| ADVANTAGE SALES & MARKETING - HD1049891 | 3/12/2013 | 22,560.00 |
| ADVANTAGE SALES & MARKETING - HD1030581 | 2/12/2013 | 18,640.00 |
| ADVANTAGE SALES & MARKETING - HD1072893 | 4/15/2013 | 28,960.00 |
| ADVANTAGE SALES & MARKETING - HD1094851 | 4/1/2013 | 29,360.00 |
| WIS INTERNATIONAL – 40664798 | 5/24/2013 | 1,608.29 |
| May 2013 invoices to be posted (estimate) | May 2013 | 40,000 |
| **TOTAL** | | **$157,836.76** |

## Schedule 2.4(c) – continued

### List of Assumed Payables

**Pallet recyclers (various):** $300,000.00 (estimated)

**iDepots (various):** $800,000.00 (estimated)

**Accrued vacation:** $100,000.00 (estimated)

**Schedule 6.10(b)**

**List of Retained Contracts**

| Party | Description |
|---|---|
| epcSolutions, Inc. | Software license agreement |
| epcSolutions, Inc. | Agreement granting right to sublicense to end-users |
| epcSolutions, Inc. | Software development and reservation of rights agreement |
| epcSolutions, Inc. | Software maintenance and support agreement |
| epcSolutions, Inc. | Term sheet to amend governing documents |
| epcSolutions, Inc. | First amendment to party agreements |
| TIBCO Software | Software license and services agreement |
| LogMeIn, Inc. | Purchase order for recurring monthly services |
| Concur Technologies, Inc. | Business services agreement |
| United of Omaha Life Insurance Company | Agreement to provide dental insurance to employees |
| United of Omaha Life Insurance Company | Agreement to provide life insurance to employees |
| United of Omaha Life Insurance Company | Agreement to provide long-term disability insurance to employees |
| United of Omaha Life Insurance Company | Agreement to provide short-term disability insurance to employees |
| United of Omaha Life Insurance Company | Agreement to provide life and AD&D insurance to employees |
| Blue Cross Blue Shield Of Florida | Master contract for employee medical insurance |
| ADP, Inc. | Major accounts agreement |
| ADP, Inc. | Major accounts COBRA/HIPAA, FSA, commuter benefits and service agreement |
| ADP, Inc. | HIPAA business associate amendment |
| ADP, Inc. | Client account agreement and authorization to debit/credit |
| ADP, Inc. | Client account agreement and authorization to debit |
| HIW-KC Orlando. LLC | Agreement of lease for Debtor's use of nonresidential real property |
| HIW-KC Orlando. LLC | First amendment to lease agreement for Debtor's use of nonresidential real property |
| HIW-KC Orlando. LLC | Second amendment to lease agreement for Debtor's use of nonresidential real property |

**Schedule 6.10(b) – continued**

**List of Retained Contracts**

| Party | Description |
|---|---|
| HIW-KC Orlando. LLC | Third amendment to lease agreement for Debtor's use of nonresidential real property |
| HIW-KC Orlando. LLC | Fourth amendment to lease agreement for Debtor's use of nonresidential real property |
| HIW-KC Orlando. LLC | Fifth amendment to lease agreement for Debtor's use of nonresidential real property |
| HIW-KC Orlando. LLC | Sixth amendment to lease agreement for Debtor's use of nonresidential real property |
| HIW-KC Orlando. LLC | Seventh amendment to lease agreement for Debtor's use of nonresidential real property |
| Hall 2600 Network Associates, Ltd. | Office lease agreement for Debtor's use of nonresidential real property |
| Hall Stonebriar Three Associates, Ltd. | First amendment to office lease agreement for Debtor's use of nonresidential real property |
| Hexaware Technologies, Inc. | Sublease agreement naming Debtor as sublessor of nonresidential real property |
| 1302 Melissa, LLC | Business lease for Debtor's use of nonresidential real property |
| Straubinger, Inc. | Warehouse lease for Debtor's use of nonresidential real property |
| Straubinger, Inc. | Lease modification agreement for Debtor's use of nonresidential real property |
| BurnsGroup | Agency services agreement to provide the Debtor ongoing advertising agency services |
| Grantek Systems Integration Corp. | Development services agreement |
| JYP Orlando, L.L.C. (d/b/a DataSite Orlando) | Colocation master services agreement |
| JYP Orlando, L.L.C. (d/b/a DataSite Orlando) | Addendum to colocation master services agreement |
| Plásticos Técnicos Mexicanos S.A. de C.V. | Pallet purchase agreement |
| Rex Lowe | Consulting agreement with the Debtor |

EAST\561391614

### Schedule 6.12

### List of Leased Real Property

1. Atlas Commerce Park Warehouse Lease, dated February 13, 2009, by and between Taft Holdings, Inc. and Straubinger, Inc., as Landlords, and iGPS Company LLC, as Tenant, in regard to the premises located at 11316 Boggy Creek Road, Unit 118, Orlando, Florida 32824; as amended by that certain Lease Modification Agreement, dated March 22, 2012; as amended by that certain Lease Modification Agreement, dated June 5, 2012.

2. Office Lease, dated August 4, 2006, by and between HIW-KC Orlando, LLC, as Landlord, and iGPS Company LLC, as the Tenant, in regard to the premises located at Landmark Center Two, 225 E. Robinson Street, Orlando, Florida 32801; as amended by that certain First Lease Amendment, dated August 1, 2007; as amended by that certain Second Lease Amendment to Lease, dated May 8, 2008; as amended by that certain Third Amendment to Lease, dated March 9, 2009; as amended by that certain Fourth Amendment to Lease, dated March 15, 2010; as amended by that certain Fifth Amendment to Lease, dated February 22, 2011; as amended by that certain Commencement Certificate, dated May 25, 2011; as amended by that certain Sixth Amendment to Lease, dated November 1, 2012; as amended by that certain Seventh Amendment to Lease, dated February 20, 2013.

3. Office Lease Agreement, effective as of February 6, 2007, by and between Hall 2600 Network Associates, Ltd., as Original Landlord, and iGPS Company LLC, as Tenant, in regard to the premises located at 2600 Network Boulevard, 3rd Floor, Frisco, Texas; as amended by that certain First Amendment to Office Lease Agreement, effective as of March 6, 2013, by and between Hall 2600 Network Associates, Ltd., as Original Landlord, Hall Stonebriar Three Associates, Ltd., as New Landlord, and iGPS Company LLC, as Tenant.

4. Sublease Agreement, dated as of November 30, 2012, by and between iGPS Company LLC, as Sublandlord, and Hexaware Technologies, Inc., as Subtenant, in regard to the premises located at Hall Office Park, Building B-1, Suite 402, 6801 Gaylord Parkway, Frisco, Texas.

5. Business Lease, dated June 3, 2010, by and between iGPS Company LLC, as Lessee, and 1302 Melissa, LLC, as Lessor, in regard to the premises located at 1302 Melissa Dr., Bentonville, Arkansas 72712.

EAST\56127914.2