# EXHIBIT A

Engagement Letter

**PROPRIETARY AND CONFIDENTIAL**

April 23, 2013

Richard DiStasio
Chief Executive Officer
iGPS Company, LLC.
225 E. Robinson St.
Orlando, FL 32801

Dear Mr. DiStasio:

Re:   *Chief Restructuring Officer*

Dear Mr. DiStasio:

This letter, together with the attached General Business Terms (collectively, the "Agreement"), confirms and sets forth the terms and conditions of the engagement of Winter Harbor LLC ("we," "us," "our," or "Winter Harbor") to act as Chief Restructuring Officer for iGPS Company LLC, ("you," "your," "Client" or "Company"). Upon execution of this letter by each of the parties below and receipt of the advance payment retainer by Winter Harbor, this letter will constitute a binding agreement between the Company and Winter Harbor.

## *SERVICES TO BE PROVIDED*

### *Appointment of CRO*

1. Upon approval of the Company's Board of Managers (the "Board"), Winter Harbor will provide the services of Shaun Martin to serve as Chief Restructuring Officer ("CRO"). The CRO will report directly to the Board.

2. Upon mutual consent of Winter Harbor and the Board, Winter Harbor will provide such additional personnel (the "Additional Personnel") as may be necessary to assist in the performance of the duties set forth below.

### *Tasks and Duties*

As directed by the Board, the CRO and Additional Personnel shall provide the Company with, without limitation, the following services:

1. Prepare data and analyses necessary to meet the requirements and requests of various parties related to the Company's restructuring.

2. In the event the Company files for relief under Chapter 11 of the Bankruptcy Code, Compile and format data and analyses necessary to meet the financial reporting requirements mandated by the bankruptcy code and the US Trustee's office.

iGPS Company, LLC.
April 23, 2013

3. Manage the Company's cash, and prepare ongoing forecasting of the cash flows and claim pools and estimate recoveries to the secured and general unsecured creditors.

4. Manage analyses and reconciliation of claims against the Company and bankruptcy avoidance actions.

5. Prepare for court hearings, for the argument of motions and provide expert testimony as required.

6. Prepare analyses in support of, and preparation of, a chapter 11 plan.

7. Manage the Company's negotiations with its creditor constituencies, including negotiations relating to the Company's chapter 11 plan.

8. Advise the Board on restructuring matters.

9. Take any and all actions necessary to preserve value.

10. The CRO and any Additional Personnel shall provide such other services as requested or directed by the Board.

*Our Services*

The Company engages Winter Harbor for the purpose of providing the management services described above in connection with the Company preparing for a Chapter 11 Bankruptcy filing and providing ongoing management services post-petition. Shaun Martin as a representative of Winter Harbor will serve as CRO to the Company under this engagement. Upon mutual consent of Winter Harbor and the Board, Winter Harbor shall provide Additional Personnel to assist in the performance of the tasks and duties outlined above. Winter Harbor may from time to time as required during the course of the engagement provide the services under this engagement through other principals and employees not specifically named herein, at its option and its discretion. The CRO will have discretion over staffing resources on the engagement. The CRO shall be responsible for the delivery of the tasks and duties as set forth above, in accordance with the Company's by-laws and in compliance with applicable provisions of state law. The CRO will report to the Company's Board, as appropriate, during the term of this engagement. The CRO shall be responsible for leading the verification and implementation of the restructuring initiatives. Winter Harbor may provide additional services beyond those described herein, if agreed upon by Winter Harbor and the Board or its designated committee. You agree to pay for such additional work at Winter Harbor's current rates.

Winter Harbor is a management consulting firm and not a CPA firm. Winter Harbor does not provide attest services, audits, or other engagements in accordance with standards established by the AICPA or auditing standards promulgated by the Public Company Accounting Oversight Board ("PCAOB"). We will not audit any financial statements or perform attest procedures with respect to information in conjunction with this engagement. Our services are not designed, nor should they be relied upon, to identify weaknesses in internal controls, financial statement errors, irregularities, illegal acts or disclosure deficiencies.

iGPS Company, LLC.
April 23, 2013

*Your Responsibilities*

In connection with our provision of services, you will perform the tasks, furnish the personnel, provide the resources, and undertake the responsibilities specified below.

You agree to provide the CRO and all Winter Harbor Additional Personnel the most favorable indemnities provided by the Company to its employees, officers and directors, whether under the Company's by-laws, partnership agreement, by contract or otherwise. This indemnification is in addition to the indemnification afforded Winter Harbor under the attached General Business Terms. You agree to name the CRO as an additional insured under your Directors & Officers liability policy. Except as stated in this engagement, the risk of loss with respect to the Company's operations and assets shall be borne by the Company. Winter Harbor shall not be deemed to have assumed or be liable for any claim, liability, or obligation of the Company whether known or unknown, fixed or contingent accrued or un-accrued. Except as otherwise required by applicable law, any reference to the nature or results of Winter Harbor's work may not be communicated to the public through public relations media, news media, sales media, or any other means without the prior written consent of both parties.

To help maximize the value of our work to you and to keep the project moving on schedule, you agree to comply with all of our reasonable requests and to provide us timely access to all information reasonably necessary to our performance of the services.

Except as stated in this Engagement Letter, the risk of loss with respect to the Company's operations and assets shall be borne by the Company. Winter Harbor shall not be deemed to have assumed or be liable for any claim, liability, or obligation of the Company whether known or unknown, fixed or contingent accrued or un-accrued. Except as otherwise required by applicable law, any reference to the nature or results of Winter Harbor's work may not be communicated to the public through public relations media, news media, sales media, or any other means without the prior written consent of both parties.

In the event the Company files for relief under Chapter 11 of the Bankruptcy Code, (a) the Company agrees to file an appropriate motion prepared in consultation with Winter Harbor seeking our retention by the Company and provision of Services as contemplated hereunder, as of the first day of the bankruptcy case, and (b) this Agreement shall be subject to the entry of a final order of the Court approving such retention. Any proposed order authorizing the engagement of Winter Harbor must be acceptable to Winter Harbor in its sole discretion.

*Fees and Expenses*

Shaun Martin will be your principal contact with respect to this engagement and his current hourly rate is $495/hour. Additionally, the following Winter Harbor professionals will be assisting in this matter:

| *Name* | *Hourly Rate* |
|---|---|
| Eric Glassman | $395 |
| Barak Tulin | $395 |

iGPS Company, LLC.
April 23, 2013

We will bill weekly based on the actual hours worked. Travel time during which no work is performed shall be itemized separately and billed at fifty percent (50%) of regular hourly rates.

Should the Board and Winter Harbor mutually agree that additional resources are required, other than those individuals named herein, we will bill those resources at our standard hourly rates as set forth below:

### Winter Harbor Hourly Rates
(In effect on the date of this Agreement)

| Role | Low | | High | |
|---|---|---|---|---|
| Managing Director | $495 | to | $595 | per hour |
| Director | $395 | to | $450 | per hour |
| Manager | $250 | to | $325 | per hour |
| Associate | $175 | to | $225 | per hour |
| Clerical/Administrative | $75 | to | $125 | per hour |

All invoices are due upon receipt. Out-of-pocket expenses (including transportation, lodging, meals, communications, supplies, copying, etc.) will be billed at the actual amounts incurred. Out of pocket expenses may also include reasonable fees and expenses of attorneys consulted or engaged by Winter Harbor (engaged upon prior written notice by Winter Harbor to Client) to assist it with matters under this Agreement in the event the Company files for protection under the US Bankruptcy Code, such as retention applications, fee applications, and collection of fees under this Agreement.

Payments for our services shall be by:

Wire transfer to:

Bank of America, N.A.
100 West 33rd Street
New York, NY 10001
Account Name: Winter Harbor LLC
Account #: 385012918148
Wire Routing/ABA #: 026009593
ACH Routing #: 011900254

We understand that our bills should be sent to:

Walter Myers
VP Finance
iGPS Company, LLC.
225 E. Robinson St.
Orlando, FL 32801

iGPS Company, LLC.
April 23, 2013

*Retainer*

You have agreed to provide Winter Harbor with an advance payment retainer in connection with this representation. Winter Harbor acknowledges that it continues to hold an advance payment retainer in the amount of $50,000 (the "Existing Retainer"), and you have agreed to provide an additional advance payment retainer of $125,000 (together with the Existing Retainer, the "Retainer"). Ownership of the Retainer passes to Winter Harbor immediately upon payment and will be deposited into Winter Harbor's retainer account. You hereby agree that you have had the opportunity to discuss this provision with counsel. *See In re Shihai*, 392 B.R. 62, 71 (Bankr. S.D.N.Y. 2008).

*Other*

This Agreement, together with the attached General Business Terms in intended to (i) supersede and prior agreement between the parties (ii) serve as the entire agreement between the parties with respect to the subject matter hereof, regardless of any billing guidelines or any other policies that the Company may maintain.

*Business Terms*

The attached General Business Terms apply to this engagement.

* * * * * *

Please indicate your agreement with these terms by signing and returning to me the enclosed copy of this letter. This engagement and the enclosed terms will become effective upon our receipt of your signed copy. We appreciate the opportunity to be of service to you and look forward to working with you on this engagement.

Sincerely,

WINTER HARBOR LLC

By: _____
       MEMBER AND MANAGING DIRECTOR

Attachments:   General Business Terms

Acknowledged and Accepted:

iGPS COMPANY, LLC.

By: _____

Title: _____

Date: ___April 23, 2013___

iGPS Company, LLC.
April 23, 2013

**Attachment to Engagement Letter dated April 23, 2013 between
Winter Harbor LLC and iGPS Company, LLC.**

**GENERAL BUSINESS TERMS**

These General Business Terms, together with the Engagement Letter (including any and all attachments, exhibits and schedules) constitute the entire understanding and agreement (the "Agreement") between us with respect to the services and deliverables described in the Engagement Letter. If there is a conflict between these General Business Terms and the terms of the Engagement Letter, these General Business Terms will govern, except to the extent the Engagement Letter explicitly refers to the conflicting term herein.

**1. Our Services and Deliverables** We will provide the services and furnish the deliverables (the "Services") as described in our Engagement Letter and any attachments thereto, as may be modified from time to time by mutual consent.

**2. Independent Contractor** We are an independent contractor and not your employee, agent, joint venturer or partner, and will determine the method, details and means of performing our Services. We assume full and sole responsibility for the payment of all compensation and expenses of our employees and for all of their state and federal income tax, unemployment insurance, Social Security, payroll and other applicable employee withholdings.

**3. Fees and Expenses** (a) Our fees and payment terms are set out in our Engagement Letter. Those fees do not include taxes and other governmental charges (which will be separately identified in our invoices.)

(b) You acknowledge that where out-of-town personnel are assigned to any project on a long-term basis (as defined from time to time in the applicable provisions of the Internal Revenue Code and related IRS regulations, and currently defined, under IRC Section 162, as a period of time reasonably expected to be greater than one year), the associated compensatory tax costs applied to out-of-town travel and living expenses also shall be calculated on an individual basis, summarized, and assessed to such personnel. In such cases, the expenses for which you shall reimburse us hereunder shall be deemed to include the estimated incremental compensatory tax costs associated with the out-of-town travel and living expenses of our personnel, including tax gross-ups. We shall use reasonable efforts to limit such expenses.

(c) We reserve the right to suspend Services if invoices are not timely paid, in which event we will not be liable for any resulting loss, damage or expense connected with such suspension.

**4. Taxes (a)** You will be responsible for and pay all applicable sales, use, excise, value added, services, consumption and other taxes and duties associated with our performance or your receipt of our Services, excluding taxes on our income generally.

(b) If you are required by the laws of any foreign tax jurisdiction to withhold income or profits taxes from our payment, then the amount payable by you upon which the withholding is based shall be paid to us net of such withholding. You shall pay any such withholding to the applicable tax authority. However, if after 120 days of the withholding, you do not provide us with official tax certificates documenting remittance of the taxes, you shall pay to us an amount equal to such withholding. The tax certificates shall be in a form sufficient to document qualification of the taxes for the foreign tax credit allowable against our corporation income tax.

**5. Confidentiality and Privacy** (a) With respect to any information supplied in connection with this engagement and designated by either of us as confidential, or which the other should reasonably believe is confidential based on its subject matter or the circumstances of its disclosure ("Confidential Information"), the other agrees to protect the confidential information in a reasonable and appropriate manner, and use confidential information only to perform its obligations under this engagement and for no other purpose. This will not apply to information which is: (i) publicly known, (ii) already known to the recipient, (iii) lawfully disclosed by a third party, (iv) independently developed, (v) disclosed pursuant to legal requirement or order, or (vi) disclosed to taxing authorities or to representatives and advisors in connection with tax filings, reports, claims, audits and litigation.

iGPS Company, LLC.
April 23, 2013

(b) Confidential Information made available hereunder, including copies thereof, shall be returned or destroyed upon request by the disclosing party; provided that the receiving party may retain other archival copies for recordkeeping or quality assurance purposes and receiving party shall make no unauthorized use of such copies.

(c) We agree to use any personally identifiable information and data you provide us only for the purposes of this engagement and as you direct, and we will not be liable for any third-party claims related to such use. You agree to take necessary actions to ensure that you comply with applicable laws relating to privacy and/or data protection, and acknowledge that we are not providing legal advice on compliance with the privacy and/or data protection laws of any country or jurisdiction.

**6. Our Deliverables and Your License** Upon full and final payment of all amounts due us in connection with this engagement, all right, title and interest in the deliverables set out in our Engagement Letter will become your sole and exclusive property, except as set forth below. We will retain sole and exclusive ownership of all right, title and interest in our work papers, proprietary information, processes, methodologies, know-how and software ("Winter Harbor Property"), including such information as existed prior to the delivery of our Services and, to the extent such information is of general application, anything which we may discover, create or develop during our provision of Services for you. To the extent our deliverables to you contain Winter Harbor Property, upon full and final payment of all amounts due us in connection with this engagement, we grant you a non-exclusive, non-assignable, royalty-free, perpetual license to use it in connection with the deliverables and the subject of the engagement and for no other or further use without our express, prior written consent. If our deliverables are subject to any third party rights in software or intellectual property, we will notify you of such rights. Our deliverables are to be used solely for the purposes intended by this engagement and may not be disclosed, published or used in whole or in part for any other purpose.

**7. Your Responsibilities.** To the extent applicable, you will cooperate in providing us with office space, equipment, data and access to your personnel as necessary to perform the Services. You shall provide reliable, accurate and complete information necessary for us to adequately perform the Services and will promptly notify us of any material changes in any information previously provided. You acknowledge that we are not responsible for independently verifying the truth or accuracy of any information supplied to us by or on behalf of you.

**8. Our Warranty.** We warrant that our Services will be performed with reasonable care in a diligent and competent manner. Our sole obligation will be to correct any non-conformance with this warranty, provided that you give us written notice within 10 days after the Services are performed or delivered. The notice will specify and detail the non-conformance and we will have a reasonable amount of time, based on its severity and complexity, to correct the non-conformance.

We do not warrant and are not responsible for any third party products or services. Your sole and exclusive rights and remedies with respect to any third party products or services are against the third party vendor and not against us.

THIS WARRANTY IS OUR ONLY WARRANTY CONCERNING THE SERVICES AND ANY DELIVERABLE, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE, ALL OF WHICH ARE HEREBY DISCLAIMED.

**9. Liability and Indemnification** (a) This engagement is not intended to shift risk normally borne by you to us. To the fullest extent permitted under applicable law, you agree to indemnify and hold us and our personnel, agents and contractors harmless against all costs, fees, expenses, damages, and liabilities (including reasonable defense costs and legal fees), associated with any legal proceeding or other claim brought against us by a third party, including a subpoena or court order, arising from or relating to any Services that you use or disclose, or this engagement generally. This indemnity shall not apply to the extent a claim arises out of our gross negligence or willful misconduct, as finally adjudicated by a finder of fact.

(b) We will not be liable for any special, consequential, incidental, indirect or exemplary damages or loss (nor any lost profits, savings or business opportunity). Further, our liability relating to this engagement will in no event

iGPS Company, LLC.
April 23, 2013

exceed an amount equal to the fees (excluding taxes and expenses) we receive from you for the portion of the engagement giving rise to such liability.

(c) Neither of us will be liable for any delays or failures in performance due to circumstances beyond our reasonable control.

**10. Non-Solicitation** During the term of this engagement, and for a period of one year following its expiration or termination, you will not directly or indirectly solicit, employ or otherwise engage any of our employees (including former employees) or contractors who were involved in the engagement.

**11. Termination**

(a) Termination for Convenience. Either party may terminate this Agreement for convenience at any time on 30 days' prior written notice to the other.

(b) Termination for Breach. Either party may terminate this Agreement for breach if, within 15 days' notice, the breaching party fails to cure a material breach of this Agreement.

(c) To the extent you terminate this Agreement for convenience, you will pay us for all Services rendered, effort expended, expenses incurred, contingent fees (if any), or commitments made by us to the effective date of termination. To the extent you terminate this Agreement for breach, you will pay us for all conforming Services rendered and reasonable expenses incurred by us to the effective date of the termination.

(d) Further, we reserve the right to terminate this Agreement at any time, upon providing written notice to you, if conflicts of interest arise or become known to us that, in our sole judgment, would impair our ability to perform the Services objectively.

(e) The terms of this Agreement which relate to confidentiality, ownership and use, limitations of liability and indemnification, non-solicitation and payment obligations shall survive its expiration or termination.

(f) In the event the Company files for relief under Chapter 11 of the Bankruptcy Code, termination shall be governed by and subject to the Bankruptcy Court.

**12. General** (a) This Agreement supersedes all prior oral and written communications between us, and may be amended, modified or changed only in a writing when signed by both parties.

(b) No term of this Agreement will be deemed waived, and no breach of this agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

(c) We each acknowledge that we may correspond or convey documentation via Internet e-mail and that neither party has control over the performance, reliability, availability, or security of Internet e-mail. Therefore, neither party will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason beyond our reasonable control.

(d) This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut without giving effect to conflict of law rules. The parties hereto agree that any and all disputes or claims arising hereunder shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any arbitration will be conducted in Westport, Connecticut. Any arbitration award may be entered in and enforced by any court having jurisdiction thereof, and the parties consent and commit themselves to the jurisdiction of the courts of the State of Connecticut for purposes of any enforcement of any arbitration award. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. In the event the Company files for relief under Chapter 11 of the Bankruptcy Code, any and all disputes or claims arising hereunder shall be settled before the Bankruptcy Court.

(e) If any portion of this Agreement is found invalid, such finding shall not affect the enforceability of the remainder hereof, and such portion shall be revised to reflect our mutual intention.

iGPS Company, LLC.
April 23, 2013

(f)     This Agreement shall not provide third parties with any remedy, cause, liability, reimbursement, claim of action or other right in law or in equity for any matter governed by or subject to the provisions of this Agreement

\* \* \*